1   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------------------X

3   ARAZ ALALI,

4                         Plaintiff,

5        -against-

6   ROBERT GAZZOLA, INDIVIDUALLY,

    PATRICK J. CARROLL,

7   INDIVIDUALLY, AND THE CITY OF

    NEW ROCHELLE, NEW YORK,

8

                        Defendants.

9   ------------------------------------------X

10                  Wilson Elser Moskowitz Edelman & Dicker, LLP

                    3 Gannett Drive, 4th Floor

11                  White Plains, New York  10604

                    June 25, 2007

12                  1:15 PM

13

14

15

16

                Examination before Trial of PLAINTIFF,

17

    ARAZ ALALI, held pursuant to Notice, at the above

18

    time and place, before Susie Cabanas-Diaz, a Notary

19

20  Public of the State of New York.

21

22

23

24

```
2    A P P E A R A N C E S :
3              LOVETT & GOULD, LLP
               Attorneys for Plaintiff
4              222 Bloomingdale Road
               White Plains, New York  10605-1513
5              BY: JONATHAN LOVETT, ESQ.
               Email: jlovett@lovett-gould.com
6
7              WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
               Attorneys for Defendants
8              3 Gannett Drive
               White Plains, New York  10604-3407
9              BY: PETER A. MEISELS, ESQ.
               Email: peter.meisels@wilsonelser.com
10
11
     ALSO PRESENT:
12
     Lalit K. Loomba, Esq.
13   Wilson Elser Moskowitz Edelman & Dicker, LLP
14
15
16
17
18
19
20
21
22
23
24
25
```

60

1                    **ARAZ ALALI**

2            During that period, I was barred from

3    driving any police vehicles.  As a matter of fact,

4    on one occasion, I believe I had a communication on

5    this.  I was at the front portion of the

6    communications room, which is glass, and Lieutenant

7    Debara and Sergeant Austin ordered me to check on an

8    immigration warrant, to call it in to see if it was

9    valid.  Upon them doing so, I did, and then

10   Lieutenant Debara said that if Captain Gazzola sees

11   you up front, he'll kill me.  I believe I had --

12   strongly believe that I put that in a communication.

13           So it was degrading, all the comments

14   made by all the civilian members of personnel, that

15   I was basically locked in the aquarium, locked in

16   the bubble.  No other member that I know of would

17   have to do that.

18       Q    You used the word jail maiden, is that

19   correct?  Or did I misunderstand?

20       A    I believe I did.

21       Q    What does that mean?

22       A    Jail escort.

23       Q    You take the prisoners back and forth to

24   the jail?

25       A    Yes.  Jail escorts.  That would be a

61

1                        ARAZ ALALI

2    better way to put it, yes.

3         Q    Okay.  Did anyone ever give you a

4    justification, whether you agreed or disagreed with

5    it, as to why you were assigned to be a dispatcher?

6         A    Yes.  During this whole process I had PBA

7    president Edward Hayes with me.  We spoke to

8    Lieutenant Fortunato with the internal affairs

9    division and he stated that the reason I was inside

10   was because Commissioner Carroll had told myself and

11   Edward Hayes that there was an investigation going

12   on of wrongdoing on my part.

13                   When we spoke to Lieutenant

14   Fortunato, he said, I don't know of any order that

15   was given, so I was given two sides of the story.

16   And then when we went back to Commissioner Carroll,

17   he said that there was an investigation going on and

18   that's why you're inside.  Fortunato, although he

19   was investigating it, he said he didn't know if that

20   was the reason I was inside.

21                   And present during this whole thing,

22   every time I spoke to Lieutenant Fortunato and

23   Commissioner Carroll, was Edward Hayes.

24        Q    So am I correct that you were told that

25   the justification for being assigned to be a

62

1                              ARAZ ALALI

2  dispatcher was that there was an internal affairs

3  investigation, is that correct?

4       A    By Captain Gazzola himself in front of

5  Edward Hayes, yes.  We spoke with Captain Gazzola

6  personally on this issue.

7       Q    And the person who told you that there was

8  a pending investigation was Captain Gazzola?

9       A    And Commissioner Carroll.

10      Q    And did you ever learn what complaint was

11  being investigated?

12      A    Yes.

13      Q    What was it?

14      A    Complaint from a FedEx driver that I had

15  arrested.

16      Q    What is the name of that person?

17      A    I don't presently recall.

18      Q    Prior to arresting that FedEx driver, had

19  you had any prior dealings with him?

20      A    Yes.  Captain Gazzola and Lieutenant

21  Marshall had called me in their office stating he

22  had made a complaint regarding making an illegal

23  u-turn.  They stated -- they forced -- Captain

24  Gazzola forced me to work a car with a camera in it,

25  against my will.  I didn't want to work in a car

65

ARAZ ALALI

1
2  unlicensed operator. Resisting arrest. Failing to

3  comply to a police officer. And that he had

4  committed numerous traffic violations, which one of

5  them being a red light. I don't recall the other

6  violations. Numerous traffic violations that he was

7  given citations for as well.

8      Q    Now, you say you arrested him for

9  resisting arrest, correct?

10      A    No.

11      Q    That was one of the -- no, you didn't?

12      A    You asked me what the charges were.

13      Q    Correct.

14      A    I said that was one of the charges. That

15  was not what I arrested him for.

16      Q    What did you arrest him for?

17      A    Unlicensed operator. He refused to give

18  me his license. He had no form of I.D. on him that

19  he would give me. That summons was limited. That

20  came subsequent to resisting arrest.

21      Q    Other than the time that you gave him the

22  ticket for making a u-turn and the time that you

23  arrested him, did you have any other contact with

24  this FedEx driver?

25      A    I don't presently recall. I was assigned

66

1                          ARAZ ALALI

2    to give parking tickets on a stretch of North

3    Avenue.  There's many deliveries being made on North

4    Avenue.  And I had very high numbers for parking

5    summons.

6              So I don't know if I had summons to

7    him personally, delivered a summons upon him, no.

8         Q    Did you have a dispute with him about his

9    delivery of a package to your house?

10        A    Yes.

11        Q    When was that?

12        A    I don't presently recall.

13        Q    You recognized him at the time that you

14   arrested him as a person you had a dispute with?

15        A    Not initially.

16        Q    At what point did you recognize him?

17        A    After the incident.

18             (Brief Recess Taken)

19        Q    Officer Alali, let's refer back to Page 3

20   of your complaint and subparagraph D, is it your

21   contention that as a result of receiving below

22   standard job evaluations that you've suffered

23   pecuniary loss?

24        A    Yes.

25        Q    Can you estimate what that loss has been?

70

ARAZ ALALI

1    the past two years, very, very few.  I can count

2    probably on one hand how many hours I have had.  A

3    few.

4    Q    And were there any years in which you

5    received anything more than a below-standard

6    evaluation since you've been a New Rochelle police

7    officer?

8    A    I don't understand the question.  I don't

9    believe there's a category substandard.  Anything

10   more than below standard?

11   Q    No, higher than?

12   A    Higher than, yes.

13   Q    What was your evaluation for the year

14   2002?

15   A    I don't presently recall.

16   Q    Was it below standard?

17   A    No.

18   Q    What was your evaluation for 2003?

19   A    I don't presently recall.

20   Q    Was it below standard?

21   A    No.

22   Q    What was your evaluation for the year

23   2004?

24   A    I don't presently recall.

71

ARAZ ALALI

1

2    Q   Was it below standard?

3    A   No.

4    Q   And what was your evaluation for 2005?

5    A   I don't presently recall.

6    Q   Was that below standard?

7    A   Could have been.

8    Q   All right.  Now, let's go back to the

9 first three years that you were employed as a New

10 Rochelle police officer:  2002, 2003, 2004.  During

11 those three years, as far as you know, did anyone in

12 the New Rochelle Police Department know that you

13 were of Middle Eastern descent?

14    A   I believe so.

15    Q   And am I correct that for the years 2002,

16 2003 and 2004, you did not receive below-standard

17 evaluations?

18    A   Yes.

19    Q   Let me go back to subparagraph D.

20    A   On Page 4?

21    Q   Yes.  Page 3.  Sorry.  The bottom of

22 Page 3.  Got it?

23    A   I got it.

24    Q   Okay.  You had explained to me the

25 distinction between departmental overtime and

89

ARAZ ALALI

1 the midnight tour?

2

3      A     Right.

4      Q     Can you estimate how long it's been since

5 you've been on the midnight tour?

6      A     It would be bad guess.

7            MR. LOVETT:  Don't guess.

8      A     I don't know.

9      Q     Let's go on to subparagraph F.  Indicates,

10 "Forbidden for substantial periods of time to

11 operate a police vehicle."

12            Does that relate to the circumstance

13 you've already testified to about the civilian

14 complaint from the FedEx driver, or does it relate

15 to something else?

16      A     That is -- for approximately the six month

17 period of time that I stated earlier.

18      Q     Okay.  Is that the same period of time

19 that you were assigned to be a dispatcher?

20      A     Yes.

21      Q     Does that relate to the civilian complaint

22 that was filed by the FedEx driver?

23      A     It depends what side of the story you get.

24 If you get it from Fortunato or you get it from

25 Commissioner Carroll.  Conflicting stories on that.

90

ARAZ ALALI

1

2     Q     Let's start with Commissioner Carroll.

3   What did he tell you?

4     A     Stated it is because of a departmental

5   investigation.

6     Q     And what did Lieutenant Fortunato tell

7   you?

8     A     He did not have knowledge that it was

9   because of a departmental investigation.

10     Q     And did Commissioner Carroll tell you

11   anything about it, other than what you already

12   testified to?

13     A     No.  Captain Gazzola also stated it was

14   because of the departmental investigation.

15     Q     And did Captain Gazzola tell you anything

16   else about it, other than what you just testified

17   to?

18     A     Well, besides issuing a standing order of

19   performing functions that are listed in this

20   complaint.

21     Q     Did Lieutenant Fortunato tell you

22   anything, other than what you've already testified

23   to, about this -- about your being barred from

24   operating a police vehicle?

25     A     No.

119

C E R T I F I C A T I O N

I, SUSIE CABANAS-DIAZ, a Court Reporter

and Notary Public within and for the State

of New York, do hereby certify:

That the witness whose deposition

is herein before set forth, was duly sworn

by me, and that the within transcript is a

true record of the testimony given by such

witness.

I further certify that I am not

related to any of the parties to this action

by blood or marriage, and that I am in no way

interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto

set my hand this 2nd  day of  July  , 2007.


_____

SUSIE CABANAS-DIAZ

121

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - -x

    ARAZ ALALI,

4

                            Plaintiff,

5

                -against-          INDEX NO.

6                                  07 CIV 1296

7   ROBERT GAZZOLA, individually, PATRICK J. CARROLL,

    individually, and THE CITY OF NEW ROCHELLE, New York,

8

                            Defendants.

9   - - - - - - - - - - - - - - - - - - - - - -x

10

11                      July 10, 2007

                        12:00 p.m.

12

13          CONTINUED EXAMINATION BEFORE TRIAL of

14  Plaintiff, ARAZ ALALI, taken pursuant to Notice, held

15  at the offices of Wilson, Elser 3 Gannett Drive,

16  White Plains, New York, before a Notary Public within

17  and for the State of New York.

18

19

20

21

22                      *   *   *

23

24

25

122

1

2    A P P E A R A N C E S:

3

     LOVETT AND GOULD, LLP

4    Attorneys for Plaintiff

     222 Bloomingdale Road

5    White Plains, NY  10605

6    BY:   JONATHAN LOVETT (4854), ESQ.

7

     WILSON ELSER

8    Attorneys for Defendant

     3 Gannett Drive

9    White Plains, NY  10604

10   BY:   PETER MEISELS, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

197

ARAZ ALALI

1

2      A      I don't recall, but again it was not

3   below standards.

4      Q      And do you recall what you got for

5   2004?

6      A      No, I do not presently recall.

7      Q      Do you recall that it was not below

8   standards?

9      A      No, I don't presently recall.

10      Q      I'm going to show you what's been

11   pre-marked as Defendants' Z for identification and

12   ask if you can identify that document?

13      A      Yes.  There's numerous documents within

14   it.

15      Q      Now, in reference to Defendants' Z, I'm

16   going to ask you if you first look at the first three

17   pages of the exhibit?

18      A      Okay.

19      Q      Is that a letter of counsel which you

20   received from Sargeant Austin?

21      A      Yes.

22      Q      And referring to the second three pages

23   of the document, is that a response that you prepared

24   in connection with the letter of counsel?

25      A      Yes.

198

ARAZ ALALI

1

2      Q      Now, go back to the beginning of the

3   document, the letter of counsel, do you recall when

4   you received the letter of counsel?

5      A      Sometime in the end of 2005 calendar

6   year.

7      Q      Now, referring to the third page of the

8   letter of counsel at the bottom, where it says,

9   Police Officer Araz Alali, is that a photocopy of

10  your signature?

11     A      Yes.

12     Q      Now, referring back to the first page

13  where it says, in your time in New Rochelle, you have

14  had several citizen complaints and several department

15  initiated complaints.  Do you know whether that was

16  true?

17     A      Yes.

18     Q      Was it true?

19     A      The question is, were these actual

20  complaints that were true?

21     Q      No.  I'm asking you whether or not --

22  let me rephrase the question.  Is it correct that you

23  had received several citizen complaints and

24  department initiated complaints during your career

25  with the City, prior to your receipt of the letter of

199

1                           ARAZ ALALI

2    counsel?

3            A       With the city of New Rochelle?

4            Q       Yes.

5            A       Yes.

6            Q       Under the category issues, looking at

7    the third paragraph, where it says, on traffic stops

8    you frequently failed to call out car stops prior to

9    making contact with the operator.  Was that true?

10           A       During -- that's a false statement.

11   While I was with Sargeant Austin, when I was, again,

12   I was punished by Captain Gazzola to ride along with

13   Sargeant Austin for a period of time, none of the

14   issues were true.

15                   And I, in my rebuttal letter, I asked

16   for them to authenticate any one of the issues,

17   giving a date, time, of a place of occurrence that

18   that happened.  So that's completely false.

19                   During my time with Sargeant Austin,

20   every traffic stop was called out.  And when I spoke

21   to Captain Gazzola, Sargeant Austin and Lieutenant

22   Schulman, if they could authenticate one incident,

23   they were unable to do so.  So, to answer your

24   question, that is incorrect.

25           Q       Turning to the second page of the

204

1                           ARAZ ALALI

2            A       Yes.  I was told if I didn't accept it

3    charges would be preferred against me.  Although,

4    what's in this summary of investigation is

5    untruthful, I was told to accept the letter of

6    reprimand, being that it's a letter of reprimand,

7    otherwise charges would be preferred against me, and

8    I was destined to lose.

9            Q       Who told you that?

10           A       Captain Gazzola.  That was early on

11   with my career with the New Rochelle Police

12   Department.

13           Q       At the time that you accepted this

14   command discipline, were you seeking a transfer to a

15   different police department?

16           A       I don't recall the time I was, but

17   early on in my career I was, due to the fact that I

18   was being harassed and persecuted based on my

19   heritage.  I wanted to get out of a hostile and

20   unfair work environment.

21           Q       Did you apply for a transfer to any

22   other police department in 2002?

23           A       What I presently recall, I had resumes

24   out early on in my career.  I don't presently recall

25   if it was in 2002 or shortly there after.

205

ARAZ ALALI

1

2      Q      When you sent those resumes did you

3  provide cover letters?

4      A      I don't presently recall.

5      Q      Did you keep copies of your

6  correspondence from 2002?

7      A      Correspondence, my resumes?  I should

8  have copies of them.

9      Q      Did you keep copies of your cover

10  letters that accompanied the resume?

11      A      I don't recall if I had a cover letter.

12      Q      Do you know which departments you sent

13  those resumes to?

14      A      Basically, within Westchester County,

15  numerous departments, in hope to the get out of this

16  incredibly biased work environment.

17      Q      When you prepared an application for

18  employment with another department, is it sufficient

19  just to mail another resume?

20      A      I wouldn't call them applications, I

21  would call them resumes.  There's no applications,

22  per say.

23      Q      Have you ever actually filled out an

24  application for employment with another police

25  department, after you joined the New Rochelle Police

208

ARAZ ALALI

1    presently recall.

3        Q       I'm going to show you what's been

4    pre-marked as Defendants' CC for identification and

5    ask you if you can identify that document?

6        A       Yes.

7        Q       Can you tell us what that is?

8        A       Again, another false command discipline

9    report generated by Sargeant Gionnati [ph] in the

10   beginning of my career with New Rochelle Police.

11       Q       And referring to the lower left hand

12   corner of the first page, does that appear to be a

13   xeroxed copy of your signature?

14       A       Yes.

15       Q       Did you check off the box that says,

16   accept the finding and the proposed disciplinary

17   action?

18       A       Yes.  Again, after being told by

19   Captain Gazzola that it's only one day leave, that I

20   was going to be taking and if I fought it, I would be

21   destined to lose in a hearing which the commissioner

22   appoints a hearing officer and made a reference that

23   it was a kangaroo court.

24       Q       Did you have occasion to discuss this

25   with your PBA representative before you signed it?

209

1                          ARAZ ALALI

2          A       I don't presently recall.  It was in

3    the beginning of my career.  It was a long time ago.

4          Q       At the time that you agreed to this

5    command discipline, were you seeking a transfer to

6    another department, other than the New Rochelle

7    Police Department?

8          A       I don't presently recall.

9          Q       I'm going to show you what's been

10   pre-marked as Defendants' DD and ask if you can

11   identify that document?

12         A       Yes.

13         Q       Can you tell us what that is?

14         A       It's a command discipline report that I

15   was, again, urged to take.  It was a call of kids

16   trapped in a burning car.

17                 There was a -- they stated Captain

18   Gazzola states, whether that it's your fault or not

19   your fault, that for all motor vehicle accidents you

20   are going to get a letter of reprimand.

21                 Again, this was early on in my career,

22   and it was a very serious call of kids trapped in a

23   burning car, and they urged me to respond code three.

24                 In my career, I don't think I've had

25   more than this one call, maybe a few to respond code

210

ARAZ ALALI

1

2     three and there's no damage to the vehicle, the

3     police vehicle, whatsoever.

4             But like I said, it was routine and

5     customary to give a letter of reprimand for any type

6     of accident that involve police car whether it's your

7     fault or not your fault.  That's the department

8     routine.

9          Q       This accident, did it involve a

10    civilian's vehicle or another police vehicle?

11          A       My vehicle with a civilian vehicle.  My

12    police vehicle with a civilian vehicle.

13          Q       Your police vehicle hit a civilian

14    vehicle?

15          A       The civilian vehicle hit my vehicle,

16    struck my vehicle.

17          Q       Were you proceeding the wrong way on a

18    one way street?

19          A       No.

20          Q       Were you making a U-turn?

21          A       No.

22          Q       How did the accident happen?

23          A       The civilian was speeding and wouldn't

24    stop for my lights and sirens.  And Sargeant Myron

25    Joseph who is an accident investigator, measured the

211

ARAZ ALALI

1 skid marks of the civilian vehicle who was speeding

2 into the yacht club at the time.

3 Like I said, there was actually no

4 damage to the police vehicle, which was my vehicle.

5 There's not even a scratch on the car, but I was told

6 that it's the New Rochelle Police Department's matter

7 of routine that whether it's your fault or not your

8 fault, you get a letter of reprimand for any type of

9 accident involving a police vehicle, and I was urged

10 again to sign it by Captain Gazzola. And it was also

11 sent, like I said on a code three call, kids trapped

12 in a burning car.

13 Q    Did this accident occur on Nautilus

14 Place?

15 A    I don't recall exactly the location of

16 the accident.

17 Q    Do you know if Nautilus Place is a one

18 way street?

19 A    I do not know that. I don't know.

20 Q    Did you consult with a PBA

21 representative before you signed this?

22 A    I don't presently recall.

23 Q    Did you consult with anybody before you

24 signed it?

212

ARAZ ALALI

1

2      A      I don't presently recall.

3      Q      Did you ever discuss this with Joseph

4  Pajoli before you signed it?

5      A      I don't presently recall.

6      Q      I'm going to show you what's been

7  pre-marked as Defendants' EE for identification and

8  ask you if you can identify that document?

9      A      It's another command, false command

10 discipline against me.

11     Q      And is it one that you agreed to?

12     A      Again, under the same pretext that it's

13 a letter of reprimand.  If I did not, I would be

14 entering into a kangaroo court, where a hearing

15 officer is appointed by the commissioner, and I would

16 lose substantial amounts of vacation and leave time.

17             So, I was urged to sign this as a

18 letter of reprimand.

19     Q      Did you discuss it with anyone before

20 you sign it?

21     A      I don't presently recall.  Perhaps I

22 discussed it.

23             MR. LOVETT:  Don't guess.

24     A      I don't presently recall.

25     Q      Did you discuss it with police officer

217

1                          ARAZ ALALI

2    with the use of the PA system, I had to take the keys

3    away from her because at this time I didn't want her

4    to leave a second time.

5              The keys were not thrown in the bushes.

6    They were not lost.  They were placed on the hood of

7    my cruiser, which is customary on that type of a

8    traffic stop, for my safety as well as hers.

9         Q      I'm going to show you what was

10   pre-marked as Defendants' FF for identification and

11   ask you if you can identify that document?

12        A      Oh, yes.

13        Q      Can you tell us what that is?

14        A      A command discipline that was upped by

15   Captain Gazzola from one day to two days, in his

16   terms, for the egregious violation of parking in

17   front of Dunkin Donuts to pick up their coffee,

18   meaning the desk officer and the civilians.

19              As a matter of routine, if you look at

20   the summonses that were issued in front of Dunkin

21   Donuts, they tell us that they, meaning Gazzola,

22   Carroll, do not issue tickets there they get coffee

23   there.  So there's routinely, there's no tickets

24   issued there.  There are police cars that are parked

25   in front, in case of emergency, they have easy access

218

ARAZ ALALI

1    to get out because it's a very congested parking lot.

2                    I was written up for one day, but he

3    said this was an egregious violation and demanded two

4    days leave.  At this time, I clearly remember I

5    thought I was going to the county police department,

6    which I was given the green light to go there and

7    completed my background and they were ready to hire

8    me.  And I was told if I fought this, there were

9    would be charges against me, that would hinder me

10   from going to county.

11                   I told them this was ridiculous, as did

12   President Edward Hayes.  No one else that we know of

13   in the history of the police department has been

14   written up for parking in front of Dunkin Donuts, yet

15   alone lost two vacation days.

16                   He stated if I wanted to get out of

17   here, I would sign this.  So, I initially, you know,

18   I mean it's clear I wanted to get out of there.  I

19   was told, like I said, he upped it.  He said I'm a

20   captain, I can do that.  He upped it to two days.  I

21   thought again, it was unjust, and I was being singled

22   out once again, based on my heritage.

23        Q        When you say upped it two days?

24        A        He doubled it, yes.  It was initially,

224

ARAZ ALALI

1  that I had interest in the Town of Mamaroneck and

2  County Police Department and that's all he stated.

3

4      Q      I'm going to show you what's been

5  pre-marked as Defendants' GG for identification and

6  ask you if you can identify that document?

7      A      Yes.

8      Q      Can you tell us what that is?

9      A      Again retaliatory strike by Captain

10  Gazzola, initiating a complaint against me when there

11  was a series of 1013 call which is officer needs

12  assistance.

13         At this time, Officers Murphy and

14  Officer Lori had a Reverend on a ride-a-long, with a

15  civilian member of service.  They encountered a very

16  irate individual who they were trying to arrest.

17         They called for a 1013 call.  I then

18  went to their assistance to help affect the arrest.

19         Captain Gazzola states there were no

20  civilian complaint.  They were routinely checking my

21  camera and found that, in his opinion, I drove at a

22  high rate of speed to this call, which was not

23  necessary.  I view that obviously to be a necessary,

24  when officers are calling for help.  It's probably

25  one of the highest calls you would receive in a

225

1                        ARAZ ALALI

2    police department.

3                  Furthermore, I had -- he also said he

4    was very upset that I didn't acknowledge at, some

5    point, that what they stated, which I didn't hear,

6    that they said to slow down, to slow it down to the

7    call.

8                  I did not -- he was upset that I did

9    not acknowledge.  I told him I didn't hear it.  He

10   subsequently cut my AM FM radio out of my car to

11   punish me and degrade me once again.  I was the only

12   officer in the entire department without a radio in

13   the car.

14                 He had sent a car down to the city

15   yard, which is a place that services the vehicle.  I

16   had to stand by while the mechanics took my vehicle

17   and cut the wires to my AM FM radio, as per Captain

18   Gazzola's order as means to punish me.

19                 I was the only member of service not to

20   have an AM FM radio and that was discussed by Edward

21   Hayes and Captain Gazzola laughed and stated I was

22   not going to get a radio in the car.

23        Q      Was your radio on when you didn't hear?

24        A      I have audible lights, I'm sorry,

25   audible sirens and overhead lights on.  As I said, it

226

ARAZ ALALI

1    was a very serious call.

3              I did recognize that Officer Murphy and

4    Officer Lori had a reverend in the car, a civilian

5    member, not only were their safety and lives in

6    jeopardy with a drug induced defendant, so was a

7    civilian member of service and me, being very close

8    by, I would do it all over again as far as assisting

9    an officer and civilian in need, and screaming for

10   help over the radio.

11        Q    Did you happen to arrest this drug

12   induced defendant?

13        A    There were two defendants.  I assisted

14   in one of the defendants.  I transported one of the

15   defendants.  I feel I definitely had assisted.

16        Q    During the course of your transporting

17   the perpetrator, did you have occasion to interrogate

18   him?

19        A    I didn't feel I was interrogated him.

20   I felt I was asking him pedigree information.

21        Q    What was he arrested for?

22        A    I don't exactly know, it was not my

23   arrest.  The charges that were against the defendant

24   I was transporting, so I don't know.  I know that

25   drugs were involved.  I don't know if there was any

227

1              ARAZ ALALI

2    other outstanding charges against either of the two

3    defendants.

4              I would assume resisting arrests, being

5    they were fighting with the defendants.

6         Q    Did you ask him any questions about the

7    incident?

8         A    I don't presently recall.

9         Q    Did you advise him of his Miranda

10   rights?

11        A    Yes, I don't presently recall when.

12        Q    Isn't it a fact that you advised him of

13   his Miranda rights after you asked him questions

14   about the incident?

15        A    I don't believe so.

16        Q    Did you discuss this command discipline

17   report that's reflected in Defendants's Exhibit GG

18   with Edward Hayes, before you declined to accept it?

19        A    Yes.

20        Q    Is there a reason that you discussed

21   this command discipline report with your PBA

22   representative, but you didn't discuss prior ones

23   with the PBA representative?

24              MR. LOVETT:  Objection as to form.  You

25        can answer.

228

1                              ARAZ ALALI

2          A        I don't recall not discussing other

3    ones, I just recall having discussed this particular

4    one with Edward Hayes, being it's a very recent

5    command discipline.

6          Q        I'm going to show you what's been

7    pre-marked as Defendants' HH for identification and

8    ask you if you can identify that document?

9          A        Yes.

10         Q        Can you tell us what that is?

11         A        It's a communication and a complaint to

12   Lieutenant Fortunato of the Internal Affairs

13   division, from me, regarding no back up provided for

14   an arrest.

15         Q        You prepared this document?

16         A        Yes.

17         Q        And on April 20, 2007?

18         A        Yes.

19         Q        Looking at the bottom of the document

20   where it says, this harassment is based on my

21   heritage.  Do you see that?

22         A        Yes.

23         Q        What was the basis for your belief that

24   this incident had anything to do with your heritage?

25         A        It was really more than a belief.  It's

240

ARAZ ALALI

1

2    you required to review the administrative manual of

3    the New Rochelle Police Department?

4         A     I believe so.

5         Q     And have you done that?

6         A     From time to time.

7         Q     I'm going to show you what's been

8    pre-marked as Defendants' RR for identification and

9    ask you whether you recognize that document as

10   representing portions of the administrative manual?

11        A     Yes.

12        Q     To the best of your knowledge, does

13   this document represents portion of the

14   administrative manual?

15        A     Yes.

16        Q     Specifically, referring to Paragraph

17   13, have you ever had occasion to review these

18   sections that relate to the criteria that go into

19   performance evaluations?

20        A     Yes.

21        Q     Based upon your review of the criteria,

22   was it your understanding that the evaluations

23   include both qualitative as well as quantitative

24   performance?

25        A     Yes.

263

1

2                     C E R T I F I C A T E

3   STATE OF NEW YORK      )

                           :  SS:

4   COUNTY OF ROCKLAND     )

5

6       I, ESTHER KATZ, a Shorthand Reporter and Notary

7   Public within and for the State of New York, do

8   hereby certify:

9       THAT ARAZ ALALI, the witness whose testimony is

10  hereinbefore set forth, was duly sworn by me; and

11      THAT the within transcript is a true record of

12  the testimony given by said witness.

13      I further certify that I am not related, either

14  by blood or marriage, to any of the parties to this

15  action; and

16      THAT I am in no way interested in the outcome of

17  this matter.

18  Dated:   July 30, 2007

19

20                  *Esther Katz*

21                  ESTHER KATZ

22

23

24

25