

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ----------------------------------------------X
       ARAZ ALALI,

4
                                    PLAINTIFF,
5                                   07 civ. 2916
                     -against-
6
       ALBERTO DEBARA, individually, KYLE WILSON,
7      individually, EDWARD AUSTIN, individually,
       GEORGE MARSHALL, individually, HUMBERTO
8      MORRELL, individually, MATTHEW BRADY,
       individually, ANTHONY MURPHY, individually,
9      ROBERT GAZZOLA, Individually, PATRICK J.
       CARROLL, individually and the CITY OF NEW
10     ROCHELLE,  NEW YORK,

11                                  DEFENDANTS.
       ----------------------------------------------X
12

13                     DATE: March 14, 2008

14                     TIME: 1:20 p.m.

15

16

17          EXAMINATION BEFORE TRIAL of the

18     Plaintiff, ARAZ ALALI, taken by the Defendant,

19     pursuant to a Court Order, held at the offices

20     of Wilson, Elser, Moskowitz, Edelman & Dicker,

21     LLP., 3 Gannett Drive, White Plains, New York,

22     before a Notary Public of the State of New

23     York.

24

25

```
 1

 2     A P P E A R A N C E S:

 3

 4     LOVETT & GOULD, LLP.
                Attorneys for Plaintiff
 5              222 Bloomingdale Road
                White Plains, New York 10605
 6              BY: DRITA NICAJ, ESQ.

 7

 8

 9     WILSON, ELSER, MOSKOWITZ, EDELMAN
       & DICKER, LLP.
                Attorneys for the Defendants
10              3 Gannett Drive
                White Plains, New York 10604
11              BY: PETER A. MEISELS, ESQ.
                LALIT K. LOOMBA, ESQ.
12              File No. 0736700059

13

14     Also present - Kyle Wilson, Edward Austin,
       George Marshall, Humberto Morrell, Matthew
15     Brady, Anthony Murphy, Robert Gazzola

16

17

18                     *           *           *
19

20

21

22

23

24

25
```

```
 1                    A. Alali
 2        A.    As a police officer.
 3        Q.    By whom?
 4        A.    Amtrak Police Department.
 5        Q.    How long were you employed by the
 6   Amtrak Police Department?
 7        A.    Maybe 2 to 3 years.
 8        Q.    Prior to being employed by the
 9   Amtrak Police Department, how were you
10   employed?
11        A.    I was a student as well as working
12   at Neiman Marcus.
13        Q.    While you were employed by the New
14   York City Police Department, were you, in your
15   opinion, ever the victim of discrimination
16   based upon your heritage?
17              MS. NICAJ:  Objection.  You can
18         answer.
19        A.    I don't believe so.
20        Q.    While you were employed by the New
21   York City Police Department, were you ever the
22   subject of civilian complaints?
23        A.    Yes.
24        Q.    While you were employed by the New
25   York City Police Department, were you ever
```

```
1                          A. Alali

2         be it.

3                    MS. NICAJ:  Okay.

4         Q.    Officer Alali, how many civilian

5    complaints were filed against you when you were

6    employed by the City of New York Police

7    Department?

8                    MS. NICAJ:  You can answer that.

9         A.    I don't presently recall.

10        Q.    Do you remember the substance of

11   those civilian complaints that were filed

12   against you when you were employed by the City

13   of New York Police Department?

14        A.    I don't presently recall.

15        Q.    When you applied for your position

16   with the New Rochelle Police Department, did

17   you disclose that you had been the subject of

18   civilian complaints?

19                   MS. NICAJ:  Objection.  You can

20        answer.

21        A.    Whatever was asked on the

22   application, I answered truthfully and

23   honestly.

24        Q.    Do you presently recall the outcome

25   of any of those civilian complaints that were
```

```
 1                      A. Alali

 2    lodged against you when you were employed by

 3    the City of New York Police Department?

 4              MS. NICAJ:  Objection.  You can

 5         answer.

 6         A.    None of those complaints were

 7    substantiated.

 8         Q.    I am sorry, could you read back the

 9    answer?

10              (Whereupon, the referred to answer

11         was read back by the Reporter.)

12    .    Q.    Do you remember how many complaints

13    were not substantiated?

14         A.    All of the complaints.

15         Q.    Do you remember how many that was?

16         A.    I don't presently recall.

17         Q.    Was it more than 5?

18         A.    I don't presently recall.

19         Q.    Do you recall whether those

20    complaints related to traffic stops?

21         A.    Perhaps.

22              MS. NICAJ:  Don't guess.  If you

23         don't know, let him know.

24         A.    I don't know.  That was a long time

25    ago.
```

1                           A. Alali

2          Q.    Do you recall whether any of those

3    complaints involved allegations that you were

4    rude or discourteous to people you had stopped?

5               MS. NICAJ:  Objection.  You can

6          answer.

7          A.    No.

8          Q.    Let me understand your answer.

9    Your answer is you don't recall if it did or it

10   didn't?

11         A.    I do not recall if it did or it

12   didn't.

13         Q.    While you were employed by the

14   Amtrak police, were you suspended?

15              MS. NICAJ:  I am directing him not

16         to answer that.

17         Q.    While you were employed by the

18   Amtrak police, were you the subject of any

19   civilian complaints?

20              MS. NICAJ:  I direct him not to

21         answer that.

22         Q.    While you were employed by the

23   Amtrak police, were your duties modified for

24   disciplinary reasons?

25              MS. NICAJ:  I direct him not to

```
 1                     A. Alali
 2         Q.    Is it your contention that no
 3   person of Hebrew descent has ever been employed
 4   by the New Rochelle Police Department?
 5         A.    No.
 6         Q.    It is your contention that no
 7   person of middle eastern descent has ever been
 8   employed by the New Rochelle Police Department?
 9              MS. NICAJ:   Objection.  You can
10         answer.
11         A.    No.
12         Q.    Are you aware of circumstances
13   where people of middle eastern descent have
14   been employed by the New Rochelle Police
15   Department?
16         A.    No one of Iraqi national descent
17   has ever been employed by the New Rochelle
18   Police Department.
19         Q.    What is the basis of your belief
20   that no person of Iraqi national descent has
21   ever been employed by the New Rochelle Police
22   Department?
23         A.    I have asked -- I have asked and
24   have been told that no one of middle east
25   descent has ever been employed.
```

```
 1                      A. Alali
 2         Q.    But do you know whether they did or
 3    they didn't?
 4         A.    Without any type of documentation
 5    to refresh my memory, I couldn't be 100 percent
 6    certain, but it would be likely that he did.
 7         Q.    The first thing that you
 8    mentioned was -- let me back up a minute.  Do
 9    you know whether or not Lieutenant Debara was
10    ever aware that you had filed an EEOC charge?
11         A.    I don't presently recall.
12         Q.    Do you know whether or not
13    Lieutenant Debara was ever aware that you had
14    filed that first lawsuit?
15         A.    Yes.
16         Q.    And what do you believe that to be?
17               MS. NICAJ:  Objection.  You can
18          answer.
19         Q.    I will rephrase the question.  What
20    is the basis of your belief?
21         A.    He told me.
22         Q.    When did he do that?
23         A.    After the filing of the lawsuit.
24         Q.    What did, in words or substance,
25    what did he say to you?
```

```
 1                        A. Alali
 2        A.     In words or substance, that he
 3   could not believe that I was filing a lawsuit
 4   against him.  He thought that it would be on a
 5   friendly basis.
 6        Q.     Isn't it a fact, Officer Alali,
 7   that he isn't a defendant in the first lawsuit?
 8             MS. NICAJ:   Objection.
 9        A.     I thought you are referring to the
10   second lawsuit.
11        Q.     I am talking about the first
12   lawsuit.  Let me clarify.  Do you know whether
13   or not Lieutenant Debara was aware of the first
14   lawsuit that you brought?
15        A.     Yes.
16        Q.     What is the basis of your belief?
17        A.     I told him.
18        Q.     When did you do that?
19        A.     I believe one of the times that we
20   had discussed it was when he assigned me to a
21   fixed hospital post, and I advised him of that
22   I believe what he was doing was harassment, and
23   I also further advised him that a lawsuit had
24   been filed.
25        Q.     Can you tell me in words or
```

```
 1                    A. Alali

 2              THE WITNESS:  Okay.

 3         A.    Okay.

 4         Q.    Has the review of the complaint

 5    refreshed your recollection as to what was said

 6    to you when you received the assignment to the

 7    hospital post from Lieutenant Debara?

 8         A.    Yes.

 9         Q.    Could you tell us in words or

10    substance what he said to you and what, if

11    anything, you said to him?

12         A.    On that date, Lieutenant Debara

13    assigned me at roll call to the hospital post.

14    Subsequently a few months after receiving that

15    post, I went to the desk where Sergeant Wilson

16    was working, and I asked him, you know, why I

17    had received that post due to the fact there

18    were probationary officers several of them

19    working that day.  He was very irate that I had

20    asked him that question and stated in sum or

21    substance get the fuck out of my face, whereas

22    not another word in the presence of several

23    civilian members of service.

24         Q.    Did you ask Lieutenant Debara why

25    you had received the post?
```

```
1                      A. Alali

2          A.    Yes.  I then was at the hospital

3    post where Lieutenant Debara came by to give

4    me -- I clearly remember this -- give you a

5    meet and scratch my notebook and stated that,

6    you know, that I would -- that he did it

7    because he can, and that from now on, I would

8    be watching suicidal prisoners, if there was

9    one, directing traffic, working at a utility

10   car, and going to the county jail.  On that

11   day, there was a sign-in sheet at the hospital.

12   I do remember that there was probationary or

13   junior officers, new officers that were there

14   prior to me, and then I was subsequently

15   relieved by a probationary or junior officer.

16         Q.    Now, in reference to --

17         A.    And also I remember memorializing

18   that conversation in writing to the internal

19   affairs officer, obviously we just have one,

20   Lieutenant James Fortunato to investigate the

21   matter.

22         Q.    Is it correct that, when you

23   received that assignment to the hospital post

24   from the Lieutenant Debara, that you told him

25   about your first lawsuit, is that correct?
```

```
 1                    A. ALALI

 2          MS. NICAJ:  I did.  Thank you.

 3     Q.    Officer Alali, before we broke

 4  we were discussing negative comments made

 5  by various people and you mention a comment

 6  made by Lieutenant DeBara, Sergeant Austin

 7  and Sergeant Wilson.  In the time period

 8  that we were discussing, the first six

 9  months of 2007, did any other people make

10  comments to you that you believed were

11  derogatory?

12          MS. NICAJ:  Apart from what

13      he's already testified?

14          MR. MEISELS:  Correct.

15          MS. NICAJ:  With respect to

16      also the first day of the deposition?

17          MR. MEISELS:  Absolutely.

18     A.    April 2007 Sergeant Morrell,

19  Sergeant Austin had advised me that I was

20  to be given undesirable assignments, given

21  below standards evaluation.  That was at

22  the direction they stated of Lieutenant

23  Marshall and Captain Gazzola.

24          Aside from that what I

25  previously testified to.  I don't recall
```

```
 1                    A. Alali
 2         A.    I don't presently recall what I
 3    told him.
 4         Q.    You had mentioned earlier an
 5    assignment that you received to double parking
 6    during a period of time of February to April
 7    2007, am I correct?
 8         A.    If I did, what -- I don't remember
 9    the date I was assigned to that, but I was
10    giving specific examples of what Debara had
11    directly supervised me giving me specific tasks
12    to do.  One of those tasks did encompass double
13    parking on Main Street and North Avenue where I
14    had written many tickets.  I don't know if it
15    was a period of time that you are specifically
16    speaking about, but.
17         Q.    And is that an assignment that you
18    received directly from Lieutenant Debara?
19         A.    Yes.  He had called me in the
20    office stated that there was a condition that
21    Commissioner Carroll wanted alleviated and that
22    I would be the right man for that job, and I
23    believe I wrote this document, I don't know the
24    dates, but hundreds of summons were written
25    when he had me doing that assignment.
```

```
 1                    A. Alali
 2   had caused me tremendous anxiety and stress
 3   that I had gone home sick, and subsequently,
 4   Sergeant Morrell had come down the hall and
 5   said that -- and laughed and said that he was
 6   just joking, I didn't have to take a foot post
 7   in the snow that day, utilize a car, I could
 8   utilize a car; however, the events were so
 9   stressful, that caused me to be very anxious
10   that I couldn't continue my tour of duty.
11        Q.    The events were so stressful you
12   couldn't continue your tour of duty, is this on
13   March 7th?
14        A.    That is correct.
15        Q.    So, am I correct that you never
16   actually went on that foot post?
17        A.    No.  After being told by Lieutenant
18   Debara those racial remarks and then being told
19   again by Sergeant Morrell that I wasn't above
20   scrutiny, to bundle up in a sarcastic voice, it
21   would be unfair for me to go out and complete
22   my tour of duty which was the cause of
23   tremendous anxiety and stress.
24        Q.    What was there about being told
25   that you are not above scrutiny that was so
```

```
 1                         A. Alali
 2             MS. NICAJ:  That is fine.
 3        Q.   Officer Alali, can you tell me
 4   words or substance what Mr. Hayes told you
 5   about any conversations he had with the
 6   Commissioner concerning settlement of the
 7   lawsuits?
 8             MS. NICAJ:  Objection.  Don't
 9        answer that.
10        Q.   Officer Alali, are you aware of any
11   information based upon which you understand
12   that Sergeant Wilson was aware that you had
13   filed an EEOC charge?
14        A.   Yes.  Due to the fact that my
15   assignment immediately after filing the EOC
16   charge had changed from the punitive
17   assignments that I mentioned of dispatcher,
18   suicidal prisoners -- well as far as -- let me
19   back up.  What happened, I will call that a
20   magical day.  That day a lot had happened after
21   the EOC.  When I returned to work after the
22   EOC, I was no longer working punitive
23   assignments.  I had shortly thereafter a stack
24   of frivolous disciplinary charges handed to me
25   after the EOC, and I was working in the
```

```
 1                    A. Alali
 2    capacity I believe at the time of that North
 3    Avenue traffic corridor.  I don't know -- but I
 4    do remember being, I can't be with 100
 5    certainty, but I had that assignment, but I do
 6    know with 100 certainty that --
 7                MS. NICAJ:  I would like to take a
 8          break.  Are you done with your response?
 9          A.   Yes.
10               (Short recess).
11               MS. NICAJ:  I want the record to
12          reflect that I called you a couple of
13          minutes prior to lunch to advise you
14          that due to a prior commitment in
15          Brooklyn at the Appellate Division, that
16          I would be a couple of minutes late.
17               MR. MEISELS:  You did.
18               MS. NICAJ:  If I am not mistaken, I
19          was here about 5 after 1.
20               MR. MEISELS:  Then you spoke with
21          your client and I had no objection to
22          that, either.
23               MS. NICAJ:  I spoke to my client a
24          whole of 5 minutes.
25               MR. MEISELS:  Why don't we find out
```

```
 1                      A. Alali
 2        Q.    When you spoke to Mr. Hayes about
 3   some of these evaluations, can you tell me in
 4   words or substance what you said to him and
 5   what he said to you?
 6        A.    He clearly saw the same issues that
 7   I saw with these performance evaluations.  He
 8   instructed me on the departmental guidelines on
 9   how to request a review of the evaluation and
10   upon his direction, I did so.
11        Q.    Was Lieutenant Marshall ever your
12   indirect supervisor?
13        A.    Yes.
14        Q.    When was that?
15        A.    Since I started with the New
16   Rochelle Police Department, he was the rank of
17   sergeant.
18        Q.    Do you know whether or not he was
19   ever aware that you had filed an EEOC charge?
20        A.    I don't presently recall.
21        Q.    Do you know whether or not he was
22   ever aware that you filed your first lawsuit?
23        A.    I don't presently recall.
24        Q.    Do you know whether or not he
25   participated in any decision relating to any of
```

1                          A. Alali

2     courses successfully completed.  So am I

3     correct that you made this request pursuant to

4     the contract?

5          A.     That is right.

6          Q.     And at the time you made the

7     request, it was your understanding that part or

8     all of the fees would be paid?

9          A.     That is correct.

10         Q.     But only in connection with courses

11    that were successfully completed?

12         A.     Which everyone of mine were, yes.

13         Q.     Am I correct that before any

14    reimbursement check would be written, the

15    courses would have could to be completed?

16         A.     Basically, to my understanding,

17    that there was an agreement between the college

18    and the department that the officer would

19    enroll and payment would be deferred to the

20    completion or the end of whatever the budgeting

21    was.  It was not demanded at the time of

22    enrollment.

23         Q.     Payment would come after the

24    courses were taken?

25         A.     Correct.

```
 1                        A. Alali
 2          Q.    And the payment could be part or
 3     all of the amount of tuition that was paid?
 4          A.    Correct.
 5          Q.    It could be part?
 6          A.    Correct.
 7          Q.    And is it your understanding that
 8     Commissioner Carroll approved your
 9     participation in the program back in November
10     of 2005?
11          A.    Yes.
12          Q.    Was that for the winter trimester
13     of 2005?
14          A.    Yes.
15          Q.    Can you explain what, as you
16     understand it, what do understand the term
17     trimester to mean?
18          A.    Trimester is a program that Iona
19     College has.  Basically what it states try, 3
20     times a year, and so you go 3 times a year as
21     opposed to twice a year.
22          Q.    Does that mean that the year is
23     divided into 3 parts of 4 months each or?
24          A.    Honestly I don't know how budgeting
25     is done.  I just know that you are able to go
```

```
 1                        A. Alali
 2    this bill?
 3          A.     No, I don't.  It states fall of
 4    2006.  I would assume it's after the fall 2006.
 5          Q.     Referring to the top left-hand
 6    corner of the page where it says invoice period
 7    fall 2006, due date past due, do you see that?
 8          A.     I am sorry?
 9          Q.     On the upper left-hand corner of
10    the page, it has your name, your account,
11    number statement --
12          A.     I see.
13          Q.     -- and it says past due.
14          A.     Yes.
15          Q.     When you received this bill, did
16    you make any inquiry as to what was past due?
17          A.     I believe the inquiry I made was to
18    the PBA president Hayes of what was past due.
19    I don't believe I contacted the college
20    regarding this past due bill.
21          Q.     What did Mr. Hayes tell you?
22          A.     That he was speaking to the Deputy
23    Commissioner and get back to me.
24          Q.     Is it your understanding that the
25    bills that you received from Iona cover both
```

1                        A. Alali

2    the portion of the tuition that would be paid

3    by the city as well as the portion that you

4    were responsible for?

5            A.    The portion that I'm responsible

6    for obviously would not be paid by the city.

7    It would be paid by myself.

8            Q.    The bills cover both?

9            A.    No.

10           Q.    This bill is only covering the part

11   you are responsible for?

12                 MS. NICAJ:  Objection.  You can

13           answer.

14           A.    That is what I don't know.  You can

15   look at this.  I don't know what is what.

16           Q.    I am going to show you what is

17   premarked Defendant's Exhibit N for

18   identification and ask if you can identify that

19   document?

20           A.    Yes.

21           Q.    Is that your request for tuition

22   reimbursement for the spring trimester of 2007?

23           A.    Yes.

24           Q.    Was it granted?

25           A.    Yes.

1                          A. Alali

2                 C E R T I F I C A T E

3

STATE OF NEW YORK        )

4                        :  SS.:

COUNTY OF KINGS          )

5

6

7          I, SARI SERBER, a Notary Public for and

8     within the State of New York, do hereby

9     certify:

10          That the witness whose examination is

11     hereinbefore set forth was duly sworn and that

12     such examination is a true record of the

13     testimony given by that witness.

14          I further certify that I am not related

15     to any of the parties to this action by blood

16     or by marriage and that I am in no way

17     interested in the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set

19     my hand this 19th day of March, 2008.

20

21                    _____

                              *Sari Serber*

22                         SARI SERBER

23

24

25

# PART II

1

2    UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------X
    ARAZ ALALI,

4

5                             PLAINTIFF,

6           -against-        Case No:
                          07 CIV. 1916

7

8    ALBERTO DeBARA, Individually, KYLE WILSON,
    Individually, EDWARD AUSTIN, Individually,

9    GEORGE MARSHALL, Individually, HUMBERTO
    MORRELL, Individually, MATTHEW BRADY,

10   Individually, ANTHONY MURPHY, Individually,
    PATRICK J. CARROLL, Individually and the

11   CITY OF NEW ROCHELLE, NEW YORK,

12                          DEFENDANTS.
    ------------------------------------------X

13             DATE:  April 4, 2008

14             TIME:  11:15 A.M

15

16           CONTINUED EXAMINATION BEFORE

17   TRIAL of the Plaintiff, taken by the

18   Defendants, pursuant to a Court Order and

19   to the Federal Rules of Civil Procedure,

20   held at the offices of Wilson, Elser,

21   Moskowitz, Edelman & Dicker, LLP, 3 Gannett

22   Drive, White Plains, New York 10604, before

23   Veronica R. Harris, a Notary Public of the

24   State of New York.

25

```
 1

 2     A P P E A R A N C E S:

 3

 4     LOVETT & GOULD, LLP
          Attorneys for the Plaintiff
 5        222 Bloomingdale Road
          White Plains, New York 10605
 6        BY:  DRITA NICAJ, ESQ.

 7

 8
       WILSON, ELSER, MOSKOWITZ, EDELMAN &
 9     DICKER, LLP
          Attorneys for the Defendants
10        3 Gannett Drive
          White Plains, New York 10604
11        BY:  PETER A. MEISELS, ESQ.
          File #:  07367.00059
12

13

14     ALSO PRESENT:

15        Kyle Wilson
          Edward Austin
16        George Marshall
          Humberto Morrell
17        Matthew Brady
          Robert Gazzola
18        Lalit Loomba

19

20

21

22

23

24

25
```

```
 1                     A. ALALI
 2    enrolled at Iona College?
 3         A.    I presently don't remember.
 4         Q.    Referring to the first six
 5    months of 2007, did you receive a job
 6    evaluation from the New Rochelle Police
 7    Department?
 8         A.    I believe so.  I believe that I
 9    been rated falsely below standards in the
10    procedures.  Every six months you get
11    reevaluated with another performance
12    evaluation.  So I believe 2007 would be no
13    different than previous years.
14              I also would like to make a
15    correction.  I want to get the record
16    clear.  I think it's important to have the
17    record clear, that regarding my previous
18    testimony with Lieutenant Al DeBara, that
19    there was regarding the hospital post that
20    I was assigned to on February 21, 2007 when
21    he had the availability of what
22    probationary officers.  However, he
23    assigned me to that hospital post.
24    Lieutenant -- that was the same day of the
25    first federal complaint and after the
```

1              A. ALALI

2    filing of the EEOC that he had placed me on

3    that fixed hospital post.  He had -- that

4    was the same day that I had asked the desk

5    officer Sergeant Wilson on why myself

6    instead of four probationary officers to be

7    placed on the hospital post.  And in the

8    presence of numerous civilian members he

9    had stated, "Get the fuck out of my face,

10   not another fucking word.  Get out of my

11   face."  At which point I obviously went to

12   the hospital and was on a fixed hospital

13   post in New Rochelle Hospital.

14              Lieutenant DeBara subsequently

15   came by the hospital and had told me that I

16   would be receiving assignments primarily as

17   a utility call, which is a degrading

18   assignment usually given to junior officers

19   or officers that are on punishment and

20   other assignments, such as directing

21   traffic.  Such as watching suicidal

22   prisoners.  Such as doing county jail

23   escorts and doing civilian work inside the

24   radio room.

25              I was subsequent relieved by a

```
 1                    A. ALALI
 2    March 7th is when Lieutenant DeBara then
 3    and that's after obviously the first
 4    federal complaint, had placed me on a foot
 5    patrol in the snow.  And then when I asked
 6    him, I made inquire why I versus other
 7    probationary officers will be getting that,
 8    that's when he made that bias comment that
 9    we can put you anywhere we want Bin Laden.
10              I want the record to be clear
11    on that, on the date of -- on
12    February 21st, it was after the EEOC filing
13    on the federal when they were notified of
14    the federal complaint.  That DeBara had put
15    me on that fixed hospital post.  And I
16    illustrated that's the assignment usually
17    given to probationary officers as I stayed
18    on the unit, that Police Officer Kenny who
19    was either a junior probationary officer
20    was assigned to a fixed hospital post.  I
21    just want that to be very clear.
22         Q.    Is there anything else that you
23    want to clarify?
24         A.    Yes.  Also, on April 7, 2007, I
25    was assigned to the radio room by Sergeant
```

                              A. ALALI

1
2    Austin and I basically and there was
3    availability that week of at least three to
4    four probationary junior officers that
5    could have been given that assignment,
6    however were not.  When I made the inquire
7    of him why I was being placed on that
8    assignment, he basically in a laughing way
9    stated that we're going -- it looks like we
10   are going back to the good old days.
11   Followed by a statement added by Sergeant
12   Brady that I better get lunch at 8:00
13   because I won't be able to leave the radio
14   room.  Good luck.
15        Q.    And this was April 7th of what
16   year?
17        A.    2007.
18        Q.    May I ask you about assignments
19   relating to directing traffic.
20              Is that an assignment that's
21   often fulfilled by police officers?
22        A.    Well, directing traffic, if
23   there is a severe -- serious car accident
24   or a situation that require police officer
25   to direct traffic, such as serious police

```
 1                    A. ALALI
 2    There was April 8, 2007, was when Sergeant
 3    Wilson had directed me to perform civilian
 4    dispatching functions, although
 5    approximately three to four other junior
 6    probationary officers available.  When I
 7    asked him and questioned him why I was
 8    being placed as dispatch rather than the
 9    other officers, his response was it's
10    Easter and you're an Arab, camel jockeys
11    don't celebrate Easter.
12         Q.    Other than what you already
13    testified to, were any other comments made
14    to you that caused you to leave duty on the
15    basis of illness?
16              MS. NICAJ:  Objection.
17              You can answer.
18         A.    In the first six months of
19    2007?
20         Q.    Correct.
21         A.    I don't presently recall at
22    this time.
23              However, there were, you know,
24    the Debara's comments in February 2007.
25    Sergeant Austin's comments in April 20,
```

```
 1                    A. ALALI
 2    Austin's comment, what comment was that?
 3          A.     I stated on April 7, 2007.  I
 4    was given that civilian dispatching
 5    assignment again and I already told you
 6    what his comment was.
 7          Q.     And where were you at the time
 8    you had that conversation with Sergeant
 9    Austin?
10          A.     Inside the communications room.
11          Q.     And do you recall approximately
12    what time that occurred?
13          A.     Right after -- on or about
14    8:00.
15          Q.     Now, earlier you referenced a
16    comment made by Sergeant Wilson?
17          A.     Yes.
18          Q.     What comment was that?  What
19    did Sergeant Wilson say?
20          A.     I just told you.
21          Q.     Well, we were at Sergeant
22    Austin.
23                 MS. NICAJ:  Objection.  He did
24            tell you previously.  But go ahead.
25          A.     I would tell you again.  I will
```

```
 1                    A. ALALI
 2   talk nice and slow.  On April 8, 2008,
 3   Sergeant Wilson -- correction on April 8,
 4   2007, not 2008, 2007, Sergeant Wilson had
 5   assigned me to work as a dispatcher.  At
 6   that point in time I asked him why I was
 7   receiving that assignment rather than other
 8   probationary officers who were available.
 9   Okay, and he had told me that I'm an Arab
10   and it's Easter and camel jockeys don't
11   celebrate Easter.
12                    Excuse me for a second.
13                    Off the record.
14            (Whereupon, an off-the-record
15         discussion was held.)
16            MS. NICAJ:  As I did last --
17         the first date of Mr. Alali's
18         deposition transcript, I'm going to
19         request a copy on his behalf so he
20         could review and make my changes or
21         corrections he deems fit.
22            MR. MEISELS:  And I would
23         suggest that you make arrangements
24         with the Stenographer.  I am sure she
25         would be glad to accommodate you.
```

```
 1                    A. ALALI
 2            MS. NICAJ:  I did.  Thank you.
 3       Q.     Officer Alali, before we broke
 4   we were discussing negative comments made
 5   by various people and you mention a comment
 6   made by Lieutenant DeBara, Sergeant Austin
 7   and Sergeant Wilson.  In the time period
 8   that we were discussing, the first six
 9   months of 2007, did any other people make
10   comments to you that you believed were
11   derogatory?
12            MS. NICAJ:  Apart from what
13        he's already testified?
14            MR. MEISELS:  Correct.
15            MS. NICAJ:  With respect to
16        also the first day of the deposition?
17            MR. MEISELS:  Absolutely.
18       A.     April 2007 Sergeant Morrell,
19   Sergeant Austin had advised me that I was
20   to be given undesirable assignments, given
21   below standards evaluation.  That was at
22   the direction they stated of Lieutenant
23   Marshall and Captain Gazzola.
24            Aside from that what I
25   previously testified to.  I don't recall
```

1                    A. ALALI

2      presently anything else in those six

3      months.

4          Q.    Earlier today you discussed

5      circumstances relating to reimbursement for

6      your tuition for the school year of 2006,

7      when did you apply for that reimbursement?

8          A.    When the time period I was

9      supposed to apply and that's prior to

10     going -- taking the classes.

11         Q.    Isn't it required that you

12     actually pass the classes and prove that

13     you've done that before you are entitled to

14     the reimbursement?

15              MS. NICAJ:  Objection.

16              You can answer.

17         A.    The reimbursement for Iona

18     College on the trimester system is

19     different than, I believe other colleges,

20     being that the trimester breaks it down to

21     three times a year.  I don't know how

22     deputy commissioner handles the budgeting

23     of that.  I know that the payment is made

24     after the successful completion and a grade

25     of a C or higher.  Which I've always had

1                    A. ALALI

2          Q.    And do you recall the dates

3     that happened?

4          A.    I do not.

5          Q.    In reference to the first six

6     months of 2007, would it be fair to say

7     that you reported sick while on duty more

8     than seven times?

9                MS. NICAJ:  Objection.

10               You can answer.

11         A.    I don't presently recall, but

12    that was approximately that amount,

13    possibly a few days more.

14         Q.    Would it be fair to say for the

15    first six months of 2007 you reported sick

16    for the full day at least six times?

17               MS. NICAJ:  Objection.

18               You can answer.

19         A.    I don't presently recall.

20         Q.    Do you recall having called in

21    sick, taking a full day at any time during

22    the first six months of 2007?

23               MS. NICAJ:  Objection.

24               You can answer.

25         A.    Repeat the question please.

1                    A. ALALI

2          Q.    Sure.

3                Do you recall having called in

4    sick and taking off a full day at any time

5    during the first six months of 2007?

6                MS. NICAJ:  Objection.

7                You can answer.

8          A.    I don't presently recall.

9          Q.    On the occasions where you went

10   home sick after having started your tour of

11   duty, were those all occasioned by comments

12   that were made by other people in the

13   department?

14               MS. NICAJ:  Objection.

15               You can answer.

16         A.    They were either comments made

17   or assignments, degrading assignments, that

18   were given.

19         Q.    Other than the assignments that

20   we've already discussed both this morning

21   and at the first part of your deposition,

22   did you receive any other assignments

23   during the first six months of 2007 that

24   you perceive to be degrading?

25         A.    I believe I covered all the

1                          A. ALALI

2      off the track.

3                  Referring to the first six

4      months of 2007, do you have any basis to

5      believe that Sergeant Austin was aware that

6      you had filed an EEOC charge?

7          A.    As I stated -- I believe, I

8      answered that question in my last meeting

9      with you.  The EEOC charge was filed in the

10     beginning of 2007.  The first federal

11     complaint was filed on February 21, 2007,

12     so they were all notified of the filing of

13     the EEOC, as well as the federal complaint.

14         Q.    But my question is, what is the

15     basis for your belief that Sergeant Austin

16     was aware you had filed an EEOC charge?

17         A.    Everyone had known that I filed

18     an EEOC charge, not just Sergeant Austin,

19     all supervisors were aware of it and all

20     civilians were aware of it.  All of the

21     police officers were aware of it.  There

22     were conversations to me regarding that by

23     many, many people.  It was a small

24     department.  It's, you know, news travel

25     very fast in that place.  It's not a large

1                    A. ALALI

2     police department.  It's like a smaller

3     precinct.

4          Q.     Do you know whether or not

5     Sergeant Austin was ever aware that you had

6     filed your first federal complaint?

7          A.     Yes.

8          Q.     What's the basis for your

9     belief that he was aware of that?

10         A.     He put me on civilian

11    dispatcher.  I was put as a dispatcher.

12         Q.     Do you have any other reasons

13    to believe that he was aware of the filing

14    of the first complaint?

15         A.     Everyone in the radio room when

16    I was in there was talking about it.  He

17    was desk officer, as well as his other

18    sergeants.  There was no mystery to this,

19    Mr. Meisels.

20         Q.     When did he assign you to the

21    radio room?

22         A.     Many, many times.  In '07, many

23    times.  I talked about a date specifically

24    on 4/7/07, there were other times that I

25    was assigned.  I talked about 4/8/07 when

1                    A. ALALI

2    Sergeant Wilson assigned me.  There was

3    numerous times.  I previously testified to

4    the fact that I've been in there for almost

5    a year.

6         Q.    Other than the assignments that

7    you already discussed today and the first

8    part of the deposition, did Sergeant Austin

9    play any role in giving you assignments

10   during the first six months of 2007 that

11   you believed were inappropriate?

12               MS. NICAJ:  Apart from what

13         he's already testified to?

14               MR. MEISELS:  Right.

15        Q.    You don't need to repeat

16   yourself.

17        A.    Just the first six months?

18               MS. NICAJ:  The first six

19         months of 2007.

20        Q.    I am referring to the period of

21   this lawsuit.

22        A.    I don't presently recall.

23        Q.    Other than what you already

24   testified to, do you have any basis to

25   believe that Sergeant Brady was aware that

1                    A. ALALI

2    you had filed an EEOC charge?

3         A.    I already testified to that.

4    There's nothing else that I presently have.

5         Q.    Other than what you already

6    testified to, do you have any basis to

7    believe that Sergeant Brady was aware of

8    the filing of your first lawsuit?

9         A.    No.

10        Q.    Other than what you already

11   testified to, did Sergeant Brady play any

12   role, as far as you know, in your receipt

13   of what you thought were inappropriate

14   assignments?

15        A.    First six months of 2007?

16        Q.    Correct.

17        A.    No, that I presently recall.

18        Q.    Other than what you already

19   testified to, do you have any basis to

20   believe that Captain Gazzola was aware that

21   you had filed an EEOC charge?

22        A.    He was captain of patrol, he

23   was notified of the EEOC, as well as all

24   the supervisory staff was.  We can go

25   individually one by one, but, you know,

1                           A. ALALI

2         A.    Captain Gazzola, PBA President

3    Edward Hayes, myself and I am not sure if

4    Lieutenant Marshall was or not.  He might

5    have been, I am not sure.

6         Q.    Where were you when you were

7    given a copy of the charges?

8         A.    In New Rochelle Police

9    Department, Captain Gazzola's office.

10        Q.    And at the time the charges

11   were preferred, did you have a conversation

12   with Captain Gazzola?

13        A.    I don't presently recall.

14        Q.    Do you recall if PBA President

15   Hayes, had a conversation with Captain

16   Gazzola?

17             MS. NICAJ:  Objection.

18             You can answer.

19        A.    I don't presently recall.

20             MR. MEISELS:  Off the record.

21             (Whereupon, an off-the-record

22        discussion was held.)

23        Q.    Officer Alali, other than what

24   you already testified to, that's today and

25   the first part of your deposition, do you

1                    A. ALALI

2    have any other reason to believe that

3    Sergeant Wilson was aware that you had

4    filed an EEOC charge?

5         A.    No, I presently don't have any

6    other information.

7         Q.    Other than what you already

8    testified to, do you have any reason to

9    believe that Sergeant Wilson was aware that

10   you had filed a lawsuit in February 2007?

11        A.    Other than what I just

12   testified to no --

13        Q.    Other than --

14        A.    No, I don't presently remember

15   any other information.

16        Q.    Okay.

17              Now, I am going to ask you the

18   same questions with respect to Lieutenant

19   Marshall.

20              Other than what you already

21   testified to, do you have any other reason

22   to believe that Lieutenant Marshall was

23   aware that you had filed an EEOC charge?

24        A.    I don't have, presently have

25   any other information.

```
1                    A. ALALI
2          Q.     And other than what you already
3    testified to, do you have any reason to
4    believe that Lieutenant Marshall was aware
5    that you had filed a lawsuit in February of
6    2007?
7          A.     Not presently.
8          Q.     And in reference to Sergeant
9    Morrell, other than what you already
10   testified to, do you have any reason to
11   believe that Sergeant Morrell was aware
12   that you had filed an EEOC charge?
13         A.     Not presently.
14         Q.     Other than what you've already
15   testified to, do you have any other reason
16   to believe that Sergeant Morrell was aware
17   that you had filed a lawsuit in February of
18   2007?
19         A.     Not presently.
20         Q.     Did you use anything to refresh
21   your recollection with before you testified
22   today?
23         A.     The federal complaint.
24         Q.     Anything else?
25         A.     No.
```

```
1

2                    C E R T I F I C A T E

3

4

        STATE OF NEW YORK         )
5                         :   SS.:
        COUNTY OF KINGS           )
6

7

8              I, VERONICA R. HARRIS, a Notary

9    Public for and within the State of New

10   York, do hereby certify:

11            That the witness whose examination is

12   hereinbefore set forth was duly sworn and

13   that such examination is a true record of

14   the testimony given by that witness.

15            I further certify that I am not

16   related to any of the parties to this

17   action by blood or by marriage and that I

18   am in no way interested in the outcome of

19   this matter.

20            IN WITNESS WHEREOF, I have hereunto

21   set my hand this 8th day of April, 2008.

22

23   _____
                   VERONICA R. HARRIS

24

25
```