**EXHIBIT 1**

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**    **Captain Gazzola, PSD**
**FROM:**    **Police Officer Alali**
**DATE:**    **03 June, 2006**
**SUBJECT:** **Rebuttal to performance appraisal for 2006**

The purpose of this letter is to strongly disagree with, respectfully, the deplorable and frivolous evaluation that Sgt. Wilson prepared for me for 2006. This latest correspondence from Sgt. Wilson reflects the same theme as the previous fallacious performance evaluation drafted by Sgt. Austin six months earlier. What does a performance evaluation mean? A performance evaluation is measurable based on an employee's performance. By Sgt. Wilson's own admission he states that my performance levels are the highest. So I am taken back that my performance evaluation is the lowest possible, that being below standard. Even though, I have been assigned to the northern most area, sector 9, I have managed to have the highest performance levels.

Sgt. Wilson states "the primary issues that officer Alali struggles with are his inability to understand, or his unwillingness to adhere to, department policies, and his lack of communication skills necessary to deal with the citizens of New Rochelle." I have not received any departmental discipline during this evaluation period. What violations of departmental policies is Sgt. Wilson referring to? He explicitly states "this rating period there have been no documented occurrences of rule violations on the part of officer Alali." This statement is conflicting. Furthermore, he states I have lack of communication skills necessary in dealing with the citizens of New Rochelle. I do not only deal with citizens of New Rochelle, I deal with citizens from this city, state and other states. I treat all citizens equally and unconditionally with courtesy, professionalism, and respect. Sgt Wilson also states "however, because of his single-minded focus on enforcement he is ignoring the other responsibilities of a sector officer." What responsibilities is he talking about? This is another vague, unsupported accusation. On one hand Sgt. Wilson states that I need to improve on communication skills, and on the other hand he states "I have rarely had the opportunity to directly observe him handle calls for service other than motor vehicle accidents and alarms. I did respond to one domestic dispute and at no time was he discourteous." So on what facts did he draw this conclusion? Some accomplishments that I have performed this rating period were a self initiated stolen gun arrest on Stratton Road, and a burglary arrest on Ronbru Drive along with many other arrests. Both areas being on non-primary roadways which apparently were an "issue" raised in the previous evaluation by Sgt. Austin. Not one of these praiseworthy arrests resulted in a positive accolade from a supervisor. However, the victim of the burglary did write to the Police Department expressing her gratitude which was refreshing. Sgt. Wilson states in the evaluation, that I had entered sexually explicit

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

materials from a statement secured by the perpetrator regarding the burglary arrest. I never was trained on how to acquire a statement at this Police Department. However, I was trained in the City of New York Police Department, were I transferred from, on how to obtain a statement. Admittedly, I am a product of training, were I was disciplined on letting the perpetrator write in his own words what had happened. If that entails profanities or sexually explicit language I certainly will not alter, doctor, or influence a statement. I am convinced that the statement was exceptional, moreover candid resulting in the successful prosecution of a felon. I will direct your attention to the fact that Sgt. Wilson was the supervisor who read, authorized, and signed off on the official police report regarding the burglary which contained the very statement he is punishing me for in my performance evaluation. That is not only disingenuous but it is misleading. Sgt. Wilson also states "because of his initiative, productivity, and investigative skills, I believe that officer Alali would be above standards officer if he could improve in the areas of discretion and communication skills." As further demonstrated above, he states that he has rarely seen me handle calls for service but the times he had observed me I at no time was discourteous. I am disoriented in his aforementioned statement. How can being the leading producer of performance, receive the lowest evaluation possible? What else will it take to achieve an impartial, uncorrupted, unprejudiced performance evaluation?

I ask you in a good faith effort to resolve this biased, opinionated, misrepresented evaluation and reward me with a legitimate evaluation rating. A great effort was made to obfuscate the truth. My performance is not opaque, it is straight-forward. Consequently, this evaluation is deceitful and unwarranted. For this reason, I pray that this Department strikes Sgt. Wilson's evaluation. As demonstared above, I will continue to strive for excellence and the highest standards set forth by this Department. I pray that this Department will not tolerate such a cavalier attitude towards me.

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

Dated: June 03, 2006

Respectfully submitted,

Cc:

    Tour Commander, Lt. Masseo
    Deputy Commissioner Murphy
    Police Commissioner Carroll
    PBA President, P.O. Hayes, Esq.
    Personnel File

                             P.O. Alali #1000

**EXHIBIT 2**

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

TO:        Capt. Gazzola
FROM:     Police Officer Alali
DATE:      02 Feb 07
SUBJECT:  Rebuttal of performance evaluation 01/06-12/06

Here we are, full circle back to another extraordinarily biased and falsified employee performance evaluation. It is puzzling and lucid what the NRPD definition is regarding performance. For some performance is about numbers, such as summons and arrests, for me it happens to be the fact I am Araz. There seems to be different sets of rules and regulations for different officers. My interpretation of employee performance is work done in employment. However, the analysis of my data is unambiguous.

As Sgt. Wilson stated that the first six months of the year, I was assigned to work the north end sectors. During that time, I patrolled my assigned sector indiscriminately. Sgt. Wilson states in sum and substance "The problem with Officer Alali while working in the north end was the fact that he did not patrol all areas. Instead, he chose to focus on main road and parkway off-ramps." That is a slanderous statement. The fact that I had affected an arrest on Ronbru Drive for a burglary shows that to be a complete distortion of the truth. Moreover, I had affected a self-initiated stolen loaded gun arrest on Stratton Road and there is not murmur of that in my evaluation nor did I receive any positive accolades, which is customary to other officers.

Sgt. Wilson states that I was reassigned to a traffic detail on North Avenue. He further states "However, his lack of discretion and communication skills led to civilian complaints. For example, Officer Alali was frequently issuing parking summons while the driver was in the car. At that time, Officer Alali was advised that he and the department would be better served if he occasionally moved an illegally parked car instead of issuing a parking ticket on a car with the driver in it." What is he talking about? To who was I "frequently" issuing parking tickets to while the driver was in the car. Who, when, where? I am baffled by this unsupported, vague generalization. Please state a specific incident supporting his claim since I allegedly had been advised. When was I advised? Who advised me? The purpose of the traffic detail that I had been told by the Police Commissioner was elevated enforcement and substantial visibility. I along with the second tour supervision believed that the goal was satisfactorily achieved. I would like to make mention to the fact that you personally Captain had told me, what type of summons to write and where to write it and even those parameters shrank considerably. Sgt. Wilson comments that both my lack of discretion and communication skills led to civilian complaints. What complaints? Are these complaints substantiated and I don't know about them? I am being penalized for complaints in this very evaluation that I have no knowledge about. There are many

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

other issues I have no knowledge of such as discipline. "He had difficulty staying within his assigned area and was often reminded of this, but he continued to stray from his post." The falsity of this accusation is astonishing. He states that he recommended department discipline for me leaving my post on two occasions. It is disheartening that I have need been informed not once of this accusation by neither Sgt. Wilson nor internal affairs or by any other member of management including you. He further states that he recommended departmental discipline four times. I am stumped when all I received was one department discipline for allegedly driving recklessly while receiving the highest call of service possible in law enforcement, that being a police officers call for assistance. On that specific incident a departmental trail is pending, however I am being penalized for this before the outcome of the trail. That seems to be the theme for this entire evaluation. Sgt. Wilson then states that there were eight civilian complaints. I do not have any knowledge of them. It would only seem logical that if I was exonerated for a complaint that is should not have a negative bearing on my evaluation. I have asked on two documented occasions for my disciplinary file from Lt. Fortunado however I have yet to receive a copy or a viewing of such. Lt. Fortunado told me that the city attorney has the aforementioned folder. It would be inconceivable that the only copy would be turned over to the city attorney.

Several supervisors have told me that the reason I have received this below standard evaluation as well as other below standard evaluation is a direct result of your dictation to the supervisors that I must be below standards. This only supports my affirmation of the biased and prejudicial treatment I have suffered while being the top-producing member of this department. It is become increasingly clear that I am being singled out due to my heritage. Being the sole middle-eastern police officer has been hopeless. As other supervisors have said, I am confident that you will "rubber stamp" the below standard evaluation. I pray that the continual harassment stops immediately.

Respectfully submitted,

P.O. _____ #1000
P.O. Alali #1000

**EXHIBIT 3**

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**      **Captain Gazzolla**
**FROM:**   **Police Officer Alali**
**DATE:**    **06/22/07**
**SUBJECT:** **Rebuttal of biased performance appraisal based solely on my heritage**

Here we are once again Captain, back to the same prejudicial, falsified, retaliatory review of my performance for the months of March 2007 through May 2007. I will once again spell out with fact, not fiction, the reasons I am incontestably NOT a "below standard" police officer as authored by the untruthful Sgt. Brady. I will accentuate the positives of my above standard performance.

After initially reading the narrative of this performance evaluation, I was perplexed, then frightened, that a police supervisor scribbled this distortion of the truth. I had to pinch myself to realize this was occurring in real time.

At no time does Sgt. Brady make mention in the narrative on my above standards performance regarding summons and arrests. I have exceeded the "quotas" for an entire year in the period of time between March 2007 and May 2007. Why is it time after time I do not receive proper recognition for a job well done? Why is it that I am placed on modified assignment by your order and direction for six months? Why am I smeared and denigrated? Why is it that my fellow officers who have lesser performance levels than myself are placed on "above standard" and "meets standard?" There is a simple, yet disturbing, cruel, and vexatious explanation for this Captain. It is because of my heritage.

Sgt. Brady states, on the third line of this evaluation that the rating period was from 01/01/07 through 05/31/07. At no time does he account for the period of time from 01/01/07 to 03/01/07, where a standing order was generated by yourself to all the second tour supervisors that I was performing the following functions; dispatcher, jail escorts, suicidal prisoner watch, no contact with the public, no operation of police or other city and departmental vehicles. Lt. de Bara further added insult to injury by instructing me that I was not permitted to walk to the front portion of the communications room to get even a paperclip in a possible attempt that a member of the public will see me. Lt. de Bara stated this was as per your order. Captain, I am not a caged animal that you could imprison for eight hours a day, I am one of the most talented police officer in this agency. My total number of arrests and summons can support this. These are numbers that are barefaced and will stand on their own merit. For all purposes, I was punished, degraded, humiliated, and banished from the normal functions that is afforded to any other police officer in this

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

department. I know, unquestionably, the motive behind this was not my abilities or performance as the top producing officer, however it is painfully obvious that you are singling me out.

Sgt Brady then states, "P.O. Alali had been disciplined in 2006 because he had difficulty staying in his assigned area." Captain, you and I both know that there is a pending departmental disciplinary hearing where the outcome has not been determined, as far as I know. I am mystified as to why Sgt. Brady would use this indeterminate situation. The very next sentence Sgt. Brady contradicts himself by stating "however that has not been a problem during this evaluation period." The problem is the fact that I am been persecuted due to my heritage.

Sgt. Brady then states, "P.O Alali received a warning letter for the use of his sick time in 2006. P.O. Alali has not improved in this area as he has used 2 full sick days and on six occasions has gone home sick during his tour of duty during this evaluation period alone." What does the warning letter state? Is he making the inference that I was out sick when I was not actually sick? If this is the case, please indicate one instance authenticating this. This is a defamatory attack once again on my integrity. He then states on "six occasions has gone home sick." There is no disclosure on WHY I went home sick while I was working; neither do the EMS reports completed by the supervisors. On one occasion I pointed out to Lt. Fortunato that Sgt. Morrell never completed an EMS report on me. I have told the supervisors each and every time I went home sick while I was working was due to anxiety and panic caused by the supervisors themselves. My attorney is handling the countless occurrences confirming this.

Sgt. Brady further states, " It was noted in his 2006 evaluation that P.O. Alali needed to improve upon his communication skills, demeanor, and his understanding of discretion. It is my opinion that he has not measurably improved in any of those areas." Captain, how is Sgt. Brady "measuring" my communication skills, demeanor, and understanding of discretion? This is extremely confusing because on several occasions my supervisors, along with yourself and Sgt. Brady have complemented me on my dispatching abilities. What mechanism does he have in place that yields him factual not opinionated results? Sgt. Brady's assertion needs to be factually based, not mythical or opinionated. Additionally, is their one incident, one occasion that supports this outrageous claim?

Lastly, Sgt. Brady states "it was discovered by an immediate supervisor during this evaluation period that he was again in violation of Rules and Regulations section 1.29. Department discipline is pending in that matter." Captain this is an investigation currently being hashed out by Lt. Fortunato which is criminal in nature. It is deplorable that he would use this example when again the outcome has not been reached, and I am a victim of a crime.

In conclusion, it should be noted that your "supervisors", in concert with yourself are persistently violating my constitutional rights solely on my heritage, and violating

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

departmental rules. Nothing short of a miracle will I ever see you and your supervisors act, honestly and ethically towards me. Through bold decisions and integrity I have taken courageous steps to expose the truth. I am now being further attacked and retaliated against for that. I am tired year after year of having a strong track record of service, dedication, and commitment being torn down right in front of my eyes. Mediocrity can never be acceptable. These incidents must be researched and reviewed carefully so everyone could cut through the lies. I no longer can sacrifice myself for this agency. I have given so much of my time seeking to enhance my leading productivity without forfeiting the quality of police services the citizens of New Rochelle demand and deserve. These years and years of inertia inflicted by yourself and your supervisors must end now. Bigotry is not only evil it is illegal. I am confident that you will rubberstamp this appraisal along with the other appraisal as "below standard." However, I am requesting that you properly review my evaluation and reverse Sgt. Brady's evaluation and place me on above standards, as I should have been from the start.

Respectfully,

P.O Alali

Cc:
Commissioner Carroll
DPC Murphy
Lt. Fortunado, IAD
PBA Edward Hayes
Attorney at law, Jonathan Lovett

**EXHIBIT 4**

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

| | |
|---|---|
| **TO** | **Captain Gazzola, PSD** |
| **FROM:** | **Police Officer Alali** |
| **DATE:** | **10 October, 2005** |
| **SUBJECT:** | **Rebuttal of "letter of counsel" dated 29 Sept, 2005** |

The intention of this communication is in reference to Sgt Austin's "letter of counsel" dated 29 Sept 2005. I want to use this forum as clarification to said letter.

When I was initially apprised that I would be assigned to Sgt. Austin approximately three weeks ago I had mixed reactions to this mandated assignment. The fundamental presumption was that this was degrading and dishonoring. Nevertheless, as time went on, I recognized this to be an exceptional opportunity to affirm and demonstrate my ability and proficiency as a New Rochelle Police Officer.

During my condensed span with Sgt. Austin, I addressed what I have been instructed as pressing issues. A particular example of this would be the administering of seatbelt and cell phone citations which I dispensed. Another illustration of a weighty contention was the demeanor and disposition towards irate or difficult citizens. An occasion arose while I was issuing a double parking citation on Drake Avenue. The operator of the vehicle approached me in an incensed and belligerent manner, at which point I remained poised and collected despite the fact she used continual profanities. Another example of my professionalism and discretion could be detected on 02 October 2005, at about 11:47 hours at Mayflower Avenue and Clove Road. On such date and time, I executed an arrest of Richard D. Leak, Jr; d.o.b. 10/03/80. During the arrest process the defendant's passenger, a female engaged in verbal profanities stating in sum and substance "you're a fuckin asshole, fuck you motherfucker, you have no justify in arresting my boyfriend." I remained focused and professional as I continued my investigation. Several times, the defendant's girlfriend placed herself along with an occupied baby stroller between me and the defendant in an attempt to avoid placing the defendant into custody. This encounter occurred across the street from Holy Family Church were numerous parishioners stopped and watched the defendant continued to use profanities against me. I exercised extraordinary discretion and restraint in not placing the defendant's girlfriend under arrest. This was due to the fact that she had an infant with her. Although Sgt. Austin was not present, Lt. de Bara, Sgt. Danko and P.O. V. Galbo personally observed the entire incident. The successful arrest of Mr. Leak resulted in eight count information

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

against him as well as numerous outstanding Westchester County Department of Public Safety arrest warrants. Both Lt. de Bara and Sgt. Danko praised me for my doggedness and professionalism.

Sgt. Austin, in his "letter of counsel" mentioned the subsequent "issues." "On traffic stops you frequently fail to call out car stops prior to making contact with the operator. I also observed you not adhering to Department Guidelines on the use of Verbal Judo when addressing the operator."

I contest that reference simply because I have "called out" my car stops with communications during my period of time with Sgt. Austin. He fails to mention a solitary incident authenticating his assertion.

Secondly, Sgt Austin states, "in situations where your authority is challenged or the subject is disrespectful it has been observed that you get upset at the challenge and will continue an argument when it is not called for. This only serves to escalate the situation instead of diffusing it as is your responsibility. This is possibly the source of some complaints you have had."

Once more, Sgt. Austin does not cite a specific incident verifying his claim. Furthermore, he is attempting to make a nexus by indicating a possible source of some complaints I received were attributed to me "getting upset at the challenge." Sgt. Austin has never been present when I have received a complaint. Speculation affirmed by Sgt. Austin as to the reasoning behind previous unsubstantiated complaints is an improper practice for a police supervisor. "Possible" and absolute are incontrovertibly two sovereign concepts.

Thirdly, Sgt Austin states, "While you actively patrol your areas of assignment your focus is on the primary roads in that area. Your priority seems to be mainly looking for vehicle violations. While this is an important component of patrol there are other needs the Department requires. You are to give due attention to all areas including side roads. Discretion can and should be used on stops and other interactions with minor offenses. Your patrol is also intended for you to be familiar with the people in the areas you are assigned and their concerns for the area such as quality of life issues and desire for a Police presence even if no active enforcement is needed or desirable."

I do not find those statements to be factual, accurate or bona fide. Throughout my period with Sgt. Austin, I have been the sole operator. I have incessantly driven 60-70 miles per tour. Unmistakably, this has not been exclusively on "primary roads."

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

Discretion had been observed by Sgt. Austin regarding traffic stops. Sgt. Austin makes utterances on stops and interactions with "minor offenses." I emphatically believe and conclude that paying appropriate attention to "minor offenses" or nuisances immensely diminishes criminal activity, hence enhancing the quality of life for our citizens. This can be depicted by business contacts I have made where Sgt. Austin has had the opportunity to observe me engaging with civilians. Additionally, I had directed enforcement towards irritant prone locations. Sgt. Austin also states that my priority seems to be mainly looking for vehicle violations. Once again, he is postulating as to what he assumes I might be looking for. The designation Sgt. Austin assigns the word "seems" in the context he characterizes above, sketches the cessation of being without question, apparently or evidently. Again this is erroneous and fallacious. Based on my continual and consistent work ethic and being the chief producer on the second tour, I have developed the opportunity to identify both unrighteous and admirable citizens. The fact that I perpetually patrol my assigned sector creates an impression or illusion of a grosser police presence.

Fourthly, Sgt Austin states, "you have had several traffic stops where arrests were made due to either drugs or weapons found in plain view. Concerns were raised as to the blatant nature of the observed items and the short time frame these occurred in. These stops occurred prior to my assignment with you and were discussed previously. All Laws and Department policies regarding search and seizure should be followed."

I am frankly disappointed and aghast by Sgt. Austin's inference and interpretation to the Fourth Amendment of the United States Constitution as it applies to me. I find his statement to be both contradictory and counterfactual. On one hand, he states, "these stops occurred prior to my assignment with you." On the other hand, he states, "concerns were raised as to the blatant nature of the observed items and the short time frame these occurred in." This specific remark is sharply defamatory. Sgt. Austin again fails to illustrate a sole incident that this yields to be authentic. I have attended and successfully graduated a rigorous Federal Academy where the primary focus was U.S. Constitutional Law and Case Law. In addition, I have attended and graduated a considerable nine month police academy for the NYPD. Owing to both of these fine institutions, I am intimately apprised of the Fourth Amendment and the application of search and seizure in the field, as it applies to policing. I am also knowledgeable and in touch with the exceptions to the Fourth Amendment such as "plain view doctrine," "open field's doctrine," "emergency situations," "exigent circumstances," "inventory searches," "search incident to arrest," "consent searches," "stop and frisk," "hot pursuit," "border and airport searches" and "vessel searches."

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

Lastly, Sgt. Austin states, "while riding with you I have observed you become aggravated with Department policies you do not agree with or feel are handled better by other departments. Also in the past you have received department discipline after being advised of Department rules you were violating and did not correct the condition."

I have had the fortunate opportunity to work in various Police Departments and experience first hand the inner workings of these departments. During our conversations together, I had asked Sgt. Austin for mere clarification of some policies. Moreover, I would expect that if I have not "corrected the condition" regarding the violation of department rules, I would receive additional departmental discipline.

In conclusion, I would like to expressly say that this has been a disenchanting and unproductive encounter. I have no confidence that Sgt. Austin could remain unbiased, nondiscriminatory, neutral and just. This can be distinctly supported by the fact that Sgt. Austin in his "letter of counsel" does not, at any time, indicate or recite a definitive, explicit or precise instance (who, what, when, where, how) that the aforementioned events or scenarios actually occurred. He purely makes abundant, immense, and considerable generalizations based on abstract principles. I accredit this to be accurate, predicated on preconceived notions which again are distorted and untruthful. During my time with Sgt. Austin, I had asked him if I was performing my duties incorrectly and if I needed to improve in any areas. His response was "No." I am always willing to learn and am open minded to new strategies of policing. However, it is evident, noticeable and transparent that the punishment meted out against me is arbitrary and capricious, carried out on a whim or impulse. Nevertheless, I will continue to maintain the high standards and integrity expected of me as a New Rochelle Police Officer, as well as, distinguishing myself as a constructive member of service.

CC:

Sgt. Austin
Lt. Schulman
Deputy Commissioner Murphy
Commissioner Carroll
P.O. Hayes, PBA                                 Respectfully Submitted,


                                                Police Officer Alali# 1000

# CITY OF NEW ROCHELLE
## NEW YORK

### INTERDEPARTMENTAL COMMUNICATION

**EXHIBIT 5**

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

**TO:** (AA) Capt Gazzolla ~~Police Officer Alali~~

**FROM:** (AM) ~~Capt. Gazzolla~~ Police officer Alali

**DATE:** 03/27/07

**SUBJECT:** Possible Sanctions imposed

On today's date while at roll call, desk officer, Sgt. Morell handed me a letter written by you on 03/22/07, attached.

I want to know why in 2005 when I rebutted the annual performance evaluation of below standards at which point in time, you "concurred" with the evaluating Sergeant stating that it was without merit I DID NOT receive a letter highlighting these aforementioned sanctions. Is it a change in departmental policy? Was it merely a slight oversight? The language of Department Rules and Regulations Chapter Two Section 2.47: states "Members of the Department who have an abusive sick leave record, a pattern of disciplinary problems or substandard work performance MAY BE barred from the aforentioned items a,b, and c. Am I barred from any or all of these sanctions? I am genuinely confused in the sudden, swift change.

Sincerely

P.O. M #1000

P.O. Alali # 1000

**EXHIBIT 6**

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

TO:        Police Officer Araz Alali
FROM:      Captain Robert Gazzola, Commanding Officer PSD
DATE:      March 21, 2007
SUBJECT:   2006 Employee Performance Appraisal

After carefully reviewing your challenge to the rating you received on your 2006 Employee Performance Appraisal, I find that your complaint is without merit, and I concur with Sergeant Wilson's appraisal of "below standards." I did amend one error that appeared on your evaluation. According to Lieutenant Fortunato your received seven civilian complaints not eight as documented in the evaluation.

Cc:    Personnel File
       Attached to original 2006 Employee Performance Appraisal

**EXHIBIT 7**

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

TO:        **Commissioner Carroll**
FROM:   **Police Officer Alali**
DATE:    **14 NOV 06**
SUBJECT: **Re-assignment/Modified Duty**

    The purpose of this communication is to address the flagrant, punitive, re-assignment administered and authorized against me. It has been brought to my attention by all the second tour supervisors collectively that there is a standing order by the commanding officer of patrol that I am limited to several tasks only. These tasks being contained to the following; 1) dispatcher, 2) DR (designated risk) prisoner watch, 3) prisoner transporter, 4) court officer assistance. I have further been told the standing order also states that I am not to use/drive any police vehicles and not to have any public/human contact except with prisoners. This is strikingly alarming by indicating prisoners as sub-human or as second-class citizens. Furthermore, I was given a direct order by Lieutenant de Bara stating in sum and substance "pretend there is an imaginary line from the radio room into the front desk. Under no circumstances are you to cross that imaginary line even if you need a paper clip or a pen, okay." He further explained that the mission is to isolate and contain me from any public viewing or contact as if I am a caged animal. If that is not degrading or downtrodden I don't know what is? What other officer is exposed to this dishonor? What other officer has been punished and been displaced before any investigation has been completed? When I asked the reason for the barefaced punitive measures I was told conjointly it was a direct result of an arrest I affected on Mr. Edwin Veras on September 12, 2006 Incident Report #37419.

    Commissioner, when you asked me to undertake the assignment to address the traffic conditions on North Avenue several months ago I was under the

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

full understanding that it would not be an effortless one.  However, I put 110 percent into this assignment, as I do with all my assignments, and managed to administer approximately one thousand one hundred summonses in an abridged span of time of only three months.  It should be noted that these summons dealt with the impeding and free flow of traffic on North Avenue such as double parkers, u-turns, bus stops, etc.   On 05 Oct 06 PBA President Edward Hayes and I met with Internal Affairs Detective Lieutenant James Fortunato to denounce this e-mail by the CO of patrol.  Detective Lieutenant Fortunato stated he did not know of any e-mails, or standing order that dealt with the aforementioned modified assignment, however he stated the reason I am being placed on modified assignment is a direct result of an internal investigation on the arrest I affected on Mr. Edwin Veras on Sept 12, 2006.  That affirmation is translucently contradictory.  On 11/13/2006 PBA President Edward Hayes met with Lieutenant Fortunato to determine if the investigation was over.  Lieutenant Fortunato said the investigation was in fact over and that he does not have any input on my assignment, merely his role being that of a "fact finder."  It is indisputable that I am being treated as if I already am guilty of whatever Lieutenant Fortunato's findings were without having a departmental trail.

Commissioner, I hope you can serve as an exploratory role in this matter, in addition to make this arbitrary and caprious ostracization of me end immediately.  On 11/13/2006 both Lieutenant de Bara and Sgt. Austin reprimanded me for using the front desk phone to confirm an active immigration warrant on Pablo Zapata-Flores d.o.b. 10/26/83.  I pray that neither you nor this department will tolerate a clear, definite, undisguised retaliatory act against me that is incontestably biased and opinionated.  Commissioner, I would like to schedule a meeting to further discuss this crucial and pressing matter.

Sincerely,

P.O. Alali#1000

Cc: Edward Hayes, PBA

**EXHIBIT 8**

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

| | |
|---|---|
| **TO:** | **Commissioner Carroll** |
| **FROM:** | **Police Officer Alali** |
| **DATE:** | **11 Jan 07** |
| **SUBJECT:** | **Persecution based on heritage** |

The purpose of this communication is to apprise you of the ostentatious prejudice against me by Captain Gazzola. As the previous communication stated on 11/14/2006 I have suffered punitive re-assignment for over four months. Attached is a copy of the 11/14/06 communication. On 01/08/07 Capt. Gazzola emailed Sgt. Brady in regards to sick leave I had taken in October 2006 and December 2006. Sgt. Brady had asked me for a doctor's note for both occasions which I furnished again upon demand. Attached is a copy of both doctor's notes. Captain Gazzola rejected both notes and ordered Sgt. Brady to generate a command discipline violating the timeliness of notes. Sgt. Brady told me that he did in fact issue two command disciplines one for October and one for December. This incontrovertibly illuminates a warped and harmful bias against me. Today, 01/11/07, I had asked Captain Gazzola if I could meet with Thomas Troetti PBA attorney who was present at headquarters and was hastily denied. Once again the case becomes increasing clearer than this is a well-defined, obvious prejudice based on my heritage. I pray that I no longer become hunted, and no further retaliatory acts are directed against me solely based upon my middle-eastern heritage.

Respectfully Submitted,

P.O. _____ #1000

**Police Officer Alali #1000**

**EXHIBIT 9**

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

TO:           **Commissioner Carroll**
FROM:         **Police Officer Alali #1000**
DATE:         **16 February 07**
SUBJECT:      **Continual retaliation based on heritage**

On 16 Feb 07 at or about 0800 hours Lt Debara advised CSO Sheey to put me out of service due to the fact he wanted to speak to me in the tour commanders office. This memo is to memorialize that meeting. Lt. Debara started off by saying that he put me in sector 4 because of the fact that I am one of the best police officers this department ever had. He further stated that I have exceptional instincts. At which point in time Sgt. Austin entered the tour commander's office and listened to Lt. Debara continual praising me as a police officer and my abilities and instincts and he had confidence that I would be able to end the string of Burglaries plaguing the west end of New Rochelle. He also stated that as per Captain Gazzola I was to have the least desirable assignments. He stated that if there were even officers working to cover the nine patrol sectors I was to work utility and be sent all over the city to handle the least desirable jobs. I am very uncomfortable and afraid to be working in such a hostile work environment created by this department and Captain Gazzolla. As I have numerously called upon you to stop this biased arbitrary and cupreous treatment of me solely based upon my heritage.

Respectfully submitted,

Cc: Lt. Fortunado
    PBA President Ed Hayes

P.O. Alali #1000

**EXHIBIT 10**

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**        **Commissioner Carroll**
**FROM:**    **Police Officer Alali**
**DATE:**    **March 07, 2007**
**SUBJECT:**  **Bombardment of unrelentless harassment**

I feel that I am numb writing you these interdepartmental communications.  On today's date 03/07/07 I came into work and was told that I would be walking a foot post in the snow although there were four probationary officers in sectors.  When I asked Lt. Debara why I was being treated unfairly his response was "because we can.

.

**EXHIBIT 11**

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**      **Commissioner Carroll**
**FROM:**    **Police Officer Alali**
**DATE:**    **18 Feb 07**
**SUBJECT:** **Continual retaliation based on heritage**

The purpose of this memo is to advise you of the chronic retaliation initiated by the supervisors. On today's date Sgt. Austin singled me out at 0750 hours and asked for my hat, which I had with me. He did not ask any other officers for their hat or equipment. A copy of today's roll call with the other officers present is filed and attached. This clearly illustrates that I am being singled out based on my heritage and because a federal lawsuit that was generated on 02/12/07. At 1440 hours communications advised me to call Sgt. Austin whom now was at the desk. I called him at 654-2229 where he belittled me and asked if my report on a criminal mischief incident report # 6155 "is this a joke." I told him "no". He asked me to rewrite the report. I do not feel that this report was lacking in any way. It had all the pertinent information necessary however he gave me a direct order and circled the report so I had to re-write it. A copy of the report is filed and attached to this memo. Be advised that I wrote the report the same way as before. I spoke to Sgt. Wilson who was on the desk when I came into HQ to rewrite the report and told him what had happened. I asked Sgt. Wilson if reports are routinely marked so the officer has to rewrite them, he stated, "no you have to take that up with Sgt. Austin." I advised Sgt. Wilson that these retaliatory acts must end. Edward Martinez, PBA board member was present at H.Q. with Sgt. Austin and Sgt. Brady. I asked Sgt. Austin if I could have Edward Martinez inside the tour commander's office due to the fact of a hostile work environment. Both Sgt Austin and Sgt. Brady denied me the right to have Edward Martinez present. Sgt. Brady stated "is not necessary and ordered me to the tour commanders office with Sgt. Austin. In the office I told Sgt. Austin that it was

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

inappropriate to call my report " a joke." I further told him that if it were someone else he would not have circled the report and ordered him or her to rewrite it. He stated that it cosmetically appealing to him because I wrote unknown followed by a line through the boxes in the person category. I told him that I had been doing that for the past five years and that no one else went out of there way to mark up my report. He stated that he never circles a report but merely asks other officer to add to the report. I told him that this is unfair and arbitrary.

Respectfully submitted,

P.O. Alali #1000

Cc: Detective Lieutenant James Fortunado, internal affairs
    PBA President Edward Hayes

**EXHIBIT 12**

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**        **Deputy Commissioner Murphy**
**FROM:**    **Police Officer Alali**
**DATE:**     **08 March 07**
**SUBJECT:** **Complaint against Captain Gazzola**

**The purpose of this communication is to file a complaint against Captain Gazzola. The substance of this complaint is discernibly clear. On 03/07/07 I was present for duty and stood roll call at 0745 hours. Lt. DeBara whom read the assignments conducted the roll call. I was put on a foot post in the snow where the temperatures were well below zero. There were four probationary officers assigned to cars. On today's date, 03/08/07, Sgt. Morrell conducted roll call and stated at roll call that he wanted to see me. I met with Sgt Morrell in the tour commander's office where Sgt. Austin was present. The sum and substance of the "meeting" was to inform me of several issues. The first being that specific boxes were not filled out on a report IR # 7578. I would especially like to direct your attention to the complaint box # 3. I filled out NRPD which should really be PSNY however I was told that this is 'the New Rochelle way of doing things." Then an interesting thing happened. The box that indicates S=Sober, HBD=Had Been Drinking, and I=Intoxicated was highlighted and I was told that one of the three boxes had to be checked off. My question to you sir is how can an entity be any of the aforementioned states. Then he went into why he (Sgt Morrell) put me on a foot post in the snow. He stated that Gazzolla said due to the fact I was "below standards" I must walk a foot post. He then stated that if people such as Officer Frank Manning and Officer Dina Moretti were rated "below standard" for productivity issues why should I not be above scrutiny? I told Sgt. Morrell that allegedly I was under review by Captain Gazzolla for my evaluation then it seems that Captain Gazzolla is already rubber-stamping my evaluation "below standards." This points to my deep-seated conviction that Captain Gazzolla ids singling me out again and again. I pray that this department and**

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**
you sir will not tolerate a disdainful, condescending, high-and-might attitude
set forth by Captain Gazzolla.  All I ever wanted is to be treated fairly,
honestly, and justly.

P.O. /R #1000

**EXHIBIT 13**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form

| | ENTER CHARGE NUMBER |
|---|---|
| | ☐ FEPA |
| | ☐ EEOC |

Charge No. 2C-2007-0737

**NEW YORK STATE DIVISION OF HUMAN RIGHTS** ____ and EEOC
*(State or local Agency, if any)*

| NAME (Indicate Mr., ) | DOB: **06/17/72** | HOME TELEPHONE NO. (Include Area Code) |
|---|---|---|
| **Mr. Araz Alali** | ss#: **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** | **914-738-0909** |

STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY
**703 Pelham Road, Unit 514, New Rochelle, New York 10805**

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| **City of New Rochelle** | **500+-** | **914-654-2227** |

STREET ADDRESS | CITY, STATE AND ZIP CODE
**475 North Avenue, New Rochelle, New York**

RECEIVED 2007 METROPOLITAN UNIT

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| **N/A** | |

STREET ADDRESS | CITY, STATE AND ZIP CODE

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE   ☒ COLOR   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN

age   RETALIATION   OTHER

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE *(Month, day, year)*
**February 12, 2007**

I am a male of Iraqi national origin and am employed as a Police Officer in the Respondent City of New Rochelle, New York. I am the only sworn member of the Department who is of Middle Eastern descent; and I believe I am the first such individual ever to be employed by the Respondent in its Police Department. Since virtually the commencement of my employment with Respondent I have been: targeted for disparate treatment (referred to as "Ali Baba", "terrorist", and *inter alia* "Ali"); denied specialized training which is routinely given to less senior officers; repeatedly false accused of wrong-doing; targeted for retaliation for conduct engaged in with complete impunity by other members of the Police Department; repeatedly given job performance evaluations falsely characterizing my work as "below standard" when in fact my job performance is above standard; repeatedly "investigated" on admittedly false/frivolous civilian complaints; punitively assigned to exclusively issue traffic tickets for double parked vehicles and operators of motor vehicles who make U-turns on North Avenue in the City of New Rochelle; punitively assigned to work as a dispatcher - - an assignment no other Police Officer has had given the employment by the Respondent of civilian dispatchers; forbidden to operate a police vehicle; assigned foot patrol on midnight tours of duty - - an otherwise non-existent assignment - - in snow and rainy conditions. Since the only conceivable motive for this disparate treatment is my race, national origin and/or ethnicity I charge Respondent with violating my rights under Title VII.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

**Araz Alali, 2/12/07**

NOTARY-(When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month and year)*

**EXHIBIT 14**

# LOVETT & GOULD, LLP
## ATTORNEYS AT LAW

JONATHAN LOVETT

JANE BILUS GOULD

222 BLOOMINGDALE ROAD

WHITE PLAINS, N.Y. 10605

———

914-428-8401

FAX 914-428-8916

KIM PATRICIA BERG+

DRITA NICAJ+

+also admitted in New Jersey

February 12, 2007

**VIA FAX & REGULAR MAIL**

Patrick J. Carroll, Commissioner
New Rochelle Police Department
475 North Avenue
New Rochelle, New York 10805

Re: <u>Araz Alali</u>

Dear Commissioner Carroll:

I represent the above-referenced Police Officer on whose behalf we have filed a Charge of Discrimination pursuant to Title VII with the United States Equal Employment Opportunity Commission. In that connection you should be aware that any retaliation causally the result of that filing is independently actionable in Federal Court for damages.

Under the circumstances I strongly suggest that you insure that no such retaliation occurs.

Sincerely,

Jonathan Lovett

JL:clp

P. 1

```
x  x  x  COMMUNICATION RESULT REPORT ( FEB. 12. 2007  4:31PM )  x  x  x
```

TTI   LOVETT & GOULD

TRANSMITTED/STORED: FEB. 12. 2007  4:31PM

| FILE | MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|------|------|--------|-----------------|--------|------|
| 250 | MEMORY TX | | 6327106 | OK | 1/1 |

```
REASON FOR ERROR
    E-1) HANG UP OR LINE FAIL          E-2) BUSY
    E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION
```

# LOVETT & GOULD, LLP
## ATTORNEYS AT LAW

JONATHAN LOVETT

JANE BILUS GOULD

222 BLOOMINGDALE ROAD

WHITE PLAINS, N.Y. 10605

KIM PATRICIA BERG+

DRITA NICAJ+

+also admitted in New Jersey

914-428-8401
FAX 914-428-8916

February 12, 2007

**VIA FAX & REGULAR MAIL**

Patrick J. Carroll, Commissioner
New Rochelle Police Department
475 North Avenue
New Rochelle, New York 10805

Re: <u>Araz Alali</u>

Dear Commissioner Carroll:

**EXHIBIT 15**

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

**TO:** Detective Lieutenant Fortunado, Internal Affairs
**FROM:** Police Officer Alali
**DATE:** 04/20/07
**SUBJECT:** No back-up provided on an arrest

The purpose of this communication is to advise you that on 04/20/07 I was attempting to affect a lawful arrest on the defendant, Loja, Walter, J dob 01/25/70, incident # 14129. Communications advised this officer that the aforementioned defendant did have 6 revocations on his NYS non-drivers identification. This officer waited approximately 10 minutes and notified communications that back-up assistance was required to safely affect the arrest on the defendant. Not until then did communications send a back-up unit, which thankfully was dispatched. Sector 4, P.O. Aguilar responded and assisted this officer in apprehending the defendant without incident. As you are well aware of, it is when you are taking an individual into custody when the risk of being injured or killed is elevated. This was indicated in my incident report #14129, which has been filed and attached. When this was turned over to Sgt. Brady who was on the desk, he stated in sum and substance "I know what happened was wrong, the dispatcher was reprimanded for that, however I am refusing to sign this and am ordering you to omit this from your report." I followed his order but again feel that this is a concealment of the truth, and decisively contend that this harassment is based on my heritage. I pray that this will never happen again so I can safely go home and see my family at the end of the day.

Sincerely,

P.O. Alali #1000

**EXHIBIT 16**

.

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

TO:           **Commissioner Carroll**
FROM:         **Police Officer Alali**
DATE:         05/30/07
SUBJECT:      Recurring bigotry solely based on heritage

On 05/30/07 roll call was conducted by Sgt. Morrell, Sgt. Austin, and Sgt. Wilson in the break room at H.Q. due to the fact that a Glock armory class was being held in the muster room. With no surprise I was excluded from such a training class. Furthermore to date, I have NEVER received any training, or promotion during the six years I have been here as the top producer in this department. I further have yet to receive a steady sector or assignment although there are probationary, junior and less productive officers with steady sectors. During the roll call Sgt. Morrell publicly humiliated me once again on a self-initiated arrest of a defendant, Mr. Bruno Fabrice, incident number 19880 that occurred on 05/29/07. There was no praise on a job well done including one of the charges, criminal possession of a weapon, however he did humiliated me by stating I did not know the penal law. He stated that the report should be amended to read irrefutably incorrectly, that an inventory search on the defendant revealed the crack pipe. Commissioner, police basics 101 would conclusively tell you that an inventory search is not for a person. I authored the report correctly stating that it was a search incidental to arrest that revealed the crack pipe on the defendant. The very next sentence read an inventory search revealed the weapon. (A copy of the aforementioned report is filed and attached.) Perhaps, Sgt. Morrell should be re-trained in the penal law, instead of being fixated on publicly disgracing me in front of the entire second tour. He then refuses to sign the report, although he knew I had to file criminal charges on the defendant in the morning. So I went up upstairs to the DA's office where Sgt. Morrell followed and he did once again degrade, and smear me in front of ADA's Bendish and Ashraf. Both said ADA's agreed that I was correct and that he was incorrect. He then engages in further bizarre conversation with both said ADA's attempting to give an example in his mind of a lawful search incidental to arrest. Sgt. Morrell states in sum and substance " what if you were looking for a burglar that walked out of the racquet club and he had a bag that would be a good search incidental to arrest." Both ADA's along with myself looked on in absolute astonhiment stating simultaneously the "it would be an unlawful search because the defendant was not under arrest." Sgt. Morrell then stated "oh yeah." We all in concert stated to Sgt. Morrell that you MIGHT have a Terry stop depending on the fact pattern. He then in

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

embarrassment walked away. Both ADA's reviewed my report and did conclude it was a well-written report that clearly spelled out the elements of the criminal acts thereof. Then I went to see Lt. Marshall regarding this since Sgt. Morrell made mention that Lt. Marshall wanted to see me. During my meeting with Lt. Marshall I told him that I am genuinely confused about the close-up examination to this arrest once again, along with all of my arrests. Lt. Marshall stated "I heard you got upset in roll call today." I replied "yes." He then stated, "Just because Sgt. Morrell was wrong in roll call for what he did I shouldn't stoop to his level because you could lose all credibility." At approximately 1400 hours on the same date I had a meeting with Detective Lieutenant Fortunato of the internal affairs division. During this meeting, Edward Hayes, PBA was present. The purpose of this meeting was to breakdown Detective Lieutenant Fortuanto's investigation. During this meeting Lt. Fortunato did state that the facts I presented to him make sense, however the motive behind Sgt. Morrell are unknown. Upon conclusion of this lengthy meeting I saw Sgt. Wilson in the communications room when I told him I was done with the meeting with Lt. Fortuanto. He then stated "your done, go home." I then encountered both Sgt. Wilson and Sgt. Austin once again outside the muster room in the hallway where Sgt. Wilson once again stated "you're done Raz see you later." A moment after Sgt. Morrell stops me and asks me for my memo book which happened to be at the end of the tour. I explained to him that I was cleared to go home by Sgt. Wilson, he stated " go get your memo book now." I explained to him that my memo book was secured in the trunk of my car. He asked "why?" I told him because I have personal property inside the memo book. He stated, "Go and get it." I went to my car and retrieved the memo book. At this point in time I saw my personal papers as well as $300.00 USC inside the sleeve of the memo bookbinder. I handed him the memo book and he signed off on it. He gave me the memo book back. He then asked for the memo book back at which point in time he forcibly removed it from my hands. I followed him back into the building telling him to give me the money and my personal papers back. He refused. I walked directly into Lt. Fortunato's office and told him what happened, explaining to him that I had money and personal papers inside the memo book. Sgt. Morrell was in Lt. Fortunato's office approximately 30 seconds and left. Lt. Fortunato asked me to make a report to him on what just happened. I told Lt. Fortunato that I have a meeting at 4:30 P.M. with my attorney Jon Lovett that I would not be able to file a report right that instant but I would be back to file it. I then found Edward Hayes, and began frantically looking for Sgt. Morrell in attempts to retrieve my personal property that he just had forcibly removed. Both officer Hayes and I located Sgt. Morrell approximately 15 minutes later in the communications room making photocopies of my memo book. The black binder was on the front desk by the door. Sgt. Morrell gave me back a photocopy of my memo book as well as my binder. I left to see Jon Lovett for my 4:30 appointment. While I was in my car I noticed that the $300.00 USC had been removed from the memo bookbinder. At the meeting with went to Jon Lovett I explained

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

to him the extraordinary events that just transpired. I then returned to HQ at approximately 17:30 hours where I told officer Hayes that the $300.00 was missing. Officer Hayes notified Lt. Fortunato via cell phone and explained the facts and circumstances. I spoke to Lt. Fortunato via Ed Hayes's cell phone and told him what had happened. Commissioner, it is glaring clear that my flurry of memos to both you and Lt. Fortunato are being ignored due to the fact that these biased incidents are not ceasing at all. These flagrant violations are not only criminal, moreover a violation of my constitutional rights.

Respectfully submitted,

Cc: Lt. Fortunato, IAD
     PBA Edward Hayes

*P. O.* #1000

P.O. Alali #1000

**EXHIBIT 17**

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**       **Captain Gazzolla**
**FROM:**     **Police Officer Alali**
**DATE:**     **06/21/07**
**SUBJECT:**  **Review of biased performance evaluation based solely on heritage**

I am requesting a review of the biased performance evaluation based solely on heritage authored by Sgt. Brady on 06/21/07 and signed off on by tour commander Lt. De Bara on the same date. I am looking forward in meeting with you once again to explicitly and unmistakably present an honest rebuttal to depict a fair and just evaluation rather than a falsified, immoral and corrupt performance appraisal.

Respectfully submitted,

P.O. _____ #T000

**Police Officer Alali**

Cc:   Commissioner Carroll
      DPC Murphy
      Lt. Fortunato
      PBA Edward Hayes
      Attorney at law, Jonathan Lovett

**EXHIBIT 18**

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**        Lt. Fortunato, Internal Affairs Division
**FROM:**    Police Officer Alali
**DATE:**     06/23/07
**SUBJECT:** Flagrant transgression by Sgt. Morrell once again

On today's date roll call was conducted by Sgt. Morrell and Lt. Schulman in the muster room at headquarters. Prior to roll call commencing Sgt. Morrell ordered me to put on my uniform hat. In a disgraceful taste of supervision after making that order Sgt. Morrell at no time puts on his uniform hat. Neither did the next ranking officer, Lt. Schulman. Leading by example seems to have been deserted by Sgt. Morrell. It seems to be self-evident that Sgt. Morrell cannot help himself and continues to harass, humiliate, and degrade me exclusively on my heritage. I have lost absolute hope that the agency will stop rogue supervisors such as Sgt. Morrell.

Cc: Commissioner Carroll
    Edward Hayes
     Attorney at law, Jonathan Lovett

Respectfully submitted,

P.O. *M #1000*

P.O. Alali

**EXHIBIT 19**

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

TO:          Commissioner Carroll
FROM:        Police Officer Alali
DATE:        07/12/07
SUBJECT:     Unceasing harassment directed by Captain Gazzolla

      On 07/12/07 at approximately 1100 hours Lt. Feery and Sgt. Wilson interviewed me in the tour commanders office in the presence of PBA President Edward Hayes. The interview was regarding a routine incident # 25565 at which point Lt Feery ordered me to answer question against my free will as per an order by Captain Gazzolla. At the conclusion of the interview I was ordered by Lt. Feery to furnish a written statement regarding incident # 25565 which I did. Commissioner you and I have discussed the very real and serious issue of harassment solely based on my heritage. This is again another one of many incidents that Captain Gazzolla along with his supervisors have singled me out based on my heritage.

P.O. /M #1000

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

TO:        Lieutenant Feery
FROM:     Police Officer Alali
DATE:      07/12/07
SUBJECT:  Ordered statement by Lt. Feery on incident# 25565

On 07/12/07 at approximately 1100 hours, Lt. Feery and Sgt. Wilson in the

presence of PBA President Edward Hayes interviewed me in the tour

commander's office.  The interview was regarding incident #25565 at which time I

was ordered by Lt. Feery to answer questions regarding said incident.  Lt. Feery

advised me that he was conducting an investigation of incident # 25565 as per the

order of Captain Gazzolla.  At the conclusion of the interview Lt. Feery ordered

me to furnish a written statement regarding incident # 25565.

On 07/04/07 at approximately 0925 hours I was dispatched to a verbal

dispute on 106 Winthrop Avenue.  I responded with P.O. Lynch.  Upon my arrival,

complainant stated that her mother's boyfriend would not allow her to get personal

items from the house due to the fact she tried to come home at 0400 hours.  Mr.

Cummings, the homeowner, relayed the same.  Complainant was able to retrieve

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**
her personal items without incident.  Condition was corrected and we resumed

patrol.

Respectfully,
P.O. ~~~~ #1000
P.O. Alali

Cc:
Sgt. Wilson
PBA President Edward Hayes
Attorney at law, Jonathan Lovett

**EXHIBIT 20**

.

08/31/07

To Commissioner Carroll,
   This is the identical letter that was submitted to you on 08/31/07 at 1000 hours in your office with Police Officer Edward Martinez as a witness. You subsequently requested to see me with P.O. E. Martinez present and rejected the letter and told me that I was suspended and to go see Lt. Fortunato. Lt. Fortunato then took my duty gun, off-duty gun, shield and identification card and escorted me out of the building.

Respectfully,
P.O.
P.O. ARAZ ALALI

Sworn to me this 31st day of August 2007

Elizabeth Rivera
Notary Public
Bronx County of NY
Reg: 01RI6105381
My Commission Expires 2 / 9 / 08

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**      **Detective Lieutenant Fortunato, Internal Affairs**
**FROM:**    **Police Officer Alali**
**DATE:**    **08/22/07**
**SUBJECT:** **Everlasting persecution based exclusively on my heritage**

The purpose of this communication is to disclose the undisguised, arrogant bigotry unleashed by the management and supervisors of this police department. Despite being served with a complaint which has been filed in federal court, the defendants in this action have continued to commit conspicuous acts of prejudice that are being delivered to me on a continual basis. I have notified you, along with the Police Commissioner, Deputy Police Commissioner, Captain Gazzolla and other supervisory staff directly in control of myself concerning the cavalier dealings and punitive assignments. It is painfully clear that the aforementioned staff along with yourself are refusing to take any steps to prevent, or are currently stopping these hateful retaliatory acts of bigotry.

On 08/12/07, I arrested defendant Darryl Rose, (DOB 07/08/83) on Webster Avenue and the Hutchinson River Parkway for unlicensed operation and criminal possession of a weapon. The desk officer and booking officer was Sgt. Morrell. I briefed Sgt. Morrell regarding the facts and circumstances of this incident. Sgt. Morrell tells me "that was a bad arrest, we never arrest anybody for unlicensed operation." He further states, "That knife was found illegally." I told Sgt. Morrell that officers from this department have arrested defendants for unlicensed operation and he is well aware of that. Lastly, I explained to Sgt. Morrell that the knife was seized pursuant to an inventory search, a procedure that is done for the defendant's safekeeping of property. He then states " its still a bad arrest, whatever, I guess I will book him anyway." Lieutenant, if in fact this was an unlawful arrest and seizure, why would Sgt. Morrell knowingly continue to book this defendant? I asked the defendant if he had any prior convictions in the State of New York. The defendant replied, "yes for menacing". This crucial statement

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

was done in front of Sgt. Morrell. Moments later Sgt. Conca comes into the booking desk with P.O. Meyers with a new arrest. This arrest was for unlicensed operation a direct contradiction to what Sgt. Morrell stated a few seconds earlier. This is all in the presence of Sgt. Morrell who subsequently books P.O. Meyers's defendant for unlicensed operation. As he is doing the booking he is showing newly appointed probationary Sergeant Conca how to book a defendant. I told Sgt. Morrell that if the defendant's statement were in fact accurate, then the proper charge would be a felony weapons charge rather than a misdemeanor charge. I suggested to Sgt. Morrell that we should fingerprint the defendant and wait for the results to come back so a determination on the appropriate charge could be made. Sgt. Morrell disregarded what I had told him quickly released the defendant. On 08/13/07, I filed charges with the DA's office and learned that the defendant's statement to both Sgt. Morrell and I was one hundred percent accurate and that the defendant was convicted of the charge of menacing in the State of New York. The DA's office upgraded this to a felony complaint. A copy of this complaint is attached.

On 08/14/07, roll call was conducted by Sgt. Morrell at which point he modified the roll call and took PPO, (and junior officer) Aguilar off the county jail escort and put me on the prisoner escort instead. PPO's (and junior officers) Guglielmo, Glass, Vaccaro and Aguilar were all available, however Sgt. Morrell spitefully put me on the jail escort. This vicious action caused me to feel ill, weak, with immense stress and anxiety that I could not complete my tour of duty. I was subsequently forced to go home sick. At home, I suffered a severe migraine and vomited several times. A copy of this roll call is attached.

On 08/17/07, my first day back, Sgt. Austin conducts roll call and again assigns me to the jail escort despite the fact that PPO's (and junior officer) Meyers and Kiernan were working. Furthermore junior officer Machado was covering sector three. These biased, vindictive, and deliberate actions once again led me to be disordered and nauseated to the point that it necessitated me to go home sick. A copy of this roll call is attached.

On 08/18/07, at 1125 hours I conducted a car stop opposite 99 Lincoln Avenue on NY registration DYX1762 for improper plates and the driver not wearing a seat belt. The operator of said vehicle identified himself to me as Ronald Allen Bartee

# CITY OF NEW ROCHELLE
# NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

(DOB 08/30/56). I notified communications regarding the car stop. Instantaneously, Sgt. Morrell calls out on my location via radio. This is a practice that Sgt. Morrell commonly selects for only me. He then states, "tell the dispatcher that the listing is no longer needed." I asked why? Sgt. Morrell replied, "I know he is suspended and I know him very well, he's a good guy, just let him go." The dispatcher, CSO Reese, calls out the status of Mr. Bartee's license as being suspended a total of fourteen times. I requested Safeway Towing for the impound. P.O. Pisano was on the scene assisting and waited for the tow. I transported Mr. Bartee to headquarters for booking and processing. At headquarters, Sgt. Morrell calls in the desk officer, which is newly appointed probationary Sergeant Conca into the tour commander's office. Sgt. Morrell had approximately a ten-minute conversation with Sgt. Conca. Sgt. Conca then books Mr. Bartee and releases him without securing bail or any identification. This is bizarre because Mr. Bartee had three hundred seventy-five dollars on his person and not one dollar was taken for bail, a practice that is routinely prescribed. Sgt. Morrell then called me on the phone at headquarters, which is a recorded line, and tells me that the registered owner picked up the vehicle. There was a period of time, approximately one half hour that the vehicle was left on the street unattended by the authority of Sgt. Morrell. P.O. Pisano who was sent on a call by Sgt. Morrell despite the fact he was safeguarding the vehicle. P.O. Pisano conveyed this to me at headquarters. I do not believe the registered owner picked up the vehicle due to the fact the keys of the vehicle were brought back to headquarters by Detective O'Rourke and placed back into Mr. Bartee's property, which was on the booking desk in a brown manila envelope. This can undeniably be proven by the booking video. The question is raised if Sgt. Morrell is so brazen and dauntless to commit these acts of misconduct right in front of me, then what else is he doing behind the scenes when no one is watching? It is lucidly obvious that Sgt. Morrell is abusing his authority and nobody is doing anything about it. A copy of the booking and the signed prisoners property sheet is attached validating that Mr. Bartee had three hundred seventy-five dollars and no money was taken for bail. It further proves no identification was present.

On 08/22/07 at approximately 1630 hours, junior officers, Dario Navarette, and Brianne Smith were handed promotions into the PACT Unit by Captain Gazzolla

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**

in his office. Even though, I am senior to both aforementioned officers, I have expressly shown in writing, a genuine interest to be in the PACT Unit, and have superior productivity, training (Federal and NYPD), and exposure, I was once again skipped for a position that I recognizably deserved and was qualified for. This decision has exhibited the malevolence, hatred, and vindictiveness of this police department. The writing is on the wall, as long as this administration is governing, I will never be promoted or given an honorable, unbiased, uncolored just chance.

It is distressing, exhausting, and grueling to come to work with splitting headaches and sharp abdominal pains knowing that I am going to be singled out merely because I filed a federal lawsuit and am of middle-eastern heritage. The fact that I am continually and consistently the chief producer on my tour in all aspects, including but not limited to, arrests and summons and am being subjugated instead of rewarded, is disenchanting to say the least. Although, I am one of the foremost producers in this police department, I continue to be punished and suffer. It is well established by the statements of my supervisors (and the fact that there are junior officer to me that are working) that being sent to the jail is retaliatory and castigating. Whenever I am working, there are junior officers working that could have been sent to the jail however are not. This is calculating and deliberate. I am not attempting to pick my assignment. I am solely trying to be taken off punishment for no legitimate reason. Officer's with far less productivity than myself have been promoted and placed into specialized units. Officer's that are junior to myself, and with far less productivity also have been promoted, as discovered on today's date with the promotion's of P.O. B. Smith and P.O. D. Navarette. I have not received any specialized or meaningful training. I have not even been radar certified which translates that I cannot give even a speeding ticket, a condition that is heartfelt by our citizens in this city. The more I complain about the situation the more the punishment persists. This is an imperialistic department that being promoted or given training is not done on merit, however handed out on building decks (at the Harbor Hub and at supervisors homes) or being related to a supervisor. If merit were remotely a factor, then I would have been promoted a long time ago. The fact that I am middle-eastern and have filed a federal lawsuit clearly holds me back. In addition,

# CITY OF NEW ROCHELLE
## NEW YORK

**INTERDEPARTMENTAL COMMUNICATION**
is has my supervisors unfailingly hunting and harassing me to the point that my
overall well-being has been destroyed. Simple routine habits such as, eating and
sleeping have been fragmented. My personal relationships have been crippled as
well. What is nearly as hopeless as being of middle-eastern
decent, is the fact that the supervision are working jointly in violating my civil
rights, rights which are suppose to be guaranteed by the federal government. I
have suffered public humiliation, public embarrassment, shame, emotional upset,
anxiety, and have been rendered sick. There are numerous other unresolved,
unsettled complaints that I have lodged against my supervisors. However, to date,
I have not been apprised of the outcome of any one of them. I have suggested to
you in the company of PBA President Edward Hayes, as per the SOA contract (in
sum and substance, for the betterment of the police department) to move Sgt.
Morrell to another tour. This suggestion was obviously pushed aside. This
decisively demonstrates the intensions of this agency now, and where it wants to
go in the future. This agency along with you has failed to discourage
discrimination. This workplace is not safe for me and free of discrimination. As
an internal affairs detective you have been charged to combat corruption,
misconduct as well as fighting to keep the playing field level and end
discrimination in the workplace. The fact that it takes you an unreasonable
amount of time to investigate these cases, leads to further discrimination that does
go unchecked, unpunished. At every step I have been ignored. This has broken
the trust with you and this agency. Where is the oversight/accountability?
Lieutenant, we have all taken an oath to uphold the Constitution of the United
States and to preserve the dignity and to respect the rights of all individuals. This
professional oath apparently, was only mere words spoken by these individuals
and thus they have tarnished the honor in their service as police officers. I
recognize that some of the management and supervisors are not only your co-
workers, but they are your friends too. Nevertheless, knowing that a systemic
pattern of corruption and misconduct exists, and failing to justly and impartially
act make you equally and identically as responsible as the perpetrators that are
carrying out these hateful deeds themselves. I am confident that this vital
complaint along with subsequent complaints will directly result in retaliatory,
corrosive, implacable hatred, and far-reaching punitive acts against myself.

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

Additionally, it is transparent and overt that I will not be taken seriously. I am extraordinarily fearful of my future within this police department, and what this police department is capable to conjure up falsehoods and without conscious. This in conjunction with other real complaints illustrates a cloudless and bona fide corruption problem within this police department and nothing is being done about it. It is your obligation, moreover your duty, as the internal affairs officer to investigate this complaint along with my other complaints, without prejudice, without biased. I will remain steadfast to expose the truth and to clear away and dispel any fabrications charged against me.

Respectfully,

Police Officer Alali

Cc:
Police Commissioner, Carroll
Deputy Police Commissioner, Murphy
Captain, Gazzolla
PBA President, Edward Hayes
Attorney at law, Jonathan Lovett

EXHIBIT 21

*Office of the Police Commissioner*
*475 North Avenue*
*New Rochelle, NY 10801*

(914) 654-2228



*Patrick J. Carroll*
*Commissioner*

# City of New Rochelle
# New York

August 31, 2007

Police Officer Araz Alali
703 Pelham Road
New Rochelle, New York  10805

Dear Officer Alali:

Effective August 31, 2007 1000hrs you are hereby suspended without pay from your duties as a Police Officer in the New Rochelle Police Department

You are to contact either Lieutenant James Fortunato or Captain Robert Gazzola by 1000 hrs. on each business day.

Sincerely,

Patrick J. Carroll
Police Commissioner

PJC:nc
CC:    Captain Robert Gazzola
         Lt. James Fortunato

**EXHIBIT 22**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
EDWIN VERAS,

                Plaintiff,                      Index No.:
                                                07 CV 11172(CLB)

      -against-

CITY OF NEW ROCHELLE, CITY OF NEW ROCHELLE      ANSWER
POLICE DEPARTMENT, ARAZ ALALI, and JOHN
and JANE DOE 1 through 10, individually and in their
capacities, (the names John and Jane Doe being fictitious,
as the true names are presently unknown),

                Defendants.
-------------------------------------------------------------x

        Defendant City of New Rochelle (the "City") (s/h/a City of New Rochelle and

City of New Rochelle Police Department), by its attorneys, Wilson, Elser, Moskowitz,

Edelman & Dicker LLP, answering the complaint, respond as follows:

        1.      Denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in ¶ 1 of the complaint.

        2.      Denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in ¶ 2 of the complaint.

        3.      Denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in ¶ 3, and respectfully refers all questions of law to the

Court.

        4.      Denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in ¶ 4, and respectfully refers all questions of law to the

Court.

5.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 5 of the complaint.

6.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 6 of the complaint.

7.    Admits the truth of the allegations contained in ¶ 7 of the complaint.

8.    Denies the truth of the allegations contained in ¶ 8 of the complaint, except admits that the New Rochelle Police Department is a department of the City.

9.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 9 of the complaint.

10.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶10 of the complaint.

11.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 11 of the complaint.

12.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in  ¶ 12 of the complaint.

13.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 13 of the complaint.

14.    Denies the truth of the allegations contained in ¶ 14 of the complaint.

15.    Denies the truth of the allegations contained in ¶ 15 of the complaint.

16.    Denies the truth of the allegations contained in ¶ 16 of the complaint.

17.    The City repeats each and every response above as if fully set forth herein.

18.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 18 of the complaint.

1864975.1

19.   Denies the truth of the allegations contained in ¶ 19 of the complaint.

20.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 20 of the complaint.

21.   Denies the truth of the allegations contained in ¶ 21 of the complaint.

22.   Denies the truth of the allegations contained in ¶ 22 of the complaint.

23.   The City repeats each and every response above as if fully set forth herein.

24.   Denies the truth of the allegations contained in ¶ 24 of the complaint.

25.   Denies the truth of the allegations contained in ¶ 25 of the complaint.

26.   The City repeats each and every response above as if fully set forth herein.

27.   Denies the truth of the allegations contained in ¶ 27 of the complaint.

28.   Denies the truth of the allegations contained in ¶ 28 of the complaint.

29.   Denies the truth of the allegations contained in ¶ 29 of the complaint.

30.   The City repeats each and every response above as if fully set forth herein.

31.   Denies the truth of the allegations contained in ¶ 31 of the complaint.

32.   Denies the truth of the allegations contained in ¶ 32 of the complaint.

33.   The City repeats each and every response above as if fully set forth herein.

34.   Denies the truth of the allegations contained in ¶ 34 of the complaint.

35.   Denies the truth of the allegations contained in ¶ 35 of the complaint.

36.   The City repeats each and every response above as if fully set forth herein.

37.   Denies the truth of the allegations contained in ¶ 37 of the complaint.

38.   Denies the truth of the allegations contained in ¶ 38 of the complaint.

39.   The City repeats each and every response above as if fully set forth herein.

40.   Denies the truth of the allegations contained in ¶ 40 of the complaint.

3

41.     The City repeats each and every response above as if fully set forth herein.

42.     Denies the truth of the allegations contained in ¶ 42 of the complaint.

43.     Denies the truth of the allegations contained in ¶ 43 of the complaint.

44.     The City repeats each and every response above as if fully set forth herein.

45.     Denies the truth of the allegations contained in ¶ 45 of the complaint.

46.     Denies the truth of the allegations contained in ¶ 46 of the complaint.

47.     Denies the truth of the allegations contained in ¶ 47 of the complaint.

48.     Denies the truth of the allegations contained in ¶ 48 of the complaint.

49.     Denies the truth of the allegations contained in ¶ 49 of the complaint.

50.     Denies the truth of the allegations contained in ¶ 50 of the complaint.

51.     Denies the truth of the allegations contained in ¶ 51 of the complaint.

52.     Denies the truth of the allegations contained in ¶ 52 of the complaint.

53.     Denies the truth of the allegations contained in ¶ 53 of the complaint.

54.     The City repeats each and every response above as if fully set forth herein.

55.     Denies the truth of the allegations contained in ¶ 55 of the complaint,
except admits that the City received a document purporting to be a notice of claim and
respectfully refers the Court to the document itself for its contents.

56.     Denies the truth of the allegations contained in ¶ 56 of the complaint,
except admits that the City has made no payment to plaintiff in reference to the claims
included in his complaint.

57.     Denies the truth of the allegations contained in ¶ 57 of the complaint.

58.     Denies the truth of the allegations contained in ¶ 58 of the complaint.

4

59.    Denies the truth of the allegations contained in ¶ 59 of the complaint, and respectfully refers all questions of law to the Court.

60.    The City repeats each and every response above as if fully set forth herein.

61.    Denies the truth of the allegations contained in ¶ 61 of the complaint.

62.    Denies the truth of the allegations contained in ¶ 62 of the complaint.

63.    The City repeats each and every response above as if fully set forth herein.

64.    Denies the truth of the allegations contained in ¶ 64 of the complaint.

65.    Denies the truth of the allegations contained in ¶ 65 of the complaint.

66.    The City repeats each and every response above as if fully set forth herein.

67.    Denies the truth of the allegations contained in ¶ 67 of the complaint.

68.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 68 of the complaint.

69.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶ 69 of the complaint.

70.    Denies the truth of the allegations contained in ¶ 70 of the complaint.

71.    Denies the truth of the allegations contained in ¶ 71 of the complaint.

72.    The City repeats each and every response above as if fully set forth herein.

73.    Denies the truth of the allegations contained in ¶ 73 of the complaint.

74.    Denies the truth of the allegations contained in ¶ 74 of the complaint.

75.    The City repeats each and every response above as if fully set forth herein.

76.    Denies the truth of the allegations contained in ¶ 76 of the complaint.

77.    Denies the truth of the allegations contained in ¶ 77 of the complaint.

78.    The City repeats each and every response above as if fully set forth herein.

1864975.1

79.    Denies the truth of the allegations contained in ¶ 79 of the complaint.

80.    Denies the truth of the allegations contained in ¶ 80 of the complaint.

81.    The City repeats each and every response above as if fully set forth herein.

82.    Denies the truth of the allegations contained in ¶ 82 of the complaint.

83.    Denies the truth of the allegations contained in ¶ 83 of the complaint.

84.    The City repeats each and every response above as if fully set forth herein.

85.    Denies the truth of the allegations contained in ¶ 85 of the complaint.

86.    The City repeats each and every response above as if fully set forth herein.

87.    Denies the truth of the allegations contained in ¶ 87 of the complaint.

88.    The City repeats each and every response above as if fully set forth herein.

89.    Denies the truth of the allegations contained in ¶ 89 of the complaint, and respectfully refers all questions of law to the Court.

90.    Denies the truth of the allegations contained in ¶ 90 of the complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

91.    Plaintiff's claims are time-barred.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

92.    Plaintiff failed to serve a timely notice of claim as to each claim asserted in his complaint.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

93.    If, as plaintiff alleges, his rights were violated, such violations did not occur as the result of any custom or policy of the City.

1864975.1

<u>AS AND FOR A FOURTH AFFIRMATIVE DEFENSE</u>

94.     There was probable cause to arrest and prosecute the plaintiff.

<u>AS AND FOR A FIFTH AFFIRMATIVE DEFENSE</u>

95.     The criminal prosecution against plaintiff was not resolved in his favor on the merits of the charges.

<u>AS AND FOR A SIXTH AFFIRMATIVE DEFENSE</u>

96.     Plaintiff fails to state a claim for which this Court may grant relief.

WHEREFORE, the City of New Rochelle requests judgment:

1) dismissing the complaint.

2) awarding the costs, disbursements and attorneys fees incurred in the defense of this matter.

Dated: White Plains, New York
        January 23, 2008

                        WILSON, ELSER, MOSKOWITZ,
                        EDELMAN & DICKER LLP
                        Attorneys for the City of New Rochelle

                By: _____
                        Peter A. Meisels (PM-5018)

                        3 Gannett Drive
                        White Plains, NY 10604
                        (914) 323-7000
                        File No. 07367.00071

**EXHIBIT 23**



# CITY COUNCIL AGENDA
# CITY HALL, 515 NORTH AVENUE
## CITY OF NEW ROCHELLE
## COMMITTEE OF THE WHOLE SESSION
## *WEDNESDAY*, FEBRUARY 6, 2008
### 3:45 P. M.

**3:45 P. M. – 4:30 P. M.**     Graham Trelstad, representing AKRF
Re:  North Avenue Planning Study

**8:00 P. M. –**

**PUBLIC HEARING(S):**

PROPOSED CABLEVISION FRANCHISE AGREEMENT

**CITIZENS TO BE HEARD**

Committee of the Whole Session, Wednesday, February 6, 2008                    4

**DEPARTMENT OF FINANCE:**

BOND RESOLUTIONS – 2008 CAPITAL IMPROVEMENT PROGRAM

4.     Communication dated January 18, 2008 from Howard Rattner, Commissioner of Finance, relative to the funding of large Capital items through the issuance of bonds or Capital leases and wherein he recommends that City Council adopt bond resolutions for the 2008 Capital Improvement Program, forwarded with approval of Charles B. Strome, III, City Manager, noted thereon, and appropriate legislation for consideration.

4.1. Bond resolution dated  February 12, 2008 authorizing the issuance of bonds of the City of New Rochelle, New York, in the principal amount of $625,000 to finance the acquisition of a fire rescue truck.

4.2. Bond resolution dated February 12, 2008 authorizing the issuance of bonds of the City of New Rochelle, New York, in the principal amount of $350,000, or an installment purchase obligation, to finance the acquisition of new Police radios and related communications equipment.

4.3. Bond resolution dated February 12, 2008 authorizing the issuance of bonds of the City of New Rochelle, New York, in the principal amount of $480,000, or an installment purchase obligation, to finance the acquisition of a fire fighting vehicle.

4.4. Bond resolution dated February 12, 2008 authorizing the issuance of bonds of the City of New Rochelle, New York, in the principal amount of $500,000 to finance a program for the rehabilitation and replacement of ornamental shade trees, including the acquisition, grooming, planting, preservation, removal, disposal or replacement of trees.

**EXHIBIT 24**

# City of New Rochelle
# New York

**Interdepartmental Communication**

**To:**       **Police Officer Araz Alali**
**From:**     **Captain Robert Gazzola, Commanding Officer PSD**
**Subject:**  **Below Standard Evaluations -2006**
**Date:**     **March 22, 2007**

Your below standard rating on your 2006 Evaluation precludes you from the following as per Department Rules & Regulations, Chapter Two Section 2.47:

*Members of the Department who have an abusive sick leave record, a pattern of disciplinary problems or substandard work performance may be barred from the following:*

   *a) Additional compensation assignments, including but not limited to, special detail employment and overtime*
   *b) Tour switches with oneself or other employees*
   *c)  Consideration for a specialized unit / assignment*

A re-evaluation of your work performance will be conducted in June 2007.  If at that time you are no longer rated as below standards the above restrictions will be removed.

.

**EXHIBIT 25**

Page 222

**Wolf**

[1]
[2] full-duty status?
[3]   A: Light-duty status.
[4]   Q: So sometime early November?
[5]   A: Correct. Exact date, I don't
[6] know.
[7]   Q: When you went back on light duty
[8] status, what duties can you perform in that
[9] status?
[10]   A: I guess it's the discretion of the
[11] department, I was assigned to the radio room.
[12]   Q: When you say you were assigned to
[13] the radio room, does this mean you were a
[14] dispatcher, or was it equipment?
[15]   A: You are dispatching, answering
[16] phones.
[17]   Q: How long did you remain in that
[18] light-duty status?
[19]   A: I believe it was until the second
[20] week of January 2008.
[21]   Q: At that time did you return to
[22] full duty?
[23]   A: Yes, in January it was full duty.
[24]   Q: Just so we are clear, so you did
[25] not have to report to work until November?

Page 223

**Wolf**

[1]
[2]   A: Correct.
[3]   Q: Now, from November to early
[4] January, you indicated that you were assigned to
[5] the radio room.
[6]   With what frequency did you serve
[7] as the dispatcher?
[8]   A: The majority of the time.
[9]   Q: Prior to the time of this injury,
[10] had you ever served as a radio dispatcher for
[11] the department?
[12]   A: On occasion.
[13]   Q: You have been with the department,
[14] I think you said, about six and a half years?
[15]   A: Yeah, six and a half, closing in
[16] on seven.
[17]   Q: How often would you be — I
[18] understand it's a rough estimate.
[19]   A: There were other injury times I
[20] was in there and after that periodically, I
[21] guess, if they were short. I couldn't tell you
[22] how many times.
[23]   Q: Would you say that you are
[24] thoroughly familiar with the radio dispatching
[25] procedures and the operation of the radio room?

Page 224

**Wolf**

[1]
[2]   A: Yes.
[3]   Q: And you know that both because of
[4] your experience as a dispatcher and as a patrol
[5] officer; is that correct?
[6]   A: Correct.
[7]   Q: Would it be fair to say that when
[8] you were not in — when you were on less than
[9] full-duty status, you served in a patrol
[10] capacity?
[11]   A: Yes.
[12]   Q: In that capacity you were
[13] responsible for answering radio runs for
[14] service?
[15]   A: Correct.
[16]   Q: Would it be fair to say that over
[17] the years, there have been problems with the
[18] radios in the New Rochelle Police Department?
[19]   A: In what capacity are you asking?
[20]   Q: Well, problems with officers
[21] receiving transmissions or having no
[22] transmissions received?
[23]   A: Yes.
[24]   Q: Would it be fair to say that it's
[25] a chronic — it has been a chronic problem?

Page 225

**Wolf**

[1]
[2]   A: It's periodic. It goes in spurts.
[3]   Q: Are there some areas in the City
[4] of New Rochelle that services can be spotty?
[5]   A: I'm sure there are.
[6]   Q: Are there some sectors that you
[7] know from your experience you had more problems
[8] than others?
[9]   A: The further north you go.
[10]   Q: And what sectors are in the north?
[11]   A: Well, they consider north-end
[12] sectors as sector 7, sector 8, and sector 9.
[13]   Q: And have there been occasions when
[14] central has sought to raise you and they
[15] couldn't get you because you were unable to
[16] receive the transmissions?
[17]   A: It has happened, yes.
[18]   Q: Would it be fair to say that you
[19] know from talking to other officers and your
[20] experience with other officers that this has
[21] also happened to them?
[22]   A: Yes.
[23]   Q: Have there been occasions when you
[24] sought to make radio transmissions to central
[25] and central was unable to receive them?

**EXHIBIT 26**

Page 279

*Hayes*

[1]
[2] Officer and counsel confer off the
[3] record.)
[4] **THE HEARING OFFICER:** Please
[5] continue.
[6]    Mr. Lovett.
[7] **MR. MILLMAN:** Before we
[8] continue, I want to note both my
[9] objection to the characterization of
[10] the commissioner and I want to note
[11] for the record my continued objection
[12] to testimony concerning any discussion
[13] regarding possible resolution of these
[14] charges, in view of the fact that you
[15] have to make a recommendation for
[16] penalty, which makes it particularly
[17] inappropriate, it seems to me, for you
[18] to hear evidence with regard to any
[19] discussion concerning possible
[20] resolution of the charges.
[21] **THE HEARING OFFICER:** I note
[22] your objection, Mr. Millman.
[23] **MR. LOVETT:** Read back the
[24] question and to the extent he gave an
[25] answer.

Page 280

*Hayes*

[1]
[2]    (The record was read as
[3] follows:
[4]    "Question: Would you tell the
[5] Hearing Officer what the commissioner
[6] said?
[7]    "Answer: I had several
[8] conversations with the Police
[9] Commissioner on the issue, and Police
[10] Commissioner Carroll had advised me
[11] that if officer Alali had
[12] withdrawn" —)
[13]                **BY MR. LOVETT:**
[14] **Q:** Go ahead.
[15] **A:** He advised me that if he had
[16] withdrawn the federal lawsuits, that he could
[17] start with a clean slate, that all the charges of,
[18] that were incurred or that were brought in the
[19] disciplinaries would be gone, that we would start
[20] with a clean slate.
[21] **Q:** Did you have any other discussion
[22] with anybody else in the department of a ranking
[23] officer that is, regarding the same subject?
[24] **A:** Yes.
[25] **Q:** Who?

Page 281

*Hayes*

[1]
[2] **A:** Lieutenant Fortunato.
[3] **Q:** Whose position is what?
[4] **A:** Internal Affairs Division officer, I
[5] guess, Commander.
[6] **Q:** And he directly reports to whom?
[7] **A:** The Police Commissioner.
[8] **Q:** Who was present when you had this
[9] second conversation?
[10] **A:** Officer Araz Alali and myself.
[11] **Q:** And Fortunato?
[12] **A:** And Lieutenant Fortunato.
[13] **Q:** What was the substance of the
[14] conversation?
[15] **A:** We were in Lieutenant Fortunato's
[16] office.
[17]    Lieutenant Fortunato had advised me
[18] that he thought that the situation could be
[19] resolved, it could be resolved by both parties
[20] coming together and that officer Alali could drop
[21] his federal lawsuits and the department could drop
[22] their charges and Officer Alali would start with a
[23] clean slate.
[24]    I advised Lieutenant Fortunato at
[25] that point that, well two things, one that Officer

Page 282

*Hayes*

[1]
[2] Alali was advised by counsel and that they would
[3] have to go to him and that I thought the situation
[4] appeared, that it was two parties basically
[5] pointing — this is actually what I told
[6] Lieutenant Fortunato, there was two parties
[7] pointing guns at each other, who was going to put
[8] their gun down first.
[9]    And I didn't feel too comfortable at
[10] that point.
[11] **Q:** Thank you.
[12] **MR. LOVETT:** Nothing further.
[13] **MR. MILLMAN:** One second.
[14]    (Discussion off the record.)
[15]           **CROSS-EXAMINATION**
[16]              **BY MR. MILLMAN:**
[17] **Q:** Officer Hayes, were you present at a
[18] meeting with officer Alali in which he was shown
[19] the video which is City 5 in evidence?
[20] **A:** I believe —
[21] **MR. LOVETT:** Objection.
[22] Improper cross.
[23] I didn't ask him anything
[24] about that under oath.
[25] **THE HEARING OFFICER:** And yet

**EXHIBIT 27**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X

ARAZ ALALI,

                          Plaintiff,

          -against-

ROBERT GAZZOLA, INDIVIDUALLY,
PATRICK J. CARROLL,
INDIVIDUALLY, AND THE CITY OF
NEW ROCHELLE, NEW YORK,

                          Defendants.
-------------------------------------------X

                    Wilson Elser Moskowitz Edelman & Dicker, LLP
                    3 Gannett Drive, 4th Floor
                    White Plains, New York  10604
                    June 25, 2007
                    1:15 PM

          Examination before Trial of PLAINTIFF,

ARAZ ALALI, held pursuant to Notice, at the above

time and place, before Susie Cabanas-Diaz, a Notary

Public of the State of New York.

1                          ARAZ ALALI

2          A R A Z   A L A L I, a Plaintiff, having

3    been first duly sworn by Susie Cabanas-Diaz, a

4    Notary Public of the State of New York, and stating

5    his address as 701 Pelham Road, Unit 514, New

6    Rochelle, New York, 10805, was examined and

7    testified as follows:

8    EXAMINATION BY

9    MR. MEISELS

10         Q    Mr. Alali, my name is Peter Meisels.  I'm

11   going to ask you some questions today about your

12   lawsuit.  If they're not clear, tell me and I'll be

13   happy to rephrase them, okay?

14         A    Okay.

15         Q    I'll show you what's been premarked as

16   Defendants' A for identification, and I'll ask you

17   if you can identify that document.

18         (Defendants' Exhibit A, previously marked for

19                   identification.)

20                   (Witness Perusing)

21         Q    Look it over carefully.

22              Can you identify that document?

23         A    Yes.

24         Q    And what is it?

25         A    It's a complaint.

Page 8

ARAZ ALALI

1
2   person of Middle Eastern descent?

3        A     I believe so.

4        Q     Would a person of Egyptian descent be a
5   person of Middle Eastern descent?

6        A     I don't know.

7        Q     Okay.  Now, referring to the fourth
8   paragraph of the same page, you reference Robert
9   Gazzola, and the last sentence indicates, "By reason
10  of the departmental chain of command, Mr. Gazzola
11  has direct supervisory authority over plaintiff."
12  Is that accurate?

13       A     Yes.

14       Q     Could you explain what the chain of
15  command is between you and Captain Gazzola?

16       A     Sure.  I'm an officer, the next chain
17  would be sergeant.

18       Q     And then?  Between you and Captain
19  Gazzola, what are the layers of authority?

20       A     Sergeant, lieutenant, and then captain.

21       Q     So am I correct that there are two layers
22  of authority between you and Captain Gazzola?

23       A     Yes.

24       Q     If you can turn to Page 3 of your
25  complaint, please.  Referring to paragraph seven,

1                          ARAZ ALALI

2    top of the page, "Commencing almost immediately

3    following plaintiff's February 2002 transfer from

4    the City's police department."

5                    Does that reference your transfer

6    from the New York City Police Department to the New

7    Rochelle Police Department?

8         A    Yes.

9              MR. LOVETT:  It says transfer to, not

10   from.

11        Q    Let me withdraw the question.

12             In February 2002, did you have

13   occasion to transfer from the New York City Police

14   Department to the New Rochelle Police Department?

15        A    Yes, as indicated in the complaint.

16        Q    And what was the reason for the transfer?

17        A    The reason for the transfer was monetarily

18   and convenience.

19        Q    Because you live in Westchester?

20        A    I live in the city of New Rochelle, yes.

21        Q    And the money in New Rochelle was better?

22        A    Yes.

23        Q    And continuing on with paragraph seven, it

24   says, "Commencing almost immediately following the

25   plaintiff's February 2002 transfer to the city's

1                          ARAZ ALALI

2    police department and continuing to date, has been

3    systematically and deliberately subjected to

4    discriminatory and disparate treatment by reason of

5    his national origin, ethnicity and/or color."

6                Would you explain what treatment that

7    you have received since your transfer to the New

8    Rochelle Police Department that you deem to be

9    discriminatory and disparate?

10      A    If you look on to number eight forward, I

11   think that clearly depicts examples.

12      Q    What I would like you to explain in your

13   own words what -- if you want to use this to refresh

14   your recollection, you're certainly welcome to, but

15   I'd like you to explain to me what you believe to be

16   the disparate and discriminatory treatment that you

17   received.

18      A    As I said just before, from paragraphs

19   eight forward, that clearly depicts the clear and

20   accurate specific examples of what I believe, what I

21   know to be discriminatory and disparate treatment.

22      Q    So is it fair to say that all of the

23   instances of discriminatory, disparate treatment

24   that you've been the victim of are explained here in

25   the complaint?

1                          ARAZ ALALI

2        A    Yes.

3        Q    Are there any that you can recall that are

4    not in the complaint?

5        A    I don't presently recall any others at

6    this time.

7        Q    Okay.  Going back to paragraph seven of

8    your complaint, it says, "By reason of his national

9    origin."  By that, do you mean the fact that you're

10    of Iraqi national origin?

11        A    Yes.

12        Q    Now, given that -- you were born in

13    Vienna, is that correct?

14        A    Yes.

15        Q    Austria?

16        A    Yes.

17        Q    Could you explain the circumstances under

18    which you're of Iraqi national origin?

19        A    Both my parents are.

20        Q    Can you identify any person in the City of

21    New Rochelle Police Department who know that your

22    parents are of Iraqi descent?

23        A    Can you rephrase that question.

24        Q    Sure.  Can you identify any persons in the

25    City of New Rochelle Police Department who are aware

1                              ARAZ ALALI

2    of the fact that your parents are of Iraqi origin?

3         A    I would say yes, that there was.  By my

4    name, by my personnel records, yes.

5         Q    Going back to paragraph seven of your

6    complaint, when you refer to ethnicity are you

7    referencing the fact that your parents are of Iraqi

8    descent?

9         A    Yes.

10        Q    And could you explain what you mean when

11   you use the word color?

12        A    Basically dark-skinned.

13        Q    Do you consider yourself to be Caucasian?

14        A    I consider myself to be of Middle Eastern

15   descent.

16        Q    My question is this:  Do you consider

17   yourself to be Caucasian?

18        A    No.

19        Q    On your application for employment with

20   the New Rochelle Police Department, didn't you

21   indicate that you were Caucasian?

22        A    I don't presently remember.

23        Q    As you sit here today, you don't consider

24   yourself to be Caucasian?

25        A    I consider myself to be of Middle Eastern

1                        ARAZ ALALI

2    descent.  No, I do not.

3        Q    Not Caucasian?

4        A    No.

5        Q    Referring to paragraph eight of your

6    complaint where it says, "In that connection,

7    plaintiff has, to defendants' knowledge and/or at

8    their direction and/or with their active

9    encouragement and condonation."

10                Now, that paragraph when you

11   reference defendants, who do you mean?

12       A    Defendants as being Robert Gazzola,

13   Commissioner Carroll.

14       Q    And let's take a look at the first

15   subdivision of paragraph A where it says,

16   "Repeatedly addressed as terrorist, Ali Baba, Camel

17   Jockey and, inter alia, Ali -- repeatedly addressed

18   as terrorist, Ali Baba, Camel Jockey and, inter

19   alia, Ali."

20                Who in the department ever addressed

21   you as being a terrorist?

22       A    That would be Captain Gazzola.

23       Q    He told you you were a terrorist?

24       A    And other supervisors.

25       Q    Let's start with Mr. Gazzola.  When did he

Page 14

1                          ARAZ ALALI

2    refer to you as a terrorist?

3          A    I would have to -- I don't presently

4    recall.  I would have to refresh my memory.

5          Q    Is there anything that you could use that

6    would refresh your memory?

7          A    I'm sure there is.

8          Q    What would that be?

9          A    Talking to counsel.

10         Q    Is there anything else that would refresh

11   your memory other than speaking with counsel?

12         A    Not right now.

13         Q    At any time?

14         A    I believe no.  Not right now or at any

15   time.

16         Q    Do you keep a memo book?

17         A    Yes, I do.

18         Q    Would that memo book indicate when that

19   happened?

20         A    I don't presently recall.

21         Q    Do you keep that memo book for every day

22   that you're on duty?

23         A    Yes.

24         Q    At the time that Captain Gazzola referred

25   to you as a terrorist, was anyone else present?

Page 15

1                          ARAZ ALALI

2        A     I don't presently recall.

3        Q     Where did that occur?

4        A     In the police station.

5        Q     Where in the police station?

6        A     I don't presently recall.

7        Q     And on how many occasions did it occur?

8        A     I don't presently recall.

9        Q     Did you make any note about that

10  occurrence when it happened?

11       A     I don't presently recall.

12       Q     Is there anything about Captain Gazzola's

13  having called you a terrorist that you can recall

14  that I haven't asked you?

15       A     I don't recall.

16       Q     Your complaint talks about being referred

17  to as Ali Baba.  Can you identify the city employees

18  that referred to you as Ali Baba?

19       A     I don't presently recall.

20       Q     Just back up a little bit.  You mentioned

21  in reference to the word terrorist that there were

22  other supervisors that used that term besides

23  Captain Gazzola, is that correct?

24       A     Correct.

25       Q     Can you identify who those persons are?

1                    ARAZ ALALI

2     A    I don't presently recall.

3     Q    Now, in reference to the term Camel

4  Jockey, can you identify the city employees that

5  referred to you as the Camel Jockey?

6     A    Yes.

7     Q    Who were they?

8     A    I don't presently recall.

9     Q    Do you recall when they referred to you as

10  a Camel Jockey?

11     A    I don't presently recall.

12     Q    Do you recall where they referred to you

13  as a Camel Jockey?

14     A    Inside the police station.

15     Q    Do you recall where inside the police

16  station?

17     A    I don't presently recall.

18     Q    Do you recall when any city employee

19  referred to you as Ali Baba?

20     A    Repeat the question, please.

21     Q    Do you recall when any New Rochelle

22  employee referred to you as Ali Baba?

23     A    I don't presently recall.

24     Q    Do you recall where they referred to you

25  as Ali Baba?

```
1                    ARAZ ALALI
2      A    I don't presently recall.
3      Q    Do you recall -- withdrawn.
4                Can you identify any city employee
5  who referred to you as Ali?
6      A    Yes.
7      Q    Can you tell me who that was?
8      A    I don't presently recall.
9      Q    And can you tell me when any city employee
10 referred to you as Ali?
11     A    I don't presently recall.
12     Q    Can you tell us where any city employee
13 referred to you as Ali?
14     A    I don't presently recall.
15     Q    Did you make any notation of that incident
16 when some city employee referred to you as Ali?
17     A    I don't presently recall.
18     Q    Now, aside from the terms that are
19 mentioned in subparagraph A, terrorist, Ali Baba,
20 Camel Jockey and Ali, has any city employee referred
21 to you in any term that you considered to be
22 derogatory?
23     A    Yes.
24     Q    Can you tell us what those terms were?
25     A    Bin Laden.  I don't presently recall any
```

Page 18

1                          ARAZ ALALI

2    others.

3        Q    Can you identify what city employee

4    referred to you as Bin Laden?

5        A    I don't presently recall.

6        Q    Do you recall when any city employee

7    referred to you as Bin Laden?

8        A    I don't presently recall.

9        Q    Do you recall where any city employee

10   referred to you as Bin Laden?

11       A    I don't presently recall.

12       Q    Did you make any notation of the fact that

13   some city employee referred to you as Bin Laden?

14       A    I don't presently recall.

15       Q    Is there anything that could refresh your

16   recollection as to when some city employee referred

17   to you as Bin Laden?

18       A    I'm sure there is.

19       Q    Can you tell us what that could be?

20       A    Talking to counsel.

21       Q    Is there anything else other than talking

22   to counsel that would refresh your recollection?

23       A    I don't presently recall.

24       Q    Moving down to -- withdrawn.

25            What is the basis -- withdrawn.

Page 19

ARAZ ALALI

1

2          Do you believe that Commissioner

3   Carroll was aware of the fact that some city

4   employee referred to you as a terrorist?

5       A    Yes.

6       Q    What is the basis for your belief that he

7   was aware of that?

8       A    Being the police commissioner.

9       Q    Any other reason to believe that he knew

10  that that happened?

11      A    Being the police commissioner.

12      Q    Aside from being the police commissioner,

13  is there any other reason?

14      A    That was it.  Just that.

15      Q    Just the fact that he's the commissioner?

16          You have to say yes or no for the

17  purpose of the record.

18      A    No, not at this time.  I don't believe any

19  other reasons at this time.

20      Q    Do you believe that Commissioner Carroll

21  knew that some city employee referred to you as Ali

22  Baba?

23      A    Yes.

24      Q    What's the basis for your belief that he

25  knew that?

Page 25

ARAZ ALALI

1

2    assignments such as issuing parking tickets on a

3    given street and that street, the -- barring me from

4    doing any police station functions.  Just relegated

5    to issue parking tickets in a confined area.

6              After filing the complaint, the EEOC

7    initially, retaliating by then serving me with false

8    charges and specifications, which is calling for a

9    30 day suspension.  There are countless other things

10   that presently do not come to my memory at this time

11   but I'm sure I'll be able at some point to remember

12   others.

13      Q    As you sit here today, can you tell us any

14   other reasons that you believe that Captain Gazzola

15   was aware of the fact that someone called you a

16   Camel Jockey?

17      A    The reasons I just stated to you.

18      Q    Can you think of any others?

19      A    Not at this time.

20      Q    In reference to the term Ali, do you

21   believe that the commissioner was aware that someone

22   referred to you as the name Ali?

23      A    I do.

24      Q    What is the basis for your belief?

25      A    Yes.  The reason being, the commissioner

1                          ARAZ ALALI

2    being served with this complaint has done absolutely

3    nothing about it.  I have continually been the

4    subject of retaliation.  Being degraded and

5    humiliated.  The commissioner has called me into his

6    office and told me to drop the lawsuit, otherwise it

7    will be a long career for me.  I believe the

8    commissioner committed acts of attempted coercion

9    and official misconduct.

10        Q    Other than what you've just mentioned, do

11   you have any other reason to believe that he was

12   aware of the fact that someone referred to you as

13   Ali?

14        A    Also the numerous departmental

15   communications that I personally addressed to him

16   regarding these bias acts, and he's done nothing

17   about them.

18        Q    In any one of your communications, did you

19   ever tell him you were referred to by the name of

20   Ali?

21        A    I don't presently recall.  I know there

22   was a flurry of communications to him.

23        Q    Other than the things that you just

24   mentioned, do you have any other reason to believe

25   that he was aware of the fact that someone called

Page 27

ARAZ ALALI

1

2  you the name Ali?

3      A    Not at this time, I don't believe so.

4      Q    Do you believe that Captain Gazzola was

5  aware of the fact that you were referred to by the

6  name Ali?

7      A    Yes.  By all the things I have indicated

8  that Captain Gazzola -- earlier on.  Forcing me

9  to -- giving these calculated below-standard

10  evaluations, forcing me to attend these degrading

11  seminars, which I -- denying me of any meaningful

12  specialized training.  And all of the things I have

13  indicated earlier.

14      Q    Other than what you've already mentioned

15  today, is there any other basis for your belief that

16  he was aware of the fact that someone called you the

17  name Ali?

18      A    I don't believe so.

19      Q    When I say he, I'm referring to Captain

20  Gazzola.  Are we on the same wavelength?

21      A    Yes.

22      Q    Do you believe that the commissioner was

23  aware of the fact that someone referred to you by

24  the name Bin Laden?

25      A    Yes.

1                        ARAZ ALALI

2   ever complained to anybody about having been called

3   a terrorist, in writing?

4        A    I don't presently recall.

5        Q    Is this the -- is your complaint the first

6   written complaint that you've made about having been

7   called these names?

8        A    I don't presently recall.

9        Q    Moving on to subparagraph B.  Page 3,

10  paragraph A but sub B, okay.  It says, "Repeatedly

11  been denied any meaningful specialized training,

12  which training is routinely provided by defendants

13  to police officers junior to plaintiff in

14  seniority."  Is that correct?

15       A    Yes.

16       Q    Could you explain what specialized

17  training you have not received that you believe you

18  should have received?

19       A    I haven't received any specialized

20  training.

21       Q    When you use the term meaningful

22  specialized training, is that different from

23  specialized training?

24       A    Yes.

25       Q    Could you explain what the difference is?

Page 31

ARAZ ALALI

1

2      A      Meaningful specialized training would be

3   training that would be beneficial to my function as

4   a patrol officer.

5      Q      Have you received any specialized training

6   since you've been a New Rochelle police officer?

7      A      No.

8      Q      Could you explain what you mean by

9   specialized?

10      A      Training such as anticrime school, data

11   master school, radar school, CIU cross-training.

12   Glock armory school.  I'm sure there is other

13   specialized training that I'm leaving out.

14   Interview and interrogation techniques.  To date I

15   have not received any specialized training, although

16   I have asked for it.

17      Q      Have you ever asked for it in writing?

18      A      Yes.

19      Q      And do you recall when you did that?

20      A      I don't presently recall.

21      Q      And to whom did you direct your requests?

22      A      I don't presently recall.

23      Q      Now, referring back to the language of

24   your complaint, indicates, "which training is

25   routinely provided by defendants to police officers

Page 32

                         ARAZ ALALI

1

2    junior to plaintiff in seniority."

3              Can you identify which officers who

4    are junior to you received the specialized training

5    that you've enumerated?

6         A    Numerous officers.

7         Q    Can you give me their names?

8         A    Officer Judy Brandeis.  Officer Hanson,

9    John Hanson.  These are officers that recently have

10   been given specialized training.  I'm certain there

11   are others that -- if you give me a minute, maybe

12   I'll be able to think of others.

13        Q    Take your time.

14        A    Officer Isabel Arias.  Officer Lillianne

15   Sanchez.

16        Q    What was the last officer's first name?

17        A    Lillianne.

18        Q    Sanchez?

19        A    Sanchez.  Officer Dario Navarrette.

20        Q    Any others?

21        A    I'm sure there are, I just can't presently

22   recall others.

23        Q    Let's start with Judy Brandeis.  What

24   specialized training did she receive?

25        A    She is a CPR instructor.  She is currently

Page 33

1                          ARAZ ALALI

2    a, I guess in training to be a detective in the

3    property theft unit.  I believe she received radar

4    school as well as data master school and currently

5    she is now not on patrol.  She has been assigned to

6    the property theft unit as a detective, I believe in

7    training.  I don't know if she's fully a detective

8    yet or still in training.

9        Q    And is the assignment to the property

10   theft unit a form of training?  Is that specialized

11   training, being in property theft?

12       A    That is a promotional rank as well as the

13   very specialized training that comes along with

14   that, interviewing and interrogation techniques, and

15   I'm sure there was others that I don't know of.

16       Q    John Hanson, what specialized training has

17   he received that you haven't received?

18       A    Field training officer.  He is -- received

19   instructoral [sic] developmental school, which

20   enabled him to be a firearms instructor.  That's all

21   I can recall on him.

22       Q    Isabel Arias.  What specialized training

23   did she receive that you haven't received?

24       A    She received some training in the --

25   called the narcotics unit.  It's undercover work for

Page 34

1                          ARAZ ALALI

2    the narcotics unit, which is referred to as SIU.

3    She has also now been assigned to the P.A.C.T.

4    units, which is the community policing unit.  Within

5    that unit she has received bicycle training.

6         Q    What kind of training?

7         A    Bicycle training.

8         Q    Could you explain what bicycle training

9    entails?

10        A    I believe -- I have not attended that

11   training but I believe it to be a class, a rigorous

12   class to use the bicycle as the means of effecting

13   arrest, as a means of patrol.  I don't know exactly

14   what it entails but it is a training class given to

15   the community police officers.

16        Q    Other than an assignment to the narcotics

17   unit and the P.A.C.T. unit, do you know of any other

18   specialized training Isabel Arias got that you have

19   not received?

20        A    I'm not sure if she received data master

21   school as well.  Or radar school.

22        Q    Lillianne Sanchez.  What specialized

23   training did she receive that you have not received?

24        A    She is currently assigned to the -- it's a

25   one man division of warrants division, as well as

Page 40

1                        ARAZ ALALI

2      A     Yes, he is.

3      Q     When did he join the department?

4      A     I'm not sure.

5      Q     I'm going to go back to your complaint.

6            In reference to subparagraph C in the

7  middle of Page 3, okay.  It says, "Forced to attend

8  a seminar concerning Tools for Tolerance post-9/11

9  which assignment was calculated by defendant to

10 humiliate and embarrass plaintiff since he alone has

11 been the departmental target of systemic intolerance

12 by reason of his ethnicity."

13           Do you know of any other officers who

14 attended the Tools for Tolerance program?

15     A     I don't presently recall.

16     Q     Okay.  Do you know if other officers

17 attended it?

18     A     A few.

19     Q     Who were they?

20     A     I don't presently recall.

21     Q     Can you estimate how many officers

22 attended that seminar?

23     A     I don't presently recall.

24     Q     When did you attend that seminar?

25     A     I don't presently recall.

Page 41

ARAZ ALALI

1
2      Q    Would it be fair to say that it was after
3  9/11?
4      A    Yes.
5      Q    You don't know how soon after that was?
6      A    I don't presently recall.
7      Q    Where was the seminar?
8      A    I believe it was in Manhattan.
9      Q    And when -- withdrawn.
10          How many days did that seminar take
11  up?
12     A    One day.
13     Q    It was a one day seminar?
14     A    Yes.
15     Q    And did you drive to the seminar?
16     A    No.
17     Q    How did you get there?
18     A    By train.
19     Q    And when you went to the seminar, did you
20  go with someone or by yourself?
21     A    By myself.
22     Q    When you got there, did you see any other
23  New Rochelle police officers?
24     A    Yes.
25     Q    Who did you see?

1                          ARAZ ALALI

2      A    I don't presently recall.

3      Q    Do you remember how many New Rochelle

4  police officers you saw there?

5      A    No.

6      Q    Do you know whether or not those officers

7  were persons of Middle Eastern descent?

8      A    There was no one else of Middle Eastern

9  descent besides myself there.

10          MR. LOVETT:  Objection as to form.  You

11      said could.

12          MR. MEISELS:  Could?

13          MR. LOVETT:  That was the question.  I'm

14      objecting as to form.

15          MR. MEISELS:  Okay, fair enough.

16      Q    Officer Alali, referring again to

17  subparagraph C, it indicates that you were forced to

18  attend a seminar concerning Tools for Tolerance

19  post-9/11, which assignment was calculated by

20  defendant to humiliate and embarrass the plaintiff.

21              Could you explain what the basis is

22  for your belief that anyone intended to humiliate

23  and embarrass you by assigning you to go to that

24  seminar?

25      A    That seminar entailed terrorists that were

Page 43

ARAZ ALALI

1

2   responsible for September 11th.  Being called a

3   terrorist, Ali Baba, Camel Jockey, and then sent to

4   that class was embarrassing and humiliating.  After

5   expressing that I did not want to go.

6        Q    Who did you explain that to, that you did

7   not want to go?

8        A    Captain Gazzola.

9        Q    Did you tell it to anybody else?

10       A    I don't presently recall.

11       Q    Did you put your objection in writing?

12       A    I don't presently recall.

13       Q    Now, is it your belief that the assignment

14  of the other New Rochelle police officers to go to

15  that seminar was also calculated to humiliate and

16  embarrass them?

17       A    I believe there was a few slots to go to

18  this class and I believe the other members of the

19  service that went were just to fill in those few

20  slots.

21       Q    Let me rephrase the question.  Do you

22  believe that these other members of the New Rochelle

23  Police Department were assigned to go to that

24  seminar in an effort to humiliate and embarrass

25  them?

Page 44

ARAZ ALALI

1

2     A    No, they were not of Middle Eastern

3   descent.

4     Q    What is the basis for your belief that

5   those officers were not of Middle Eastern descent?

6     A    Being that I feel I'm the only -- I know

7   I'm the only Middle Eastern police officer in the

8   department.

9     Q    And other than what you've already

10  testified to today, is there any other basis for

11  your belief that you're the only officer of Middle

12  Eastern descent in the police department?

13    A    No.

14    Q    Do you know whether or not there are any

15  Jewish police officers in the police department?

16    A    I don't know.

17    Q    Okay.  Do you believe that Commissioner

18  Carroll calculated to embarrass you by having you

19  assigned to go for that Tools for Tolerance seminar?

20    A    Yes.

21    Q    What is the basis for your belief that he

22  contemplated embarrassing you?

23    A    Firstly, by being the police commissioner.

24  Secondly, by -- I expressly -- I did tell Captain

25  Gazzola that I did not want to attend the seminar.

Page 45

ARAZ ALALI

The fact that I was -- all the other facts in this
complaint that he was aware of.

Q    Do you believe that Captain Gazzola
calculated to humiliate and embarrass you by sending
you to the seminar?

A    Yes.

Q    What is the basis for your belief that he
intended to embarrass and humiliate you?

A    What I stated earlier, by calling me those
derogatory names, as well as upon me telling him
that I did not want to go, he ordered me to go.

Q    Now, do you recall whether you attended
this seminar in the year 2001?

A    I joined the police department in 2002.

Q    That's correct.  Withdrawn.

Do you recall whether you attended
the seminar in 2002?

A    I don't presently recall.

Q    Do you recall what year you attended the
seminar?

A    I don't presently recall.

Q    Had you been called the name terrorist
before you were assigned to go to the seminar?

A    I don't presently recall.

Page 46

1                          ARAZ ALALI

2        Q    Had you been called the name Ali Baba

3   before you were assigned to go to the seminar?

4        A    I don't presently recall.

5        Q    Had you been called the name Camel Jockey

6   before you were assigned to go to the seminar?

7        A    I don't presently recall.

8        Q    Had you been called the name Ali before

9   you were assigned to go to the seminar?

10       A    I don't presently recall.

11       Q    Okay.  Had you been called the name Bin

12  Laden before you were assigned to go to the seminar?

13       A    I don't presently recall.

14       Q    Aside from those derogatory terms that

15  we've just mentioned, had you been the victim of any

16  other forms of intolerance before you were assigned

17  to go to the seminar?

18       A    I don't know the date that I went to the

19  seminar so I can't accurately answer that question.

20       Q    Okay.  Aside from the commissioner and

21  aside from Captain Gazzola, are you aware of any

22  other city employee who intended to humiliate or

23  embarrass you by having you assigned to go to that

24  seminar?

25       A    I don't believe so.

1                        ARAZ ALALI

2       Q    Okay.  Referring to the next subparagraph,

3  D, it says, "Systematically been given calculatedly

4  false below-standard job performance evaluations."

5                As you sit here today, who do you

6  understand calculated to give you those

7  below-standard job performance evaluations?

8       A    Captain Gazzola.

9       Q    Anybody else?

10      A    I don't believe so.

11      Q    Okay.  And reading on in your complaint

12  where it says, "When in fact his job performance has

13  consistently been above average."

14                Could you explain what the basis is

15  for your belief that your performance has been

16  consistently above average?

17      A    Yes.  A performance evaluation that was

18  recently conducted by Sergeant Kyle Wilson stated

19  that since I have entered the New Rochelle Police

20  Department in 2002, I have been consistently the

21  top-producing police officer.

22                There are goals/objectives that are

23  set forth by the department.  Those goals and

24  objectives are 120 moving violations per year that

25  consist of ten moving violations per month and 25

Page 48

1                          ARAZ ALALI

2    parkers a month.  I don't know what that totals out

3    to.

4                     But since I have been there, since

5    2002, I have well exceeded that.  Other officers who

6    have not even come close to that, not even met the

7    goals or objectives, have been given standard

8    performance evaluations.

9                     As far as also arrests, I work the

10   second tour, which is eight to four.  I have the

11   highest arrest on that tour since I have been there,

12   every year.  Just to give you an example, between

13   March and May 31st, I have exceeded the 120 that is

14   given as an annual objective.  Also during that

15   period I have had 19 arrests.  However, I have been

16   given a below-standard evaluation by Sergeant Brady.

17   Other members of the service that clearly do not

18   have those performance levels are given either

19   above-standard or standard performance evaluations.

20                    And that also serves as them barring

21   me from doing any overtime, which substantially

22   impaired my income.  And also barring me from doing

23   mutual switches, which again is a great

24   inconvenience since I care for a two-and-a-half-

25   year-old child.

1                    ARAZ ALALI

2              That letter also was generated by

3    Captain Gazzola himself, stating that I was barred

4    from doing overtime assignments and also barred from

5    doing mutual switches.

6         Q    As far as you know, is there any

7    acceptable number of civilian complaints that a

8    police officer is allowed to receive?

9         A    Civilian complaints fall into different

10   categories of substantiated, unsubstantiated,

11   exonerated.  There is no number set forth by the

12   department as I stated with the other numbers, such

13   as parking violations is 25 per month, 10 moving

14   violations per month.  There is no number.  I have

15   received complaints.  Almost every one of them has

16   been unsubstantiated.

17        Q    Does the term -- is the term

18   unsubstantiated synonymous with unfounded?

19        A    I believe so.

20        Q    Do you have any understanding as to how

21   you compare with other police officers in terms of

22   the number of civilian complaints that have been

23   received?

24        A    No.  But I do know how I fare with the

25   other officers as far as arrests and summonses.

1                        ARAZ ALALI

2    Clearly above.  I lead the tour every year that I

3    have been a member of the service with the New

4    Rochelle Police Department, since 2002, as indicated

5    by Sergeant Wilson's evaluation, as indicated by the

6    rebuttal letters.

7        Q    And is Sergeant Wilson's evaluation the

8    basis for your belief that you led the other

9    officers?

10       A    No.  On top of the -- there is a system

11   you can get into which shows -- computer-based

12   system that shows the numbers for each officer,

13   which is inputted by a civilian member of the

14   service, and it's spelled out in black and white.

15   The sergeant would use that to transpose that onto

16   the performance evaluations.

17       Q    Does that system indicate to you where you

18   stand in comparison to other police officers?

19       A    The numbers show I have ten summonses and

20   you one, clearly I would have more summonses than

21   you.

22       Q    Are you able to see what other police

23   officers have done by accessing that system?

24       A    Yes.

25       Q    Okay.  Have you done that?

Page 51

1                          ARAZ ALALI

2        A     Yes.

3        Q     Going back to subparagraph D of

4    paragraph 8 of your complaint where it indicates,

5    "use of language replete with fabrications and

6    falsehoods."

7                    As you sit here today, what

8    fabrications or falsehoods were included in your job

9    evaluation?

10       A     Many.  I don't have the narrative in front

11   of me of those performance evaluations, but by the

12   mere fact that they were clearly rated falsely as

13   below standard and not above standard is the crux of

14   why it's completely fabricated.  I would have the

15   exact narrative in front of me to point out each and

16   every one of the fabrications, but the overall

17   evaluation being served as below standard is clearly

18   false.

19       Q     And is the basis for your opinion that

20   those evaluations were false that your numbers are

21   significantly higher than the other officers?

22       A     I don't think it's opinion.  I think it's

23   factual.  I think numbers are factual.  Again, I

24   think if you use number one, one is less than -- two

25   is greater than one.  I don't think there is any

Page 52

1                         ARAZ ALALI

2    opinionation [sic] in performance numbers, arrest

3    numbers.  No matter what angle you look at these

4    numbers, they are black and white.  Stand on its own

5    merit.

6         Q    Is the basis for your belief that these

7    evaluations were false the fact that your numbers

8    were higher than other police officers?

9         A    I don't believe.  Let me make that clear.

10   I don't believe them to be false, I know them to be

11   false.  It's not opinionated.  It's not a belief.

12   It's not mythical.  It's factually false.

13        Q    Is it your understanding that they're

14   false based upon your numbers being higher than

15   other police officers?

16        A    My understanding they're false for

17   numerous reasons, by sergeants themselves telling me

18   Captain Gazzola has ordered them to make them below

19   standards, and they apologize.  They're false for,

20   as I have indicated, I have had the highest

21   performance levels in all the areas of a patrol

22   officer.

23        Q    Can you identify the persons who told you

24   that Captain Gazzola ordered them to classify you as

25   below standards?

Page 53

                            ARAZ ALALI

1

2      A    Sure.  That would be Sergeant Kyle Wilson,

3   Sergeant Matthew Brady, Sergeant Humberto Morel,

4   known as Al Morel.

5      Q    And do I understand correctly that

6   Sergeant Wilson told you --

7      A    And also let me add Sergeant Edward

8   Austin.  There was also a time when Sergeant Edward

9   Austin was ordered by Captain Gazzola to ride along

10  with me after one of my evaluations, of my false

11  evaluation of being below standards, and indicated

12  that he was extremely embarrassed as well.  It was

13  humiliating, degrading for other members of the

14  service to see me, top-producing member, riding

15  along with a sergeant.  And during my time with him

16  he indicated that as well.

17     Q    Now, let's start with Sergeant Wilson.  Do

18  I understand it correctly that Sergeant Wilson told

19  you that he was ordered by Captain Gazzola to

20  evaluate you as being below standards?

21     A    Yes.

22     Q    When did he tell you that?

23     A    I don't presently recall.

24     Q    How many times did he tell you that?

25     A    Several.

1                        ARAZ ALALI

2        Q      Do you recall what year he told you that

3    in?

4        A      In 2006 and 2007.

5        Q      And did you ever reduce that conversation

6    to something in writing?

7        A      I told Captain Gazzola during my rebuttal

8    meeting with -- PBA president Edward Hayes was

9    there, that the sergeant had told me that --

10   Sergeant Wilson had told me that Captain Gazzola

11   ordered him to make me below standards.  So I had

12   indicated, I believe, in my rebuttal letter, but

13   definitely verbally where Edward Hayes was sitting

14   next to me, he is the PBA president, in that meeting

15   with Captain Gazzola.

16       Q      Did Sergeant Wilson tell you whether or

17   not he agreed or disagreed with the classification

18   being below standard?

19       A      He just simply said I'm sorry.

20       Q      Did he tell you whether he agreed or

21   disagreed with the classification?

22       A      No.

23       Q      Sergeant Brady, did he ever tell you that

24   Captain Gazzola ordered him to give you a

25   below-standard evaluation?

Page 55

ARAZ ALALI

1

2    A    Yes.

3    Q    When did he tell you that?

4    A    Recently.  In 2007.  That would be June of

5    2007.  I don't have the exact date.

6    Q    Is that the first time he told you that?

7    A    Yes.

8    Q    Did you reduce that to writing in any

9    fashion?

10    A    I have now given Captain Gazzola -- when I

11    had gotten my performance evaluation, I indicated

12    that I am signing in receipt of it only, I clearly

13    disagree with it.  Procedure is within a few days

14    you have to notify Captain Gazzola in writing that

15    you requested a review of that performance

16    evaluation.  I did that the same day I received my

17    evaluation and I'm now waiting for that meeting with

18    Captain Gazzola.

19    Q    Did Sergeant Brady tell you whether he

20    agreed or disagreed with the classification of being

21    below standard?

22    A    He stated he disagreed and he stated that

23    if it was up to him, I would be at least standard.

24    I clearly remember this because it was just this

25    month.

Page 56

ARAZ ALALI

1

2    Q    So did Sergeant Brady tell you that he

3  gave you an evaluation that he believed to be false?

4    A    He was ordered to by Captain Gazzola to

5  give me a below-standard evaluation.

6              And those numbers I had given you

7  were well above the year -- annual requirement in

8  the few months I was on the street.  Prior to that I

9  was ordered by Captain Gazzola to work the radio

10  room while he and other members of the department

11  were investigating false allegations of wrongdoing.

12  So I wasn't even out from January to June.  I was

13  from March sometime to May, and those numbers

14  exceeded.

15              As far as civilian complaints, I

16  stated there was only one complaint.  It was a very

17  vague evaluation.  But again, I was falsely given a

18  below-standard evaluation.  He apologized, he said

19  maybe next time you'll be standard.

20    Q    In reference to the assignment to the

21  radio room, do you know of any other police officers

22  who had been assigned to the radio room?

23    A    Not for six months on end, no.  I was

24  there for approximately six months and I was not

25  even allowed to go to the front area to have any

Page 57

1                           ARAZ ALALI

2    interaction with the public.  Lieutenant Debara

3    stated that I'm not even allowed to get a paper clip

4    in the front area.  That was addressed to Captain

5    Gazzola.  He wanted my departmental communications.

6                Also, no other police officer was

7    given the assignment to watch suicidal prisoners,

8    dispatch on a daily basis, and disbarred from

9    departmental vehicles, as well as being a steady

10   jail maiden.

11       Q    Now, I asked you whether or not any other

12   police officers were ever assigned to the

13   communications room.  Your response was not for six

14   months, am I correct?

15       A    Yes.

16       Q    Do you know, setting aside any time limit,

17   have other police officers to your knowledge been

18   assigned to the communications room?

19       A    If there was a shortage for a day,

20   possibly.  If one of the civilian members is out

21   sick or if one of the police officers is out injured

22   and he can't work the street, he's not physically

23   capable of working the street, it will be at the

24   discretion of the department to allow them to come

25   back to work to earn a salary, to work inside the

Page 68

1                        ARAZ ALALI

2    regarding part-time work.

3        Q    So would it be correct to say that you

4    don't know whether you could have or could not have

5    done that?

6        A    Yes.  I don't know.

7        Q    Since you have been employed as a New

8    Rochelle police officer, have you received any

9    overtime compensation?

10       A    Yes.

11       Q    And do you recall when that was?

12       A    No, I don't presently recall.

13       Q    Do you recall what year it was?

14       A    I believe that I have received overtime

15    since I have been there in 2002.  I don't know dates

16    or the amounts but.

17       Q    Is it correct or incorrect to say that

18    you've received overtime compensation every year

19    since you've been a New Rochelle police officer?

20       A    I believe so.

21       Q    It's correct?

22       A    I believe so.

23       Q    Has -- withdrawn.

24                Would it be fair to say that the

25    below-standard job evaluations that you have

1                        ARAZ ALALI

2    received have not prevented you from receiving

3    overtime compensation?

4         A    Say that question one more time.

5         Q    Sure.  Would it be correct to say that the

6    below-standard job evaluations that you have

7    received have not prevented you from receiving

8    overtime compensation?

9         A    They have prevented me from receiving

10   overtime compensation, the below-standard

11   evaluations.  They have barred me from performing

12   overtime.

13        Q    But am I correct that you have, in fact,

14   received overtime compensation each year that you've

15   been a New Rochelle police officer?

16        A    There is two different types of overtime.

17        Q    Could you explain?

18        A    There's departmental overtime where an

19   officer will call in sick or there is a shortage of

20   personnel for some reason, and there's off-duty

21   employment which is employment basically, you know,

22   when you're off duty.

23        Q    And is it correct that you have received

24   departmental overtime?

25        A    Since these below-standard evaluations for

Page 70

1                           ARAZ ALALI

2    the past two years, very, very few.  I can count

3    probably on one hand how many hours I have had.  A

4    few.

5        Q    And were there any years in which you

6    received anything more than a below-standard

7    evaluation since you've been a New Rochelle police

8    officer?

9        A    I don't understand the question.  I don't

10   believe there's a category substandard.  Anything

11   more than below standard?

12       Q    No, higher than?

13       A    Higher than, yes.

14       Q    What was your evaluation for the year

15   2002?

16       A    I don't presently recall.

17       Q    Was it below standard?

18       A    No.

19       Q    What was your evaluation for 2003?

20       A    I don't presently recall.

21       Q    Was it below standard?

22       A    No.

23       Q    What was your evaluation for the year

24   2004?

25       A    I don't presently recall.

1                          ARAZ ALALI

2        Q    Was it below standard?

3        A    No.

4        Q    And what was your evaluation for 2005?

5        A    I don't presently recall.

6        Q    Was that below standard?

7        A    Could have been.

8        Q    All right.  Now, let's go back to the

9   first three years that you were employed as a New

10  Rochelle police officer:  2002, 2003, 2004.  During

11  those three years, as far as you know, did anyone in

12  the New Rochelle Police Department know that you

13  were of Middle Eastern descent?

14       A    I believe so.

15       Q    And am I correct that for the years 2002,

16  2003 and 2004, you did not receive below-standard

17  evaluations?

18       A    Yes.

19       Q    Let me go back to subparagraph D.

20       A    On Page 4?

21       Q    Yes.  Page 3.  Sorry.  The bottom of

22  Page 3.  Got it?

23       A    I got it.

24       Q    Okay.  You had explained to me the

25  distinction between departmental overtime and