1                          ARAZ ALALI

2    off-duty employment.  Is off-duty employment

3    employment with actually a private employer that is

4    compensated through the City?

5         A    Yes.

6         Q    And do you know whether or not there is

7    any limit on how much off-duty employment you're

8    allowed to perform?

9         A    I believe if it's your days off, you can

10   work as many hours as you want.  I believe when

11   you're working, I believe it's four hours past your

12   tour of duty.

13        Q    Do you know whether there is any limit as

14   to how much off-duty employment you're allowed to

15   perform in any given week?

16        A    I don't know the numbers now.

17        Q    Have you ever estimated how much pecuniary

18   loss you've suffered as a result of not being

19   assigned to off-duty employment?

20        A    I have looked into it.  I don't have the

21   exact numbers with me.

22        Q    Do you have estimates?

23        A    No, I do not.

24        Q    Let's go back to the departmental

25   overtime.  Do you have estimates as to how much was

```
1                        ARAZ ALALI
2    lost as a result of not receiving departmental
3    overtime assignments?
4         A    Say that again.  That didn't make sense to
5    me.  I'm sorry.
6         Q    Okay.  Sure.  Can you estimate what your
7    pecuniary loss has been as a result of not receiving
8    departmental overtime assignments?
9         A    No.
10        Q    If you could just turn the page to the
11   next subparagraph D.
12                   (Off the Record)
13        Q    Officer Alali, do you have the top of the
14   page, Page 4?
15        A    Yes.
16        Q    It says, "Assigned for months at a time as
17   a dispatcher in the police department's
18   communications room."
19                   Is that the circumstance you
20   testified to earlier this afternoon?
21        A    Yes.
22        Q    And can you estimate how many months you
23   were assigned to be dispatcher?
24        A    Assigned for approximately six months and
25   I was only released from that dispatcher assignment
```

1                          ARAZ ALALI

2      after the EEOC was filed and served upon the

3      department.  The very next day I was relieved of the

4      dispatcher assignment.

5          Q     So would it be correct to say that you

6      were assigned to be a dispatcher for the six months

7      preceding your filing the EEOC complaint, is that

8      correct?

9          A     Yes.

10         Q     And do you know whatever happened to that

11     civilian complaint that was filed by the FedEx

12     driver?

13         A     Yes.

14         Q     What happened to it?

15         A     Lieutenant Fortunato told me that that

16     complaint was unfounded.

17         Q     Do you know whether or not the FedEx

18     driver started a lawsuit against the City of New

19     Rochelle?

20         A     Not to my knowledge.

21         Q     Do you know whether or not he filed a

22     notice of claim against the City of New Rochelle?

23         A     Not to my knowledge.

24         Q     Do you know whether or not he filed a

25     lawsuit against you?

1                              ARAZ ALALI

2        A      Not to my knowledge.

3        Q      Okay.  Do you know what happened to the

4    charges that you filed against him?

5        A      I was told by Edward Hayes that all of the

6    criminal charges were dropped because the police

7    commissioner went to the ADA's office and requested

8    them to be dropped, as well as all of the moving

9    violations were also dropped by the request of the

10   police commissioner.

11       Q      Did you ever discuss that subject with the

12   police commissioner?

13       A      No.

14       Q      Do you know whether or not it's true that

15   the commissioner made that request to the district

16   attorney's office?

17       A      I inquired into the district attorney's

18   office as well, and they said that all the charges

19   had been dropped.

20       Q      Did they discuss with you the substance of

21   any communications that they had with the

22   commissioner?

23       A      No.

24       Q      Did the district attorney's office advise

25   you as to why the charges were withdrawn?

1                    ARAZ ALALI

2       A    No.

3       Q    Did you ask?

4       A    I don't presently recall.

5       Q    Do you recall who in the district

6    attorney's office you spoke to?

7       A    I don't presently recall.  Also, I was

8    told by Edward Hayes that the charges were dropped

9    as well as the moving violations.

10       Q    So you were told by Edward Hayes and by

11    the district attorney's office?

12       A    Yes.

13       Q    And did Edward Hayes tell you why the

14    charges were dropped?

15       A    I don't presently recall.

16       Q    Who told you that the commissioner had

17    contacted the district attorney's office?

18       A    I believe it to be Edward Hayes.

19       Q    Did he tell you how he knew that

20    information?

21       A    I don't presently recall.

22       Q    Do you recall when you had this

23    conversation with Edward Hayes?

24       A    During the time I was assigned -- during

25    the approximately six months I was assigned as a

Page 77

                              ARAZ ALALI

1

2    dispatcher.  I don't know exactly when.

3        Q    Can you estimate how -- withdrawn.

4             Can you estimate on how many

5    occasions each year a police officer is assigned to

6    work as a dispatcher?

7        A    How many times a year?

8        Q    Each year does that happen?

9        A    I would have no idea.  All I know is that

10   it is a civilian function and I don't remember any

11   police officer doing it for an extensive period of

12   time such as half a year.

13       Q    Am I correct that you do recall that other

14   police officers have been assigned for some period

15   of time to do that?

16       A    Some very short periods of time.

17       Q    What's the longest period of time that you

18   can recall any police officer assigned to be a

19   dispatcher?

20       A    I would say -- I don't know who, but when

21   a police officer is injured, for the period of time

22   they're injured or impaired, that would probably be

23   a longer period of time than when a civilian member

24   calls in sick.

25       Q    Let's take a look at subparagraph E where

```
 1                    ARAZ ALALI
 2   it indicates, "Forced to work walking posts during a
 3   midnight to 8:00 a.m. tour of duty."
 4                    When were you assigned to a walking
 5   post on the 8:00 a.m. -- on the midnight to
 6   8:00 a.m. tour?
 7        A    Again, when I was assigned to the midnight
 8   tour, I don't presently recall the year.  However, I
 9   was assigned for months on that tour to walk a foot
10   post.
11        Q    Where was that foot post?
12        A    Wherever they deemed it to be that night.
13        Q    So would that foot post change from day to
14   day?
15        A    I don't know about day to day, but it was
16   different areas that I was walking.  I don't know if
17   it was day to day or week to week.
18        Q    But the location was variable?
19        A    Yes, basically variable, yeah.  I remember
20   one time that it was on Union Avenue on the corner
21   when it was snowing out.  That's an area that's not
22   heavily populated at night.  It's not on the police
23   post.  There are some foot posts for the day tours,
24   not on the midnights.  But that's not in the police
25   post book at all.  Kind of an off the track area.
```

ARAZ ALALI

1

2          I was told to stand on the corner of

3    Union Avenue while it was snowing out and not to

4    move from the corner.  For no purpose.

5          Q    Who ordered you to do that?

6          A    That was Sergeant Jones and Sergeant

7    Gianatti.

8          Q    And when did that occur?

9          A    I don't have the dates, but when I was

10   assigned to the midnight tour.

11         Q    What years were you assigned to the

12   midnight tour?

13         A    I don't presently recall.  It was early on

14   in my career.

15         Q    Were you assigned to the midnight tour

16   during the years that you received standard

17   evaluations?

18         A    I don't presently recall.

19         Q    How long did you work the midnight tour?

20         A    I don't presently recall, but I know the

21   incident that changed me.  Walking the midnight tour

22   was the complaint -- supervisor complaint generated

23   by Sergeant Jones, which is a false complaint,

24   stating that I did not give him the reason for a car

25   stop.  And then the second part of that complaint

1                         ARAZ ALALI

2    was the fact that I did not hand the complaint to

3    him in a timely fashion.  That complaint was

4    forwarded to Captain Gazzola.  Both parts of that

5    complaint were false.  Captain Gazzola then

6    rescinded the complaint.  Took it -- basically took

7    it back.  Out and out perjury by Sergeant Jones on

8    that complaint.

9                   That was the incident that put me

10   onto the eight to four tour shortly after that.

11        Q    Whose decision was it to move you from the

12   midnight tour to the eight to four, as far as you

13   know?

14        A    I'm not sure.

15        Q    And do I understand correctly that Captain

16   Gazzola in effect took your side in this complaint

17   rather than Sergeant Jones' side?

18        A    Not about taking sides, he had no choice.

19   I had PBA representative Neal Reynolds there at that

20   time.  I had handed Neal Reynolds the reason why I

21   did the car stop as per Sergeant Jones' request, I

22   did that on my own time.  I met him in the parking

23   lot at midnight when I was off, days before it was

24   due.

25                   Because I knew that Sergeant Jones

ARAZ ALALI

1

2  making me walk these foot posts in the snow, if I

3  personally handed it to him, there was a good

4  likelihood that he would say that I did not hand it

5  to him.

6              He also stated in part of his

7  complaint that I did not call out the car stop,

8  which I had.  It was all recorded.

9              So I handed that piece of paper of

10  the reasons why.  It was ridiculous that I have to

11  even state why I did the car stop to Sergeant

12  Jones -- excuse me, to Neal Reynolds to then give it

13  to Sergeant Jones.  Even after that, Sergeant Jones

14  had written me up for not handing that in on a

15  timely fashion and not calling out the car stop.

16              I went to the communications room,

17  which is run by Detective Deandrea, and gave him the

18  date of the car stop, and he was easily able to pull

19  that up.  I told him to show that to Captain

20  Gazzola.  So it was not about taking sides.

21      Q    The evidence was there.

22      A    The evidence was clear and compelling.

23      Q    Did you ever learn whether or not Sergeant

24  Jones knew you were of Middle Eastern descent?

25      A    Yes.

1                          ARAZ ALALI

2        Q      When did you learn that?

3        A      Since my employment there.  By my name.

4    He was one of the sergeants that had called me --

5    now I'm recalling that we're talking about Sergeant

6    Jones -- had called me Ali.  Would carry me on the

7    roll call as Ali.  I told him not to address me as

8    Ali.  My name is Mr. Alali.  I believe in the

9    complaint to Captain Gazzola he referred to me as

10   Ali.  So, yes, those are the indicators that would

11   lead me to believe that he knew I was of Middle

12   Eastern descent.

13       Q      And other than what you've already

14   testified to, do you have any other reason to

15   believe that he was aware of the fact that you are

16   of Middle Eastern descent?

17       A      The fact that he would force me to walk

18   these posts in the rain and snow at midnight, when

19   it's routinely not done at all, except as

20   punishment.

21              MR. LOVETT:  Give me one second.

22              MR. MEISELS:  Sure.

23                   (Off the Record)

24       Q      Officer Alali, when you first joined the

25   New Rochelle Police Department, what tour were you

ARAZ ALALI

1    assigned to?

3       A    I believe it was four to 12.  When you
4    first join you have to rotate the tours.  I believe
5    it was four to 12.

6       Q    And do you recall when that changed?

7       A    No.  There is a period of time that they
8    would rotate you to the next tour.  You have to be
9    exposed to all three tours.  I don't presently
10   recall the date.

11      Q    Do you recall when you were assigned for
12   the first time to midnight?

13      A    No, I do not.

14      Q    Do you recall when you were assigned to a
15   different tour other than midnights?

16      A    I don't presently recall.  I just know
17   that now I'm currently on the eight to four tour.  I
18   don't know the dates that it shifted from one tour
19   to the other.

20      Q    Do you recall how long you were assigned
21   to the midnight tour?

22      A    I don't presently recall.

23      Q    And during that period of time, do you
24   recall how often you were assigned to a foot post?

25      A    Very frequently.  For months.

Page 84

1                          ARAZ ALALI

2        Q    Now, was it snowing all the time you were

3    assigned to a foot patrol?

4        A    No.

5        Q    But it snowed on occasion when you were

6    assigned to a foot patrol?

7        A    It snowed and rained, yes.

8        Q    Is it your understanding that prior to

9    your being assigned to a foot patrol on the midnight

10   tour, that no other officer had ever been assigned

11   to a foot patrol on the midnight tour?

12       A    That was exclusively set as punishment and

13   it would be for a few nights as a punishment.  There

14   was no walking posts, so to speak, on that tour, on

15   the midnight tour.

16       Q    So it's correct that you were the -- as

17   far as you know, the first police officer to be

18   assigned to a walking tour -- withdrawn.

19                 Is it your understanding that you

20   were the first police officer to be assigned to a

21   walking post on the midnight tour?

22       A    No.

23       Q    No.  Okay.  So is it your understanding

24   that the other police officers had been assigned a

25   walking post on the midnight tour before you were

1                    ARAZ ALALI

2   assigned to a walking post on the midnight tour?

3        A     For punishment purposes only.  It's not a

4   routine function of the midnight tour to walk a foot

5   post.

6        Q     Were those other officers officers of

7   Middle Eastern descent?

8        A     I believe I'm the only Middle Eastern

9   police officer in the department.

10        Q     Do you know whether or not any police

11   officers have been assigned to a walking post on the

12   midnight tour after you transferred from that tour?

13        A     I don't know.

14        Q     Can you identify which other police

15   officers were assigned to a walking post on the

16   midnight tour before you were assigned to the

17   walking post on the midnight tour?

18        A     I don't presently recall.

19        Q     You indicated that the assignment you

20   believe was for punishment, is that right?

21        A     I know it to be for punishment.

22        Q     Okay.  Explain what the basis is for your

23   knowledge that it was punishment.

24        A     The sergeants themselves tell you, let me

25   say initially there was no foot posts on midnight,

Page 86

1                        ARAZ ALALI

2    on the day-to-day operation there are no foot posts

3    on midnight.  Sergeants would call you in and tell

4    you you were being punished and walking a tour of

5    duty on the midnight tour, and, you know, they would

6    tell you that it's for punishment purposes.

7         Q     Which sergeant told you that?

8         A     Sergeant Jones, Sergeant Gianatti.

9         Q     And did they tell you what it was

10   punishment for?

11        A     No.

12        Q     Did you ask?

13        A     Yes.

14        Q     And what did they say?

15        A     They laughed.

16        Q     Were both Sergeant Jones and Sergeant

17   Gianatti your supervisors on the midnight tour?

18        A     Yes.

19        Q     And who made the decision, as far as you

20   know, to have you walk the -- withdrawn.

21              Who made the decision, as far as you

22   know, to have you have a walking assignment on the

23   midnight tour?

24        A     I don't know.

25        Q     Do you have any reason to believe that you

ARAZ ALALI

1

2   received that assignment based upon being a person

3   of Middle Eastern descent?

4        A    Yes.

5        Q    What is the basis for your belief that

6   this had something to do with your heritage?

7        A    Due to the fact, again, when I was on that

8   tour I had the highest performance numbers on that

9   tour.  And no reason was given as to why I was

10  walking that tour.

11       Q    Now, when you indicate that there is no

12  walking post assigned on the midnight tour -- is

13  that correct, there is none?

14       A    There is none.  No, that's not a function

15  of the tour, to have a walking post, correct.

16       Q    And what's the basis for your belief that

17  there is not a function of the midnight tour to have

18  a walking post?

19       A    The fact that when I was there, no one

20  else was walking.  It was -- people were assigned in

21  cars.  The fact that when they put you on a walking

22  post, as I indicated, they said it was for

23  punishment.  So I would not believe that a

24  punishment would be a routine assignment.

25       Q    Is it written anyplace as to which tours

Page 88

1                         ARAZ ALALI

2    have walking posts and which ones don't?

3        A    I believe that roll calls that are

4    administered every day by the desk officer indicate

5    the walking posts, if there are to have one.  Such

6    as midnights, it was -- there was no indication of

7    that.  Periodically on the eight to four tours there

8    is.  Sorry.  The answer to your question, on the

9    roll call assignments.

10       Q    Is that something that's in writing?

11       A    Yes.

12       Q    And do I understand you correctly that on

13   the roll call for the midnight tour, there was

14   nothing written about there being a walking post?

15       A    Except me.

16       Q    And do you know whether or not there was

17   anything written about a walking post before you

18   were assigned the midnight tour?

19       A    No.

20       Q    Do you know whether or not there is

21   anything written about a walking post after you were

22   transferred out of the midnight tour?

23       A    No.  Currently there is no one walking on

24   the midnight tour.

25       Q    And currently there is no one walking on

1                        ARAZ ALALI

2    the midnight tour?

3       A    Right.

4       Q    Can you estimate how long it's been since

5    you've been on the midnight tour?

6       A    It would be bad guess.

7            MR. LOVETT:  Don't guess.

8       A    I don't know.

9       Q    Let's go on to subparagraph F.  Indicates,

10   "Forbidden for substantial periods of time to

11   operate a police vehicle."

12            Does that relate to the circumstance

13   you've already testified to about the civilian

14   complaint from the FedEx driver, or does it relate

15   to something else?

16      A    That is -- for approximately the six month

17   period of time that I stated earlier.

18      Q    Okay.  Is that the same period of time

19   that you were assigned to be a dispatcher?

20      A    Yes.

21      Q    Does that relate to the civilian complaint

22   that was filed by the FedEx driver?

23      A    It depends what side of the story you get.

24   If you get it from Fortunato or you get it from

25   Commissioner Carroll.  Conflicting stories on that.

1                          ARAZ ALALI

2        Q    Let's start with Commissioner Carroll.

3   What did he tell you?

4        A    Stated it is because of a departmental

5   investigation.

6        Q    And what did Lieutenant Fortunato tell

7   you?

8        A    He did not have knowledge that it was

9   because of a departmental investigation.

10       Q    And did Commissioner Carroll tell you

11  anything about it, other than what you already

12  testified to?

13       A    No.  Captain Gazzola also stated it was

14  because of the departmental investigation.

15       Q    And did Captain Gazzola tell you anything

16  else about it, other than what you just testified

17  to?

18       A    Well, besides issuing a standing order of

19  performing functions that are listed in this

20  complaint.

21       Q    Did Lieutenant Fortunato tell you

22  anything, other than what you've already testified

23  to, about this -- about your being barred from

24  operating a police vehicle?

25       A    No.

ARAZ ALALI

1

2      Q     Does a person who is assigned to be a

3  dispatcher need a police vehicle?

4      A     No.

5      Q     Am I correct that you were barred from

6  operating a police vehicle for the same period of

7  time you were a dispatcher?

8      A     Yes.  Also, I'd like to add that I was not

9  allowed to take a police vehicle on my meal period

10  as well, and I had to be picked up and dropped off

11  and be picked up and dropped off.

12            And also a situation arose where

13  Edward Hayes and I spoke to Captain Gazzola in

14  regards to if I used my personal vehicle and there

15  was an accident, who would be liable, since I was

16  barred from using any police vehicles.  If I use my

17  personal vehicle, I have the insurance under my

18  name.  Although I was working as a police officer on

19  a tour of duty, I was barred from me using a police

20  vehicle even to get a sandwich.

21      Q     So during that time that you were barred

22  from using the police vehicle, did you use your own

23  personal vehicle?

24      A     Actually, no.  I had some officers pick me

25  up and drop me off and I walked to a close-by deli.

1                      ARAZ ALALI

2        Q     Is there a reason you didn't use your

3   personal vehicle?

4        A     Because of liability reasons.

5        Q     Is that liability any different from any

6   other time that you drive your own car?

7        A     Yes.  I'm working on a tour of duty in

8   uniform as a police officer driving a private

9   civilian vehicle.  I think that's clearly different

10  than when I'm off duty driving my vehicle.  I'm

11  doing it in the scope of my employment is the

12  difference.

13       Q     Let's take a look at subparagraph G.

14  Withdrawn.  Let me go back.

15              Did anyone ever tell you why you were

16  barred from using a police vehicle even when you

17  were taking a break or going out for a meal period?

18       A     Yes.

19       Q     Who told you that?

20       A     Captain Gazzola, Lieutenant Debara,

21  Sergeant Wilson, Sergeant Brady, Sergeant Morel,

22  Sergeant Tierney.

23       Q     Let's start with Sergeant Tierney.  What

24  did she tell you?

25       A     She stated that she received an e-mail

1                        ARAZ ALALI

2    from Captain Gazzola stating that I was to perform

3    the dispatcher function, I was to be used for

4    suicidal prisoners, not to work the street.  Not to

5    have any interaction with the public.  To do the

6    jail escorts and at no time to operate a police

7    vehicle.

8         Q    Did you ever see a copy of the e-mail?

9         A    I saw it -- she had it on the screen.  I

10   do not have a photocopy of it.  It was from Captain

11   Gazzola to her.

12        Q    Did you ever ask Captain Gazzola why he

13   sent that e-mail?

14        A    I asked Captain Gazzola, with Edward

15   Hayes, why there was a standing order to perform

16   those functions.  He stated there was a departmental

17   investigation.

18        Q    Did you ever ask Captain Gazzola why you

19   were prohibited from operating a police vehicle?

20        A    Yes.  I asked him for each and every one

21   of the items such as dispatcher, jail escort,

22   suicidal prisoner watch, dispatcher, and excluded

23   from operating a police department vehicle, he

24   stated it was because of a departmental

25   investigation.

Page 94

1                              ARAZ ALALI

2          Q    So, now, when you transported prisoners to

3    the county jail, how did you get there?

4          A    When there are prisoners that go to the

5    county jail, it's a two-man operation.

6          Q    Right.

7          A    And whoever the other officer that was

8    going, generally a junior officer, they would drive

9    the vehicle.

10         Q    You never drove the vehicle when you took

11   prisoners to the jail?

12         A    No.

13         Q    Moving on to subparagraph G where it

14   states, "Forbidden for substantial periods of time

15   to interact with members of the public while on

16   duty."

17               Does that reference the same six

18   months that you were assigned to be a dispatcher?

19         A    Yes, dispatcher also with the other

20   functions, jail escort, suicidal prisoners watch.

21   Not just dispatcher.  I was doing these other

22   degrading functions.

23         Q    What is the function of the dispatcher,

24   what do you do?

25         A    Dispatcher is, as we speak now, is being

1                         ARAZ ALALI

2    manned by civilians on all tours.  As we sit here

3    right now, it's a civilian position in nature.  I

4    received no training for being dispatch.  Basically

5    giving cops assignments on where to go.  Also, I

6    believe there is a 911 communication system

7    answering calls and inputting calls into the

8    computer so the cops can get the information they

9    need to get to their location safety.  I had no

10   training on that whatsoever.  Again, it's -- all

11   these functions such as dispatcher are civilian in

12   nature.

13       Q    When you were the dispatcher, what did you

14   do?

15       A    I was assisted by another civilian member

16   of dispatcher how to -- basically all I did was read

17   the screen and press a button and tell the cops

18   where to go.  I didn't input it.  I didn't know how

19   to input it.  I didn't know how to do anything of

20   that.  They just showed me a crash course on just

21   look at the screen, press the button and talk into

22   the microphone.

23       Q    So your communication was with other

24   police officers?

25       A    Yes.

1                              ARAZ ALALI

2        Q    Did you ever communicate with members of

3   the public while you were dispatcher?

4        A    No, I was barred from answering the phone.

5        Q    Aside from the time that you were assigned

6   to be a dispatcher, have you ever been barred from

7   interacting with members of the public while you

8   were on duty?

9        A    I don't presently recall.

10       Q    Let's move down to subparagraph I where it

11  says, "Subjected repeatedly to investigations of

12  supposed wrongdoing under circumstances where no

13  wrongdoing occurred and defendant knew that no

14  wrongdoing had occurred."  Do you see that?

15       A    Yes.

16       Q    Could you explain what investigations

17  you're referencing in that paragraph?

18       A    There were many.  The most recent

19  investigation was when I was put in the radio room

20  as a civilian, reduced to a civilian dispatcher, of

21  the wrongful arrest on the FedEx driver, when in

22  fact the captain, police commissioner, knew that

23  there was absolutely no violation of the law on my

24  part.  The defendant violated the law.  I had

25  absolutely done nothing wrong.

1                          ARAZ ALALI

2                          However, they investigated that for

3    over six months.  Like I stated to you, Lieutenant

4    Fortunato stated that the complaint of the FedEx

5    driver had no merit and it was unfounded.

6                          The other instance I gave you was of

7    Sergeant Jones of what I stated earlier about not

8    calling out a traffic stop and not handing in a

9    reason of why I conducted a traffic stop.  Captain

10   knew of that incident and took back the complaint.

11                         And I remember when I asked the

12   Captain if I had -- there was an out-and-out lie,

13   that if Sergeant Jones had perjured himself and put

14   it on paper, what would be the consequences.  He

15   didn't answer.  I stated what happened if I had

16   perjured myself.  Kind of smiled at that, didn't

17   give an answer.

18                         There was other investigations but

19   these are the investigations that we're talking

20   about right now.

21      Q    You mentioned the investigation relating

22   to the FedEx driver and you mentioned the one

23   concerning Sergeant Jones' allegations about failure

24   to call out a stop.

25      A    And failure to hand him the reason for the

1                         ARAZ ALALI
2    stop in writing in a timely manner, which was done.
3         Q    These are two separate investigations, am
4    I correct?
5         A    Yeah.  I believe when he wrote them up
6    they were two separate charges, Captain Gazzola.
7         Q    So Sergeant Jones basically submitted two
8    separate charges related to the same incident?
9         A    Right.
10        Q    And that's an entirely separate incident
11   from the incident with the dispatcher, is that
12   right?
13        A    Correct.
14        Q    Now, other than those two incidents, do
15   you know of any other investigations that the
16   department conducted where you believed that the
17   defendants knew that you hadn't done anything wrong?
18        A    There is numerous civilian complaints that
19   they knew that there was no wrongdoing on my part,
20   however, they had conducted investigations.  On one
21   occasion, I believe, Lieutenant Fortunato had given
22   me a verbal reprimand on a civilian complaint which
23   had absolutely no merit and was false.  And I'm sure
24   there are others, I just can't presently recall.
25        Q    As you sit here today, can you identify

1                          ARAZ ALALI

2      any other particular investigations, other than the

3      two you've already mentioned?

4           A      Other than the three?  Lieutenant

5      Fortunato too.

6           Q      What was that verbal reprimand for?

7           A      He initially had modified it.  It was a

8      reprimand on using the P.A. system.  He stated it

9      was to be used for emergencies only.  Situation was

10     an emergency in nature.  He rescinded that and

11     stated that he -- can't exactly remember the

12     language of his complaint but basically to be nicer

13     to the public.  Something to that effect.

14          Q      When did that occur?

15          A      I don't presently recall.

16          Q      Do you remember what year it occurred?

17          A      I don't presently recall.

18          Q      Other than the three investigations you've

19     mentioned, the one involving FedEx driver, the one

20     involving Sergeant Jones and the one involving

21     Lieutenant Fortunato, can you think of any other

22     investigations that you were subjected to where the

23     defendants knew that you had done nothing wrong?

24          A      There was another incident that comes to

25     mind with Lieutenant Shulman.  I had arrested a

1                          ARAZ ALALI

2    defendant for criminal possession of a forged

3    instrument on a felony count.  I had placed him

4    under arrest.  Had his vehicle impounded.

5                   When Sergeant Wilson showed up on the

6    scene, which was at North Avenue and Lovell Road,

7    and said that Lieutenant Shulman says to unarrest

8    the defendant and to release the vehicle.  The

9    defendant already was handcuffed in the back of the

10   police car and the tow truck already had the

11   defendant's car on the tow truck and it was leaving.

12                   Upon his, Sergeant Wilson's command,

13   I unarrested the defendant and released the vehicle

14   back to the defendant and he was on his way.  Spoke

15   to Lieutenant Shulman about that.  He said his

16   investigation was that on the daytime we're busy

17   doing school crossings, we can't arrest people for

18   forged instruments.  That was something that should

19   be done exclusively on the midnight tour.

20                   I explained to him that the law

21   doesn't have different hours of which the statute of

22   criminal possession of a forged instrument doesn't

23   have different hours which to effect an arrest, and

24   he stated -- and I had vouchered the defendant's

25   driver's licence, which he had altered and forged,

1                         ARAZ ALALI

2    as evidence.  I had generated a police incident

3    report regarding the incident.  However, Sergeant

4    Wilson clearly stated it was wrong, but he was

5    outranked by Lieutenant Shulman.

6                   That's just another one that comes to

7    my mind at this point that was an investigation of

8    wrongdoing.  Defendant clearly had violated the law.

9    And secured the evidence that was ordered to by the

10   supervisor, Sergeant Wilson, to unarrest him and to

11   release the vehicle and send him on his way.

12        Q    Was there any investigation conducted of

13   that incident?

14        A    The investigation by Lieutenant Shulman on

15   that.  And his investigation yielded the fact that

16   that type of arrest, the forged instrument, should

17   not be conducted on the -- between the hours of

18   8:00 a.m. to 4:00 p.m.  This was all relayed to

19   Captain Gazzola and Captain Gazzola basically stated

20   that there are school crossings and other functions

21   during the day tour that are paramount.

22        Q    Do you recall how long that investigation

23   was pending?

24        A    I don't know.

25        Q    Did it all occur in a matter of hours?

1                          ARAZ ALALI

2       A     I don't know.

3       Q     Was the person who was arrested, was the

4    defendant released at the scene of the arrest?

5       A     He was released in the middle of the

6    street, yes.  As per the order of the sergeant.

7       Q     So am I correct that Lieutenant Shulman

8    made a decision on the spot to have him released?

9       A     Lieutenant Shulman -- Sergeant Wilson

10   stated it was Lieutenant Shulman who stated to have

11   him unarrested, and I confirmed that after -- I

12   released the defendant, I spoke to Lieutenant

13   Shulman, and he confirmed that.

14      Q     Am I correct that this person was never

15   brought to headquarters?

16      A     That defendant, like I stated earlier, was

17   released in the middle of the street, and so was his

18   vehicle.

19      Q     And were you punished in any way for

20   having made that arrest?

21      A     I don't presently recall, but I believe I

22   was on foot post after that.  Walking post.

23      Q     And at the time that you made this arrest

24   for criminal possession of a forged instrument, what

25   tour were you working?

1                          ARAZ ALALI

2        A    Eight to four.

3        Q    And is it your recollection that after you

4   made that arrest you were assigned to a walking

5   post, but on the eight to four tour of duty?

6        A    I believe so.

7        Q    Were you assigned to a walking post on the

8   eight to four tour of duty before you made the

9   arrest?

10       A    Yes, as a junior officer during the

11  holiday period.  Other times of the year, if I was a

12  junior officer I would walk along with the other

13  junior officers.

14       Q    And are foot posts common on the eight to

15  four tour of duty?

16       A    At times.

17       Q    Are foot posts customary on the eight to

18  four tour of duty?

19       A    If there are enough manpower, I believe

20  so.

21       Q    Other than the incidents you just

22  mentioned of the FedEx driver, the incident with

23  Sergeant Jones, the verbal reprimand from Lieutenant

24  Fortunato and the criminal possession of a forged

25  instrument arrest involving Lieutenant Shulman, can

1                         ARAZ ALALI

2    you think of any other investigations that you were

3    subjected to concerning matters where the defendants

4    in this case knew that you had done nothing wrong?

5         A    Yes.  Investigation conducted by Captain

6    Gazzola where he stated that on the assignment that

7    I was given at North Avenue detail, that I was

8    writing summonses off post, off the area.  The area

9    had been changed and modified from time to time.

10   The type of summonses that were being dispensed were

11   also modified at Captain Gazzola's discretion from

12   time to time.

13                  Another investigation by Captain

14   Gazzola regarding the use of a camera that was put

15   into the car against my will, and notified him and

16   made him aware that the camera in a roll call with

17   other police officers present where he was asking

18   for feedback on the particular type of camera, which

19   is a Coband camera, and I told him that it logs off

20   frequently and doesn't work.  I also gave him a

21   written memo on that as well as going in there with

22   Edward Hayes on at least two occasions, telling him

23   in his office the camera logs off.

24                  They sent the camera out to repair,

25   police repair in Mamaroneck.  Came back, it was

1                         ARAZ ALALI

2    still defective.  However, I was written up for not

3    using the in-car camera after they knew that the

4    camera was defective.

5                    After being notified both verbally,

6    numerous times verbally, with other police officers

7    present, myself and Edward Hayes, and also with

8    written correspondence indicating that.

9         Q    Now, in reference to the contention that

10   you were writing summonses in areas that were off

11   your assigned post, is that the subject of the

12   pending disciplinary hearing or is it a different

13   matter?

14        A    No, it is.

15        Q    It is.  Okay.  And in reference to the

16   alleged failure to use a camera, is that the subject

17   of a pending disciplinary hearing?

18        A    Yes.

19        Q    Now, are there any other instances where

20   you believe you were investigated by -- for doing

21   things that the defendants knew you had not done

22   wrong?

23        A    Yes.  The New Rochelle High School

24   crossing, the assignment that you cross at times is

25   referred to as crossing, at times referred to as

ARAZ ALALI

1
2    patrol, it's very vague on the specific assignment.
3    I have given out summonses for failure to yield to
4    pedestrians.  Primarily for the safety of the school
5    children.  And also the free flow of traffic for the
6    school buses, make sure they discharge students
7    safely.  I have given summonses when it was
8    absolutely necessary to do so in connection with
9    that patrol or crossing and been reprimanded to
10   state that my job is not to give summonses out, it's
11   just to primarily be highly visible and just to
12   cross the kids.  That was also the same scenario at
13   Ursuline School, which is at North and Lovell.
14                On some occasions, very rare
15   occasions, I would have given out summonses for
16   either a motorist going through a red light while I
17   was in the middle of the intersection trying to
18   cross kids or a failure to yield to the students.
19   And there was investigations regarding that when
20   there was no wrongdoing.  They knew no wrongdoing
21   had occurred and they conducted investigations,
22   called me in on the investigations when other
23   members of the service do the same and issue a lot
24   more summonses on those posts.  There's no
25   investigations.

1                          ARAZ ALALI

2              Such as Kathleen O'Connor.  She has

3    routinely had that post at the high school.  She, on

4    a matter of routine, issues summonses at the high

5    school crossing.  There is no investigations that

6    are conducted on her.

7        Q    Now, in reference to the summonses at the

8    New Rochelle High School crossing, who conducted the

9    investigation?

10       A    I believe it was -- I don't know who

11   initiated it but I believe all investigations get

12   forwarded to Lieutenant Fortunato of Internal

13   Affairs Division.

14       Q    Do you know what the outcome was of the

15   investigation?

16       A    Absolutely no wrongdoing there.  I mean,

17   there was a legitimate summons, there shouldn't have

18   been an investigation initiated in the first place.

19   But that was -- I believe Captain Gazzola had

20   routinely made a matter of fact to review every one

21   of my summonses that was issued.  So if he saw that

22   summons was issued at a high school crossing, an

23   investigation would be initiated as to why.

24       Q    Do I understand correctly that after

25   Lieutenant Fortunato investigated it, he found you

1                          ARAZ ALALI

2    had committed no wrongdoing?

3        A    Correct.

4        Q    So you were not punished in any way,

5    right?

6        A    No, just began to investigate it when they

7    knew there was no wrongdoing had occurred.

8        Q    In reference to the Ursuline school, who

9    conducted that investigation?

10       A    As with all investigations, they get

11   funneled through to Lieutenant Fortunato.  He's the

12   only member of the Internal Affairs Division.  It's

13   a one-man unit.

14       Q    What was the outcome of that

15   investigation?

16       A    No wrongdoing.

17       Q    So you were not penalized in any way?

18       A    No.  Again, subject to a departmental

19   investigation.

20       Q    In reference to the investigation

21   concerning the FedEx driver, what was the outcome of

22   that investigation?

23       A    There is nothing about a wrongful arrest.

24   However, a departmental hearing that's outstanding

25   at this time regarding other infractions of the New

1                          ARAZ ALALI

2    Rochelle procedures.

3        Q    In reference to the complaint filed by the

4    FedEx driver, what happened to that?

5        A    Lieutenant Fortunato called me to his

6    office and stated there was absolutely no wrongdoing

7    in connection with that.

8        Q    So you were not punished for that, is that

9    right?

10       A    I was punished for being assigned to

11   dispatching position.  I was on it for six months.

12   I was punished for being a jail escort, punished for

13   barring the use of departmental vehicles, punished

14   for watching suicidal prisoners.  I was degraded and

15   humiliated by other members of the service.

16       Q    How soon after Lieutenant Fortunato closed

17   the investigation were you then assigned to a

18   different job other than being the dispatcher?

19       A    I don't presently recall.  I do recall

20   that as soon as the EEOC notice was filed, I was

21   then put back on the street.  Right after that

22   notice was filed.  Shortly right after.

23       Q    Do you know when Lieutenant Fortunato

24   completed his investigation and determined that the

25   claim was unsubstantiated?

**EXHIBIT 28**

1                         ARAZ ALALI

2    recall presently, at this time, if it was on or about

3    January 7th.

4          Q       Did you ever send him any kind of

5    memorandum or letter or written or other written

6    communication talking about persecution based on

7    heritage?

8          A       As I just stated earlier, yes.

9          Q       Do you recall when you did that?

10         A       I don't presently recall.

11         Q       Do you recall what year you did it in?

12         A       I don't presently recall.

13         Q       If you could just turn the page to

14   Page, 5, the top Subparagraph B, where it says, On

15   February 2nd advised Gazzola in a rebuttal.  Do you

16   see that?

17         A       Yes.

18         Q       Did you have occasion to meet with

19   Captain Gazzola on February 2nd, 2007?

20         A       I don't presently recall the date that

21   I met with him, but yes, I have met with him

22   specifically discussing this.

23         Q       Am I correct you don't recall whether

24   you met with him on February 2nd, 2007?

25         A       I don't presently recall.

Page 134

1                     ARAZ ALALI

2        Q      Do you recall whether or not you met

3    with him on or about February 2nd, 2007?

4        A      I don't presently recall the date.

5        Q      Do you recall whether or not you ever

6    communicated with him in writing on February 2nd,

7    2007?

8        A      I don't presently recall the date, but

9    I have communicated in writing exactly to what's

10   specified in B on Page 5.

11       Q      I just missed the part of your answer.

12   Am I correct that you said you don't recall the date

13   you did that?

14       A      I don't presently recall the date, but

15   however, I do recall that I met with him in person

16   and also given him memorandums advising him of

17   exactly what's described in B on Page 5.

18       Q      Do you know what month you did that?

19       A      I don't presently recall the date.

20       Q      Moving on to Paragraph 10, do you see

21   where it says, as approximate result of Plaintiff's

22   expressions of concern, as evidenced by the preceding

23   Paragraph 9, Defendants agreed to punish him by

24   denying Plaintiff tuition reimbursement.  Do you see

25   that?

1                          ARAZ ALALI

2        A       Yes, I do.

3        Q       Okay.  What is the basis for your

4   belief that the Defendants agreed to punish you, by

5   denying you tuition reimbursement?

6        A       My belief is that PBA president Edward

7   Hayes [ph] had a discussion with Deputy Commissioner

8   Carroll, regarding the tuition reimbursement that was

9   exceeding $10,000.  And he told Edward Hayes, I'm not

10  going to pay Officer Alali's tuition.

11              Furthermore, I received a phone call on

12  my home, from the deputy commissioner on my voice

13  mail, stating he did not have the grades for that or

14  the letter that I submitted to him that I requested

15  to go to school, which I clearly had given him both

16  the grades and the letter, which I have copies of.

17              To date, to date, as I'm sitting here

18  before you now, tuition is still outstanding.  It has

19  not been paid.

20       Q       Has the City of New Rochelle made any

21  payments towards tuition reimbursement for you?

22       A       A small partial payment and the way

23  that was reached is a mystery.  But clearly, there's

24  an outstanding tuition balance that's approximately

25  $10,000 as of date, as of today's date.

1                        ARAZ ALALI

2              Like I said, it was told to Edward

3    Hayes, that for no other reason he's just not going

4    to pay my tuition, and he paid other officer's

5    tuitions.

6         Q    How did you learn of this conversation

7    that was had with Edward Hayes?

8         A    Edward Hayes had informed me of a

9    conversation, after I had brought it to his attention

10   with outstanding bills from Iona College, which was

11   grossly past due and affecting my credit, and he

12   addressed that with deputy commissioner who's in

13   charge of budgeting.

14        Q    Now, earlier in your response you used

15   the title deputy commissioner, but then said Carroll.

16   Was that in error?

17        A    If I said that, it's in error.  The

18   deputy commissioner I'm referring to is Deputy

19   Commissioner Murphy.

20        Q    Okay.  You mentioned you received a

21   message at home from the deputy commissioner?

22        A    Correct, on my home voice mail.

23        Q    And I understand that he told you in

24   substance that he didn't have grades or letter

25   authorizing you to do what?

                              ARAZ ALALI

1

2        A        He didn't have the grades for Iona

3   College.

4        Q        Right.

5        A        And furthermore, did not have a letter

6   authorizing me to go to Iona College, and I had

7   submitted both the grades, which I'm on the Dean's

8   List and also I a signed letter by him, by the deputy

9   commissioner, himself, authorizing me to go to

10  school.

11              So, then at a later time, I sat me down

12  with Edward Hayes and he came up with a number, that

13  both Edward Hayes and I ask how he came to, and we

14  don't know, that he's going to pay a small portion

15  and each officer had a different amount.

16              But to date, I still have an

17  outstanding balance with Iona College and it's

18  currently effecting my credit.

19       Q        How much did the city of New Rochelle

20  pay to Iona College?

21       A        I don't presently know.  It was a small

22  amount.  It was not close to the amount that was

23  owed.

24       Q        What is the basis for your belief that

25  under the tuition reimbursement plan that they should

```
1                      ARAZ ALALI
2   have paid the entire amount?
3       A     Well, the very fact that he clearly
4   told Edward Hayes that he's not going to pay the
5   tuition, until he was then served after with a facts
6   of basically, of my counsel Lovett's memorandum of
7   not retaliating.  Subsequent to that, he agreed to
8   pay a portion.
9               Prior to that, he flat out told Edward
10  Hayes, he told myself, that he's not paying any of
11  the tuition, whatsoever.
12              After he received the correspondence
13  from counsel Lovett, he had reached out to me on my
14  voice mail at home, stating that he did not have the
15  grades, nor had given the authorization to go to
16  college, which that is a flat out lie.
17              I had submitted the grades and also had
18  submitted the letter which he authorized with his
19  signature, that I can attend school, attend Iona
20  College.
21      Q     After you received that voice mail
22  message, did you give him another copy of the grades
23  and the letter?
24      A     I don't presently recall, but I
25  definitely had a conversation with him regarding
```

Page 139

ARAZ ALALI

1
2    that.

3              I believe he said that he found the

4    letter and that he was going to pay.  He came up with

5    a number, a small portion, of it.  And when he was

6    asked by myself and Edward Hayes how he arrived at

7    that number, how he came up with that number, he

8    couldn't provide an explanation.

9         Q    When you say a small portion, do you

10   mean less than half?

11        A    I believe so.

12        Q    Okay.  Is there any documentation as to

13   what you're entitled to under the tuition

14   reimbursement plan?

15        A    There is the letter that he authorizes,

16   that I generate, that they will pay the tuition, that

17   he sign off on.

18             That's basically a memo generated by

19   myself to the deputy commissioner, which he

20   authorizes.  But understand this, that even prior to

21   paying that small portion, he had told Edward Hayes

22   and myself that he's not paying any of it and he only

23   paid a small portion after receiving the

24   correspondence from counsel Lovett that I was being

25   singled out, based on my heritage.

1                          ARAZ ALALI

2          Q      Okay.  Mr. Alali, at the last sentence

3    on Page 5 and it goes over to Page 6, it says, by

4    reason of Defendants' intentional discriminatory

5    treatment of Plaintiff, he has been caused

6    substantial pecuniary damages.  Do you see that?

7          A      Yes, I do.

8          Q      Can you explain what those damages are?

9          A      Surely.  The fact that I was falsely

10   rated below standards, barred and prevented me from

11   doing any type of overtime assignments, off duty

12   assignments, any type of mutual switches.

13         Q      What would be the economic impact of

14   being able to have mutual switches, versus not being

15   able to have mutual switches?

16         A      It would not be an economic impact for

17   mutual switches, however it would enable me to

18   alleviate child care issues that I would have at

19   home.

20         Q      In reference to special off duty

21   assignments, do you know whether or not there's a

22   limitation as to how many hours a week a police

23   officer is permitted to work special, off duty

24   assignments?

25         A      I know that there is a rule in place.

1                       ARAZ ALALI

2    I don't know the exact hours, but I know that that

3    rules have also been bent, and officers have exceeded

4    whatever the amounted hours are.

5               For the past few years, I have not been

6    permitted to work any type of overtime or off duty

7    jobs, because of the false, below standards

8    evaluations.

9        Q       Do you know how many hours are provided

10   for in the rule, regulating special off duty

11   assignments?

12       A       As I said earlier, no, I do not know

13   the amount of hours.

14       Q       Okay.  Have you ever calculated your

15   financial loss, incurred as a result of not working

16   special off duty assignments?

17       A       I don't presently recall if I

18   calculated that.  However, I did suffer substantial

19   monetary loss, due to the fact that false, below

20   standard performance evaluations.

21       Q       Is that as a result of not being able

22   to work special off duty assignments?

23       A       That is correct.

24       Q       Okay.  Officer, I'm going to show you

25   what has been marked as Defendants' Exhibit B for

1                        ARAZ ALALI

2    identification, and ask you if you can identify that

3    document?

4         A      Yes.

5         Q      Okay.  Have you ever seen that document

6    before today?

7         A      Yes, I have.

8         Q      Okay.  When did you first see it?

9         A      I don't presently recall.

10        Q      Okay.  Did you receive this document at

11   your home?

12        A      Yes, I did.

13        Q      Did you respond to it in any way?

14        A      I talked it over with counsel.

15        Q      Did you have occasion to communicate

16   with Mr. Iarocci, after you received this letter?

17        A      No.

18        Q      Is there a reason that you didn't

19   respond to Mr. Iarocci?

20               MR. LOVETT:  It's a yes or a no.

21        A      Yes.

22        Q      What was that reason?

23        A      There's a -- handling this matter with

24   my counsel, because I was --

25        Q      I'm going to show you what's been

Page 148

1                          ARAZ ALALI

2      pre-marked as Defendants' C for identification.

3      Officer Alali, is that a copy of the charge that you

4      filed with the EEOC?

5           A      Yes, it is.

6           Q      I'm going to show you what has been

7      pre-marked as Defendants' D for identification and

8      there's a copy for your counsel attached.  Can you

9      identify Defendants' D for identification?

10                 I'm going to withdraw that question and

11     rephrase it.  Referring to Defendants' D for

12     identification, is that a copy of the charges and

13     specifications that are pending against you at the

14     moment?

15          A      Yes.

16          Q      Now, in reference to specification one,

17     it starts on Page 1, reckless operation of a

18     department vehicle, do you see that?

19          A      Yes.

20          Q      Were you offered a command discipline

21     in resolution of that charge?

22          A      I don't presently recall.

23          Q      I'm going to show you what's been

24     pre-marked as Defendants' E for identification.  Here

25     is a copy for your counsel, and I'm going ask you if

1                     ARAZ ALALI

2    you can identify that document?

3         A     Yes.

4         Q     Can you tell us what it is?

5         A     It's an incident report on an assault.

6         Q     And did you make an arrest in this

7    case?

8         A     Yes.

9         Q     Did that result in a civilian

10   complaint?

11        A     I do not know.

12        Q     And looking at the lower left hand

13   corner of the exhibit, is that a copy of your

14   signature?

15               MR. LOVETT:  The first page?

16               MR. MEISELS:  The first page, yes.

17        A     It's a photocopy of it, yes.

18        Q     It is.  Looking at the lower, left hand

19   corner of the second page, is that a photocopy of

20   your signature?

21        A     Yes.

22        Q     I'm going show you what has been

23   pre-marked as Defendants' F for identification, and

24   ask if you can identify that document?

25        A     No.

Page 150

1                        ARAZ ALALI

2         Q      Referring to the middle of the page,

3   where there appears to be a scrawl, is that your

4   signature?

5         A      No.

6         Q      Referring to September 10, 2006, did

7   you have occasion to be present at the Thruway Diner?

8         A      I don't presently recall.

9         Q      Have you ever been in the Thruway

10  Diner?

11        A      Yes.

12        Q      And referring back to the fall 2006,

13  were you ever in the Thruway Diner?

14        A      I don't presently recall.

15        Q      Did you ever have a dispute with anyone

16  in the Thruway Diner, concerning a discount on a

17  bill?

18        A      No.

19        Q      Did you ever threaten to arrest a

20  cashier because she wouldn't give you a discount on a

21  bill?

22        A      No.

23        Q      Did you ever threaten to arrest a

24  cashier for disorderly conduct because she wouldn't

25  give you a discount on a bill?

1                          ARAZ ALALI

2    paragraph?

3          A        The reassignment that I was talking

4    about was being reassigned to the dispatcher

5    position, as well as -- primarily dispatcher, as well

6    as watching designated risk suicidal prisoners,

7    prison transporter and court officer assistance,

8    assisting court officers, New York State court

9    officers.

10          Q        Did there come a time that you learned

11    that your reassignment was occasioned because of a

12    civilian complaint that had been filed against you?

13          A        Depends who you talk to.  Commissioner

14    Carroll had a stance on it, and Lieutenant Fortunato

15    had a different stance on it.

16          Q        Is it correct that the commissioner

17    told you that the reason for the assignment was

18    because of a civilian complaint?

19          A        Yes.

20          Q        Did he tell you it that before or after

21    you gave him this document?

22          A        After I gave him this document.

23          Q        And did he tell you that in that

24    meeting that you had with him, the short time after

25    you gave him the document?

                              ARAZ ALALI

1

2        A        Yes, which Edward Hayes was present as

3    well.

4        Q        And can you tell me in words or

5    substance what the commissioner said to you at that

6    meeting?

7        A        Basically, that I had been reassigned

8    due to a civilian complaint, and I will be there

9    until the investigation is over.

10       Q        And can you tell me in words or

11   substance what Mr. Hayes said at the meeting?

12       A        Mr. Hayes stated and reaffirmed if, in

13   fact, there was a standing order from Captain Gazzola

14   stating that I had to perform specific tasks, such as

15   being a dispatcher, designated risk prisoner watch,

16   prisoner transporter, court officer's assistance, the

17   Commissioner did state there was a standing order and

18   that I had to perform those tasks while the

19   investigation was ongoing.

20       Q        Did Edward Hayes say anything, other

21   than what you've already explained?

22       A        I don't presently recall.

23       Q        Can you tell us in words or substance

24   what you said at the meeting?

25       A        Basically, that I was again, being

1                          ARAZ ALALI

2   singled out due to my heritage.  That I've been --

3   the standing order by Captain Gazzola was, once

4   again, a means to degrade and humiliate me.

5                I'm working hard.  Took this

6   opportunity, under false complaint, to punish me and

7   to degrade me even further then he already has on

8   previous occasions.

9        Q    Now, the civilian complaint that was

10  referenced, was that a complaint by Mr. Edwin Veras?

11       A    That's what was related to me by

12  Lieutenant Fortunato.

13       Q    Is Edwin Veras the Fed Ex driver that

14  we discussed in the first part of the deposition?

15       A    Yes.

16       Q    Do you know whether or not Mr. Veras

17  actually filed a civilian complaint against you?

18       A    No, I do not.

19       Q    Were you ever interviewed by the

20  Internal Affairs department in reference to a

21  civilian complaint, supposedly filed by Edwin Veras?

22       A    Yes.  I was interviewed and also told

23  that I had absolutely no wrongdoing in my encounter

24  with Mr. Edwin Veras and the arrest and the facts and

25  circumstance prior to the arrests were lawful.  And

1                         ARAZ ALALI

2      that was told to me by Lieutenant Fortunato and also

3      present was PBA president, Edward Hayes.

4            Q      Was Edward Hayes present when you were?

5            A      Yes.

6            Q      On how many occasions did you speak to

7      Lieutenant Fortunato about the Edwin Veras complaint?

8            A      Numerous times.

9            Q      Was Mr. Hayes present on each occasion?

10           A      Each and every occasion, yes.

11           Q      As you sit here today, can you

12     distinguish between what was said in each one of

13     those different meetings you had with Lieutenant

14     Fortunato?

15           A      No.  Just that I was there for an

16     extended period of six months so, I had numerous

17     meetings on this false allegations.  And prior to, I

18     would say, midway through this six month period,

19     approximately, Lieutenant Fortunato stated to myself

20     and Edward Hayes that I had committed no wrongdoing

21     with Mr. Veras, that investigation was over and

22     arrest was lawful and the facts and circumstances

23     prior to the arrest of Mr. Veras was lawful and he

24     had no problem with the outcome of Mr. Veras.  And

25     that was, also, like I stated earlier, witnessed by

1                          ARAZ ALALI

2    Edward Hayes with each and every meeting I had with

3    Lieutenant Fortunato.

4                    However I did remain inside after the

5    investigation was over and we had spoken to

6    Commissioner Carroll, that the investigation was over

7    he acknowledged it was over, however kept me inside

8    for many months after the investigation was over.  I

9    would like to make that clear.

10                   And we went numerous times to

11   Commissioner Carroll and Lieutenant Fortunato and as

12   I stated earlier, it depends what stance you had.

13   Lieutenant Fortunato stated that this was not a

14   result, he did not have any knowledge that it was a

15   result of a complaint or a standing order by Captain

16   Gazzola.

17                   Commissioner Carroll said the opposite,

18   and both times with meetings with Fortunato, numerous

19   times with meetings with Fortunato and Commissioner

20   Carroll, Edward Hayes was present to this as well.

21                   This was only after the filing of the

22   EEOC, the first day that I had come back, was I put

23   back to resume normal duties.

24        Q    Do you know when the Internal Affairs

25   investigation of a civilian complaint, filed by Edwin

1                      ARAZ ALALI

2    Veras, was completed?

3         A     I didn't know if Mr. Veras had filed a

4    complaint.  I was just told that, through Lieutenant

5    Fortunato.

6         Q     Am I correct that you were interviewed

7    a number of times by Lieutenant Fortunato?

8         A     I believe so.

9         Q     So, based upon that, was it your

10   impression that there was an investigation?

11        A     Yes.

12        Q     And do you know when the investigation

13   was concluded?

14        A     When Lieutenant Fortunato stated it was

15   concluded.

16              As I stated earlier, several months

17   after me being let go after the EEOC filing by

18   counsel.

19        Q     Referring to Defendants' O, you

20   indicated that, furthermore, I was given a direct

21   order by Lieutenant Debarras [ph].  Do you see that?

22        A     Yes.

23        Q     Do you recall receive any order from

24   Lieutenant Debarras, directly?

25        A     Absolutely.

1                    ARAZ ALALI

2    and false evaluations, that I would only patrol main

3    streets.  That's clearly not the case as indicated by

4    the areas of occurrence on my arrests and summonses

5    given through out the City of New Rochelle.  Just

6    another fabrication on the administration.

7         Q      And skipping two sentences, instead, he

8    chose to focus on main road and parkway off ramps.

9    Does that reference the same question as to where you

10   were focused and whether or not it was too focused on

11   highways and some other places?

12        A      That's exactly what I stated earlier,

13   that the evaluating Sargeant in conjunction with

14   Captain Gazzola, had fabricated that, stating I

15   focused on main roadways and parkway off ramps.

16   That's a false statement.  That's a distortion of the

17   truth.

18        Q      And then the next sentence says, that

19   is a slanderous statement.  Do you see that?

20        A      Yes.

21        Q      Can you explain what is there about

22   that statement that's slanderous?

23        A      It's an out and out lie.  I don't know

24   how else to put it.  That's clearly supported by my

25   numerous summonses given in different areas of the

                                    ARAZ ALALI
1
2   sector that I'm assigned, as well as arrests.

3            If you look at the next line, that's

4   clear.  The fact that I had an arrest on Rombru Drive

5   for a burglary clearly shows the distortion of the

6   truth.  That is a very highly residential area in the

7   north end of New Rochelle, that I affected a numerous

8   burglary arrests over there, shows that that is

9   nowhere near an on ramp or off ramp or main roadway.

10           It's a very excluded highway

11  residential area of north end New Rochelle, away from

12  any commercial establishments or on ramps or main

13  roadways.

14       Q     Referring, turning to the second page

15  of the document towards the middle of the page, do

16  you see where it says, Sargeant Wilson then states

17  there were eight civilian complaints?

18       A     Yes.

19       Q     And then you indicate, I do not have

20  any knowledge of them.  Was that accurate when you

21  wrote that?

22       A     I didn't have knowledge of all eight

23  complaints, is accurate, yes.  I might have knowledge

24  of a few, as I indicated with Mr. Veras, but not of

25  all eight complaints.

1                          ARAZ ALALI

2              That was then reworded by Captain

3     Gazzola to have been incorrect, and I don't know the

4     number he came up with, but it was less.

5              Again, that statement is a distortion

6     of the truth, and I wasn't made aware of the majority

7     of these complaints.

8         Q    Now, the document then goes on to say,

9     it would only seem logical that if I was exonerated

10    from a complaint, that it should not have a negative

11    bearing on my evaluation.  Do you know whether or not

12    you were exonerated on any of these complaints?

13        A    As I stated earlier, the complaint, the

14    fictitious complaint that Mr. Veras had lobbied

15    against me, I was told by Lieutenant Marshall and

16    Captain Gazzola that I was exonerated, due to the

17    fact that I was on camera and even referenced to what

18    I stated earlier, a joke about it was not so bad

19    about being on camera after all.

20        Q    Do you know whether any of those

21    complaints resulted in the finding that they were

22    unsubstantiated?

23        A    I don't know, as I stated earlier, the

24    difference if it's synonymous, unsubstantiated or

25    exonerated.  However, that was used against me in the

1                              ARAZ ALALI

2      performance evaluation.

3                    The fact that the number was not even

4      correct of complaints, and the fact that it was

5      either unsubstantiated or exonerated that I was being

6      rated below standard for such things, is wrong.

7           Q      As far as you understand, is there a

8      difference between a complaint being unsubstantiated

9      versus being exonerated?

10          A      To me, they both lead to the same

11     conclusion, that there was no wrongdoing on the part

12     of the officer that was involved.

13          Q      I'm going to show you what's been

14     pre-marked as Defendants' S for identification and

15     ask you if you can identify that document?

16          A      Yes.

17          Q      Can you tell us what it is?

18          A      It's a document communication by

19     Captain Gazzola to me, punishing me for a false below

20     standards evaluation in 2006.

21          Q      Now, do you recall when you received

22     this document?

23          A      On or about the date that's specified

24     in March 2007.

25          Q      Have you, yourself, ever reviewed the

Page 184

ARAZ ALALI

1
2    department's rules and regulations?

3        A      Yes.

4        Q      Do you know whether or not the

5    quotation here from the rules and regulations is

6    accurate?

7                MR. LOVETT:  Your copy has a quote?

8        Q      The quote is referenced by the bold

9    language?

10       A      Can you rephrase that question, please?

11       Q      Sure.  Do you know whether or not the

12    material referenced in bold on this document,

13    accurately reflects the provision in the department

14    rules and regulations concerning the limitations on

15    your overtime work?

16       A      I assume so, since I consulted with

17    Edward Hayes.

18       Q      Did he advise you that these

19    limitations were provided for in the department's

20    rules and regulations?

21       A      I believe so.

22       Q      I'm going to show you what's been

23    pre-marked as Defendants' T for identification and

24    I'm going to ask you if you can identify that

25    document?

1                          ARAZ ALALI

2          A      Yes.

3          Q      Can you tell us what it is?

4          A      It is a communication from Captain

5    Gazzola to myself regarding his finding of

6    performance evaluation of 2006.

7          Q      Do you recall when you received this?

8          A      On or about March of 2007.

9          Q      I'm sorry, on or about March 21st, did

10   you receive it?

11         A      No.  On or about March 2007.  I don't

12   know the exact date.

13         Q      Was it your understanding that Captain

14   Gazzola did amend the evaluation to indicate that you

15   had receive seven civilian complaints, not eight?  Is

16   that correct?

17         A      That's what it states in this

18   communication, yes.

19         Q      I'm going to show you what's been

20   pre-marked as Defendants' U for identification, and

21   other than the handwritten notation on the top of the

22   first page indicating Copy, can you identify this

23   document?

24         A      Yes.

25         Q      Can you tell us what it is?

1                          ARAZ ALALI

2    was asked about it, he said that's what he heard

3    through third party information.

4                    Again, he also said there was a

5    tremendous amount of pressure put on him to write and

6    author something, due to Captain Gazzola leaning on

7    him to do something, which was Captain Gazzola's idea

8    for me to ride with him.  So it's a bunch of fluff

9    and falsehoods in there, once again.

10                   I further went and stated on the last

11   page, if I committed these nine departmental

12   infractions, why can't I be given one out of the

13   nine, authenticating it to be true.  That was

14   depicted in my rebuttal letter.

15                   They were unable to confirm or verify

16   one incident out of the nine that they stated I had

17   committed this, while I was with Sargeant Austin.

18        Q       Could you turn to the fourth page of

19   the document, is that your rebuttal letter?

20        A       Yes, it is.

21        Q       And could you turn to the second page

22   of your rebuttal letter and looking at the second to

23   last sentence of the first paragraph, where it says,

24   based on my continual and consistent work ethic and

25   being the chief producer on the second tour, I have

1                          ARAZ ALALI

2    developed the opportunity to identify both

3    unrighteous and admirable citizens?

4          A      I'm sorry.  I need to stop you.  I

5    don't see that.

6                  MR. MEISELS:  I don't either.

7          Q      It's the next to last page of the

8    document.

9          A      Of my rebuttal?

10         Q      Yes.

11                MR. LOVETT:  Yes next to last page of

12       this Exhibit Z.

13         Q      It's the first paragraph.  On top it

14   says interdepartmental communication.  Take your

15   time.

16                MR. LOVETT:  Here, based on my

17       continual and --

18                MR. MEISELS:  That's right.

19         A      I got it.

20         Q      Take a look at that.  My question is,

21   can you explain what you meant by an unrighteous

22   citizen?

23         A      Basically, I've developed the skills

24   throughout my law enforcement career, to identify

25   both perpetrators and citizens that are not

1                          ARAZ ALALI

2    perpetrators of the law.  Unrighteous is obviously

3    referring to perpetrators.

4         Q       Based upon your training and experience

5    as a police officer, was it your understanding that

6    when you make an arrest that you should provide

7    someone with their Miranda rights before you

8    interrogate them?

9         A       Prior to interrogation, yes.

10        Q       I'm going show you what's been

11   pre-marked as Defendants' AA for identification and

12   ask if you can identify that document?

13        A       Yes.

14        Q       Can you tell us what it is?

15        A       Command discipline report from 2002.

16        Q       Okay.  Now, turning to the bottom of

17   the page on the left hand side, is that a photocopy

18   of your signature?

19        A       Yes.

20        Q       And above your signature there's a

21   check mark next to the word, accept.  Does that

22   indicate that you accepted this command discipline?

23        A       Yes.

24        Q       And was that a letter of reprimand that

25   you received?

1                    ARAZ ALALI

2        A      Yes.  I was told if I didn't accept it

3    charges would be preferred against me.  Although,

4    what's in this summary of investigation is

5    untruthful, I was told to accept the letter of

6    reprimand, being that it's a letter of reprimand,

7    otherwise charges would be preferred against me, and

8    I was destined to lose.

9        Q      Who told you that?

10       A      Captain Gazzola.  That was early on

11   with my career with the New Rochelle Police

12   Department.

13       Q      At the time that you accepted this

14   command discipline, were you seeking a transfer to a

15   different police department?

16       A      I don't recall the time I was, but

17   early on in my career I was, due to the fact that I

18   was being harassed and persecuted based on my

19   heritage.  I wanted to get out of a hostile and

20   unfair work environment.

21       Q      Did you apply for a transfer to any

22   other police department in 2002?

23       A      What I presently recall, I had resumes

24   out early on in my career.  I don't presently recall

25   if it was in 2002 or shortly there after.

1                          ARAZ ALALI

2          Q      When you sent those resumes did you

3    provide cover letters?

4          A      I don't presently recall.

5          Q      Did you keep copies of your

6    correspondence from 2002?

7          A      Correspondence, my resumes?  I should

8    have copies of them.

9          Q      Did you keep copies of your cover

10   letters that accompanied the resume?

11         A      I don't recall if I had a cover letter.

12         Q      Do you know which departments you sent

13   those resumes to?

14         A      Basically, within Westchester County,

15   numerous departments, in hope to the get out of this

16   incredibly biased work environment.

17         Q      When you prepared an application for

18   employment with another department, is it sufficient

19   just to mail another resume?

20         A      I wouldn't call them applications, I

21   would call them resumes.  There's no applications,

22   per say.

23         Q      Have you ever actually filled out an

24   application for employment with another police

25   department, after you joined the New Rochelle Police

1                        ARAZ ALALI

2    Department?

3        A      Yes.  As I indicated earlier, Town of

4    Mamaroneck and Westchester Police Department.  I had

5    done background investigation, not applications.

6        Q      Do you recall what year you did that

7    in?

8        A      No, but it was after 2002.  But also,

9    other resumes went out to other departments, besides

10   those two.

11       Q      I'm going to show you what's been

12   pre-marked as Defendants' BB for identification, and

13   ask you if you can identify that document?

14       A      Yes.

15       Q      Can you tell us what that is?

16       A      A letter of reprimand from Captain

17   Gazzola to me, in the form of an interdepartmental

18   communication.

19       Q      Now, in reference to that discipline

20   that you accepted in December of 2002 and received

21   this letter of reprimand, did you ever consult with

22   your PBA representative about it?

23       A      I don't presently recall, but like I

24   stated, it was told to me by Captain Gazzola that

25   it's only a letter and to fight it I was destined to

```
 1                     ARAZ ALALI
 2   lose numerous vacation days numerous vacation days.
 3   I was basically strong armed to sign.  As I stated,
 4   the facts and circumstance in the command discipline
 5   are not true, however I was told basically, that I
 6   strongly urged to sign the letter of reprimand and
 7   influenced to do so.
 8        Q     Did you seek advice from anyone else
 9   other than Captain Gazzola about what you should do?
10             MR. LOVETT:  Objection as to form.  You
11        can answer.
12        A     I don't presently recall.
13        Q     Did you ever have occasion to discuss
14   any grievances you might have with PBA president
15   Pajoli [ph]?
16        A     It's a long time ago.  I do not
17   presently recall.
18        Q     Do you recall what years Officer Pajoli
19   was president of the PBA?
20        A     No.  I do remember when I started he
21   was PBA president.  I don't know how much longer
22   after he was president of the PBA.
23        Q     Did he ever attend any meetings that
24   you had with Captain Gazzola?
25        A     It was such a long time ago, I do not
```

1                          ARAZ ALALI

2    presently recall.

3          Q    I'm going to show you what's been

4    pre-marked as Defendants' CC for identification and

5    ask you if you can identify that document?

6          A    Yes.

7          Q    Can you tell us what that is?

8          A    Again, another false command discipline

9    report generated by Sargeant Gionnati [ph] in the

10   beginning of my career with New Rochelle Police.

11         Q    And referring to the lower left hand

12   corner of the first page, does that appear to be a

13   xeroxed copy of your signature?

14         A    Yes.

15         Q    Did you check off the box that says,

16   accept the finding and the proposed disciplinary

17   action?

18         A    Yes.  Again, after being told by

19   Captain Gazzola that it's only one day leave, that I

20   was going to be taking and if I fought it, I would be

21   destined to lose in a hearing which the commissioner

22   appoints a hearing officer and made a reference that

23   it was a kangaroo court.

24         Q    Did you have occasion to discuss this

25   with your PBA representative before you signed it?

1                        ARAZ ALALI

2       A       I don't presently recall.  It was in

3   the beginning of my career.  It was a long time ago.

4       Q       At the time that you agreed to this

5   command discipline, were you seeking a transfer to

6   another department, other than the New Rochelle

7   Police Department?

8       A       I don't presently recall.

9       Q       I'm going to show you what's been

10  pre-marked as Defendants' DD and ask if you can

11  identify that document?

12      A       Yes.

13      Q       Can you tell us what that is?

14      A       It's a command discipline report that I

15  was, again, urged to take.  It was a call of kids

16  trapped in a burning car.

17              There was a -- they stated Captain

18  Gazzola states, whether that it's your fault or not

19  your fault, that for all motor vehicle accidents you

20  are going to get a letter of reprimand.

21              Again, this was early on in my career,

22  and it was a very serious call of kids trapped in a

23  burning car, and they urged me to respond code three.

24              In my career, I don't think I've had

25  more than this one call, maybe a few to respond code

ARAZ ALALI

1

2    three and there's no damage to the vehicle, the

3    police vehicle, whatsoever.

4                    But like I said, it was routine and

5    customary to give a letter of reprimand for any type

6    of accident that involve police car whether it's your

7    fault or not your fault.  That's the department

8    routine.

9         Q        This accident, did it involve a

10    civilian's vehicle or another police vehicle?

11         A        My vehicle with a civilian vehicle.  My

12    police vehicle with a civilian vehicle.

13         Q        Your police vehicle hit a civilian

14    vehicle?

15         A        The civilian vehicle hit my vehicle,

16    struck my vehicle.

17         Q        Were you proceeding the wrong way on a

18    one way street?

19         A        No.

20         Q        Were you making a U-turn?

21         A        No.

22         Q        How did the accident happen?

23         A        The civilian was speeding and wouldn't

24    stop for my lights and sirens.  And Sargeant Myron

25    Joseph who is an accident investigator, measured the

```
 1                        ARAZ ALALI
```

 2    skid marks of the civilian vehicle who was speeding

 3    into the yacht club at the time.

 4                Like I said, there was actually no

 5    damage to the police vehicle, which was my vehicle.

 6    There's not even a scratch on the car, but I was told

 7    that it's the New Rochelle Police Department's matter

 8    of routine that whether it's your fault or not your

 9    fault, you get a letter of reprimand for any type of

10    accident involving a police vehicle, and I was urged

11    again to sign it by Captain Gazzola.  And it was also

12    sent, like I said on a code three call, kids trapped

13    in a burning car.

14         Q      Did this accident occur on Nautilus

15    Place?

16         A      I don't recall exactly the location of

17    the accident.

18         Q      Do you know if Nautilus Place is a one

19    way street?

20         A      I do not know that.  I don't know.

21         Q      Did you consult with a PBA

22    representative before you signed this?

23         A      I don't presently recall.

24         Q      Did you consult with anybody before you

25    signed it?

1                           ARAZ ALALI

2          A       I don't presently recall.

3          Q       Did you ever discuss this with Joseph

4    Pajoli before you signed it?

5          A       I don't presently recall.

6          Q       I'm going to show you what's been

7    pre-marked as Defendants' EE for identification and

8    ask you if you can identify that document?

9          A       It's another command, false command

10   discipline against me.

11         Q       And is it one that you agreed to?

12         A       Again, under the same pretext that it's

13   a letter of reprimand.  If I did not, I would be

14   entering into a kangaroo court, where a hearing

15   officer is appointed by the commissioner, and I would

16   lose substantial amounts of vacation and leave time.

17                 So, I was urged to sign this as a

18   letter of reprimand.

19         Q       Did you discuss it with anyone before

20   you sign it?

21         A       I don't presently recall.  Perhaps I

22   discussed it.

23                 MR. LOVETT:  Don't guess.

24         A       I don't presently recall.

25         Q       Did you discuss it with police officer

Page 213

```
 1                      ARAZ ALALI
 2  Edward Hayes before you signed it?
 3        A      I don't presently recall.
 4        Q      Did you seek advice from anybody before
 5  you signed it?
 6        A      I don't presently recall.  Advice was
 7  given to me by Captain Gazzola to sign it as a
 8  letter, only.  And as I stated, if I declined, I
 9  would lose substantial -- whether the fact or
10  circumstances, again, of the complaint are
11  untruthful, that I would be definitely losing some
12  substantial leave time, because they would be
13  appointing a hearing officer, and I would be entering
14  into a kangaroo court.
15        Q      At the time that Captain Gazzola
16  represented that to you, was your PBA officer
17  present?
18        A      I don't presently recall.
19        Q      Earlier today you mentioned that PBA
20  President Hayes often accompanied you on meetings
21  with Captain Gazzola, is that right?
22        A      When I was issuing the communications,
23  yes.
24        Q      And when you issued this communication
25  of accepting this, was he present?
```

Page 214

ARAZ ALALI

1

2      A      I didn't issue the communication.  I

3  had received a communication.  Captain Gazzola issued

4  it.  I didn't issue this communication.

5      Q      Where were you when you signed this

6  letter?

7      A      In Captain Gazzola's office.

8      Q      And do you recall if anyone else was

9  present, besides you and Captain Gazzola?

10     A      I don't presently recall.

11     Q      In reference to the summary of the

12  investigation, are you familiar with the incident

13  that gave rise to this discipline?

14     A      Yes.

15     Q      What happened?

16     A      There was an investigation generated by

17  Lieutenant Fortunato which was modified several

18  times.

19            He had put in the investigation that

20  use of a PA system, the public address system, is

21  only to be used in emergencies.

22            The incident involved a -- and wanted

23  to basically issue a command discipline for such and

24  this was an emergency situation.

25            Again, there were -- after I told --

```
1                        ARAZ ALALI
2    they knew the facts and circumstances of the case,
3    they then reluctantly modified it, and it's
4    untruthful that it states that I was discourteous and
5    unprofessional to the motorist.
6                 I exercised great restraint.  The
7    motorist left after I had conducted a traffic stop,
8    and I had to pursue the motorist and get back in the
9    vehicle.  I exercised great restraint by not and
10   placing the motorist under arrest.
11        Q     What PA system are you referring to?
12        A     Inside only some of the cruisers, other
13   cruisers, there have been a lot of cruisers that PA
14   systems have been pulled out, as have the AM FM
15   radios.
16                 On my vehicle, car 18, has been cut out
17   by the order of Captain Gazzola.  This particular car
18   I was fortunate enough to have a PA system on the
19   front of the car that directs a motorist to do what
20   you want them to do.
21        Q     What did the motorist claim you said
22   over the PA system?
23             MR. LOVETT:  Objection as to form.
24        A     I don't know what they claim to say, I
25   was not privy there, when Lieutenant Fortunato was
```

1                        ARAZ ALALI

2    interviewing or interrogating, however you want to

3    put it, the motorist.  I just know what I said was

4    for the motorist to pull to the right of the roadway.

5         Q      Do you know of the nature of the

6    discourteous and unprofessional conduct was alleged

7    to be?

8         A      No, I do not.

9         Q      No one ever told you that?

10        A      No.

11        Q      Did you ever ask?

12        A      Yes.

13        Q      Who did you ask?

14        A      Lieutenant Fortunato.

15        Q      And what did he tell you?

16        A      He stated that the motorist claimed

17   nothing that was discourteous, but I had taken her

18   keys away from her and thrown them on the bushes,

19   which was clearly untrue.  I took the keys away from

20   her and placed them on the hood of my vehicle,

21   because she had left after, as I indicated earlier,

22   conducted a traffic stop.

23              I asked her for her license and

24   registration and she left the traffic stop, after I

25   was speaking to her.  So, when I had to pursue her

1                          ARAZ ALALI

2    with the use of the PA system, I had to take the keys

3    away from her because at this time I didn't want her

4    to leave a second time.

5              The keys were not thrown in the bushes.

6    They were not lost.  They were placed on the hood of

7    my cruiser, which is customary on that type of a

8    traffic stop, for my safety as well as hers.

9         Q    I'm going to show you what was

10   pre-marked as Defendants' FF for identification and

11   ask you if you can identify that document?

12        A    Oh, yes.

13        Q    Can you tell us what that is?

14        A    A command discipline that was upped by

15   Captain Gazzola from one day to two days, in his

16   terms, for the egregious violation of parking in

17   front of Dunkin Donuts to pick up their coffee,

18   meaning the desk officer and the civilians.

19              As a matter of routine, if you look at

20   the summonses that were issued in front of Dunkin

21   Donuts, they tell us that they, meaning Gazzola,

22   Carroll, do not issue tickets there they get coffee

23   there.  So there's routinely, there's no tickets

24   issued there.  There are police cars that are parked

25   in front, in case of emergency, they have easy access

1                          ARAZ ALALI

2     to get out because it's a very congested parking lot.

3               I was written up for one day, but he

4     said this was an egregious violation and demanded two

5     days leave.  At this time, I clearly remember I

6     thought I was going to the county police department,

7     which I was given the green light to go there and

8     completed my background and they were ready to hire

9     me.  And I was told if I fought this, there were

10    would be charges against me, that would hinder me

11    from going to county.

12              I told them this was ridiculous, as did

13    President Edward Hayes.  No one else that we know of

14    in the history of the police department has been

15    written up for parking in front of Dunkin Donuts, yet

16    alone lost two vacation days.

17              He stated if I wanted to get out of

18    here, I would sign this.  So, I initially, you know,

19    I mean it's clear I wanted to get out of there.  I

20    was told, like I said, he upped it.  He said I'm a

21    captain, I can do that.  He upped it to two days.  I

22    thought again, it was unjust, and I was being singled

23    out once again, based on my heritage.

24         Q    When you say upped it two days?

25         A    He doubled it, yes.  It was initially,

1                          ARAZ ALALI

2    one day was prescribed.  When I went to him, he said

3    I was captain of patrol.  It's an egregious

4    violations and I'm upping it to two days, so it

5    doubled the penalty.  He recommended two days and I

6    was, again, I thought I was out to the County Police

7    Department, but apparently I was told if I didn't

8    sign and accept it, that that would hinder me from

9    going.

10             There was nothing else I wanted more

11   than to get out of this incredibly biased work

12   environment.

13             As you can see, no one else that I know

14   of has been ever written up or Edward Hayes and he's

15   been there for 17 years that were written up for

16   parking in front of Dunkin Donuts to pick up the

17   coffee that they sent me to pick up.

18        Q     Did consult with a PBA representative

19   before you signed this?

20        A     Yes, I did.

21        Q     Who?

22        A     I consulted with Edward Hayes on this.

23        Q     What did Mr. Hayes advise you on this?

24        A     He recommended that due to the fact

25   that I was leaving to the County, this was at the

1                          ARAZ ALALI

2    point in time that I was supposed to be leaving, to

3    put this all behind, that if I fought it although it

4    was right to do, that they were prefer charges

5    against me, that the county, at that time, would not

6    hire me.

7                     In an effort to get out of this

8    department, you know, to put this all, this

9    nightmare, horror story behind me, I accepted the

10   loss of two days for something that was completely,

11   you know, out of line and never happens in the City

12   of New Rochelle for parking on Dunkin Donuts which

13   happens every day.

14                     Supervisor's vehicles are in front.

15   Patrolman's vehicles are in front.  Supervisors are

16   there with patrolmen sitting down having coffee in

17   front of Dunkin Donuts.

18                     I was getting humiliated and

19   embarrassed and laughed at by all members of service,

20   but again, I accepted it because I wanted to go to

21   the county police in the worst way to alleviate the

22   pain I was suffering in this department.

23        Q       Was it Mr. Hayes' advice in substance

24   that if you had a hearing an were convicted of

25   blocking the driveway of Dunkin Donuts you wouldn't

Page 221

1                        ARAZ ALALI

2    be fit for --

3         A       I wasn't blocking of driveway of Dunkin

4    Donuts.

5         Q       What was the allegation?

6         A       I was in a no parking any time in front

7    of Dunkin Donuts.  There's no blocking of any

8    driveway.

9                 And Edward Hayes' recommendation was

10   this was -- he's never seen anything like this, but

11   he saw the bias and prejudice against me and it was

12   best for me to move on to the county police

13   department.

14                And if I declined it and had a hearing,

15   the county at that point would not want to hire me,

16   which was ironic, they didn't hire me anyway, because

17   one of the administrators in the city of New Rochelle

18   giving me a false and fictitious recommendation.

19        Q       So, was it Mr. Hayes' advice to you, in

20   his capacity as PBA president, that if you had a

21   hearing and were convicted of parking illegally in

22   front of Dunkin Donuts you would not get hired by the

23   County of Westchester?

24        A       That's not accurate.  Mr. Hayes'

25   recommendation was, that at this very time that I was

1                          ARAZ ALALI

2    getting served with this complaint, that if I were to

3    decline, the department would then prefer charges

4    against me that could take many months.  The county

5    police department would not hire me with outstanding

6    charges against me.

7                    Just for the record, that egregious

8    violations is a $25 parking ticket.  He had joked and

9    said, do you want to take the $25 parking ticket or

10   two days vacation, as a matter of being, I guess, a

11   joke that at the same time was egregious.

12        Q       Earlier you mentioned that you thought

13   that someone had given you a bad reference concerning

14   your application for employment with the County of

15   Westchester Police Department, is that right?

16        A       And the Town of Mamaroneck Police

17   Department.

18        Q       Okay.  Did you ever see a copy of that

19   reference that you believed to be bad?

20        A       I believe it was a phone call.  It

21   wasn't any letter written.  I believe it was a phone

22   call by Captain Gazzola.

23        Q       Did anyone in the county police ever

24   tell you that they received a bad reference from

25   someone in the New Rochelle Police Department?

ARAZ ALALI

1

2      A      No.  I was told by the county police, I

3  was set to start working there.  My background was

4  cleared and they hired other officers that went to

5  the county police after I did.  And I didn't end up

6  getting the job.  Other officers, meaning other

7  officers from the City of New Rochelle that got

8  hired.

9              And the same exact thing happened with

10  the Town of Mamaroneck.  It's a very small police

11  department.  Approximately three to four officers,

12  four officers got hired from the City of New Rochelle

13  for that small department, after I was told I was

14  going to get the job as well.

15      Q      Did anyone from the Town of Mamaroneck

16  Police Department ever tell you that they received a

17  bad reference from someone in the New Rochelle Police

18  Department?

19      A      I was told that there was no guarantees

20  I was going to get the job, after I was told I was

21  going to get the job.

22      Q      Did Captain Gazzola ever tell that you

23  he had given you any kind of reference or any kind of

24  transfer?

25      A      Captain Gazzola stated that he knew

1                    ARAZ ALALI

2   that I had interest in the Town of Mamaroneck and

3   County Police Department and that's all he stated.

4        Q       I'm going to show you what's been

5   pre-marked as Defendants' GG for identification and

6   ask you if you can identify that document?

7        A       Yes.

8        Q       Can you tell us what that is?

9        A       Again retaliatory strike by Captain

10  Gazzola, initiating a complaint against me when there

11  was a series of 1013 call which is officer needs

12  assistance.

13              At this time, Officers Murphy and

14  Officer Lori had a Reverend on a ride-a-long, with a

15  civilian member of service.  They encountered a very

16  irate individual who they were trying to arrest.

17              They called for a 1013 call.  I then

18  went to their assistance to help affect the arrest.

19              Captain Gazzola states there were no

20  civilian complaint.  They were routinely checking my

21  camera and found that, in his opinion, I drove at a

22  high rate of speed to this call, which was not

23  necessary.  I view that obviously to be a necessary,

24  when officers are calling for help.  It's probably

25  one of the highest calls you would receive in a

1                    ARAZ ALALI

2    police department.

3              Furthermore, I had -- he also said he

4    was very upset that I didn't acknowledge at, some

5    point, that what they stated, which I didn't hear,

6    that they said to slow down, to slow it down to the

7    call.

8              I did not -- he was upset that I did

9    not acknowledge.  I told him I didn't hear it.  He

10   subsequently cut my AM FM radio out of my car to

11   punish me and degrade me once again.  I was the only

12   officer in the entire department without a radio in

13   the car.

14             He had sent a car down to the city

15   yard, which is a place that services the vehicle.  I

16   had to stand by while the mechanics took my vehicle

17   and cut the wires to my AM FM radio, as per Captain

18   Gazzola's order as means to punish me.

19             I was the only member of service not to

20   have an AM FM radio and that was discussed by Edward

21   Hayes and Captain Gazzola laughed and stated I was

22   not going to get a radio in the car.

23        Q    Was your radio on when you didn't hear?

24        A    I have audible lights, I'm sorry,

25   audible sirens and overhead lights on.  As I said, it

Page 226

                              ARAZ ALALI

1
2    was a very serious call.

3              I did recognize that Officer Murphy and
4    Officer Lori had a reverend in the car, a civilian
5    member, not only were their safety and lives in
6    jeopardy with a drug induced defendant, so was a
7    civilian member of service and me, being very close
8    by, I would do it all over again as far as assisting
9    an officer and civilian in need, and screaming for
10   help over the radio.

11        Q    Did you happen to arrest this drug
12   induced defendant?

13        A    There were two defendants.  I assisted
14   in one of the defendants.  I transported one of the
15   defendants.  I feel I definitely had assisted.

16        Q    During the course of your transporting
17   the perpetrator, did you have occasion to interrogate
18   him?

19        A    I didn't feel I was interrogated him.
20   I felt I was asking him pedigree information.

21        Q    What was he arrested for?

22        A    I don't exactly know, it was not my
23   arrest.  The charges that were against the defendant
24   I was transporting, so I don't know.  I know that
25   drugs were involved.  I don't know if there was any

Page 227

ARAZ ALALI

1

2  other outstanding charges against either of the two

3  defendants.

4          I would assume resisting arrests, being

5  they were fighting with the defendants.

6      Q    Did you ask him any questions about the

7  incident?

8      A    I don't presently recall.

9      Q    Did you advise him of his Miranda

10  rights?

11      A    Yes, I don't presently recall when.

12      Q    Isn't it a fact that you advised him of

13  his Miranda rights after you asked him questions

14  about the incident?

15      A    I don't believe so.

16      Q    Did you discuss this command discipline

17  report that's reflected in Defendants's Exhibit GG

18  with Edward Hayes, before you declined to accept it?

19      A    Yes.

20      Q    Is there a reason that you discussed

21  this command discipline report with your PBA

22  representative, but you didn't discuss prior ones

23  with the PBA representative?

24          MR. LOVETT:  Objection as to form.  You

25      can answer.

Page 228

1                              ARAZ ALALI

2          A      I don't recall not discussing other

3    ones, I just recall having discussed this particular

4    one with Edward Hayes, being it's a very recent

5    command discipline.

6          Q      I'm going to show you what's been

7    pre-marked as Defendants' HH for identification and

8    ask you if you can identify that document?

9          A      Yes.

10         Q      Can you tell us what that is?

11         A      It's a communication and a complaint to

12   Lieutenant Fortunato of the Internal Affairs

13   division, from me, regarding no back up provided for

14   an arrest.

15         Q      You prepared this document?

16         A      Yes.

17         Q      And on April 20, 2007?

18         A      Yes.

19         Q      Looking at the bottom of the document

20   where it says, this harassment is based on my

21   heritage.  Do you see that?

22         A      Yes.

23         Q      What was the basis for your belief that

24   this incident had anything to do with your heritage?

25         A      It was really more than a belief.  It's

                              ARAZ ALALI
1
2    knowledge of the fact that if you look at the date of
3    April 20, 2007, that was after the filing of the
4    federal complaint.  I received no back up.
5              If you review any of the arrests with
6    any other officers, it's always, always, not maybe,
7    that another unit is sent to assist an officer during
8    an arrest.
9              At no time did they dispatch a unit to
10   assist me.  I had to request and wait over ten
11   minutes and being in an area that was not, again, on
12   a main roadway and wait for backup to come.  Wait ten
13   minutes, and ten minutes is a very long time and it
14   was only upon my request, several requests, actually.
15       Q    I'm going to show you what's been
16   marked as Defendants' Exhibit II and ask you if you
17   can identify that document?
18       A    It appears to be a personal history
19   questionnaire for the City of New Rochelle Police
20   Department.
21       Q    Could you turn to the last page of the
22   document?
23       A    Yes.
24       Q    Do you see where it says, applicant
25   sign here?

1                          ARAZ ALALI

2          A       Yes.

3          Q       Is that a photocopy of your signature?

4          A       Yes.

5          Q       This does appear to be an application

6    that you filled out for employment with the City of

7    New Rochelle Police Department?

8          A       I believe so.

9          Q       I'm going to show you what's been

10   pre-marked as Defendants' JJ for identification and

11   ask you if you can identify that document?

12         A       Yes.

13         Q       What is it?

14         A       A letter from Commissioner Carroll

15   stating that I have been selected for employment by

16   New Rochelle Police Department.

17         Q       I'm going to show you what's been

18   pre-marked as Defendants' KK for identification and

19   ask you if you can identify that document?

20         A       It's a letter from Commissioner

21   Carroll, stating that -- my acceptance to the New

22   Rochelle Police Department.

23         Q       I'm going to go show you what's been

24   pre-marked as Defendants' LL for identification and

25   ask you if you can identify that document?

Page 231

ARAZ ALALI

1

2      A      It appears to be a letter from the New

3  York State Retirement System.

4              MR. LOVETT:  With an illegible,

5      apparent handwritten inscription below the words

6      director-disability processing.

7      Q      Let me rephrase my question.  Referring

8  to Defendants' LL, can you identify this document,

9  not including the illegible handwritten matter on the

10 bottom?

11     A      No.

12     Q      Do you recall ever receiving a

13 communication from the retirement system?

14     A      I don't presently recall this one.

15     Q      Did you ever apply for accidental

16 disability?

17     A      Yes.

18     Q      Do you recall when you applied for

19 accidental disability?

20     A      I don't presently recall.

21     Q      Was it while you were employed by the

22 City of New Rochelle?

23     A      Yes.

24     Q      Do you recall what accident the

25 disability referenced?

1                         ARAZ ALALI

2        A      It was an accident that I had when my

3   foot was caught in the rocks pursuing a burglary

4   suspect.  My foot was trapped between some rocks when

5   I was in the water, affecting the arrest.  I was

6   ordered to go down by Sargeant Jones.

7        Q      Do you know what happened to your

8   application for disability?

9        A      It was initially denied.

10       Q      Was it ever ultimately granted?

11       A      I, through rehabilitation, returned

12  back to work.

13       Q      How long were you away from work, based

14  upon that disability?

15       A      I don't presently recall.

16       Q      Was it a matter of months?

17       A      Yes.

18       Q      Was it more than a year?

19       A      I don't presently recall.

20       Q      In reference to the denial of your

21  application for accidental disability retirement, did

22  you take an appeal?

23       A      I don't presently recall.  I don't.

24       Q      I'm going to show you what's been

25  pre-marked as MM for identification and ask you if

**EXHIBIT 29**

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    -----------------------------------------------X
     ARAZ ALALI,
4
                                  PLAINTIFF,
5                                 07 civ. 2916
              -against-
6
     ALBERTO DEBARA, individually, KYLE WILSON,
7    individually, EDWARD AUSTIN, individually,
     GEORGE MARSHALL, individually, HUMBERTO
8    MORRELL, individually, MATTHEW BRADY,
     individually, ANTHONY MURPHY, individually,
9    ROBERT GAZZOLA, Individually, PATRICK J.
     CARROLL, individually and the CITY OF NEW
10   ROCHELLE,  NEW YORK,

11                                DEFENDANTS.
     -----------------------------------------------X

12

13                     DATE: March 14, 2008

14                     TIME: 1:20 p.m.

15

16

17         EXAMINATION BEFORE TRIAL of the

18    Plaintiff, ARAZ ALALI, taken by the Defendant,

19    pursuant to a Court Order, held at the offices

20    of Wilson, Elser, Moskowitz, Edelman & Dicker,

21    LLP., 3 Gannett Drive, White Plains, New York,

22    before a Notary Public of the State of New

23    York.

24

25

7

```
 1                          A. Alali
 2    from the time you were born until you were 7
 3    years old?
 4          A.    Yes.
 5          Q.    When you moved to Pelham Manor, did
 6    you move with your parents?
 7          A.    Yes.
 8          Q.    Are you an American citizen?
 9          A.    Yes.
10          Q.    Were you born an American citizen?
11          A.    No.
12          Q.    When were you naturalized as an
13    American citizen?
14          A.    I don't know presently recall.
15          Q.    Do you have any other source of
16    information other than your own recollection as
17    to when you became a naturalized citizen?
18          A.    Beyond citizenship paperwork and
19    naturalization paperwork.
20          Q.    Do you have copies of that?
21          A.    Not with me, no.
22          Q.    But can you get it in your
23    possession?
24          A.    No, not in my possession.
25          Q.    Not necessarily here?
```

```
1                           A. Alali
2          A.      Right.
3          Q.      You do have copies of that?
4          A.      Absolutely.
5          Q.      Do you know what year you became a
6    naturalized citizen?
7          A.      I don't presently recall.
8          Q.      Are your parents American citizens?
9          A.      Yes.
10         Q.      As I understand from your
11   complaint, you transferred to the New Rochelle
12   Police Department?
13         A.      Yes.
14         Q.      Prior to transferring to the New
15   Rochelle Police Department, how were you
16   employed?
17         A.      As a police officer.
18         Q.      Where was that?
19         A.      City of New York Police Department.
20         Q.      How long were you employed by the
21   City of New York Police Department?
22         A.      Approximately 4 to 5 years.
23         Q.      And prior to being employed by the
24   New York City Police Department, how were you
25   employed?
```

```
 1                          A. Alali
 2        A.      As a police officer.
 3        Q.      By whom?
 4        A.      Amtrak Police Department.
 5        Q.      How long were you employed by the
 6   Amtrak Police Department?
 7        A.      Maybe 2 to 3 years.
 8        Q.      Prior to being employed by the
 9   Amtrak Police Department, how were you
10   employed?
11        A.      I was a student as well as working
12   at Neiman Marcus.
13        Q.      While you were employed by the New
14   York City Police Department, were you, in your
15   opinion, ever the victim of discrimination
16   based upon your heritage?
17               MS. NICAJ:  Objection.  You can
18        answer.
19        A.      I don't believe so.
20        Q.      While you were employed by the New
21   York City Police Department, were you ever the
22   subject of civilian complaints?
23        A.      Yes.
24        Q.      While you were employed by the New
25   York City Police Department, were you ever
```

```
 1                       A. Alali
 2    brought up on disciplinary charges?
 3         A.    No, I was not.
 4         Q.    Did you ever receive a command
 5    discipline while you were employed by the New
 6    York City Police Department?
 7         A.    No.
 8         Q.    Were you ever placed on modified
 9    duty while you were employed by the New York
10    City Police Department?
11         A.    No.
12              MS. NICAJ:  Mr. Meisels, just for
13         the record, this deposition is limited
14         to the issue of qualified immunity for
15         the purposes of your making that motion;
16         is that correct?
17              MR. MEISELS:  I'm not under oath.
18         I can't answer any questions, but I
19         will --
20              MS. NICAJ:  I am asking is that
21         your understanding of the purpose?
22              MR. MEISELS:  I can't advise you,
23         but my understanding is I think it's
24         privileged.  If you have a comment to
25         make, please feel free to make it.
```

1                   A. Alali

2            MS. NICAJ:  No, privileged, the

3       issue is whether the deposition is on

4       the issue of qualified immunity.  Is

5       that your understanding of today's --

6            MR. MEISELS:  I said I'm not here

7       to answer the questions.  I'm not under

8       oath anyway, so it wouldn't matter.  If

9       you have an objection, state it.

10           MS. NICAJ:  I am going to object at

11      this juncture to your line of

12      questioning with respect to Mr. Alali.

13      I am also going to be requesting a short

14      break, okay.  There is no pending

15      question, right?  I just want to make

16      sure there are no pending questions

17      before I take my break, okay.

18           (Short recess).

19           MS. NICAJ:  I'm going to object to

20      this line of questioning as it concerns

21      I think it's on qualified immunity and

22      that is it, and I'm going to object and

23      advise him not to answer.

24           MR. MEISELS:  I'm going ask

25      questions and if that be your advice, so

12

1                         A. Alali

2          be it.

3                    MS. NICAJ:  Okay.

4          Q.    Officer Alali, how many civilian

5     complaints were filed against you when you were

6     employed by the City of New York Police

7     Department?

8                    MS. NICAJ:  You can answer that.

9          A.    I don't presently recall.

10         Q.    Do you remember the substance of

11    those civilian complaints that were filed

12    against you when you were employed by the City

13    of New York Police Department?

14         A.    I don't presently recall.

15         Q.    When you applied for your position

16    with the New Rochelle Police Department, did

17    you disclose that you had been the subject of

18    civilian complaints?

19                   MS. NICAJ:  Objection.  You can

20         answer.

21         A.    Whatever was asked on the

22    application, I answered truthfully and

23    honestly.

24         Q.    Do you presently recall the outcome

25    of any of those civilian complaints that were

13

```
 1                        A. Alali

 2   lodged against you when you were employed by

 3   the City of New York Police Department?

 4              MS. NICAJ:  Objection.  You can

 5          answer.

 6       A.    None of those complaints were

 7   substantiated.

 8       Q.    I am sorry, could you read back the

 9   answer?

10              (Whereupon, the referred to answer

11          was read back by the Reporter.)

12       Q.    Do you remember how many complaints

13   were not substantiated?

14       A.    All of the complaints.

15       Q.    Do you remember how many that was?

16       A.    I don't presently recall.

17       Q.    Was it more than 5?

18       A.    I don't presently recall.

19       Q.    Do you recall whether those

20   complaints related to traffic stops?

21       A.    Perhaps.

22              MS. NICAJ:  Don't guess.  If you

23          don't know, let him know.

24       A.    I don't know.  That was a long time

25   ago.
```

14

```
 1                    A. Alali
 2        Q.    Do you recall whether any of those
 3   complaints involved allegations that you were
 4   rude or discourteous to people you had stopped?
 5              MS. NICAJ:  Objection.  You can
 6        answer.
 7        A.    No.
 8        Q.    Let me understand your answer.
 9   Your answer is you don't recall if it did or it
10   didn't?
11        A.    I do not recall if it did or it
12   didn't.
13        Q.    While you were employed by the
14   Amtrak police, were you suspended?
15              MS. NICAJ:  I am directing him not
16        to answer that.
17        Q.    While you were employed by the
18   Amtrak police, were you the subject of any
19   civilian complaints?
20              MS. NICAJ:  I direct him not to
21        answer that.
22        Q.    While you were employed by the
23   Amtrak police, were your duties modified for
24   disciplinary reasons?
25              MS. NICAJ:  I direct him not to
```

1                           A. Alali

2          answer that.

3          Q.     Officer Alali, I am correct that

4    it's your position that you are a person of

5    middle eastern descent?

6                 MS. NICAJ:  Objection.  You can

7          answer that.

8          A.     Clearly, yes.

9          Q.     You are.  Could you explain what is

10   meant by the term middle eastern descent?

11         A.     A person that is from that region.

12         Q.     Are you from that region?

13         A.     Yes.

14         Q.     Can you tell me which particular

15   country you are from?

16         A.     Yes.

17         Q.     What country is that?

18         A.     Iraq.

19         Q.     Now, earlier didn't you testify

20   that you were born in Vienna, Austria?

21                MS. NICAJ:  Objection.  You can

22         answer.

23         A.     That is where I was born.  That is

24   not where I am from.

25         Q.     Have you ever lived in Iraq?

```
1                           A. Alali

2          A.    No.

3          Q.    Let me see if I understand that.

4    You never lived in Iraq but you are from Iraq?

5          A.    Both my parents are from Iraq,

6    correct.

7                MS. NICAJ:   Hence middle eastern

8          descent.

9          Q.    In the term middle earth descent,

10   what other countries besides Iraq would be

11   included?

12         A.    I don't have an atlas in front of

13   me, um, but clearly Iraq is the confines of the

14   middle east.

15         Q.    Would a person say of Hebrew

16   descent be of middle eastern descent?

17               MS. NICAJ:   Objection.  Objection.

18         You can answer.

19         A.    Yes.

20         Q.    Is it your contention that no

21   person of Hebrew descent has ever been employed

22   by the New Rochelle Police Department?

23               MS. NICAJ:   Objection.  You can

24         answer.

25         A.    Say the question again, please.
```

1                            A. Alali

2          A.     Not to my knowledge.

3          Q.     Has there been a hearing as to the

4    second set of charges?

5          A.     No, there has not.

6          Q.     I would like to call your attention

7    to the period of time of February through April

8    2007.  Can you tell me which tour of duty you

9    were working during that period of time?

10         A.     February 2007 until when?

11         Q.     April 2007.

12         A.     Second tour.

13         Q.     What are the hours of the second

14   tour of duty?

15         A.     8 a.m. to 4 p.m.

16         Q.     During that period of time, can you

17   tell me who your immediate supervisors were?

18         A.     The defendants that were named in

19   the lawsuit.

20         Q.     Could you by name identify who your

21   immediate supervisors were from February until

22   April of 2007?

23         A.     They are still, with the exception

24   of Lieutenant Al Debara, they are still the

25   same set of immediate supervisors.  And by the

A. Alali

1    term immediate, do you mean first line

2    supervisors, second line supervisors?

3        Q.    Who were your first line

4    supervisors from February to April 2007?

5        A.    The same set of first line

6    supervisors that are presently supervising me

7    today.

8        Q.    Who are they?

9        A.    That would be Sergeant Kyle Wilson,

10   Sergeant Humberto Morrell, Sergeant Edward

11   Austin, Sergeant Matthew Brady.  I believe

12   those would be the first line supervisors.

13       Q.    Now, can you explain the procedure

14   of supervision, do all of those people

15   supervise you at the same time?

16            MS. NICAJ:  Objection.  You can

17            answer.

18       A.    If you are referring to

19   specifically something else as an evaluation,

20   are you referring to supervision --

21            MS. NICAJ:  If you are not sure

22            about the question.

23       A.    Can you break the question down?

24       Q.    Sure.  As far as you understanding,

1                           A. Alali

2      do all of the people who you just named

3      supervise you simultaneously?

4          A.     If there they happen to be working,

5      yes.  They are not all always working together

6      at the same time.

7          Q.     So, are there any occasions that

8      you're aware of which would have occurred

9      during this period of time February to April

10     2007 where all of the people you mentioned

11     would have been working at the same time?

12         A.     There is no way for me to know if

13     they were working at the same time.

14         Q.     So you this is something you

15     couldn't recall?

16         A.     I could not recall if they work at

17     the same.  They do have days off, and the days

18     off do vary.

19         Q.     Was it customary from February to

20     April of 2007 that all of the people who you

21     just identified would be working at the same

22     time?

23         A.     Again, I can't tell you scheduling,

24     you know.  They have varying schedules.  Could

25     it be possible, yes.  Do I personally recall if

```
 1                    A. Alali
 2  every individual supervisor worked at the same
 3  time, no.
 4        Q.    Would it be correct to say that
 5  given the way this schedule works, that it
 6  would be unlikely that all of those supervisors
 7  would be working at the same time?
 8             MS. NICAJ:  Objection.  You can
 9        answer.
10  A.    Yes.
11             MS. NICAJ:  By the way, Mr. Alali,
12        unless I direct you not to do so, over
13        my objection, you can answer.  Okay?
14  A.    Okay.
15        Q.    You had referenced a term called a
16  second line supervisor, am I correct, did I
17  understand you correctly?
18        A.    Yes.
19        Q.    Can you explain what you understand
20  that to mean?
21        A.    It would mean -- that that to me
22  would mean the rank the lieutenant.  First line
23  being sergeants.
24        Q.    As far as you understand, are
25  lieutenants responsible for your direct
```

1                         A. Alali

2    supervision?

3          A.    Can you be more specific by the

4    word direct?  Immediate, is that --

5          Q.    That would be a fair

6    interpretation.  Are lieutenants -- let me

7    rephrase the question.  Is it your

8    understanding that lieutenants would be

9    responsible for the direct supervision of

10   police officers?

11         A.    Yes, through sergeants.

12         Q.    And could you explain what you mean

13   by the word "through"?

14         A.    Ultimately the lieutenant is

15   supervising police officers sometimes on a

16   direct basis, sometimes through the first line

17   supervision which are sergeants; however,

18   lieutenants would be ultimately responsible for

19   the actions of both sergeants and police

20   officers and so on and so forth with the

21   hierarchy.

22         Q.    Now, referring to that time frame

23   of February through April, 2007, do you recall

24   having any direct contact with Lieutenant

25   Debara?

                              A. Alali

1

2        A.    Yes.

3        Q.    Could you explain?

4             MS. NICAJ:  Objection.  You can

5        answer.

6        A.    Numerous contacts I have had with

7   Lieutenant Debara.  He was a lieutenant on the

8   second tour.

9        Q.    Were there any circumstances during

10  that period of time where he was your direct

11  supervisor?

12       A.    There was periods of time that he

13  would what we call in New Rochelle have a

14  meeting, inspect the memo book, take reports

15  occasionally, and instruct me to do various

16  tasks.

17       Q.    During that period of time, did he

18  inspect your memo book?

19       A.    I don't presently recall, but, yes,

20  he has inspected my memo book.  I don't know if

21  during that period of time he has.

22       Q.    Do you recall any specific

23  instances during that period of time whether

24  Lieutenant Debara took direct supervision of

25  you as a police officer?

A. Alali

2      A.      There were times that he has taken

3   direct supervision of me.  I don't know between

4   which periods.  I could think of several

5   examples that he has.

6           Q.      Could you explain?

7           A.      One example comes to mind would be

8   when, I believe it was in 2007 -- and I am sure

9   the federal complaint could refresh my

10  memory -- that he had assigned me to a hospital

11  post.

12          Q.      Do you recall are there any other

13  instances that you can recall besides that?

14          A.      Yes.

15          Q.      Could you tell us what those were?

16          A.      Sure.  There was a period of time

17  that he assigned me to do double parking on

18  Main Street, North avenue.  He instructed me to

19  work in the capacity of a utility car, watch

20  suicidal prisoners, do jail escorts, and also

21  assigning me to foot post.

22          Q.      Do you recall if those assignments

23  occurred between February and April of 2007?

24          A.      They very well could have because

25  he did that frequently.

A. Alali

1

2      Q.     But do you know whether they did or

3   they didn't?

4      A.     Without any type of documentation

5   to refresh my memory, I couldn't be 100 percent

6   certain, but it would be likely that he did.

7      Q.     The first thing that you

8   mentioned was -- let me back up a minute.  Do

9   you know whether or not Lieutenant Debara was

10  ever aware that you had filed an EEOC charge?

11     A.     I don't presently recall.

12     Q.     Do you know whether or not

13  Lieutenant Debara was ever aware that you had

14  filed that first lawsuit?

15     A.     Yes.

16     Q.     And what do you believe that to be?

17            MS. NICAJ:  Objection.  You can

18     answer.

19     Q.     I will rephrase the question.  What

20  is the basis of your belief?

21     A.     He told me.

22     Q.     When did he do that?

23     A.     After the filing of the lawsuit.

24     Q.     What did, in words or substance,

25  what did he say to you?

```
 1                    A. Alali
 2        A.    In words or substance, that he
 3   could not believe that I was filing a lawsuit
 4   against him.  He thought that it would be on a
 5   friendly basis.
 6        Q.    Isn't it a fact, Officer Alali,
 7   that he isn't a defendant in the first lawsuit?
 8             MS. NICAJ:  Objection.
 9        A.    I thought you are referring to the
10   second lawsuit.
11        Q.    I am talking about the first
12   lawsuit.  Let me clarify.  Do you know whether
13   or not Lieutenant Debara was aware of the first
14   lawsuit that you brought?
15        A.    Yes.
16        Q.    What is the basis of your belief?
17        A.    I told him.
18        Q.    When did you do that?
19        A.    I believe one of the times that we
20   had discussed it was when he assigned me to a
21   fixed hospital post, and I advised him of that
22   I believe what he was doing was harassment, and
23   I also further advised him that a lawsuit had
24   been filed.
25        Q.    Can you tell me in words or
```

A. Alali

1

2  substance what you said to him about that

3  lawsuit?

4           MS. NICAJ:  Objection.  You can

5       answer.

6       A.    I don't presently recall.

7       Q.    Did he respond to you?

8       A.    Yes.  I don't -- a sarcastic

9  response.  I don't remember exactly what it

10  was.

11       Q.    During the period of February to

12  April 2007, did he assign you to a hospital

13  post on more than one occasion?

14       A.    I believe so, yes.

15       Q.    Could you explain what you mean by

16  a hospital post?

17       A.    A hospital post is an assignment,

18  when a prisoner needs medical attention, to go

19  to the hospital and can't come directly back to

20  headquarters after being discharged by a

21  doctor.  A police officer has to accommodate

22  that prisoner for obvious reasons.

23       Q.    And is it correct that the person

24  who is assigned to that post has to be a police

25  officer?

A. Alali

1

2      A.     Yes.

3      Q.     What was the basis for your belief

4  that you should not have been assigned to that

5  post?

6              MS. NICAJ:  Objection.  You can

7         answer.

8      A.     That post is usually reserved for 2

9  instances, one of them being for junior

10 officers.  As of today's date, police officer

11 Kane who is a junior and quite possibly a

12 probationary officer was on a hospitalized

13 prisoner or it also -- the second instance is

14 it has been used for punishment purposes as

15 well when there is a senior officer that they

16 are punishing.

17     Q.     In your opinion, in February to

18 April of 2007, were you a senior officer?

19             MS. NICAJ:  Objection.  You can

20        answer.

21     A.     I was senior to numerous officers

22 that were working at that time.  I was not the

23 most senior officer; however, there were junior

24 officers that were available, and it was

25 customary to give junior officers that

37

                          A. Alali

1
2    assignment, and coupled with the things that
3    were said during the assignment.
4         Q.    Can you tell us who said those
5    things during the assignment?
6         A.    Can I take a look at the federal
7    complaint?
8         Q.    Sure.
9              MS. NICAJ:  You didn't mark it?
10             MR. MEISELS:  I have not.
11        A.    Prior to looking at it, I know that
12   Lieutenant Debara has made comments, I know
13   that Sergeant Morrell has made comments, and I
14   know Sergeant Austin has made comments.  When I
15   had inquired to why I was being sent on these
16   posts, there was comments made in conjunction
17   and me being send on the post, and the comments
18   that were made, it was clear that I was being
19   singled out.
20        Q.    What I am going to do is just go
21   one by one.  Let's just do the hospital post at
22   the moment.  What comments were made by you
23   when you were assigned to the hospital post?
24        A.    May I look at the federal
25   complaint, please.

38

                        A. Alali

1

2        Q.       Sure.

3                MS. NICAJ:  Let's mark this, then.

4                MR. MEISELS:  Sure, I will be glad

5        to.  Let's mark this, we're up to, that

6        would be Defendant's Exhibit double B.

7                (Whereupon, the aforementioned

8        complaint was marked as Defendant's

9        Exhibit BB for identification as of this

10       date by the Reporter.)

11       Q.       Officer Alali, you can review that

12   and when you are finished, let us know and I

13   will proceed.

14       A.       You are specifically talking about

15   the hospital post, Mr. Meisels?

16       Q.       The question is what was said to

17   you at the time that you received the hospital

18   post that you just testified to?

19       A.       Well, on February 21, 2007,

20   Lieutenant Debara, as I testified to earlier,

21   had assigned me to a hospital post on numerous

22   occasions.  That was one of the occasions that

23   he assigned me to the hospital post that I was

24   referring to.  On that date, there was junior

25   officers available as well who, you know,

39

                              A. Alali

1
2    should have been given the assignment but were
3    not.
4         Q.    Excuse me.  I would prefer that you
5    not read it.  Refresh your recollection and
6    when you are ready to answer the question, you
7    could answer it.
8              MS. NICAJ:  I'm going to object to
9              that characterization, and you can go
10             ahead, Mr. Alali.
11        A.    On that date, I just testified to I
12   asked --
13        Q.    Do you need to refresh your
14   recollection any further with the complaint?
15        A.    Periodically I have to, yes.
16        Q.    I will give it back to you when you
17   ask for it.  In reference to the one question
18   that I asked you if you refreshed your
19   recollection.
20        A.    Give me a moment and I will
21   continue to.
22             MS. NICAJ:  Just review that entire
23             portion which relates to the incident,
24             and once you have done reviewing it, let
25             us know, okay?