```
 1                        A. Alali
 2              THE WITNESS:  Okay.
 3      A.      Okay.
 4      Q.      Has the review of the complaint
 5  refreshed your recollection as to what was said
 6  to you when you received the assignment to the
 7  hospital post from Lieutenant Debara?
 8      A.      Yes.
 9      Q.      Could you tell us in words or
10  substance what he said to you and what, if
11  anything, you said to him?
12      A.      On that date, Lieutenant Debara
13  assigned me at roll call to the hospital post.
14  Subsequently a few months after receiving that
15  post, I went to the desk where Sergeant Wilson
16  was working, and I asked him, you know, why I
17  had received that post due to the fact there
18  were probationary officers several of them
19  working that day.  He was very irate that I had
20  asked him that question and stated in sum or
21  substance get the fuck out of my face, whereas
22  not another word in the presence of several
23  civilian members of service.
24      Q.      Did you ask Lieutenant Debara why
25  you had received the post?
```

```
 1                         A. Alali

 2          A.     Yes.   I then was at the hospital

 3     post where Lieutenant Debara came by to give

 4     me -- I clearly remember this -- give you a

 5     meet and scratch my notebook and stated that,

 6     you know, that I would -- that he did it

 7     because he can, and that from now on, I would

 8     be watching suicidal prisoners, if there was

 9     one, directing traffic, working at a utility

10     car, and going to the county jail.  On that

11     day, there was a sign-in sheet at the hospital.

12     I do remember that there was probationary or

13     junior officers, new officers that were there

14     prior to me, and then I was subsequently

15     relieved by a probationary or junior officer.

16          Q.     Now, in reference to --

17          A.     And also I remember memorializing

18     that conversation in writing to the internal

19     affairs officer, obviously we just have one,

20     Lieutenant James Fortunato to investigate the

21     matter.

22          Q.     Is it correct that, when you

23     received that assignment to the hospital post

24     from the Lieutenant Debara, that you told him

25     about your first lawsuit, is that correct?
```

A. Alali

1

2     A.    I don't presently recall what I

3    told him.

4     Q.    You had mentioned earlier an

5    assignment that you received to double parking

6    during a period of time of February to April

7    2007, am I correct?

8     A.    If I did, what -- I don't remember

9    the date I was assigned to that, but I was

10    giving specific examples of what Debara had

11    directly supervised me giving me specific tasks

12    to do.  One of those tasks did encompass double

13    parking on Main Street and North Avenue where I

14    had written many tickets.  I don't know if it

15    was a period of time that you are specifically

16    speaking about, but.

17     Q.    And is that an assignment that you

18    received directly from Lieutenant Debara?

19     A.    Yes.  He had called me in the

20    office stated that there was a condition that

21    Commissioner Carroll wanted alleviated and that

22    I would be the right man for that job, and I

23    believe I wrote this document, I don't know the

24    dates, but hundreds of summons were written

25    when he had me doing that assignment.

                        A. Alali

1

2        Q.      You had mentioned earlier an

3   assignment to a utility car.  Could you explain

4   what you mean by a utility car?

5        A.      It's a term that the New Rochelle

6   Police Department designates as a, perhaps,

7   extra car that picks up all types of jobs to

8   alleviate the burden on the sector cars.  Also

9   a utility car, as I stated, is an extra car

10  that could be used to relieve a hospital

11  prisoner, watch a suicidal prisoners inside

12  headquarters, to be used as a many different

13  ways.  It's to supplement -- I think usually

14  given primarily to officers that are junior or

15  officers that are being punished.

16       Q.      Now, is that an assignment that

17  must be given to a sworn police officer?

18       A.      Yes.

19       Q.      Is it your opinion that you should

20  not have been given that assignment?

21            MS. NICAJ:  Objection.  You can

22       answer.

23       A.      Like I stated earlier, that is an

24  assignment that is primarily given to junior

25  officers or officers that are being placed on

```
 1                        A. Alali

 2   punishment.  That has been the past practice

 3   since I have been there.

 4          Q.     How long were you assigned to the

 5   utility car?

 6          A.     I don't know.  I don't have exact

 7   dates.

 8          Q.     Approximately.

 9          A.     I can't tell you.  I don't have

10   that roll calls in front of me to refresh my

11   memory, but I have been assigned to utility

12   cars.  I have been assigned as a civilian

13   dispatcher which I am currently serving as now.

14   I have been assigned to watch suicidal

15   prisoners, when there is junior people working,

16   and I have been assigned to utility cars.  I

17   can't tell you how many dates or times, but

18   numerous times.  For a year now, I have been

19   working as a civilian dispatcher inside of the

20   radio room.

21          Q.     Let's go one at a time.  We will

22   get there.  The utility cars, were you assigned

23   to the utility car on more than 5 occasions in

24   the period of time of February through April

25   '07?
```

```
 1                      A. Alali
 2       A.      It could have been.  I'm not 100
 3  percent sure.
 4       Q.      Can you estimate the number of
 5  times that you were assigned to utility car in
 6  the period of February to April 2007?
 7       A.      I cannot estimate, no.
 8       Q.      Am I correct that you are not
 9  certain whether the double parking assignment
10  occurred between February and April 2007?
11       A.      That is correct.
12       Q.      Am I correct that the hospital
13  assignment that you referenced did occur
14  between February and April 2007?
15       A.      Yes.
16       Q.      You had mentioned a assignments to
17  watch suicidal prisoners.  Referring to the
18  period of time between February and April 2007,
19  on how many occasions were you assigned to
20  watch suicidal prisoners?
21       A.      Again without the availability of
22  roll call in front of me, I don't know, but I
23  can definitely say that I was assigned -- we
24  don't have too many suicidal prisoners, but
25  when there was one and I was working, you know,
```

```
 1                        A. Alali
 2   I would be assigned to one.
 3           Q.      Would it be fair to say that it was
 4   less than 5 times during February to April
 5   2007?
 6           A.      Yes.
 7           Q.      Is it correct that a person who is
 8   assigned to watch a suicidal prisoner must be a
 9   sworn police officer?
10           A.      That is incorrect.
11           Q.      That is incorrect?
12           A.      Yes.
13           Q.      Could that person be a civilian?
14           A.      Yes.
15           Q.      During the period of time of
16   February to April of 2007, do you know whether
17   any other sworn police officers were assigned
18   to watch suicidal prisoners besides you?
19           A.      I do not know who else, but that is
20   usually given to a civilian member of service
21   or a junior police officer.
22           Q.      For the whole year 2007, do you
23   know whether or not any police officer other
24   than you was assigned to watch a suicidal
25   prisoner?
```

1                          A. Alali

2          A.    No, I don't know who else was.

3          Q.    You had mentioned an assignment to

4    a foot post in the snow, am I correct?

5          A.    Yes.

6          Q.    Did that occur between February and

7    April of '07?

8          A.    I believe so.  I could refresh my

9    memory again by looking at the complaint.

10         Q.    What you like to look at what has

11   been marked Defendant's Exhibit BB again?

12         A.    Sure.  Okay.

13         Q.    Does that refresh your

14   recollection?

15         A.    Yes.

16         Q.    Can you tell me when that

17   assignment to the foot post in the snow

18   occurred?

19         A.    March 7th, 2008.  Correction, March

20   7, 2007.  We're in 2008 now.

21         Q.    Do you recall who assigned you to

22   that foot post?

23         A.    Yes.

24         Q.    Who was that?

25         A.    Lieutenant Debara.

48

```
 1                       A. Alali
 2          Q.    Do you recall on how many occasions
 3   during the period of February to April 2007
 4   that he assigned you to a foot post in the
 5   snow?
 6          A.    No.
 7          Q.    Was it more than once?
 8          A.    I don't know.  I can't -- I don't
 9   presently recall.
10          Q.    Do you recall what is the basis for
11   your recollection that it was snowing on March
12   7, 2007?
13          A.    When I came in, there was snow on
14   the ground that day, and I had documented that
15   day in my memo book.
16          Q.    Is it your understanding that he
17   should not have assigned you to that foot post?
18          A.    Yes.
19          Q.    What is the basis for your belief
20   that he should not have assigned you to that
21   foot post?
22                MS. NICAJ:   Objection.   You can
23          answer.
24          A.    The comment that he made that day
25   and in conjunction of the fact that there was
```

```
 1                          A. Alali
 2    numerous junior officers working, and that is
 3    again past practice and customary that a junior
 4    police officers or officers that are being
 5    placed -- that are being punished to have a
 6    foot patrol assignment, and on that day, he had
 7    made a specific comment along with putting me
 8    on the foot post in the snow along with junior
 9    officers working, that is the basis of my claim
10    that it was based solely on my heritage.
11         Q.    Can you tell me in words or
12    substance what that comment was?
13         A.    Sure.  Because we can, we can put
14    you anywhere, Bin Laden.
15         Q.    Did you respond to that comment?
16         A.    I was shocked, just shocked, and I
17    then asked the desk officer why I was being put
18    on the foot post in the snow, desk officer
19    Sergeant Morrell.
20         Q.    Did anyone ever give you an
21    explanation as to why you got that assignment?
22         A.    Lieutenant Debara stated that he
23    could put me anywhere he wanted followed by Bin
24    Laden and as well as -- correction, Sergeant
25    Morrell, the serving desk officer at that time
```

                              A. Alali

1    stated that, although I was a talented police

2    officer, that I was not above scrutiny, to go

3    out and take the foot post in the snow, bundle

4    up, that it was very cold that day.

5          Q.     Do you know whether or not

6    Lieutenant Debara was aware of the fact that

7    you were a person of Iraqi descent?

8          A.     Yes.

9          Q.     What is the basis for you -- what

10   is the answer, was he aware of it?

11         A.     Yes.

12         Q.     What is the basis of your belief

13   that he was aware of it?

14         A.     Many conversations that we had, he

15   asked what your background was and I told him.

16         Q.     When did those conversations occur?

17         A.     On the meets that we would have,

18   which was basically, when the supervisor

19   would -- is supposed to inspect the memo book,

20   we would have conversations about -- different

21   conversations, and one of them was he asked

22   what background I was from.  He asked, I told

23   him.  I also have to state that day that he

24   made that comment as well as Sergeant Morrell

                            A. Alali

1

2     had caused me tremendous anxiety and stress

3     that I had gone home sick, and subsequently,

4     Sergeant Morrell had come down the hall and

5     said that -- and laughed and said that he was

6     just joking, I didn't have to take a foot post

7     in the snow that day, utilize a car, I could

8     utilize a car; however, the events were so

9     stressful, that caused me to be very anxious

10    that I couldn't continue my tour of duty.

11         Q.    The events were so stressful you

12    couldn't continue your tour of duty, is this on

13    March 7th?

14         A.    That is correct.

15         Q.    So, am I correct that you never

16    actually went on that foot post?

17         A.    No.  After being told by Lieutenant

18    Debara those racial remarks and then being told

19    again by Sergeant Morrell that I wasn't above

20    scrutiny, to bundle up in a sarcastic voice, it

21    would be unfair for me to go out and complete

22    my tour of duty which was the cause of

23    tremendous anxiety and stress.

24         Q.    What was there about being told

25    that you are not above scrutiny that was so

```
 1                        A. Alali
 2   stressful?
 3             MS. NICAJ:  Objection.  You can
 4        answer.
 5        A.    I told him what Lieutenant Debara
 6   had said and asked him why I was being placed
 7   on a foot assignment in the snow.  It wasn't
 8   just that comment.  It was the comment of
 9   Lieutenant Debara had said what I testified to
10   earlier along with the comment of, you know,
11   although the most talented -- acknowledging
12   that I am talented and that, you know, I am not
13   above scrutiny -- I don't know if those were
14   his words verbatim -- to bundle up and take a
15   foot post in the snow, and then I was walking
16   to take the foot post in the snow, and he ran
17   down the hall to tell me he was just joking, it
18   was -- I mean I don't know if you have been
19   called derogatory names and systemically been
20   discriminated based on your heritage, but it is
21   tremendous stress and anxiety, causes me
22   anyhow.
23        Q.    You were socially friendly with
24   Sergeant Morrell, weren't you?
25        A.    Absolutely not.
```

```
 1                        A. Alali

 2          Q.    Did you attend class with him at

 3   Iona?

 4          A.    I attended maybe one to 2 classes

 5   with him Iona.

 6          Q.    Did you ever go to restaurants with

 7   him?

 8          A.    No.

 9          Q.    Did you ever work together in any

10   school projects with him?

11          A.    Perhaps for maybe one of my

12   classes.  I don't think -- no, not together.

13   But we had classes together.  No, never worked

14   on a project together with him.

15          Q.    Did you ever do homework together?

16          A.    No.

17          Q.    Did you ever discuss his religion

18   with him?

19          A.    His?

20          Q.    Yes.

21          A.    No.

22          Q.    Did you ever discuss your religion

23   with him?

24          A.    I don't presently recall.

25          Q.    Do you know whether or not Sergeant
```

54

```
 1                    A. Alali
 2   Morrell is a Muslim?
 3        A.    No, I do not.
 4        Q.    Is it correct that Sergeant Morrell
 5   told you that you could cover this foot post in
 6   a car?
 7        A.    No.
 8        Q.    Did anyone tell you, you could
 9   cover that foot post in a car?
10        A.    That does not make any type of
11   sense to cover a foot post in a car.  A foot
12   post would mean you are walking.
13        Q.    When Sergeant Morrell apologized
14   for his comment, did he discuss with you
15   whether or not it was necessary for you to
16   actually walk that foot post?
17        A.    I believe the chain of events,
18   after I told him that I was going home sick due
19   to the anxiety and stress, that he had said
20   that I was able to -- that he was joking, that
21   I was able to take a car to work that day, not
22   the foot post assignment, I no longer had to
23   work it.
24        Q.    So --
25        A.    That was after the fact I told him
```

                        A. Alali

1

2    I was going home.

3         Q.    So am I correct that the chronology

4    was you told him you were going to go home

5    sick, and he told you that it was not necessary

6    for you to walk the foot post, is that

7    accurate?

8         A.    No, it's not.

9         Q.    Explain to me what the chronology

10   was.

11        A.    The chronology was there was roll

12   call on March 7, '07, by Lieutenant Debara

13   where he assigned me to the foot post in the

14   snow.  Subsequent after that, he made a comment

15   to me, when I questioned why I was being put on

16   a foot post in the snow, he said because we

17   can, we could put you anywhere, Bin Laden.

18   After that, I had spoken to the desk officer

19   and asked him why I was being put on the foot

20   post in the snow when there was available

21   probationary junior officers working, and his

22   response is what I testified to earlier that I

23   was not above scrutiny, although I was one of

24   the most talented officers, you know, to go

25   outside and take the foot post in the snow, to

56

```
 1                     A. Alali
 2   bundle up, it's really cold.  And then at that
 3   point, I told him I was going to go home
 4   sick -- that is the chronology -- due to the
 5   anxiety and stress, and at that point, after I
 6   told him I was going to go home sick, is when
 7   he had told me that I did not -- it was a
 8   joke -- I did not have to take the foot post in
 9   the snow.  I could use a car for the day.
10        Q.    And after he told you that you
11   could use the car, did you electric to work
12   that tour or did you go home sick?
13        A.    I went home sick.  Like I said, it
14   would be impossible for me to work that tour
15   due to the chain of events immediately prior to
16   that.
17        Q.    At the time that you received that
18   assignment, were other people present?
19        A.    Yes.
20        Q.    Who was present?
21        A.    When the assignment was initially
22   given, it was given at roll call by Debara,
23   whoever the police officers were at roll call
24   that day, and at the desk, whoever the civilian
25   members or police officers that were getting
```

57

```
 1                        A. Alali
 2   equipment at the time were present as well.
 3           Q.    Do you recall specifically anyone
 4   who was present?
 5           A.    Whoever was on the roll call that
 6   day was present.  I don't have the roll call in
 7   front of me.
 8           Q.    Can you approximate the number of
 9   people present?
10           A.    No.  It would be unfair for me to
11   guess.
12           Q.    In reference to the hospital post
13   that we discussed earlier, was anyone else
14   present at the time you received the hospital
15   post?
16           A.    On the March 7th hospital post?
17           Q.    Correct.  Actually I'm not sure
18   that the hospital post was the March 7th.
19           A.    The snow.
20           Q.    Whenever you got the hospital post,
21   was assignment, was anyone else present?
22           A.    Obviously when they give you the
23   assignment at roll call and the officer that
24   would have to or that takes me to the hospital
25   post, and the officer that I would relieve for
```

```
 1                    A. Alali

 2    the hospital post and the officer that would

 3    relieve me for the hospital post.

 4         Q.    Was it your belief that some police

 5    officer other than you should have been

 6    assigned to that foot post on March 7th?

 7              MS. NICAJ:  Objection.  You can

 8         answer.

 9         A.    Like I testified to earlier,

10    Mr. Meisels, I stated that foot posts are

11    primarily given to junior officers.  We can go

12    back as far as 6 years of roll calls where

13    officers are being placed on punishment for one

14    reason or another.  They are not reserved for

15    officers that are productive or not on

16    punishment or not junior.  That has been the

17    past practice of this department.

18         Q.    Other than the assignment that you

19    already testified to, did Lieutenant Debara

20    either directly or indirectly participate in

21    assignments that you think were inappropriate?

22         A.    Yes.

23         Q.    Could you explain what they were?

24         A.    The assignments that I testified to

25    earlier of being a civilian dispatcher, of
```

1                    A. Alali

2    watching suicidal prisoners, of doing the jail

3    escorts, you know, traffic post, direct

4    traffic.  I memorialized that as well in

5    writing to I believe Lieutenant Fortunato and

6    possibly the Police Commissioner Carroll.

7    There was an instance that I remember very

8    clearly with Lieutenant Debara that, while I

9    was to work in the radio room, I was to -- he

10   said this in front of several civilian members

11   of service, and I can tell you their names now,

12   that if I even needed a paper clip or a pen,

13   that there was an imaginary line in the

14   communications room not to go forward so no

15   members of the public would see me.  There is

16   another incident that I was asked to assist on

17   an immigration warrant by Lieutenant Debara --

18   correction -- by Sergeant Austin who is a desk

19   officer, and Lieutenant Debara saw me at the

20   front desk giving information to the

21   immigration officer, and basically had

22   reprimanded me for being at the front desk and

23   told me didn't I tell you not to be at the

24   front window, I don't want anyone to see you.

25   He actively did participate in that, and the

60

1                          A. Alali

2      civilian members that I clearly remember

3      because he said this on more than one occasion

4      that were present, in reference to the

5      imaginary line, do not cross that, were CSO

6      Madden, CSO Sheehy, CSO Cruz, CSO Brown, CSO

7      Holder.  Those are the CSO's that I clearly

8      member.  He said that on more than one

9      occasion, and also he had told me that I cannot

10     take a police vehicle for under these

11     circumstances, not for lunch, not at all, not

12     to, when I walk out of the building, not to

13     walk through the front, because that would mean

14     members of the public would see me, to walk

15     through the back.  That is some of the

16     instances that come to mind right now.

17           Q.    Do you know whether or not

18     Lieutenant Debara discussed these various

19     assignments with any other members of the

20     department?

21           A.    Yes.

22           Q.    With whom did he discuss them?

23           A.    With the first line of supervision

24     Sergeant Morrell, Sergeant Brady, Sergeant

25     Wilson, Sergeant Austin.  There was a memo put

```
 1                      A. Alali

 2   out by Captain Gazzola, stating -- via e-mail

 3   stating that I was to perform the limited

 4   functions of dispatcher, jail escorts, suicidal

 5   prisoners, and not to utilize any police

 6   vehicles.  So an e-mail was circulated to the

 7   second tour of supervision, and they were made

 8   aware of that, and I do remember generating a

 9   intradepartmental communication basically

10   stating that obviously is egregious and unfair,

11   and I am being punished again solely based on

12   my heritage.

13        Q.    That was a communication initiated

14   by you?

15        A.    Initiated by me, correct, in

16   response to Captain Gazzola's directive.

17        Q.    What is the basis for your belief

18   that Lieutenant Debara discussed the various

19   assignments that you've testified to with

20   Sergeant Morrell?

21        A.    Well, I will make this easy for

22   you.  Not just Sergeant Morrell, all of the

23   sergeants because I was specifically, when the

24   other sergeants, Sergeant Morrell, Sergeant

25   Wilson, Sergeant Brady were working, Sergeant
```

```
 1                        A. Alali

 2     Austin, I was working in the capacity of a

 3     dispatcher or I was on the jail escort.  I was

 4     not working street anymore during that time.

 5     So obviously the connection would be that they

 6     were all advised, obviously, I think, as I told

 7     you, via e-mail by Captain Gazzola and also

 8     that they were the desk officers at various

 9     times, and I was working in the capacity of

10     dispatcher or jail escort or watching a

11     suicidal prisoner.  I was not working in the

12     capacity of a police officer in the field.

13          Q.    Let's just go one at a time.  In

14     reference to any communication that Lieutenant

15     Debara had with Sergeant Morrell, are you aware

16     of any communication regarding your assignments

17     other than the e-mail that you just mentioned?

18          A.    They basically each and every

19     supervisor told me that my function would be

20     the function I spoke to, I am not to work the

21     front desk, I am not to be on the street, I am

22     not to utilize a police vehicle.  I am to

23     dispatch only, and that goes with each and

24     every one of the sergeants.

25          Q.    Let me go back to the question,
```

1                          A. Alali

2      though, of communications between Debara and

3      Morrell, are you aware of any communications

4      between Lieutenant Debara and Sergeant Morrell

5      regarding your assignments other than the

6      e-mail that you testified to already?

7          A.    Well, when I asked him why, and I

8      asked each one of them why I was doing these,

9      as I -- obviously, when I had a peculiar

10     assignment, they had stated that directive came

11     from Captain Gazzola, and Lieutenant Debara

12     took the matter, and they had to abide by the

13     directive, and that was my assignment.  That

14     could be well established by my assignments I

15     was working was limited to those functions.

16         Q.    Well, during the period of time

17     from February to April of 2007, did you receive

18     any assignments that you thought were

19     appropriate?

20         A.    I don't presently recall, but I do

21     know I received many assignments that were

22     inappropriate that I had basically either

23     through written communications or verbal

24     communication had addressed them.  I think we

25     spoke about several of them right here today.

```
1                    A. Alali
2        Q.    Is it correct that you got some,
3  during the period of time of February to April
4  of '07, you got some assignments that you
5  thought were inappropriate and you had some
6  assignments that were appropriate?
7        A.    No.  Again, when I was talking
8  about -- I think you are cleverly trying to
9  mince my words -- I think we were talking about
10 the directive that was initiated by Captain
11 Gazzola to the sergeants I just mentioned.  I
12 every day on a daily basis during -- I don't
13 know the period of time that was -- and I'm not
14 testifying that it was in the time that you
15 just stated, but I was serving in the capacity
16 as a civilian dispatcher or doing a jail escort
17 or watching a suicidal prisoner, banned from
18 using police vehicles, that is what I'm
19 testifying to and that was inappropriate.  And
20 I had made verbal and written communications
21 affirming that.  I don't recall presently if
22 the period of time was during the time you just
23 stated February to March, I don't recall, but I
24 know there were assignments that were
25 inappropriate that were just stated a few
```

1                           A. Alali

2          A.     I don't presently recall if I

3    retained a copy of it or but I do remember

4    seeing it.

5          Q.     You read it?

6          A.     Yes.

7          Q.     Other than what you already

8    testified to, do you remember anything else

9    that was in it?

10         A.     No.

11         Q.     In reference to Sergeant Wilson, do

12   you have any basis to believe that Lieutenant

13   Debara ever discussed your assignments with

14   Sergeant Wilson?

15         A.     Yes.

16         Q.     What is the basis for your belief?

17         A.     Sergeant Wilson told me as well as

18   making inquiry to him while he was working as a

19   desk officer.  I do not remember the dates and

20   times, but it was after the assignment was

21   given when he was on the desk.

22         Q.     Do you know which assignment that

23   referred to?

24         A.     I basically talked about all of the

25   assignments.  And he had told me the

A. Alali

1

2    assignments that I was capable of carrying out

3    which were, as I stated earlier, in Captain

4    Gazzola's e-mail and was told to me by

5    Lieutenant Debara as well as what Lieutenant

6    Debara had told them.  I was not present, but

7    that is what they told me.

8         Q.    Other than the e-mail that you

9    described, do you have any reason to believe

10   that Lieutenant Debara discussed your

11   assignments with Sergeant Wilson?

12        A.    Yes.  I just testified 30 seconds

13   ago conversations I had with Sergeant Wilson

14   telling me that these are the specific

15   functions I must do and also the fact that he

16   told me that there was an e-mail that was

17   generated.

18        Q.    Am I correct --

19        A.    Besides --

20        Q.    -- that your understanding was that

21   that was based upon the e-mail?

22        A.    And also conversations I had with

23   him, not including the e-mail, numerous

24   conversations I had with him.

25        Q.    When you say him, who do you mean?

```
 1                          A. Alali

 2         A.    Sergeant Wilson.  That is who we're

 3   talking about, right?

 4         Q.    Correct.

 5         A.    Correct.

 6         Q.    So, am I correct that based upon

 7   your conversations with Sergeant Wilson, you

 8   concluded that he had communicated with

 9   Lieutenant Debara based upon that e-mail?

10               MS. NICAJ:  Objection.  You can

11         answer.

12         A.    No.

13         Q.    It's not correct?

14         A.    No.   That is not what I'm saying,

15   that is not what I'm testifying to.  I made it

16   clear.  We had numerous conversations, Sergeant

17   Wilson and I to what my tasks were to be, that

18   he was -- that besides the e-mail, that he was

19   told what my assignments, what they were going

20   to be by the Lieutenant Debara, and I stated

21   that it was unfair, and it was -- it was

22   another example of being singled out.

23         Q.    Other than the e-mail, can you

24   identify any other communication between

25   Lieutenant Debara and Sergeant Wilson
```

```
 1                    A. Alali

 2  concerning your assignments?

 3       A.    What Sergeant Wilson had told me

 4  that Lieutenant Debara had said that my

 5  assignments must be.

 6       Q.    What did Sergeant Wilson tell you

 7  that he claimed that Lieutenant Debara said

 8  your assignments must be?

 9       A.    He didn't claim.  He stated that is

10  what my assignments must be, and that is the

11  same assignments that I testified to with

12  Sergeant Morrell which was dispatcher, watching

13  suicidal prisoners, jail escorts, forbidden to

14  use police vehicles, forbidden to direct the

15  public and work the front window.  My

16  assignment in the radio room must be specific

17  to dispatching only.

18       Q.    And what period of time was

19  referenced in those discussions with Sergeant

20  Wilson?

21       A.    I don't remember the period, but as

22  I testified to earlier, prior to the EOC

23  filing.

24       Q.    Officer Alali, is it your

25  understanding that Sergeant Austin ever
```

```
 1                      A. Alali
 2   federal actions, and if there was another
 3   matter that could be grieved by the PBA such as
 4   half a sick day, they would obviously do so.
 5        Q.    Did you ever discuss these
 6   assignments with someone from the PBA before
 7   you filed the EOC charge?
 8        A.    I have been subject to a systemic
 9   pattern of bigotry and hatred since I started
10   this department, and whoever was the PBA
11   president at the time or we had the same PBA
12   attorney Thomas Troetti.
13        MS. NICAJ:  I am going to caution
14        you, whatever communications you may
15        have had with the PBA attorney are
16        confidential communications, and I am
17        instructing you not to disclose any of
18        that.
19        A.    I have been advised basically every
20   step of the way through my journey in the New
21   Rochelle Police Department.
22        Q.    Did you discuss with Edward Hayes
23   the assignments with which you were unhappy
24   before you filed the EEOC charge?
25        A.    Yes.  I have discussed it and he
```

<pre>
 1                    A. Alali

 2   has seen the intradepartmental communications

 3   detailing that.

 4        Q.    Aside from the PBA attorney --

 5        A.    I am talking about Edward Hayes,

 6   not --

 7        Q.    In addition to Edward Hayes, but

 8   not including counsel, did you discuss it with

 9   anyone else from the PBA?

10        A.    There was one instance prior to my

11   suspension, Edward Hayes was out of town in Las

12   Vegas, and I had a PBA representative Edward

13   Martinez present.  I handed a letter to

14   Commissioner Carroll stating on going

15   harassment and bigotry.  After receiving that

16   letter, he called me back in with the PBA

17   president Edward Hayes present and then

18   suspended me subsequently for 30 days.  So that

19   is one instance that Edward Hayes was not

20   present due to the fact he was, you know, out

21   of the state.  I had another representative,

22   the next representative available, in that case

23   it was Edward Martinez.

24        Q.    Prior to filing your EEOC charge,

25   on how many occasions did you speak with Edward
</pre>

1                          A. Alali

2    Hayes about the assignments that you thought

3    were inappropriate?

4          A.    What assignment -- all assignments

5    that I know of that were inappropriate?

6          Q.    Correct.

7          A.    Many, many, many times, countless.

8          Q.    When you say countless, do you mean

9    more than 10?

10         A.    Yes.

11         Q.    More than 20?

12         A.    Probably, yes.

13         Q.    More than 30?

14         A.    It could be more than 50.

15         Q.    Do you recall the substance of any

16   one of these conversations that you had with

17   Mr. Hayes?

18         A.    Prior to the EOC?

19         Q.    Yes.   Correct.

20         A.    Basically the assignments, numerous

21   conversations with Edward Hayes with the

22   directive Captain Gazzola assigning me to the

23   functions of civilian dispatcher, no

24   interaction with the public, not being able to

25   use a police vehicle, watching suicidal

1                         A. Alali

2    prisoners, being also limited to doing jail

3    escorts only, I discussed that with him.    I

4    think he has -- I know we have sat down and had

5    conversations with Captain Gazzola regarding

6    this and I believe he has had numerous

7    conversations on his own and that is prior to

8    the EOC.

9         Q.     Prior to the EOC charge, at any

10   time, did Mr. Hayes give you some advice as to

11   what he thought you should do about your

12   concerns?

13        A.     Yes.

14        Q.     What did he tell you?

15        A.     He told me the fact of, you know,

16   that if there was a grievable matter, that they

17   would be able to grieve it, to document the

18   incidents, and basically also made a referral

19   to Tom Troetti, the PBA attorney.

20        Q.     Did he give you any other advice

21   other than what you just testifies to?

22        A.     Nothing that I presently recall.

23        Q.     Did he offer you any advice as to

24   whether or not your concerns were grievable?

25        A.     I think I don't really presently

1                          A. Alali

2    doing.

3         Q.    At the time that you were assigned

4    to that camera car, do you know whether or not

5    the police department had other camera cars?

6         A.    As I stated to you, they had the

7    cars in the traffic division that were a

8    antiquated camera system that were not

9    operational, that were based upon a VHS system

10   completely different from my system, and as I

11   stated, that was known beforehand that the

12   officer that is in the traffic division was to

13   be using a camera car.  The car that I was

14   using was especially fitted just for me and no

15   other officer.  Did any other officers utilize

16   that car, perhaps, but I was the first one to

17   use it, and when I was working, no other

18   officer was authorized to use that car except

19   for me.

20        Q.    Do you know whether or not Sergeant

21   Wilson was aware that you had filed a first

22   lawsuit?

23             MS. NICAJ:  Ever?

24             MR. MEISELS:  Yes.

25        A.    I mean I don't know if he initially

1                    A. Alali

2    knew, but every one of the supervisor know that

3    the lawsuit has been filed.

4         Q.    What is the basis for your belief

5    that they all knew that the first lawsuit was

6    filed?

7         A.    Basically the whole department was

8    talking about it.  There was talk in the radio

9    room and the locker room among all of the other

10    officers.  I would classify New Rochelle as a

11    small precinct.  It's not a large department.

12    Word travels very fast, and I think it's clear

13    that at some point in time, not only Sergeant

14    Wilson and the other people -- everyone knew

15    this lawsuit was filed.

16         Q.    Now, did ever come a time that you

17    received an assignment from Sergeant Wilson

18    that you felt was inappropriate?

19         A.    During -- I can't specifically

20    recall, but, if there was an assignment during

21    the time that he was a desk officer in the

22    radio room, and it was the assignment I was

23    given as a dispatcher or a county jail escort,

24    he did assign me to whatever needed to be done.

25    So, yes.  I don't know the dates and times, but

1                        A. Alali

2   clearly he did assign me to the county jail

3   prisoner escort, he assigned me to the foot

4   post, he assigned me to dispatching duties.

5   You know, he was the desk officer, and he is

6   also many, many times turned out the second

7   tour.

8           Q.    Do you recall when you received

9   those assignments that you thought were

10  inappropriate?

11          A.    When -- the question is --

12                MS. NICAJ:  Objection.  You can

13          answer.

14          A.    I have received inappropriate

15  assignments the minute I walked through --

16  basically shortly after I walked through the

17  door of New Rochelle.

18          Q.    Well, was Sergeant Wilson your

19  direct supervisor then?

20          A.    Sergeant Wilson was my supervisor

21  when I was working on the second tour.

22                Also Sergeant Wilson and I were --

23  I would like the record to reflect that we were

24  patrolmen together on the first tour which is

25  midnights.  He was sector one, and I would

                              A. Alali

1
2      float around whatever assignment they would
3      give me and would tell me basically, you know,
4      be careful, they are haunting you.
5      Subsequently he became the supervisor on the
6      second tour, and, you know, had to be my
7      immediate supervisor and, you know, give my
8      evaluations and gave me the punitive
9      assignments.
10         Q.    When you say that he gave you the
11     punitive assignments, what was that punishment
12     for?
13         A.    It was for no legitimate reason.
14     It was the punitive assignments, as I stated,
15     were various, were foot posts in the snow to
16     foot posts when the junior officers were
17     working, to jail escorts, to do the prisoner
18     escorts and that was on a consistent basis.  I
19     was barred from doing normal police functions
20     that was working outside the street.  The only
21     time that I would see the street was when I was
22     doing the jail escorts.
23         Q.    You characterize the assignments as
24     being punitive, is that correct?
25         A.    That is correct.

1                           A. Alali

2          Q.    What was your understanding as to

3     what the punishment was for, why were you being

4     punished?

5          A.    There was no clear reason given to

6     me.  Probably what I encountered through my

7     whole time here was based on my heritage.

8          Q.    That is just a possibility?

9                MS. NICAJ:  Objection.

10         A.    No.  That is fact.  When you are

11    top producer and you are constantly going out

12    there and working, and there are people that

13    aren't and are given choice assignments and you

14    are consistently being fictitiously rated as

15    below standards and standing on a foot post in

16    a midnight tour in the snow, and you are out

17    there producing, I would say there is something

18    abnormal about that.  What would you say,

19    Mr. Meisels?

20         Q.    From that circumstance, you would

21    conclude am I correct, that the reason that

22    this happened is because you of your heritage?

23                MS. NICAJ:  Objection.

24         A.    Absolutely.  It wasn't because of

25    my productivity or my abilities or my

```
 1                    A. Alali
 2  experience or any of that.
 3         Q.    Did you ever take issue with any
 4  performance evaluations that you had got from
 5  Sergeant Wilson?
 6         A.    I believe so.
 7         Q.    I'm going to show you what has been
 8  premarked as Exhibit R and ask you if you can
 9  identify what has been marked Defendant's
10  Exhibit R, can identify that document?
11         A.    This is a performance appraisal
12  authorized by Sergeant Wilson, an appraisal
13  that I strongly disagree with, and I have given
14  a written rebuttal to the reasons why I
15  disagreed with this performance evaluation.
16         Q.    If you look --
17         A.    I would like to add this is maybe
18  one of at least -- he has evaluated me more
19  than this occasion.  This is just one of the
20  several times he has evaluated me.
21         Q.    Could you turn to the second page
22  of the exhibit?
23         A.    Sure.
24         Q.    Now, in reference to the first full
25  paragraph on the top of the page where it says
```

1                          A. Alali

2    during the rating period, officer Alali

3    received 8 civilian complaints.  Was that true?

4         A.    I have no way to verify that.  Um,

5    I don't know, I don't know the exact number.  I

6    know that I, during the rating period, I had

7    received civilian complaints.  There is know

8    way for me to know there were 8.

9         Q.    The next sentence says of the

10   complaints filed, 3 were for abuse of

11   authority.  Do you know if that is true?

12        A.    No, I would not know if that is

13   true.  I do know that almost every complaint

14   that I received in New Rochelle, the complaints

15   had been unsubstantiated, so I wouldn't know.

16        Q.    And skip the next line, go to the

17   next line where it says 2 complaints were for

18   discourtesy.  Do you know if that is true?

19        A.    No.

20        Q.    The next sentence both were

21   unsubstantiated but you received counseling for

22   one incident.  Is that true?

23        A.    I don't know.  I can't -- I can't

24   remember what kind of counseling it was.

25        Q.    Next sentence, he received 2

A. Alali

2   complaints for reckless driving.  Do you know

3   if that was true?

4       A.    No.

5       Q.    The next sentence one complaint is

6   pending charges and the other is

7   unsubstantiated with officer Alali receiving

8   counseling.  Do you know if that is true?

9       A.    No.  Why I know it's not true is

10  there is a lot of fabrications that I was

11  recommended for department discipline 2 times

12  which I never received during the rating

13  period.  A lot of the complaints would come in;

14  I don't know about every complaint that comes

15  in, if they are actually a legitimate complaint

16  are not legitimate.  There are a lot of

17  fabrications in here such as states on the

18  first page I received 2 departmental complaints

19  for leaving my post on 2 occasions.  I did not

20  receive any of them during this rating period.

21  I wrote a detailed memorandum stating that, you

22  know, stating that I was -- the purpose of

23  department discipline is to correct or modify

24  behavior, that I should be given that, and it

25  was never given to me.  So there are a lot of

```
                           A. Alali
1
2    things in here that I did do a detailed
3    rebuttal to this outlining it.  So there is a
4    lot of inconsistencies here.
5           Q.     Officer Alali also received a
6    complaint for excessive force.  Do you know if
7    that was true or not?
8           A.     No.  I don't know if that is true.
9    I don't know if the complaint is pending.  I
10   don't know the outcome.
11          Q.     I'm going to show you what has been
12   premarked as Defendant's Exhibit T for
13   identification and ask you if you can identify
14   that?
15          A.     It's a communication from Captain
16   Gazzola to myself.
17          Q.     Do you recall receiving this?
18          A.     Yes.
19          Q.     Looking at the last sentence,
20   according to Lieutenant Fortunato, you received
21   7 civilian complaints, not 8 as documented in
22   the evaluation.  Do you know whether that is
23   true?
24          A.     No.
25          Q.     I'm going to show you what has been
```

A. Alali

1

2    Q.    How many occasions did you discuss

3    the below standard evaluations with Mr. Hayes?

4    A.    When I received them, I would

5    discuss them with him every time I received the

6    below standard evaluation.

7    Q.    Do you recall how many such

8    discussions you had with him?

9    A.    However many below standard

10   evaluations there were.

11   Q.    Every time you got a below standard

12   evaluation, you discussed it with him?

13   A.    Fictitious below standard

14   evaluations, yes.

15   Q.    How about the circumstances when

16   they weren't fictitious?

17   MS. NICAJ:  Objection.  You can

18   answer.

19   A.    When a performance evaluation was

20   appropriate, and it wasn't full of, as we

21   looked at the performance evaluation with

22   Sergeant Wilson was filled with fabrications,

23   obviously, if it was a truthful performance

24   evaluation, I would not object to it.  If it's

25   truthful, obviously I would object to it.

1                          A. Alali

2          Q.     When you spoke to Mr. Hayes about

3   some of these evaluations, can you tell me in

4   words or substance what you said to him and

5   what he said to you?

6          A.     He clearly saw the same issues that

7   I saw with these performance evaluations.  He

8   instructed me on the departmental guidelines on

9   how to request a review of the evaluation and

10  upon his direction, I did so.

11         Q.     Was Lieutenant Marshall ever your

12  indirect supervisor?

13         A.     Yes.

14         Q.     When was that?

15         A.     Since I started with the New

16  Rochelle Police Department, he was the rank of

17  sergeant.

18         Q.     Do you know whether or not he was

19  ever aware that you had filed an EEOC charge?

20         A.     I don't presently recall.

21         Q.     Do you know whether or not he was

22  ever aware that you filed your first lawsuit?

23         A.     I don't presently recall.

24         Q.     Do you know whether or not he

25  participated in any decision relating to any of

                              A. Alali

1

2    the assignments that you testified to that you

3    thought were inappropriate?

4         A.    Lieutenant Marshall changed from

5    being my indirect supervisor to I believe my

6    direct supervisor, and he became executive

7    officer for patrol. He was there I don't know

8    for assistance or as a witness to Captain

9    Gazzola during numerous rebuttal of performance

10   evaluations, and I believe he was aware as well

11   of the assignment that was given to me

12   regarding the prisoner transports, civilian

13   dispatcher and on and so forth, and I can look

14   at the federal complaint as well, that would

15   refresh my memory specifically as to the

16   instances that he was aware of, certain

17   patterns of misconduct, and may I look at

18   federal complaint, please?

19        Q.    Actually your attorney is entitled

20   to ask questions after I am finished, and if

21   she wants to discuss the complaint with you,

22   I'm going to let her do it.

23             MS. NICAJ:  For the record, you

24         want the complaint to refresh your

25         memory as to Mr. Meisels's line of

1                        A. Alali

2    questioning?

3    A.    It would help me tremendously.

4         MS. NICAJ:   Okay.  You made your

5    record known.  So if he does not want to

6    follow up with anything concerning the

7    complaint, it's his avenue.

8         MR. MEISELS:   Your attorney can ask

9    questions when --

10        MS. NICAJ:  Why would I if he

11   solicited you to show him the complaint

12   and you are not doing so?

13        MR. MEISELS:   Your state of mind is

14   not an issue.  Whatever you decide to do

15   is your business.

16        MS. NICAJ:   It's your state of

17   mind, because obviously you don't want

18   his memory refreshed.  So, therefore,

19   you are trying to pin him down

20   without -- he clearly told you that he

21   needs his memory refreshed and showing

22   the complaint would help him do so, and

23   for me to do it at the conclusion of the

24   deposition given the context of your

25   questioning now is unfair, and you know

```
 1                        A. Alali

 2        it.

 3                 MR. MEISELS:  Do you have any other

 4        concerns you want to put on the record?

 5                 MS. NICAJ:  No.  That is it.

 6        Q.    Other than what you've testified to

 7     already, do you know of any role that

 8     Lieutenant Marshall played in deciding what

 9     your assignment should be?

10        A.    As I stated earlier, if I could

11     look at the federal complaint that we're here

12     on today, that would help me refresh my memory.

13     Short of that, I am not going to presently

14     recall, but I am sure I will be able to recall

15     it at another time when I can look at the

16     complaint.

17        Q.    I am going show you what has been

18     premarked as Defendant's Exhibit A for

19     identification and ask you if you can identify

20     that document?

21                 MS. NICAJ:  You said A, right?

22                 MR. MEISELS:  A.

23        A.    The tuition bill generated by Iona

24     College.

25        Q.    Do you recall ever seeing that
```

                              A. Alali

2    document before?

3         A.    Yes, sent to my house.

4         Q.    Do you recall when you received it?

5         A.    No.  I received so many bills from

6    Iona.  I just received one yesterday, as a

7    matter of fact.  So I don't remember this

8    particular bill.

9         Q.    And am I correct that you have from

10   time to time applied for tuition reimbursement

11   from the police department?

12        A.    Every time I attended classes, I

13   applied for tuition reimbursement.

14        Q.    What is your understanding as to

15   your entitlement as to tuition reimbursement?

16        A.    That officers will be reimbursed

17   based upon a number that is allocated and be

18   dispersed evenly, and that is my understanding.

19        Q.    When you say dispersed evenly, what

20   is your understanding of evenly?  Is it same

21   exact number of dollars or is it a percentage

22   or some other methodology?

23        A.    I would think that the evenly would

24   mean, if I took 5 classes and you took 5

25   classes, we would get -- the moneys would be

                        A. Alali

1

2   distributed evenly between me and you.  That is

3   my definition of evenly.

4        Q.    Is this reimbursement program

5   provided for in the PBA contract?

6        A.    Yes.

7        Q.    And have you ever discussed with

8   someone from the PBA other than PBA counsel as

9   to what your entitlement was of the tuition

10  reimbursement?

11       A.    As I testified to earlier, with PBA

12  president Edward Hayes, he has claimed that he

13  has an issue with Deputy Commissioner Murphy

14  regarding tuition reimbursement.  He wants to

15  see how it's allocated, and other than that,

16  no.  I mean we basically submit the bills and

17  the Deputy Commissioner would state what is

18  owed, if any, at times depending on how many

19  students went to college at the time.

20       Q.    Is the reimbursement done in a form

21  of a check to Iona or is it in a form of a

22  check to you?

23       A.    Well, it used to be in a form of a

24  check to Iona.  Presently that has changed and

25  has been modified to a check to the member.  So

A. Alali

1

2    the first time I just received a check.  All of

3    the other previous times, I have not received a

4    check and I believe it was sent to Iona

5    College.

6         Q.    Now, I am going to show you what

7    was premarked as Defendant's Exhibit B for

8    identification and ask you if you can identify

9    that document?

10        A.    It's standard language used in

11   intradepartmental communication when you are

12   requesting to enroll in a college, and

13   basically it's the state of language that is

14   used for every time you attend school.

15        Q.    Referring to this particular

16   memorandum, is that from you to the

17   Commissioner?

18        A.    Yes.

19        Q.    It's dated November 11, 2005.

20        A.    Yes.

21        Q.    Going to the second paragraph of

22   the memo, it says please be advised as per the

23   union contract for the City of New Rochelle

24   part or all of the fees and tuition will be

25   paid by the New Rochelle Police Department for

1                          A. Alali

2    courses successfully completed.  So am I

3    correct that you made this request pursuant to

4    the contract?

5         A.    That is right.

6         Q.    And at the time you made the

7    request, it was your understanding that part or

8    all of the fees would be paid?

9         A.    That is correct.

10        Q.    But only in connection with courses

11   that were successfully completed?

12        A.    Which everyone of mine were, yes.

13        Q.    Am I correct that before any

14   reimbursement check would be written, the

15   courses would have could to be completed?

16        A.    Basically, to my understanding,

17   that there was an agreement between the college

18   and the department that the officer would

19   enroll and payment would be deferred to the

20   completion or the end of whatever the budgeting

21   was.  It was not demanded at the time of

22   enrollment.

23        Q.    Payment would come after the

24   courses were taken?

25        A.    Correct.

1                          A. Alali

2          Q.     And the payment could be part or

3     all of the amount of tuition that was paid?

4          A.     Correct.

5          Q.     It could be part?

6          A.     Correct.

7          Q.     And is it your understanding that

8     Commissioner Carroll approved your

9     participation in the program back in November

10    of 2005?

11         A.     Yes.

12         Q.     Was that for the winter trimester

13    of 2005?

14         A.     Yes.

15         Q.     Can you explain what, as you

16    understand it, what do understand the term

17    trimester to mean?

18         A.     Trimester is a program that Iona

19    College has.  Basically what it states try, 3

20    times a year, and so you go 3 times a year as

21    opposed to twice a year.

22         Q.     Does that mean that the year is

23    divided into 3 parts of 4 months each or?

24         A.     Honestly I don't know how budgeting

25    is done.  I just know that you are able to go

1                          A. Alali

2    full time, being it's broken down for 3 times a

3    year, you are able to complete the full time

4    curriculum.

5         Q.    I'm going to show you what is

6    premarked Defendant's Exhibit C and ask you if

7    you can identify that document.

8         A.    Yes.

9         Q.    What is it?

10        A.    It's a letter authored by Deputy

11   Commission Murphy to Iona admission stating

12   that I will be enrolled for winter 2005

13   trimester.

14        Q.    I am going to show you what has

15   been premarked as Defendant's Exhibit D for

16   identification and ask if you can identify that

17   document?

18        A.    It's a letter from me -- I am

19   sorry -- from me, yes, to Commissioner Carroll

20   regarding tuition reimbursement.

21        Q.    Was this for the 2005 fall

22   trimester?

23        A.    Again, I am very confused on when

24   it's paid.  It could have been -- it says fall

25   on here.  This would be fall.  Completed, yes.

**EXHIBIT 30**

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      -------------------------------------------X
       ARAZ ALALI,
4
                                    PLAINTIFF,
5

6              -against-          Case No:
                                  07 CIV. 1916
7

8      ALBERTO DeBARA, Individually, KYLE WILSON,
       Individually, EDWARD AUSTIN, Individually,
9      GEORGE MARSHALL, Individually, HUMBERTO
       MORRELL, Individually, MATTHEW BRADY,
10     Individually, ANTHONY MURPHY, Individually,
       PATRICK J. CARROLL, Individually and the
11     CITY OF NEW ROCHELLE, NEW YORK,

12                              DEFENDANTS.
       -------------------------------------------X
13                    DATE:  April 4, 2008

14                    TIME:  11:15 A.M

15

16           CONTINUED EXAMINATION BEFORE

17     TRIAL of the Plaintiff, taken by the

18     Defendants, pursuant to a Court Order and

19     to the Federal Rules of Civil Procedure,

20     held at the offices of Wilson, Elser,

21     Moskowitz, Edelman & Dicker, LLP, 3 Gannett

22     Drive, White Plains, New York 10604, before

23     Veronica R. Harris, a Notary Public of the

24     State of New York.

25

8

```
1                    A. ALALI
2   reimbursement of 2005 stating that
3   $2,751.40 will be reimbursed back to me.
4        Q.    Was it reimbursed?
5        A.    Not to me, perhaps to Iona.
6   I'm not sure.
7        Q.    Did you ever make any inquire
8   about it?
9        A.    I know that my current status
10  with the college is that they reported it
11  to the credit agency that I am in
12  collection.  I also know that in 2006 the
13  tuition that was -- that actually there was
14  no tuition initially reimbursed to me.
15            There was a filing of the EEOC
16  and then the first Federal complaint on
17  February 21, 2007, and prior to that Police
18  Commissioner, Deputy Police Commissioner
19  Anthony Murphy had numerous conversations
20  with PBA President Edward Hayes stated that
21  he is not going to pay my tuition period.
22            After the EOC filing Deputy
23  Commissioner Murphy, called via cell phone
24  to my residence which was at 703 Pelham
25  Road Unit 514 in New Rochelle, stating that
```

1                          A. ALALI

2    he would pay the tuition, however he needs

3    my grades.  The grades were already

4    submitted to him.

5              Upon, you know, I was -- I was

6    on the Dean's list there and always

7    submitted my grades and permission to go to

8    college.  He had then subsequently called

9    myself and PBA President, Edward Hayes and

10   had a detail conversation to both of us

11   stating that he is going to pay my 2006

12   tuition.  However, PBA President Hayes will

13   not be happy with the figure he was going

14   to give because it was going to allot me

15   more money than the other members.  They

16   figured that -- the amount that was

17   submitted for 2006 it was approximately

18   $10,000, roughly.

19              He then stated that he was

20   going to pay me an excess of the other

21   members, which is approximately $5,700.

22   Police officers Craig Wolf also submitted

23   approximately $10,000 in tuition.

24   Approximately an $80.00 difference between

25   myself and Police Officer Wolf.  However,

1                           A. ALALI

2      Police Officer Wolf had received $2,000

3      more in tuition, final tuition payment to

4      the college than myself.

5                 I believe his reimburse, it was

6      approximately 73 percent to mine being

7      approximately 50 percent.  This was only

8      done after the EEOC filing and prior to

9      that he had clearly stated to police

10     officer -- PBA President, Police Officer

11     Hayes that he would not make any tuition

12     payments and the college followed up with

13     that and indicated that he did not.

14                 So, after I called myself and

15     PBA President Hayes in, and said they was

16     going to pay me more than the other

17     members.  They came up with the figure of

18     $5,700, Edward Hayes wanted to know how he

19     arrived at that number.  He said, well, I

20     am going to pay more than the other members

21     and we know that to be a fact not true that

22     I was paid approximately $2,000 less than

23     Police Officer Wolf.

24         Q.    Do I understand you correctly

25     that prior to the EEOC charge, it was the

```
 1                    A. ALALI
 2   Deputy Commissioner's position that he was
 3   not going to pay the tuition reimbursement
 4   at all?
 5        A.    Period, correct.
 6        Q.    After you filed the charge a
 7   determination was made to make some payment
 8   to you; is that correct?
 9        A.    To make a payment greater than
10   other members.
11        Q.    And so am I correct that the
12   circumstances -- your circumstances got
13   better as a result of filing the charge?
14             MS. NICAJ:  Objection.
15             You can answer.
16        A.    Apparently they did not get
17   better.  It was -- as I stated a few
18   seconds ago, that it was $2,000 less than
19   another officer who had submitted
20   approximately the same exact amount as I
21   did, difference of $80.00.  However, he
22   received an additional, approximately
23   $2,000 more than myself.
24        Q.    What is the basis for your
25   belief as to how much this other officer
```

                           A. ALALI

1
2    received?
3              MS. NICAJ:  We have this, if
4         you want to see it.
5         A.    A 2006 Tuition Reimbursement
6    that was furnished by Deputy Police
7    Commissioner Anthony Murphy to PBA
8    President Hayes, giving the amount
9    submitted and a final amount.  And also
10   there is a percentage at the end and it
11   clearly depicts the amount that was
12   submitted and the final payment to the
13   college.
14        Q.    And I gather that you have a
15   copy of the amounts that were paid to each
16   person that year?
17        A.    Correct.
18             MR. MEISELS:  And I would
19        produce it -- appreciate a copy of
20        that whenever it's convenient?
21             MS. NICAJ:  Sure.
22        Q.    Is that the basis -- is that
23   document the basis for your belief as to
24   how much was paid to each person?
25        A.    Yes.  I mean, what he said to

```
 1                    A. ALALI
 2    me in his office in the presence of Edward
 3    Hayes and what the document states, is an
 4    accurate depiction.  But I would also like
 5    to state that there is a variation of
 6    approximately $2,000 between myself and
 7    Police Officer Wolf.  The amount submitted
 8    is approximately identically the same, the
 9    difference of only $80.00.
10         Q.   Did you call that circumstance
11    to the Deputy Commissioner's attention?
12         A.   I did.  I have not -- I've been
13    in his office and after having been told
14    that I would not receive any monies
15    whatsoever, despite the fact that I
16    requested permission to go to the college.
17    Despite the fact that my grades were above
18    satisfactory and it took an EEOC filing for
19    him to finally call me at my home and tell
20    me that he was going to make a payment.
21    And the payment obviously was not even
22    close to being accurate or correct of what
23    I deserved.
24         Q.   Did you ever complain about
25    that to the Deputy Commissioner?
```

```
 1                   A. ALALI

 2        A.    I've -- with Edward Hayes have

 3   talked to Deputy Commissioner about my

 4   account being delinquent and in collection

 5   and it's adversely affecting, obviously my

 6   credit and every time I would register for

 7   the college they basically would tell me

 8   that that amount is outstanding.  And

 9   that's when I made the inquiries and Deputy

10   Police Commissioner stated that he would

11   not pay the tuition period to Edward Hayes

12   and obviously that was accurate because I

13   went back to the school and the amount has

14   not been paid.  And currently, I believe, I

15   am approximately $17,000, approximately

16   $17,000 outstanding and in collection at

17   this time.  Resulting from either no

18   payments or late payments or inaccurate

19   payments.

20        Q.    Now, in reference to the

21   tuition reimbursement that you just

22   referred to with Deputy Commissioner

23   originally said he wouldn't do and then

24   changed his mind and did do it.

25                   What was the difference between
```

```
 1                    A. ALALI
 2    what you received and Officer Wolf
 3    received?
 4         A.    I just stated, approximately
 5    $2,000 difference.
 6         Q.    How much are you in arrears at
 7    Iona College?
 8         A.    A total of approximately
 9    $17,000.
10         Q.    So --
11         A.    That was just one year that I
12    gave you.  That was a break down of 2006.
13    Obviously, I went to school more than one
14    year.
15         Q.    Am I correct that you did
16    receive tuition reimbursement for 2005?
17         A.    Like I stated earlier at my
18    previous testimony, that 2008 was the first
19    year that we received a check directly to
20    myself.  All the other payments were made
21    directly to Iona College.  So I don't know
22    if the payments were made or not made.
23    What I do know, and there was many
24    inquiries to the Deputy Police Commissioner
25    via Edward Hayes on the break down on how
```

```
 1                    A. ALALI
 2   the money was going to be distributed,
 3   however, he failed to provide that
 4   information.
 5            What I am telling you, I am in
 6   collection as today and what I am telling
 7   you is as a clear example of 2006 Police
 8   Officer Wolf and myself had submitted
 9   almost identical amounts.  However, there
10   was approximately 20 percent difference in
11   tuition.
12        Q.    And that's about $2,000, am I
13   correct?
14        A.    Approximately, yes.
15        Q.    In 2008, did you personally
16   make any payments to Iona College?
17        A.    I have a check that was given
18   to me for the first time by Deputy
19   Commissioner Murphy for the amount of
20   $3,900.
21        Q.    That's for 2008?
22        A.    I believe it's for 2007.
23        Q.    For 2008?
24            MS. NICAJ:  For the school
25        year.
```

1                    A. ALALI

2          Q.     For the tuition reimbursement

3    period of 2008.

4                  Have you personally, not from

5    The City, you personally, made any payments

6    to Iona College?

7          A.     No, I have not.

8          Q.     For the school year 2007, did

9    you personally make any payments to Iona

10   College?

11         A.     I don't recall.

12         Q.     For the year 2006, school year

13   2006, did you personally make any payments

14   to Iona College?

15         A.     I do not believe so.

16         Q.     For the year 2005, did you

17   personally make any payments to Iona

18   College?

19         A.     No, I did not.

20         Q.     And for the year 2004, did you

21   personally make any payments to Iona

22   College?

23         A.     I don't believe so.  I don't

24   know if I was enrolled at that time.

25         Q.     Do you recall when you first

```
 1                    A. ALALI
 2   enrolled at Iona College?
 3        A.    I presently don't remember.
 4        Q.    Referring to the first six
 5   months of 2007, did you receive a job
 6   evaluation from the New Rochelle Police
 7   Department?
 8        A.    I believe so.  I believe that I
 9   been rated falsely below standards in the
10   procedures.  Every six months you get
11   reevaluated with another performance
12   evaluation.  So I believe 2007 would be no
13   different than previous years.
14              I also would like to make a
15   correction.  I want to get the record
16   clear.  I think it's important to have the
17   record clear, that regarding my previous
18   testimony with Lieutenant Al DeBara, that
19   there was regarding the hospital post that
20   I was assigned to on February 21, 2007 when
21   he had the availability of what
22   probationary officers.  However, he
23   assigned me to that hospital post.
24   Lieutenant -- that was the same day of the
25   first federal complaint and after the
```

```
 1                    A. ALALI
 2    filing of the EEOC that he had placed me on
 3    that fixed hospital post.  He had -- that
 4    was the same day that I had asked the desk
 5    officer Sergeant Wilson on why myself
 6    instead of four probationary officers to be
 7    placed on the hospital post.  And in the
 8    presence of numerous civilian members he
 9    had stated, "Get the fuck out of my face,
10    not another fucking word.  Get out of my
11    face."  At which point I obviously went to
12    the hospital and was on a fixed hospital
13    post in New Rochelle Hospital.
14            Lieutenant DeBara subsequently
15    came by the hospital and had told me that I
16    would be receiving assignments primarily as
17    a utility call, which is a degrading
18    assignment usually given to junior officers
19    or officers that are on punishment and
20    other assignments, such as directing
21    traffic.  Such as watching suicidal
22    prisoners.  Such as doing county jail
23    escorts and doing civilian work inside the
24    radio room.
25            I was subsequent relieved by a
```

1                         A. ALALI

2     probationary officer on that date.  On that

3     date I went to Lieutenant

4     Fortunado(phonetic) who is the internal

5     affairs officer and had filed a complaint

6     on what had transpired.  And Lieutenant

7     Fortunado had said that Lieutenant Marshall

8     would be handling the complaint due to the

9     fact that Captain Gazzola, was, I believe

10    not in town or not in the office on that

11    day.

12                I told Lieutenant Fortunado

13    that it's appropriate because he is

14    internal affairs officer and he reports

15    directly to the Police Commissioner and

16    they would led up towards corruption.  He

17    advised me that Lieutenant Marshall, who

18    was at that time executive officer and

19    still is executive officer, will be

20    handling that complaint.

21                Nothing -- I did follow up to

22    Lieutenant Fortunado, nothing subsequent to

23    that was given to me of any reason why I

24    would be given those assignments.  Now,

25    that was on February 21st.  I believe on

1                    A. ALALI

2    March 7th is when Lieutenant DeBara then

3    and that's after obviously the first

4    federal complaint, had placed me on a foot

5    patrol in the snow.  And then when I asked

6    him, I made inquire why I versus other

7    probationary officers will be getting that,

8    that's when he made that bias comment that

9    we can put you anywhere we want Bin Laden.

10              I want the record to be clear

11   on that, on the date of -- on

12   February 21st, it was after the EEOC filing

13   on the federal when they were notified of

14   the federal complaint.  That DeBara had put

15   me on that fixed hospital post.  And I

16   illustrated that's the assignment usually

17   given to probationary officers as I stayed

18   on the unit, that Police Officer Kenny who

19   was either a junior probationary officer

20   was assigned to a fixed hospital post.  I

21   just want that to be very clear.

22        Q.    Is there anything else that you

23   want to clarify?

24        A.    Yes.  Also, on April 7, 2007, I

25   was assigned to the radio room by Sergeant

1                    A. ALALI

2    Austin and I basically and there was

3    availability that week of at least three to

4    four probationary junior officers that

5    could have been given that assignment,

6    however were not.  When I made the inquire

7    of him why I was being placed on that

8    assignment, he basically in a laughing way

9    stated that we're going -- it looks like we

10   are going back to the good old days.

11   Followed by a statement added by Sergeant

12   Brady that I better get lunch at 8:00

13   because I won't be able to leave the radio

14   room.  Good luck.

15        Q.    and this was April 7th of what

16   year?

17        A.    2007.

18        Q.    May I ask you about assignments

19   relating to directing traffic.

20              Is that an assignment that's

21   often fulfilled by police officers?

22        A.    Well, directing traffic, if

23   there is a severe -- serious car accident

24   or a situation that require police officer

25   to direct traffic, such as serious police

1                        A. ALALI

2    accident, maybe hazardous condition, branch

3    down in the roadway.  Usually a police

4    officer will be relieved by either a junior

5    police officer or civilian member, CSO.  So

6    initially the officer on the scene will

7    pick up that post and subsequently be

8    relieved by either a junior officer, a

9    utility car or a civilian member.

10        Q.    When you use the term "junior

11   officer," could you explain what that

12   means?

13        A.    This department is -- our past

14   practice goes based on seniority.  Unless

15   they are using that the seniority is out of

16   the window if you are being punished.  So

17   junior officer means an officer with less

18   years of service than a senior officer.

19        Q.    Is that provided for in the

20   rules and regulations of the department?

21        A.    No, that is not in the rules

22   and regulations.  However, it is past

23   practice.

24        Q.    Is it written any place?

25        A.    It's not written, no.  But it

1                          A. ALALI

2     officers?

3          A.     Yes.

4          Q.     And can you identify any other

5     police officers other than you who have

6     been assigned to be a dispatcher?

7          A.     Absolutely.

8          Q.     Could you tell me?

9          A.     Well, I would like the record

10    reflect, I know you said other than me.  I

11    have been a dispatcher approximately a year

12    and my status is, I'm not injured.  I'm not

13    sick.  I'm able to work the street.

14               Other police officers other

15    than myself that would work it would be

16    primarily be officers that are either on

17    sick or injured status.  And if they are

18    not on sick or injured status, it would be

19    because of a shortage inside the

20    communications room that there is not

21    enough civilian members working that

22    require a police officer with dispatcher

23    experience to fill that position.

24               Like I stated, it's not a

25    permanent assignment.  It has been given to

```
 1                    A. ALALI
 2   me and the only time a police officer that
 3   is not sick or injured that would be
 4   dispatching would be if there is shortage
 5   in the radio room.  I have not been trained
 6   to be a dispatcher in any way, shape or
 7   form besides another CSO verbally telling
 8   me this is what, you know, you should be
 9   doing.
10        Q.    Can you identify by name any
11   other police officers who are assigned the
12   dispatcher?
13        A.    I don't know on the top of my
14   head, but it's not a common position.  As I
15   stated, it is a position that a police
16   officer that is sick or injured will be
17   filling or a police officer that knows how
18   to dispatch and there is a shortage in the
19   communication room of civilians.  It's
20   definitely not a position that a police
21   officer would be filling for a period of a
22   year on a daily basis.
23        Q.    For the first six months of
24   2007, did you receive a job evaluation?
25        A.    I believe so.
```

                          A. ALALI

1
2       Q.    And do you remember what your
3    job evaluation was?
4       A.    Well, for the last few years
5    with the exception of one job evaluation
6    that was amended and that was when Sergeant
7    Brady was the evaluating officer, it was
8    amended by him from below standards to meet
9    standards.  For the last several years,
10   I've always been falsely below standards.
11   Although, that I've been consistently the
12   top producer.
13      Q.    When did Sergeant Brady amend
14   the evaluation from below standard to meet
15   standards?
16      A.    It could have been 2007 or
17   2006.  I don't really remember.
18      Q.    And in addition to Sergeant
19   Brady, do you know if anybody else had any
20   role in that job evaluation that was
21   changed from below standards to meet
22   standards?
23      A.    Well, captain of patrol,
24   Captain Gazzola, would be -- the process is
25   when you get rated below standards you have

```
1                       A. ALALI
2      a period of five days to rebut that
3      evaluation to the captain of patrol, which
4      is Captain Gazzola and then we'll hear your
5      rebuttal, set up a meeting and make a
6      determination if the evaluation would
7      remain what was authored by the evaluating
8      officer or if it would be overturned.
9                   I would like to state that I've
10     always rebutted when there is a false
11     performance evaluation given to me.  And as
12     recently as this year, I was given a below
13     standards evaluation by Sergeant Brady.
14     I -- as a dispatcher.  I had rebutted that
15     and during the interim of my rebuttal my
16     father suffered a severe stroke and he
17     lives in Fairfax, Virginia and I had to
18     leave on an emergency, family emergency and
19     go to John Hopkins Medical Center in
20     Baltimore, Maryland.  I advised Captain
21     Gazzola of the situation and immediately
22     upon my return from Baltimore, Maryland
23     back to work in New York, I received a
24     letter stating that I was not within the
25     five days perimeters of rebutting the
```

1                          A. ALALI

2    letter.  And I basically issued another

3    letter to Captain Gazzola that that would

4    be impossible for me to rebut the letter

5    knowing that I was out of the state in

6    Baltimore, Maryland at my father's bed

7    side.

8                    And on March 5, 2008, Captain

9    Gazzola issued a letter stating that I'm

10   below standards and following sanctions of

11   no overtime, no switches, and whatever else

12   he attached along to that letter would

13   follow.  And obviously illustrates -- when

14   you ask who was responsible, it would be

15   Captain Gazzola, but, you know, it shows

16   basically how, if he's directing the

17   supervisors to make me below standards.  He

18   is the one ultimately going to review that.

19   It's corruption to the core.

20        Q.    I am restricting my questions

21   to the period of time that's covered by

22   your complaint, February when you filed the

23   EEOC charge up to the date that you filed

24   the complaint in April of 2007.  And if

25   that isn't clear, I am just going to remind

```
 1                      A. ALALI
 2    you, that's the period I'm interested in.
 3    You don't have to be exactly precise.  I'm
 4    not focusing on things that happened either
 5    before that or things that might have
 6    happened after it if it's not covered by
 7    your complaint.
 8                Let me go back to the first six
 9    months of 2007, am I correct that you got a
10    job evaluation?
11         A.    That would be accurate.
12         Q.    The first six months?
13         A.    I believe so.
14         Q.    And that evaluation was meet
15    standards?
16         A.    I don't remember if it was the
17    beginning of 2007.  Like I stated, there
18    was only one in the last several years that
19    was basically amended to meet from below
20    standards to meet standards.  It could have
21    been 2007, the beginning of 2007.  I am not
22    100 percent sure.
23         Q.    And as far as you understand
24    the people who participated in that
25    evaluation of meet standards was Sergeant
```

1                    A. ALALI

2    Brad and Captain Gazzola; is that correct?

3        A.    Yes.

4        Q.    As far as you know did anybody

5    else participate?

6        A.    Not to my knowledge.

7        Q.    I am going to show you what's

8    been premarked as Defendant's Exhibit EE

9    and ask you if you can identify that

10   document?

11       A.    It's a communication from

12   Captain Gazzola to me dated July 25, 2007,

13   regarding the performance evaluation from

14   January 1st, '07 to May 31st, '07.  It

15   states that he had --

16       Q.    You don't have to read it.  I

17   just asked for you to identify it.

18             Have you ever seen this before?

19       A.    Yes.

20       Q.    You received this?

21       A.    Yes, I did.

22       Q.    Does that refresh your

23   recollection at all as to the period of

24   time for which you got a meet standard

25   evaluation?

```
 1                      A. ALALI
 2         A.    This is -- like I stated in my
 3    testimony, is the only time that I met
 4    standards in the last several years.
 5         Q.    Does that refresh your
 6    recollection as to when you met standards?
 7         A.    Well, initially I was below
 8    standards and that was amended to meet
 9    standards.
10         Q.    Does this refresh your
11    recollection as to when you were evaluated
12    as meeting standards?
13         A.    Yes.
14         Q.    And when was it?
15         A.    This was dated on July 25,
16    2007.  I don't know the date that I
17    received it.  I don't recall.
18         Q.    Do you know what period it
19    covered?
20         A.    Like I stated earlier
21    January 1st, '07 to May 31st, '07.
22         Q.    Again, referring to the first
23    six months of 2007, aside from the
24    testimony you've already given concerning
25    having gone on sick leave and you were
```

```
 1                    A. ALALI
 2     assigned to the foot patrol, do you know on
 3     how many other occasions you left duty
 4     based upon an explanation that you were
 5     sick?
 6               MS. NICAJ:  Objection.
 7               You can answer.
 8          A.    Every time that I left duty --
 9     well, I obviously came to work and
10     subsequently went home sick.  It was a
11     direct result of an action by a supervisor
12     resulting in stress and anxiety.
13          Q.    Do you recall in the first six
14     months of 2007 how often that happened?
15               MS. NICAJ:  Objection.
16               You can answer.
17          A.    I don't recall.
18          Q.    I call your attention to
19     March 14th of 2007, at that time what was
20     your tour of duty?
21          A.    It would be impossible for me
22     to recall without you providing me some
23     type of documentation.
24          Q.    Referring back to March of
25     2007, I am just asking what your tour of
```

```
1                    A. ALALI
2    duty was?
3         A.    I misunderstood you.  I thought
4    you said if I was working or not.
5              It was eight to four.
6         Q.    Referring to March 14, 2007, do
7    you recall if you left duty based upon
8    illness at approximately 11:00 in the
9    morning?
10        A.    I don't recall.
11        Q.    Referring to April 7, 2007, do
12   you recall if you left duty at about
13   nine o'clock in the morning?
14             MS. NICAJ:  Objection.
15          1you can answer.
16        A.    I don't recall.
17        Q.    Referring to April 8, 2007, do
18   you recall if you left duty at
19   approximately 9:15 in the morning based
20   upon an explanation of being sick?
21             MS. NICAJ:  Objection.
22             You can answer.
23        A.    Mr. Meisels, I don't presently
24   recall.  However, I would like to make it
25   clear that you are reading from a set of
```

```
1                          A. ALALI
2     dates in front of you that I went home
3     sick.  There was a whole bunch of times
4     that I did go sick in 2007, like I stated
5     after being placed on foot post in the snow
6     and put on a fixed hospital post followed
7     by comments that were bias that caused
8     tremendous stress and anxiety.  So you can
9     go through the whole list of dates,
10    anything that you have in front of you and
11    I have gone home sick a bunch of times in
12    2007.  I don't know the dates offhand,
13    apparently you have them, but there was
14    direct cause by a supervisor retaliating
15    against me because of the federal lawsuit.
16         Q.    Other than the comments you
17    already testified to, you don't have to
18    repeat yourself, were any other comments
19    made to you that caused you to leave sick?
20         A.    Yes.
21         Q.    Could you tell us what they
22    were?
23         A.    I don't know if it caused me to
24    be home sick or not.  I don't have the
25    dates in front of me, but probably had.
```

1                          A. ALALI

2      There was April 8, 2007, was when Sergeant

3      Wilson had directed me to perform civilian

4      dispatching functions, although

5      approximately three to four other junior

6      probationary officers available.  When I

7      asked him and questioned him why I was

8      being placed as dispatch rather than the

9      other officers, his response was it's

10     Easter and you're an Arab, camel jockeys

11     don't celebrate Easter.

12          Q.     Other than what you already

13     testified to, were any other comments made

14     to you that caused you to leave duty on the

15     basis of illness?

16               MS. NICAJ:  Objection.

17               You can answer.

18          A.     In the first six months of

19     2007?

20          Q.     Correct.

21          A.     I don't presently recall at

22     this time.

23               However, there were, you know,

24     the Debara's comments in February 2007.

25     Sergeant Austin's comments in April 20,

1                    A. ALALI
2    2007, Sergeant Wilson's comments in April
3    2007.  Whether that, on those particular
4    dates I went home sick.  I don't presently
5    recall without having something to refresh
6    my memory.
7        Q.    Now, when you say that
8    Sergeant -- when you say Lieutenant
9    DeBara's comment, which comment are you
10   referring to?
11       A.    The comment on, I believe it
12   was in March of 2008, the beginning of
13   March when he basically stated that they
14   can do -- he can do whatever he wants with
15   me, Bin Laden.
16       Q.    And where did that conversation
17   occur?
18       A.    That occurred right outside,
19   either right outside the role call room.
20   Right after I was given the assignment.
21       Q.    And do you recall what date
22   that was?
23       A.    I believe it was February 7,
24   2007.
25       Q.    You referred to Sergeant

```
 1                    A. ALALI
 2   Austin's comment, what comment was that?
 3         A.     I stated on April 7, 2007.  I
 4   was given that civilian dispatching
 5   assignment again and I already told you
 6   what his comment was.
 7         Q.     And where were you at the time
 8   you had that conversation with Sergeant
 9   Austin?
10         A.     Inside the communications room.
11         Q.     And do you recall approximately
12   what time that occurred?
13         A.     Right after -- on or about
14   8:00.
15         Q.     Now, earlier you referenced a
16   comment made by Sergeant Wilson?
17         A.     Yes.
18         Q.     What comment was that?  What
19   did Sergeant Wilson say?
20         A.     I just told you.
21         Q.     Well, we were at Sergeant
22   Austin.
23              MS. NICAJ:  Objection.  He did
24         tell you previously.  But go ahead.
25         A.     I would tell you again.  I will
```

```
 1                    A. ALALI
 2   talk nice and slow.  On April 8, 2008,
 3   Sergeant Wilson -- correction on April 8,
 4   2007, not 2008, 2007, Sergeant Wilson had
 5   assigned me to work as a dispatcher.  At
 6   that point in time I asked him why I was
 7   receiving that assignment rather than other
 8   probationary officers who were available.
 9   Okay, and he had told me that I'm an Arab
10   and it's Easter and camel jockeys don't
11   celebrate Easter.
12                  Excuse me for a second.
13                  Off the record.
14              (Whereupon, an off-the-record
15          discussion was held.)
16          MS. NICAJ:  As I did last --
17          the first date of Mr. Alali's
18          deposition transcript, I'm going to
19          request a copy on his behalf so he
20          could review and make my changes or
21          corrections he deems fit.
22          MR. MEISELS:  And I would
23          suggest that you make arrangements
24          with the Stenographer.  I am sure she
25          would be glad to accommodate you.
```

1              A. ALALI

2              MS. NICAJ:  I did.  Thank you.

3        Q.     Officer Alali, before we broke

4    we were discussing negative comments made

5    by various people and you mention a comment

6    made by Lieutenant DeBara, Sergeant Austin

7    and Sergeant Wilson.  In the time period

8    that we were discussing, the first six

9    months of 2007, did any other people make

10   comments to you that you believed were

11   derogatory?

12             MS. NICAJ:  Apart from what

13        he's already testified?

14             MR. MEISELS:  Correct.

15             MS. NICAJ:  With respect to

16        also the first day of the deposition?

17             MR. MEISELS:  Absolutely.

18        A.     April 2007 Sergeant Morrell,

19   Sergeant Austin had advised me that I was

20   to be given undesirable assignments, given

21   below standards evaluation.  That was at

22   the direction they stated of Lieutenant

23   Marshall and Captain Gazzola.

24             Aside from that what I

25   previously testified to.  I don't recall

1                      A. ALALI
2    presently anything else in those six
3    months.
4         Q.    Earlier today you discussed
5    circumstances relating to reimbursement for
6    your tuition for the school year of 2006,
7    when did you apply for that reimbursement?
8         A.    When the time period I was
9    supposed to apply and that's prior to
10   going -- taking the classes.
11        Q.    Isn't it required that you
12   actually pass the classes and prove that
13   you've done that before you are entitled to
14   the reimbursement?
15             MS. NICAJ:  Objection.
16             You can answer.
17        A.    The reimbursement for Iona
18   College on the trimester system is
19   different than, I believe other colleges,
20   being that the trimester breaks it down to
21   three times a year.  I don't know how
22   deputy commissioner handles the budgeting
23   of that.  I know that the payment is made
24   after the successful completion and a grade
25   of a C or higher.  Which I've always had

                          A. ALALI

1
2    the exact timing of when he makes that
3    payment or when payment is to be made to
4    Iona College, I don't know.
5            Q.    So in reference to the school
6    year 2006, would it have been necessary
7    that you take and pass the courses before
8    you could apply for reimbursement?
9            MS. NICAJ:   Objection.  He can
10           answer.
11           A.    You apply for reimbursement
12   first then you enroll in the classes.  Then
13   after you take the classes and successfully
14   complete them with a C or better you submit
15   the grades.  After you submit the grades at
16   some point thereafter the deputy
17   commissioner will make a payment to the
18   college directly.  This is the first year
19   that the deputy commissioner has made a
20   payment directly to a member itself.
21           Q.    In reference to the school year
22   2006, when did you submit your grades to
23   deputy commissioner?
24           A.    Immediately after the grades
25   were posted.

```
 1                    A. ALALI
 2        Q.    And do you recall the dates
 3   that happened?
 4        A.    I do not.
 5        Q.    In reference to the first six
 6   months of 2007, would it be fair to say
 7   that you reported sick while on duty more
 8   than seven times?
 9             MS. NICAJ:  Objection.
10             You can answer.
11        A.    I don't presently recall, but
12   that was approximately that amount,
13   possibly a few days more.
14        Q.    Would it be fair to say for the
15   first six months of 2007 you reported sick
16   for the full day at least six times?
17             MS. NICAJ:  Objection.
18             You can answer.
19        A.    I don't presently recall.
20        Q.    Do you recall having called in
21   sick, taking a full day at any time during
22   the first six months of 2007?
23             MS. NICAJ:  Objection.
24             You can answer.
25        A.    Repeat the question please.
```

1                  A. ALALI

2        Q.    Sure.

3              Do you recall having called in

4    sick and taking off a full day at any time

5    during the first six months of 2007?

6              MS. NICAJ:  Objection.

7              You can answer.

8        A.    I don't presently recall.

9        Q.    On the occasions where you went

10   home sick after having started your tour of

11   duty, were those all occasioned by comments

12   that were made by other people in the

13   department?

14             MS. NICAJ:  Objection.

15             You can answer.

16       A.    They were either comments made

17   or assignments, degrading assignments that

18   were given.

19       Q.    Other than the assignments that

20   we've already discussed both this morning

21   and at the first part of your deposition,

22   did you receive any other assignments

23   during the first six months of 2007 that

24   you perceive to be degrading?

25       A.    I believe I covered all the

```
 1                    A. ALALI
 2   basis.
 3        Q.    Earlier this morning you had
 4   mentioned an assignment to transport a
 5   prisoners to the jail, am I correct that
 6   you perceive that to be a degrading
 7   assignment?
 8        A.    That is an assignment, again,
 9   that is primarily, examples to be
10   illustrated on a day to day basis even
11   given to an assignment that they deem to
12   be -- needed to be punished or they, the
13   management excluding from being punished
14   will be an officer who's either
15   traditionally goes by seniority order and
16   junior officer.
17        Q.    So during the first six months
18   of 2007, were you assigned to transport
19   prisoners to the jail?
20        A.    If there was a prisoner to be
21   transported, I was definitely on that
22   transport if I was working on that day.
23        Q.    Did you perceive that to be a
24   degrading assignment?
25        A.    Yes.  Due to the fact that
```

```
 1                    A. ALALI
 2   there were probationary or junior officers
 3   that should have been given that assignment
 4   who routinely are given that assignment.
 5           Q.    When prisoners are transported
 6   to the jail, what kind of a vehicle was
 7   used?
 8           A.    It has been amended if there is
 9   more than it used to be a few prisoners
10   two, three or four to take radio cars back
11   and forth to the jail.  Captain Gazzola had
12   amended that after getting a new prisoner
13   bus, which is bus number 13 and he wanted
14   that bus to be used at all times.  whether
15   it was one prisoner or whether it was, you
16   know, several prisoners.  So it has changed
17   throughout the years, but with initially it
18   would depend on the amount of prisoners and
19   then there came a point in time when
20   Captain Gazzola issued a directive that no
21   matter how many prisoners that bus number
22   13 had to be utilized to transport back and
23   forth to the jail.
24           Q.    So the term assigned to the
25   vehicle is used to transport vehicles is
```

```
 1                      A. ALALI
 2     called the bus?
 3          A.    bus 13 is -- I don't know what
 4     you call it.  It's probably a hybrid of a
 5     passenger vehicle or a van, we refer to it
 6     as a bus.  The previous bus was bus 14.
 7          Q.    The police officer refer to it
 8     as a bus, is that right, is that how you
 9     refer to the vehicle, it's a bus?
10          A.    Yes.
11          Q.    Is it obligatory that some of
12     the buses that are used by the police
13     department are driven by someone with a CDL
14     license?
15          A.    There is a bus that does not
16     require a CDL license.  However, the
17     department requires -- it's not required by
18     vehicle and traffic law.  However, the
19     department does require a member to drive a
20     particular bus.
21          Q.    Which bus is that?
22          A.    The older prisoner transport
23     bus number 14.
24          Q.    And do you have a CDL license?
25          A.    Yes.
```

1                          A. ALALI

2          Q.     And do you know which, if any,

3    probationary officers have CDL licenses?

4          A.     A whole bunch of them just

5    received their license.

6          Q.     When was that?

7          A.     There is a list that they have.

8    It would be impossible for me to memorize

9    the list, there are so many names on it.

10   But, yes, probationary officers just

11   recently, I know, received their CDL

12   license.  Which is a license that is it's

13   required by the department, however, not

14   mandated by New York State Vehicle and

15   Traffic Law to have a CDL to operate a

16   police bus.

17         Q.     And you are aware of a number

18   of probationary officers who just received

19   CDL licenses?

20         A.     There's probation officers, new

21   officers being hired all the time.  It

22   would be impossible without me having the

23   list in front of me to see who's a

24   probationary officer that currently

25   possesses one and who's not and who's is a

```
 1                    A. ALALI
 2   junior officer.   There are many officers
 3   that possess a CDL license.
 4        Q.     Referring to the first six
 5   months of 2007, can you identify any
 6   probationary officers that has CDL
 7   licenses?
 8        A.     Not without having the list in
 9   front of me.  But I believe, that the
10   prisoner bus 13, the newer bus, does not
11   does not require a CDL license by the
12   department.  Neither requires it by New
13   York State Vehicle Traffic Law, but I
14   believe that the newer bus does not require
15   it.
16             And currently there was a
17   Police Officer Michael Vacarro(phonetic)
18   who was a junior officer that had removed
19   both seat belts out of that bus by a pocket
20   knife that he had, committing a felony act
21   of criminal mischief in the penal law.  The
22   punishment that was meted out was loss of
23   four vacation days.  And he was an officer
24   that was junior to myself that had gone to
25   the jail.
```

```
 1                        A. ALALI
 2        Q.      Referring to the first six
 3   months of 2007, did you identify any police
 4   officers, police officers who were junior
 5   to you who had CDL licenses?
 6        A.      Like I said earlier,
 7   Mr. Meisels, without a list in front of me
 8   it would be very difficult or impossible to
 9   do so.
10        Q.      In reference to the
11   disciplinary charges that were preferred
12   against you in February 15, 2007, do you
13   recall who signed the charges, who?
14        A.      Are you done with your
15   question?
16        Q.      Yes.
17        A.      Can you repeat it please.
18        Q.      In reference to the
19   disciplinary charges that were preferred on
20   February 15, 2007, do you recall who signed
21   those charges?
22            MS. NICAJ:   Objection.
23            You can answer.
24        A.      There's two sets of
25   disciplinary charges, one dated 9/11 --
```

```
1                      A. ALALI
2         Q.     I am just referring to
3    February 15, 2007.
4         A.     That would be preferred by
5    Captain Gazzola.
6         Q.     And do you know whether or not
7    Captain Gazzola discussed those charges
8    with anybody else before he preferred them?
9              MS. NICAJ:  Objection.
10             You can answer.
11        A.     I would not be privy to that
12   information.
13             Also for the record, I would
14   like to also state on your questioning me
15   about civilian complaints that I received
16   in 2007, and I believe you introduced into
17   evidence a correction made by Captain
18   Gazzola regarding a number of complaints
19   received in that year.  What I would like
20   the record to reflect is the fact that all
21   of the civilian complaints made in that
22   calendar year, were either unsubstantiated
23   or exonerated, including the excessive
24   force complaint and that evaluation was
25   authored by Sergeant Wilson.  Stating that
```

1                    A. ALALI

2    basically I had whatever the amount of

3    complaints were and not making it clear as

4    to the disposition of all the complaints

5    including stating that I had outstanding

6    excessive force complaint.  That complaint,

7    along with the other complaints, were

8    unsubstantiated.  I talked to Lieutenant

9    Fortunado regarding the excessive force

10   complaint and he unsubstantiated that as

11   well and the complaint was -- while I was

12   working the camera car and it couldn't be

13   viewed.  So basically those complaints

14   were -- the charge against me, as if they

15   had been substantiated or had merit to

16   them.  However, the author of that

17   evaluation knew that if the complaints were

18   unsubstantiated.

19                I also would like to explain

20   that when you have the number amount of

21   contacts with the public, as I do as being

22   a top producing officer in aspects, such as

23   arrest and summonses, the likelihood of

24   getting a civilian complaint against you is

25   greater, obviously.  And if you take the

1                          A. ALALI

2    number of arrests and the number of moving

3    violations and parking summonses, the

4    number of contacts I have versus the number

5    of complaints, it's much less than an

6    officer who has much fewer activity, with

7    fewer complaints but their percentage of

8    ratio of their complaints would be higher

9    than myself.  So, you know, that has been

10   always been the practice of the department

11   to -- when I talk about false performance

12   evaluations, one of the aspects would be to

13   list unsubstantiated or exonerated

14   complaints in there and use that against me

15   to rate me as below standards officer.

16        Q.    Is it your understanding that

17   the number of arrests that you made and

18   tickets that you issued, justify the number

19   of civilian complaints that you received?

20            MS. NICAJ:  Objection.

21            You can answer.

22        A.    I am not offering a

23   justification.  I'm just offering

24   statistically speaking, the greater number

25   of contacts that you have with the public

1                    A. ALALI
2    increases your exposure to civilian
3    complaints.  By the nature of our work
4    issue someone a ticket or taking them into
5    custody, obviously would not make them
6    happy or satisfied and the greater amount
7    of times you do so, would increase the
8    potential of that happening.  And what I am
9    stating here clearly, is if you have an
10   officer with a fewer complaints than
11   myself, however, had substantially fewer
12   contacts with the public, we're getting a
13   greater ratio of complaints than I do, with
14   the number of arrests, parking summonses
15   and arrests that I have with the public.
16              And also understand that when I
17   was forced to work that camera car I was
18   assigned to specific functions of elevating
19   the flow of traffic, and given specific
20   types of enforcement, such as double
21   parking summonses and U-turns and those are
22   the -- those summonses increase the
23   potential of a complaint people are going
24   into a store running out and they are
25   unhappy about it.  And I was ordered to do

1                          A. ALALI

2      so and that was all captured on camera.  So

3      to obviously to use that against me and

4      performance evaluation to, I guess boot

5      strap that would be a below standards

6      evaluation when they know the outcome of

7      those complaints, such as the one authored

8      by Sergeant Wilson, I believe reading that

9      there was an excessive force complaint that

10     was pending and that complaint was already

11     disposed of as being unsubstantiated or

12     exonerated.

13          Q.    You used two terms

14     unsubstantiated or exonerated, could you

15     explain what you understand the difference

16     to be?

17          A.    The final outcome, I don't know

18     how the department defines the two.  But I

19     would perceive them to be the final outcome

20     is that the officer did, did not do

21     anything wrong or, you know, I don't know

22     how they use those terms interchangeably,

23     but I know that's clearly different than

24     being substantiated.  Obviously

25     unsubstantiated would be the opposite of

```
1                    A. ALALI
2    substantiated.
3         Q.    I am asking you what your
4    understanding is as to what the difference
5    is between unsubstantiated versus
6    exonerated?
7         A.    I believe it to be the same
8    outcome.
9         Q.    What is the difference in the
10   term?
11              MS. NICAJ:  Objection.
12              You can answer.
13        A.    I don't know how the department
14   differentiate the two, but I perceive them
15   to be the same.  I perceive them to be the
16   opposite of obviously substantiated.
17        Q.    So I understand -- I am asking
18   what your understanding, not somebody
19   else's.  Your understanding is that it's
20   the same?
21        A.    It was never explained to me.
22   But I would think the direct opposite of
23   substantiated.
24        Q.    And do you have any
25   understanding as to the difference between
```

```
 1                    A. ALALI
 2   unsubstantiated and exonerated?
 3        A.    No.
 4        Q.    You referenced a time that you
 5   were assigned to a camera car?
 6        A.    Correct.
 7        Q.    At the time you were assigned
 8   to that camera car, you were working eight
 9   to four?
10        A.    Yes.
11        Q.    Do you know who was assigned to
12   that car four to 12?
13        A.    Only an officer that basically
14   was working, not the sector, if there were
15   not enough cars to fill that.  What I do
16   know is on day tours when I was working, I
17   was only to be assigned that car and nobody
18   else.  I can't speak for the other two
19   because I wasn't there.
20        Q.    So am I correct, that you don't
21   know who was assigned to use that car on
22   the four to 12 tour?
23              MS. NICAJ:  Objection.
24              You can answer.
25        A.    Not particularly no, no.  It's
```

```
 1                      A. ALALI
 2    not a sector car.
 3           Q.    Do you know if anyone was
 4    assigned to use it on the four to 12 tour?
 5                 MS. NICAJ:  Objection.
 6                 You can answer.
 7           A.    No, I don't.
 8           Q.    Do you know who was assigned to
 9    use that car on the 12 to eight tour?
10           A.    No.
11           Q.    Do you know if anyone was
12    assigned to use it on the 12 to eight tour?
13                 MS. NICAJ:  Objection.
14                 You can answer.
15           A.    No.
16           Q.    Do you know, I am now referring
17    again to just the first six months of 2007,
18    do you know whether or not Sergeant Austin
19    was ever aware that you had filed an EEOC
20    charge?
21           A.    Mr. Meisels, just for the
22    record let me backup regarding car 18.
23                 What I do know is that, I was
24    to be assigned to it, and if there was no
25    other -- that car was not available, I was
```

1                    A. ALALI

2    applied for the position in the County of

3    Westchester?

4         A.    No, not presently.

5         Q.    Do you recall what year you

6    applied for the position with the Town of

7    Mamaroneck?

8         A.    There were pretty much within

9    the same time period.  It could have been

10   2006.

11        Q.    When you say the same time

12   period, you mean the same time period that

13   you applied for the position with the

14   County of Westchester?

15        A.    Not exactly, within the same

16   year.

17        Q.    So am I correct, those two

18   applications were made in the same year?

19        A.    Yes.

20        Q.    Okay.

21              And that it could have been

22   2006?

23        A.    It could have been, correct.

24        Q.    Other than what you already

25   testified to, do you have any reason to

86

1                    A. ALALI

2     believe that Deputy Commissioner Murphy was

3     aware that you had filed an EEOC charge?

4          A.    Yes.  The EEOC charge was faxed

5     over to the Commissioner's office, which

6     both the deputy and the police commissioner

7     share together.

8          Q.    Are you saying that the EOC

9     charges faxed from the office, which is

10    shared by the deputy and the commissioner?

11                MS. NICAJ:  Objection.

12                You can answer.

13         A.    That's one of the ways they

14    were notified.

15         Q.    So, am I correct, that the

16    basis for your belief that Deputy

17    Commissioner Murphy was aware of it, was

18    that he shares an office with the

19    commissioner?

20                MS. NICAJ:  And apart from what

21          else that he's already testified to?

22                MR. MEISELS:  Correct.

23                MS. NICAJ:  okay.

24         A.    There's so much that I

25    testified to regarding tuition and phone

```
 1                    A. ALALI
 2   calls to my house.
 3        Q.    You don't have to repeat that,
 4   it's different.
 5        A.    Okay.
 6        Q.    Other than what you already
 7   testified to, is there any reason to
 8   believe that Deputy Police Commissioner
 9   Murphy was aware that you filed an EEOC
10   charge?
11        A.    Presently don't recall
12   anything.
13        Q.    Other than what you already
14   testified to, is there any reason to
15   believe that Deputy Commissioner Murphy was
16   aware that you had filed your first
17   lawsuit?
18        A.    I don't presently recall
19   anything further.
20        Q.    What's the basis for your
21   belief that Commissioner Carroll was aware
22   that you had filed an EEOC charge?
23             MS. NICAJ:  Objection.
24             You can answer.
25        A.    The fact that he authorized
```

1                    A. ALALI

2    Captain Gazzola, I don't know if I

3    testified to that or not, authorized

4    Captain Gazzola with the disciplinary

5    charges against me, 9/11 and on April '07.

6    And the numerous memorandums that I had

7    sent him that I was being retaliated

8    against despite a federal action that was

9    pending.

10        Q.    Do you know when Commissioner

11    Carroll became aware of the filing of the

12    EOC charge?

13        A.    I don't know the exact date,

14    but I would say prior to February 21st of

15    2007.

16        Q.    When disciplinary charges were

17    preferred against you on February 15th, do

18    you know if the commissioner was on

19    vacation?

20        A.    I don't know the commissioner's

21    status on a day to day basis whether he's

22    in the office or on vacation.  I am not

23    privy to that.

24        Q.    When those charges were

25    preferred who was present?

<pre>
 1                        A. ALALI
 2        A.      Captain Gazzola, PBA President
 3   Edward Hayes, myself and I am not sure if
 4   Lieutenant Marshall was or not.  He might
 5   have been, I am not sure.
 6        Q.      Where were you when you were
 7   given a copy of the charges?
 8        A.      In New Rochelle Police
 9   Department, Captain Gazzola's office.
10        Q.      And at the time the charges
11   were preferred, did you have a conversation
12   with Captain Gazzola?
13        A.      I don't presently recall.
14        Q.      Do you recall if PBA President
15   Hayes, had a conversation with Captain
16   Gazzola?
17             MS. NICAJ:  Objection.
18             You can answer.
19        A.      I don't presently recall.
20             MR. MEISELS:  Off the record.
21             (Whereupon, an off-the-record
22          discussion was held.)
23        Q.      Officer Alali, other than what
24   you already testified to, that's today and
25   the first part of your deposition, do you
</pre>

```
 1                    A. ALALI
 2   have any other reason to believe that
 3   Sergeant Wilson was aware that you had
 4   filed an EEOC charge?
 5        A.    No, I presently don't have any
 6   other information.
 7        Q.    Other than what you already
 8   testified to, do you have any reason to
 9   believe that Sergeant Wilson was aware that
10   you had filed a lawsuit in February 2007?
11        A.    Other than what I just
12   testified to no --
13        Q.    Other than --
14        A.    No, I don't presently remember
15   any other information.
16        Q.    Okay.
17             Now, I am going to ask you the
18   same questions with respect to Lieutenant
19   Marshall.
20             Other than what you already
21   testified to, do you have any other reason
22   to believe that Lieutenant Marshall was
23   aware that you had filed an EEOC charge?
24        A.    I don't have, presently have
25   any other information.
```

```
 1                      A. ALALI
 2          Q.      And other than what you already
 3    testified to, do you have any reason to
 4    believe that Lieutenant Marshall was aware
 5    that you had filed a lawsuit in February of
 6    2007?
 7          A.      Not presently.
 8          Q.      And in reference to Sergeant
 9    Morrell, other than what you already
10    testified to, do you have any reason to
11    believe that Sergeant Morrell was aware
12    that you had filed an EEOC charge?
13          A.      Not presently.
14          Q.      Other than what you've already
15    testified to, do you have any other reason
16    to believe that Sergeant Morrell was aware
17    that you had filed a lawsuit in February of
18    2007?
19          A.      Not presently.
20          Q.      Did you use anything to refresh
21    your recollection with before you testified
22    today?
23          A.      The federal complaint.
24          Q.      Anything else?
25          A.      No.
```