UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ARAZ ALALI,

                       Plaintiff,                  **07 CV 2916 (CLB)**

       -against-

ALBERTO DeBARA, individually, KYLE WILSON,
Individually, EDWARD AUSTIN, individually, GEORGE
MARSHALL, individually, HUMBERTO MORRELL,
Individually, MATTHEW BRADY, individually,
ANTHONY MURPHY, individually, ROBERT GAZZOLA,
Individually, PATRICK J. CARROLL, individually,
and the CITY OF NEW ROCHELLE, New York,

                       Defendants.
----------------------------------------------------------------x


# PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT


                                 LOVETT & GOULD, LLP
                                 Attorneys for Plaintiff
                                 222 Bloomingdale Road
                                 White Plains, New York 10605
                                 (914) 428-8401

**Table of Contents**

Page

Table of Authorities ...............................................................................iii

Preliminary Statement.............................................................................1

Preliminary Observations.........................................................................2

THE MATERIAL UNDISPUTED AND DISPUTED FACTS...............................3

    The Parties...................................................................................3

    The Material Facts Which Culminated in Plaintiff Filing Alali I....................4

    The Material Facts of Alali II.............................................................8

    Further Protected Activity and Ensuing Retaliation After Alali II was filed......11

ARGUMENT

POINT I
THE RECORD IS REPLETE WITH EVIDENCE SUFFICIENT TO
SUSTAIN PLAINTIFF'S CLAIMS OF RETALIATION FOR MAKING
COMPLAINTS OF DISCRIMINATION AGAINST HIM IN VIOLATION
OF 42 U.S.C. SECTIONS 1981 AND 1983, TITLE VII AND THE NEW YORK
STATE HUMAN RIGHTS LAW...................................................................14

    A. Plaintiff Engaged in Protected Activity...........................................15

    B. Plaintiff was Subjected to Retaliatory Action.....................................17

    C. There are Material Facts, if Believed, that Defendants were
    Motivated by Retaliatory Animus....................................................22

POINT II
DEFENDANTS ARE NOT ENTITLED TO QUALIFIED
IMMUNITY.......................................................................................25

    A. DeBara is not Entitled to Qualified Immunity....................................26

**Statutes**                                                                                    **Page**

New York State Human Rights Law § 296……………………………………………..…15

New York State Human Rights Law § 297………………………………………………...15

42 U.S.C. §1981……………………………………………………………………..7, 15

42 U.S.C. §1983……………………………………………………….…………....7

Title VII 42 U.S.C. §2000e *et seq*..……………………………………….…………7

## TABLE AUTHORITIES

**Cases**                                                                    **Page**

Alexander v. Holden, 66 F.3d 62 (4th Cir. 1995)……………………………………….32

Amnesty v. Town of West Hartford, 361 F.3d 113 (2d Cir. 2004)………………………..31

Bernhardt v. Interbank of N.Y., 18 F.Supp.2d 218 (E.D.N.Y. 1998)…………………….23

Brennan v. Straub, 246 F.Supp.2d 360 (S.D.N.Y. 2003)…………………………………..32

Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006)..17, 18, 23

Burns v. Reed, 500 U.S. 478 (1991)…………………………………………………………32

Butz v. Economou, 438 U.S. 478 (1978)……………………………………………………..32

CBOCS West, Inc. v. Humphries, 128 S.Ct. 1951 (May 27, 2008)………………….15, 26

Community Health Care Association of New York v. DeParle, 69 F.Supp.2d 463
        (S.D.N.Y. 1999)(Parker, D.J.)……………………………………………………31

Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033 (2d Cir. 1993)………………………...15

DeMatteis v. Eastman Kodak Co., 511 F.2d 306 (2d Cir. 1975)…………………………15

Desert Palace, Inc. v. Costa, 123 S.Ct. 2148 (2003)………………………………………22

Dobosz v. Walsh, 892 F.2d 1135 (2d Cir. 1989)……………………………………………32

Forrester v White, 484 U.S. 219 (1988)……………………………………………………..32

Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County,
        252 F.3d 545 (2d Cir. 2001) ……………………………………………………..23

Grant v. Bethlehem Steel Corp., 622 F.2d 43 (2d Cir. 1980)…………………………….23

Gronowski v. Spencer, 424 F.3d 285 (2nd Cir. 2005)……………………………………..30

Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727 (1982)……………………………..26

Hawkins v. County of Oneida, 497 F.Supp.2d 362 (N.D.N.Y. 2007)…………...15, 25, 26

Holtz v. Rockefeller & Co., Inc., 258 F.3d 62 (2d Cir. 2001)…………………………...22

Imbler v. Pachtman, 424 U.S. 409 (1976)................................................32

Jeffes v. Barnes, 208 F.3d 57 (2d Cir. 2000)...........................................30

Kempkes v. Downey, 2008 WL 852765 (S.D.N.Y. Mar. 31, 2008)........................31

Kessler v. Westchester County Dept. of Social Services,
     461 F.3d 199 (2d Cir. 2006)..................................................17, 26

Kotcher v. Rosa Sullivan Appliance Ctr., 957 F.2d 59 (2d Cir. 1992)....................15

Lizardo v. Denny's, Inc., 270 F.3d 94 (2d Cir. 2001)................................14, 26

Patterson v. County of Oneida, 375 F.3d 206 (2d Cir. 2004)..........................25

Ponticelli v. Zurich Am. Ins. Group, 16 F.Supp.2d 414 (S.D.N.Y. 1998)................15

Raniola v. Bratton, 243 F.3d 610 (2d Cir. 2001)..................................15, 22

Richardson v. New York State Department of Correctional Service,
     180 F.3d 426 (2d Cir. 1999)......................................................23

Saenz v. Lucas, 2008 WL 2735867 (S.D.N.Y.) (Conner, D.J.)............................31

Saucier v. Katz, 533 U.S. 194, 21 S.Ct. 2151 (2001)..................................25

Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597 (2d Cir. 2006)..............15, 26

Spear v. Town of West Hartford, 954 F.2d 63 (2d Cir. 1992),
     cert. denied, 506 U.S. 819 (1992)..............................................31

Stephens v. State Univ. of N.Y. at Buffalo, 11 F.Supp.2d 242 (W.D.N.Y. 1998)........23

Stephenson v. John Doe, Detective, 332 F.3d 68 (2d Cir. 2003)........................25

Suggs v. Port Auth. of N.Y. and N.J., 1999 WL 269905 (S.D.N.Y. May 4, 1999)........23

Uddin v. City of New York, 427 F.Supp.2d 414 (S.D.N.Y. 2006)........................22

Whaley v. City of University of New York, 555 F.Supp.2d 381
     (S.D.N.Y. 2008)..................................................................15

Zelnik v. Fashion Institute of Technology, 464 F.3d 217 (2d Cir. 2006)................18

B. Wilson, Austin, Morrell and Brady are not Entitled to
Qualified Immunity...................................................................27

C. Marshall and Gazzola are not Entitled to Qualified Immunity.................28

D. Murphy and Carroll are not Entitled to Qualified Immunity.....................29

POINT III
     DEFENDANTS' REMAINING HODGEPODGE ARGUMENTS
     ARE MERITLESS.........................................................................30

A. The City is not Entitled to Summary Judgment on Plaintiff's
Title VII Claim......................................................................30

B. The City is not Entitled to Summary Judgment on Plaintiff's
§§1981 and 1983 Retaliation Claims.................................................30

Conclusion.......................................................................................32

## PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of Plaintiff Araz Alali in opposition to Defendants' motion for summary judgment. The case at bar, Alali v. DeBara, et al., 07 Civ. 2916 (CS)(hereinafter "Alali II") is the second of four actions filed by Plaintiff in this Court relating to his employment at the City of New Rochelle Police Department.  Plaintiff opposes the motion in all respects.[1]

Although the individual Defendants properly move for summary judgment on qualified immunity pursuant to the Court's Civil Case Discovery Plan and Scheduling Order, the Defendants also moved for summary judgment with respect to the City of New Rochelle in violation of this Court's directive.[2]

Plaintiff's deposition has been conducted pursuant to the Court's rule requiring an early Rule 12 or Rule 56 motion where qualified immunity is asserted and permitting a deposition of Plaintiff, whose testimony must be deemed to be true. As set forth below, the material facts which are both disputed and undisputed compel a denial of Defendants' motion for summary judgment.

---

[1] The Court granted summary judgment to the Defendants on the first of those actions, Alali v. Gazzola, et al., 07 Civ. 196 (CLB).  It should be noted that the Court in that decision stated "Plaintiff submits only an attorney affirmation stating that Plaintiff believes the motion is premature because, although Plaintiff was deposed, reasonable discovery has not been conducted, including depositions of the Individual Defendants."  Apparently recognizing the number of cases which had been filed by Plaintiff and that Plaintiff had not submitted a counter-statement pursuant to Rule 56.1 or memorandum of law, the Court also clearly stated that "[t]he following facts are presumed true for the purposes of this motion only" (Loomba Decl. E p. 1).
[2] The Court's order provides that "[t]he motion shall, in the absence of agreement of counsel, be limited to the issue of qualified immunity."

## Preliminary Observations

Instead of focusing the claims in this case, the Defendants seek to divert the Court's attention to claiming -- that the mere fact that Plaintiff received multiple civilian complaints justified Defendants taking action against him to so-call "re-train, and if necessary, discipline the officer" (Defendants' Memorandum p. 1). The last thing Defendants want to have the Court actually do is examine the allegations of <u>Alali II</u>, Plaintiff's depositions and Plaintiff's written communication protesting discriminatory treatment of him by reason of his national origin, ethnicity and/or color. Furthermore, Defendants conveniently gloss over the allegations contained in the complaint as testified to by Plaintiff relating to Defendants' retaliatory actions which on some occasions were accompanied with epithets directed at Plaintiff's Middle Eastern ancestry – including DeBara referring to Plaintiff as "Bin Laden" and Wilson's proclamation to him that "[y]ou are an Arab and its Easter. Camel jockeys don't celebrate Easter." Not surprisingly, Defendants' 56.1 Statement and Memorandum of Law minimize these critical albeit presumably disputed facts -- because Defendants have not yet been deposed.

Defendants also disregard this Court's decision in <u>Alali I</u> which clearly limited its factual finding to that case only (as of the Court's January 31, 2008 decision, <u>Alali II</u> and <u>Alali III</u> had already been filed). Further, the Court clearly did not intend for collateral estoppel and *res judicata* to apply to the other Alali cases before it. In that connection, the Court plainly found **"[t]he following facts are presumed true for the purposes of this motion only**" (Loomba Decl. Ex. 3 p. 1). Thus, Defendants' attempt to contradict the Court's decision in <u>Alali I</u> by claiming collateral and/or res judicata is meritless -- if not frivolous.

Moreover, with respect to Defendants' pre-discovery motion to dismiss the case at bar, the Court denied Defendants' motion in its entirety (Loomba Decl. Ex. H. pp. 1-9). First, the

2

Court rejected the identical argument Defendants make in their moving memorandum:

"Defendants argue that in the present complaint, Plaintiff has made the same claims against the same parties, based upon the same facts, as he did in <u>Alali I</u> complaint. . .The Court disagrees." (Loomba Decl. Ex. H p. 3).

## THE MATERIAL UNDISPUTED AND DISPUTED FACTS

**The Parties**

Plaintiff Araz Alali is a citizen of the United States and has been employed as a Police Officer by the City of New Rochelle, New York Police Department (hereinafter the "Department") since February 2002, having previously been employed as such by the City of New York Alali is of Iraqi national origin and as such is the only Police Officer of Middle Eastern descent who has ever been employed by the City of New Rochelle (hereinafter alternatively the "City") (Pl. 56.1 Stmt ¶¶1-2)

Defendants Alberto DeBara and George Marshall, at all times relevant, were employed by the City as police Lieutenants (Pl. 56.1 Stmt ¶¶3, 6).

Defendant Kyle Wilson, Edward Austin, Humberto Morrell and Matthew Brady, at all times relevant were employed by the City as police Sergeants (Pl. 56.1 Stmt ¶¶4,5, 7 & 8).

Defendant Anthony Murphy (hereinafter "Murphy"), at all times relevant to this complaint was employed by the City as Deputy Police Commissioner (Pl. 56.1 Stmt ¶9).

Defendant Robert Gazzola (hereinafter "Gazzola"), at all times relevant to this complaint was employed as a police Captain by the City (Pl. 56.1 Stmt ¶10).

Defendant Patrick J. Carroll (hereinafter "Carroll"), at all times relevant to this complaint was employed by the City as Commissioner of Police (Pl. 56.1 Stmt ¶11).

Defendant City of New Rochelle, New York (herein "City"), is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of the State of New York (Pl. 56.1 Stmt ¶12).

**The Material Facts Which Culminated in Plaintiff Filing <u>Alali I</u>**

Commencing almost immediately following Alali's transfer to the City's Police Department, and continuing to date, he has been systematically and deliberately subjected to discriminatory and disparate treatment by reason of his national origin, ethnicity and/or color. In that connection, Alali has repeatedly been addressed as: "terrorist"; "Ali Baba", "Camel Jockey" and *inter alia*, "Ali" Gazzola and other supervisors repeatedly referred to Plaintiff as a Terrorist. Alali has also been referred to as Bin Laden (Pl. 56.1 Stmt ¶¶13-15).

Plaintiff has repeatedly communicated with Carroll about biased acts such as these but Carroll has failed to do anything about them (Pl. 56.1 Stmt ¶16).

Alali has repeatedly been denied any meaningful specialized training, which training is routinely provided by Defendants to Police Officers junior to Plaintiff in seniority due to his national origin, ethnicity and/or color. In fact, numerous officers who were junior to Plaintiff received the training (Pl. 56.1 Stmt ¶17).

Moreover, Alali was forced to attend a seminar concerning "Tools for Tolerance Post 911", which assignment was calculated by Defendants to humiliate and embarrass Plaintiff since he alone has been the departmental target of systemic intolerance by reason of his ethnicity (Pl. 56.1 Stmt ¶18).

Alali advised Captain Gazzola that he (Alali) did not want to attend the class because after being referred to as a terrorist, Ali Babi, Camel Jockey it was humiliating for him to attend

4

that class (6/25/07 Alali Dep. 42-43, Nicaj Aff. Ex. 27). Gazzola clearly intended to embarrass and humiliate Alali by sending him to the seminar (6/25/07 Alali Dep. 44-45, Nicaj Aff. Ex. 27).

Alali has been systematically been given calculatedly false "below standard" job performance evaluations (when in fact his job performance has consistently been above average), replete with fabrications and/or falsehoods, which evaluations have served as Defendants' predicate for barring Plaintiff from working on an overtime basis - - thus causing him substantial pecuniary losses, which Plaintiff has repeatedly rebutted (Pl. 56.1 Stmt ¶20).

In connection with these false evaluations, Defendants Wilson, Brady, Austin and Morrell advised Alali that Gazzola has ordered them to falsely issue below standard evaluations (Pl. 56.1 Stmt ¶21).

Alali has been assigned for months at a time as a "dispatcher" in the Police Department's Communications Room - - even though the dispatcher function is civilian in nature and otherwise performed by non-police employees of the Department. Alali was also forced to work walking posts during a midnight to 8:00 a.m. tour of duty, in heavy rain and/or snow, when there otherwise is no walking post assigned on such a shift. Sergeants advised Alali that this post was meant as punishment. Additionally, Alali has also been forbidden, for substantial periods of time, to operate a police vehicle (Pl. 56.1 Stmt ¶¶22-24). Alali was prohibited, for substantial periods of time, to interact with members of the public while on duty (Pl. 56.1 Stmt ¶¶25).

Plaintiff has been prohibited, by reason of the false "below standard" job performance evaluations, to engage in so-called "mutual switches" of job duty assignments with other sworn members of the Police Department (Pl. 56.1 Stmt ¶26).

Alali was subjected repeatedly to "investigations" of supposed wrong doing under circumstances where no wrong doing occurred and Defendants knew that no wrong doing had occurred (Pl. 56.1 Stmt ¶27).

On November 14, 2006, Alali wrote to Carroll to complain of retaliation and bias concerning his assignments. On January 7, 2007, Alali non-disruptively again expressed to Carroll that he was the subject of "[p]ersecution based on heritage" and that he was the subject of retaliatory actions "solely based upon [his] middle-eastern heritage" (Pl. 56.1 Stmt ¶¶29-30).

On February 2, 2007, Alali advised Gazzola in a rebuttal to one of many calculated false "below standard" job performance evaluations: "I am being singled out due to my heritage. Being the sole middle-eastern police officer has been hopeless". Alali further wrote that "[s]everal supervisors have told me that the reason I have received this below standard evaluation as well as other below standard evaluation[s] is a direct result of your [Gazzola's] dictation to the supervisors that I must be below standards. This only supports my affirmation of the biased and prejudicial treatment I have suffered while being the top-producing member of the department. It is become increasingly clear that I am being singled out due to my heritage (Pl. 56.1 Stmt ¶31).

By reason of the continuing discriminatory treatment and the retaliation imposed because Alali expressed his opposition to that treatment, on February 12, 2007, he duly filed a Charge of Discrimination ("race", "color" and "national origin") with the EEOC. That same day, Plaintiff through counsel notified Defendants by facsimile of the EEOC filing and cautioned that "any retaliation causally the result of that filing is independently actionable in Federal Court for damages" (Pl. 56.1 Stmt ¶32-33).

Defendants have denied Plaintiff tuition reimbursement in the amount of $10,180 which was payable to Iona College for courses taken by Plaintiff in accordance with police departmental policy (Pl. 56.1 Stmt ¶34).

On February 15, 2007, with a series of frivolous disciplinary charges for the stated objective of penalizing him through the forfeiture of one month's salary. By way of contrast certain other members of the Police Department and personnel employed in the City's Court, who are known to Defendants to have committed both felonies and misdemeanors, have not been subjected to similar disciplinary action - - much less arrest/prosecution (Pl. 56.1 Stmt ¶35).

On February 16, 2007, Alali wrote to Carroll with a copy to the Internal Affairs Officer, Lieutenant Fortunado and PBA President Ed Hayes of the "Continual retaliation based on heritage". In memorandum, Alali advised Carroll that Lieutenant DeBara praised by telling him that Alali was "one of the best police officers this department ever had." Furthermore,

> [DeBara] also stated that as per Captain Gazzola I was to have the least desirable assignments. He[DeBara]also stated that if there were even officers working to cover the nine patrol sectors I was to work utility and be sent all over the city to handle the least desirable jobs. I am very uncomfortable and afraid in such a hostile work environment created by this department and Captain Gazzola. As I numerously called upon you to stop this arbitrary . . .treatment of me solely based upon my heritage"

(Pl. 56.1 Stmt ¶36).

On February 18, 2007 Alali again wrote to Carroll with a copy to Fortunado and PBA President Edward Hayes concerning the "[c]ontinual retaliation based on heritage" (Pl. 56.1 Stmt ¶37).

As a result of the foregoing, on February 21, 2007, Plaintiff filed an action in this Court Alali v. Gazzola, et al., 07 Civ. 1296 (CLB) (hereinafter "Alali I") asserting claims under *inter alia* 42 U.S.C. §§1981, 1983 and 2000e *et. seq.* (Pl. 56.1 Stmt ¶38).

**The Material Facts of Alali II**

From February to April 2007, Alali's direct supervisors were Sergeants Wilson, Morrell, Austin, and Brady and other supervisors were DeBara, Marshall and Gazzola.  Shortly after Alali I was filed in this Court, all Defendants learned that Plaintiff had filed a lawsuit and Defendants' retaliatory action ensued (Pl. 56.1 Stmt ¶39).

In that connection, at roll call on February 21, 2007, and in the presence of a number of Plaintiff's co-workers, DeBara intentionally assigned Plaintiff to a fixed hospital post (normally a post assigned to either probationary and/or junior officers) to watch a prisoner - - despite the availability of at least four probationary police officers any one of whom should have been given that assignment.  Debara advised him that the reason he was doing so was because he could  (Pl. 56.1 Stmt ¶40).

When Alali inquired of Wilson as to why he was given the fixed hospital post when any of the four probationary officers should have been so assigned, Wilson responded (in the presence of several civilian members of the Police Department):

> "Get the fuck out of my face now Raz. Not another fucking word,
>
> get out of my face"

At the conclusion of Plaintiff's hospital post shift he was relieved at that post by a probationary police officer (Pl. 56.1 Stmt ¶41).

Subsequently DeBara informed Plaintiff that prospectively he (Plaintiff) would be primarily assigned to a "utility car" - - a degrading assignment usually reserved for probationary officers,  junior officers or officers being punished - - and in the event that utility car services were not required Plaintiff would be assigned to other such assignments including directing

traffic, watching suicidal prisoners, performing civilian dispatch work, and transporting prisoners to the County jail (Pl. 56.1 Stmt ¶42).

At roll call on March 7, 2007, in the presence of a number of Plaintiff's co-workers, DeBara assigned Plaintiff to a fixed, foot patrol post in the snow - - to the laughter of Plaintiff's co-workers and despite the availability of a number of probationary police officers who should have been assigned to that post. When Plaintiff inquired of DeBara as to why he, rather than any of the probationary officers was given that degrading assignment, DeBara advised: "because we can, we could put you anywhere Bin Laden" (Pl. 56.1 Stmt ¶43).

That same date when Plaintiff inquired of Morrell (who was serving as desk officer) as to why he, rather than a probationary police officer was put on that fixed post, Morrell responded: "because even though you are the most talented police officer you are not above scrutiny and I don't like you, ok, so hurry up and go outside. It's really cold out - - bundle up" (Pl. 56.1 Stmt ¶45).

On March 8, 2007, Austin and Morrell advised Plaintiff that he was routinely going to be given "undesirable assignments" because he (Plaintiff) was "a below standards officer" - - a descriptive falsely given to Plaintiff by reason of his skin color, national origin and/or ethnicity. In that connection Morrell further advised Plaintiff, in Austin's presence, that Gazzola and Marshall had both directed him (Morrell) as well as other supervisors to give Plaintiff "bad assignments" by reason of his being rated "below standards" (Pl. 56.1 Stmt ¶46).

On March 21, 2007, Gazzola advised Plaintiff in writing that he (Gazzola) rejected Plaintiff's then pending challenge to a job performance evaluation as authored by Wilson in which Wilson falsely characterized Plaintiff as "below standards" (Pl. 56.1 Stmt ¶47)

On March 22, 2007, Gazzola issued to Plaintiff a calculatedly false memorandum describing him (Plaintiff) as "below standard" and advising him that as a result of that status he was: barred from performing overtime work; forbidden to perform special detail assignments; forbidden to engage in tour switches with other officers; and precluded from consideration for any specialized unit assignments. (Pl 56.1 Stmt ¶48).

At roll call on April 7, 2007, in the presence of a number of Plaintiff's co-workers Austin deliberately assigned Plaintiff to perform the civilian functions of dispatching police vehicles from the Department's radio room - - despite the availability of four probationary police officers any one of whom should have been given that assignment instead. In that connection first Austin advised Plaintiff:

> "It looks like you are going backwards like the
>
> good old times",

and then Brady added: "you better get a good lunch at 800 [hours] since you won't be able to leave the [radio] room, good luck" (Pl. 56.1 Stmt ¶49).

On April 8, 2007, Wilson assigned Plaintiff to work with civilian employees of the Department - - despite the availability of four probationary police officers any one of whom should have been given that assignment. When Plaintiff questioned Wilson as to why he rather than a probationary officer was given that degrading assignment, Wilson advised: "You are an Arab and its Easter. Camel jockeys don't celebrate Easter" (Pl. 56.1 Stmt ¶50).

In furtherance of Defendants' retaliatory plan Murphy, with the agreement, approval and/or condonation of Gazzola and Carroll has intentionally withheld from Plaintiff college tuition reimbursement funds to which he is entitled. As a result Plaintiff is presently in arrears on tuition payments to Iona College (Pl. 56.1 Stmt ¶51).

By reason of the foregoing retaliatory taken by the Defendants as a result of the

Plaintiff's protected activities, including EEOC Charge being filed on February 12, 2008 and the

filing of Alali I in this Court, on April 11, 2007, Plaintiff then filed Alali II.

**Further Protected Activity and Ensuing Retaliation After Alali II Was Filed**

On April 20, 2007, Plaintiff wrote Detective Lieutenant Fortunato concerning the failure

of the Department to provide police back-up to assistant him in an arrest.  In pertinent respect, he

wrote,

> [t]he purpose of this communication is to advise you that on 4/20/07 I was
> attempting to affect a lawful arrest on the defendant. . .Communications
> advised this officer that the aforementioned defendant did have 6
> revocations on his NYS non-drivers identification.  This officer waited
> approximately 10 minutes and notified communications that back-up
> assistance was required to safely affect the arrest on the defendant.  Not
> until then did communications send a back-up unit, which thankfully was
> dispatched.  Sector 4, P.O. Auigilar responded and assisted this officer in
> apprehending the defendant without incident. As you are well aware of, it
> is when you are taking an individual into custody when the risk of being
> injured or killed is elevated.  This was indicated in my incident report
> #14129, which has been filed and attached.  When this was turned over to
> Sgt. Brady who was on the desk, he stated in sum and substance 'I know
> what happened was wrong, the dispatcher was reprimanded for that,
> however I am refusing to sign this [incident report] and am ordering you
> to omit this from your report.' I followed his order but again feel that this
> is a concealment of the truth, and decisively contend that **this is
> harassment is based on my heritage.**  I pray that this will never happen
> again so I can safely go home and see my family at the end of the day."

(Pl. 56.1 Stmt ¶53)(emphasis added).

On May 30, 2007, Plaintiff wrote to Carroll concerning the "[r]ecurring bigotry solely

based on heritage."  Moreover, Plaintiff complained of Morrell's theft of $300.00 from

Plaintiff's memo book (Pl. 56.1 Stmt ¶54)

On June 21, 2007, Plaintiff requested in writing that Gazzola (copied to Carroll, Murphy, Fortunato, Hayes and his attorney) review a "biased performance evaluation based solely on heritage. In that connection, Alali advised:

> I am requesting a review of the biased performance evaluation based solely on heritage authored by Sgt. Brady on 6/21/07 and signed off by tour commander Lt. De Bara on the same date. I am looking forward in meeting with you once again to explicitly and unmistakably present an honest rebuttal to depict a fair and just evaluation rather than a falsified, immoral and corrupt performance appraisal"

(Pl. 56.1 Stmt ¶55)

On June 23, 2007, Plaintiff then complained regarding the "[f]lagrant transgression by Sgt. Morrell once again":

> On today's date roll call was conducted by Sgt. Morrell and Lt. Schulman in the muster room at headquarters. Prior to roll call commencing Sgt. Morrell ordered me to put on my uniform hat. In a disgraceful taste of supervision after making that order Sgt. Morrell at no time put[] on his uniform hat. Neither did the next ranking officer, Lt. Schulman. Leading by example seems to have been deserted by Sgt. Morrell. It seems to be self-evident that Sgt. Morrell cannot help himself and continues to harass, humiliate, and degrade me [based] exclusively on my heritage. I have lost absolute hope that the agency will stop rouge supervisors such as Sgt. Morrell.

(Pl. 56.1 Stmt ¶56).

On July 12, 2007, Plaintiff again wrote to Carroll regarding the "[u]nceasing harassment directed by Captain Gazzola." Plaintiff further complained "[t]his is again another one of many incidents that Captain Gazzola along with his supervisors have singled me out based on my heritage" (Pl. 56.1 Stmt ¶57).

On August 31, 2007 at approximately 10:00 a.m., Alali handed Carroll a written Interdepartmental Communication dated August 22, 2007 which was addressed to Fortunato and

copied to Carroll, Murphy, Gazzola, Hayes and Alali's attorney. The August 22, 2007

Communication in pertinent part states

> Despite being served with a complaint which has been filed in
> federal court, the defendants in this action have continued to commit
> conspicuous acts of prejudice that are being delivered to me on a
> continuing basis. I have notified you, along with other Police
> Commissioner, Deputy Police Commissioner, Captain Gazzola and other
> supervisory staff directly in control of myself concerning the cavalier
> dealing and other punitive assignments

> *      *      *      *

> Whenever I am working there are junior officers working that could have
> been sent to the jail however are not. This is calculating and deliberate. I
> am not attempting to pick my assignment. I am solely trying to be taken
> off punishment for no legitimate reason.

(Pl. 56.1 Stmt ¶¶58-59). Later that day Carroll suspended Plaintiff without pay (Pl. 56.1

Stmt ¶60).

In March 2008, Alali received yet another below standards evaluation. While Alali

ordinarily has five days in which to rebut the evaluation, Alali's father suffered a severe stroke in

the interim which necessitated Alali leaving in order to be at his father's bedside at John Hopkins

Medical Center located in Baltimore, Maryland (Pl. 56.1 Stmt ¶61).

Despite the fact that Alali advised Gazzola of the situation, Gazzola issued a letter stating

that Alali did not comply within the five days in which submit a rebuttal. In any event, Alali

submitted another communication to Gazzola advising him that it was impossible for Alali to

rebut the evaluation within the time frame provided because he was out of state at his father's

bedside (Pl. 56.1 Stmt ¶62).

Notwithstanding Alali's family emergency, Captain Gazzola issued a letter on March 5,

2008 stating that Alali was below standards and issued another directive stating that Alali could

not perform overtime and mutual switches (Pl. 56.1 Stmt ¶63)

All of the Defendants were aware of Plaintiff's protected activities, which included were Plaintiff's filing the EEOC Charge of discrimination and Alali I in this Court for everyone in the Department was talking about it, including DeBara who Plaintiff told. When Alali advised DeBara, he (DeBara) responded in a sarcastic manner (Pl. 56.1 Stmt ¶64).

During the period from February 2007 to March 14, 2008, Plaintiff's direct supervisors were Wilson, Morrell, Austin and Brady. Each of them advised Alali that he was not to work the front desk, be on the street and was to be assigned to civilian dispatch duties only. At one point, Wilson warned "they" – referring to Defendants were hunting for Plaintiff. DeBara communicated Plaintiff's assignments to Wilson, Austin, Morrell and Brady (Pl. 56.1 Stmt ¶65).

## ARGUMENT

### POINT I

**THE RECORD IS REPLETE WITH EVIDENCE SUFFICIENT TO SUSTAIN PLAINTIFF'S CLAIMS OF RETALIATION FOR MAKING COMPLAINTS OF DISCRIMINATION AGAINST HIM IN VIOLATION OF 42. U.S.C. SECTIONS 1981 AND 1983, TITLE VII AND THE NEW YORK STATE HUMAN RIGHTS LAW**

In view of the material facts that, if true, establish Defendants' retaliatory actions, Defendants' motion for summary judgment must be denied.

To sustain a prima facie case of retaliation under Section 1981, a Plaintiff must adduce evidence sufficient to permit a rational trier of fact to find that (1) he engaged in protected activity under anti-discrimination statute, (2) that defendants was aware of this activity, (3) that the defendants took adverse action against the plaintiff and (4) that a causal connection exists between the protected activity and the adverse action, i.e. that a retaliatory motive played a part in the adverse employment action. Lizardo v. Denny's, Inc., 270 F.3d 94, 105 (2d Cir. 2001); *see*

*also* Kessler v. Westchester Department of Social Services, 461 F.3d 199 (2d Cir. 2006). The United States Supreme Court has recently held that 42 U.S.C. Section 1981 encompasses a claim for retaliation. CBOCS West, Inc. v. Humphries, 128 S.Ct. 1951 (May 27, 2008); *see also* Hawkins v. 1115 Legal Services Care, 163 F.3d 684, 693 (2d Cir. 1998)(retaliation claim may be brought under Section 1981); and DeMatteis v. Eastman Kodak Co., 511 F.2d 306 (2d Cir.1975). Moreover the analysis applied to Title VII retaliation claims is also applicable to claims asserted under the New York State Human Rights Law, Sections 296 and 297 of the Executive Law. Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006). Further, while only the City may be sued under Title VII, both the New York State Human Rights Law[3] and Section 1981 allow suits against individual supervisors.


**A. Plaintiff Engaged in Protected Activity**

It is axiomatic that to establish a retaliation claim, a plaintiff need not prove that the conditions for which he complained actually amounted to a violation of the underlying statute. Raniola v. Bratton, 243 F.3d 610, 623 (2d Cir. 2001), *quoting* Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999).

Furthermore, Plaintiff has engaged in protected activity where the employer was aware that he filed EEOC complaint. Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.1993). An informal complaint to a supervisor opposing discrimination is also a protected activity. Kotcher v. Rosa Sullivan Appliance Ctr., 957 F.2d 59, 65 (2d Cir. 1992); *see also* Whaley v. City of University of New York, 555 F.Supp.2d 381, 405 (S.D.N.Y. 2008)(McMahon,

---

[3] Notwithstanding Defendants' contentions, there is sufficient evidence in the record to establish that the individual Defendants had knowledge of, acquiesced in, condoned or engaged in the retaliatory conduct demonstrated and are therefore liable under Section 296 of the Executive Law. Ponticelli v. Zurich Am. Ins. Group, 16 F.Supp.2d at 414, 433 (S.D.N.Y. 1998)

D.J.) (letter to dean complaining of supervisor's micromanagement and exclusion of plaintiff and another minority professor from a committee possibility that supervisor's "patterns and practices with respect to faculty of color raises questions about civil rights" was protected activity).

Plaintiff engaged in protected activity in November 2006 and January 7, 2007 when he wrote to Carroll to complain of bias and persecution based on his "heritage" (Pl. 56.1 Stmt ¶¶29-30). In February 2, 2007 Alali also complained of discrimination in rebuttal to Wilson's 2006 annual evaluation of him to Gazzola contending that the below standard evaluation he (Alali) had received was completely false and that he was being singled out because of his heritage.

When Plaintiff filed a charge of discrimination on February 12, 2007 with the EEOC, it was also faxed to the Commissioners' (Carroll and Murphy) office the same day (Pl. 56.1 Stmt ¶32-33). Plaintiff also wrote another memorandum on February 16, 2007 to Carroll complaining of "retaliation based on heritage' (Pl. 56.1 Stmt ¶¶33, 36). On February 18, 2007, Alali wrote yet another correspondence to Carroll concerning continual retaliation based on heritage" (P. 56.1 Stmt ¶¶37).

On February 21, 2007, Plaintiff filed Alali 1 in This court alleging discriminatory and retaliatory treatment.

Additional protected activity included Plaintiff's April 20th complaint that there been a substantial delay by the Department in responding to Plaintiff's call for police assistance in the arrest of a suspect — thereby putting Plaintiff in tremendous danger (Pl. 56.1 Stmt ¶53). Alali also wrote to Carroll on May 20th concerning the "recurring bigotry solely based on heritage" (Pl. 56.1 Stmt ¶54). Plaintiff again complained of a biased performance evaluation based on his heritage in a memorandum to Gazzola on June 21, 2007 which was copied to Carroll, Murphy and Fortunato (Pl. 56.1 Stmt ¶55).

16

On July 12, 2007, Plaintiff further communicated to Carroll that "Gazzola along with his supervisors have single me out based on my heritage" (Pl. 56.1 Stmt ¶57). Plaintiff additionally engaged in protected activity on August 31, 2007 when he personally handed Carroll a interdepartmental memorandum which was addressed to Fortunato and copied to Carroll, Murphy, and Gazzola among others about retaliation to which Alali was subjected (Pl. 56.1 Stmt ¶¶58-59). Incidentally, as set forth below, within hours of Plaintiff handing Carroll the memorandum – Carroll suspended Plaintiff without pay.

## B. Plaintiff Was Subjected to Retaliatory Action

As set forth in Alali II, Plaintiff's deposition on March 14, 2008 and April 4, 2008 and documented in a number of his interdepartmental communications, the material facts evidence that Defendants subjected him to retaliatory action.

In Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199 (2d Cir. 2006), the Second Circuit concluded in light of Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006), there were material issues of fact as to whether a plaintiff was subjected to retaliation despite the fact that his job title, job grade, salary, benefits and work hours remained the same. The plaintiff there worked as an assistant commissioner for the Westchester County Department of Social Service ("DSS") in White Plains. The plaintiff, who was a white, Jewish male born in 1945, filed a charge of discrimination pursuant to Title VII and the ADEA in June 2002 charging that defendants had denied him a promotion and other privileges on the account of his age, race, gender and religion. In 2003, plaintiff was involuntarily transferred to DSS' Yonkers office in June 2003. Once he transferred to Yonkers, his responsibilities as set out by DSS for his position significantly diminished.

The anti-retaliation provision is not limited to discriminatory actions that affect the terms and conditions of employment. Zelnik v. Fashion Institute of Technology, 464 F.3d 217 (2d Cir. 2006). As the Second Circuit noted in Zelnik, citing Burlington, 548 U.S. at 66, 126 S.Ct. at 2415, "actionable retaliation is that which well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 227.

Furthermore, in denying Defendants' pre-discovery motion to dismiss the case at bar, the Court specifically denied their contention that Plaintiff failed to show "adverse employment action" (Loomba Decl. Ex. H p. 6). In fact the Court persuasively found:

> In this case, Plaintiff has clearly stated facts sufficient to state a claim of adverse employment actions for the purposes of a motion to dismiss. Some of these facts, all which must be taken as true, include the assignment to inferior posts and diminished responsibilities, such as the following: 1) assignments to a fixed hospital post which is normally assigned to either probationary and/or junior officers under circumstances where there were at least four probationary officers who should have received the assignment instead; 2) a 'utility car' which is a 'degrading assignment usually reserved for probationary officers and/or junior officers'; 3) a fixed foot patrol post, in the snow, where probationary officers were available to and would normally serve; 4) an assignment to work with a civilian despite the availability of four probationary officers who would normally serve in such a post; 5) an assignment where Plaintiff was told 'you are an Arab and its Easter. Camel jockeys don't celebrate Easter.". Plaintiff alleges that, in response to Plaintiff's inquiry as to why he was assigned to a foot patrol assignment, Defendant DeBara stated 'because we can, we could put you anywhere Bin Laden.'
>
> \*        \*        \*        \*
>
> These allegations, as pleaded, are sufficiently plead to defeat the motion to dismiss.

(Loomba Decl. Ex. H pp. 6-8). As set forth below, the same facts the Court accepted in as true for the purposes of Defendants' denying pre-discovery motion to dismiss are

present here in addition some other retaliatory acts which occurred after the filing of <u>Alali</u>
<u>II</u>.

In that connection, on the same day <u>Alali I</u> was filed, in the presence of Alali's co-
workers and an attempt to humiliate him, DeBara assigned him to a hospital post to watch a
prisoner -- an assignment that usually given to probationary and/or junior officers -- despite the
fact that at least four probationary police officers were available.  And when Alali then attempted
to ask Wilson why he was assigned to this punitive responsibility, Wilson in the presence of a
number of civilian members of the Department, responded "[g]et the fuck out of my face now
Raz. Not another fucking word, get out of my face" (Pl. 56.1 Stmt ¶41).[4]

Shortly after the incident with the hospital post, DeBara assigned Plaintiff to a "utility
car" which again was usually reserved for probationary and/or junior officers[5] and in the event
that utility car services were not required Plaintiff was assigned to direct traffic, watch suicidal
prisoners, perform civilian work and transport prisoners all responsibilities typically given to
probationary or junior officers.

As further evidence of DeBara's retaliatory and discriminatory animus towards Plaintiff,
DeBara assigned him to a fixed, foot patrol in the snow -- yet another assignment usually given to
probationary and junior officers.  When Plaintiff attempted to inquire why he instead of the
probationary officers were given the degrading assignment, DeBara advised **"because we can,
we could put you anywhere Bin Laden."**[6] And when then Plaintiff inquired to Morrell why he
rather than a probationary police officer was put on that fixed post, Morrell responded by stating,

---

[4] The foregoing incident was one of the incidents described by the Court in denying Defendants' pre-discovery to
dismiss the case bar (Loomba Decl. Ex. H p. 7).
[5] See footnote four.
[6] See footnote four.

"because even though you are the most talented police officer you are not above scrutiny and I don't like you, ok, so hurry up and go outside. It's really cold out – bundle up."[7]

On March 8, 2007, Austin and Morrell both advised Plaintiff that he was routinely to be given undesirable assignments. Morrell additionally advised Plaintiff in Austin's presence that Gazzola and Marshall told all Plaintiff's supervisors give him "bad assignments" (Pl. 56.1 Stmt ¶46). On March 22, 2007, Gazzola ignored Plaintiff's February 2, 2007 rebuttal to his performance evaluation wherein Alali complained that the below standard evaluations were based on his heritage. Instead, Gazzola barred Plaintiff from performing overtime work, special detail assignments and engaging in tour switches with other officers and precluded Alali from consideration of any specialized unit assignments (Pl. 56.1 Stmt ¶48).

Highlighting the rampant discriminatory and retaliatory conduct engaged in Defendants, on April 7, 2007, when Austin deliberately assigned Plaintiff to perform civilian functions of dispatching police vehicles from the Department's radio room -- in front of Alali's co-workers despite the ample availability of probationary police officers who were usually used to fill in, Alali was instead assigned to that function. Further humiliating Plaintiff in front of his colleagues, Austin then advised him, "[i]t looks like you are going backwards like the good old times" and Brady added to Plaintiff's humiliation by stating, "you better get a good lunch at 800 [hours] since you won't be able to leave the [radio] room, good luck" (Pl. 56.1 Stmt ¶49).[8]

Furthermore, Defendants' retaliatory actions abound and have gone unchecked. On Easter Sunday 2007, when Plaintiff asked Wilson why he was working with civilian employees

---

[7]See footnote four.
[8] See footnote four

despite the availability of four probationary employees -- Wilson told Plaintiff, "[y]ou are an Arab and its Easter. Camel jockeys don't celebrate Easter" (Pl. 56.1 Stmt ¶50).[9]

Moreover, in retaliation for Alali opposing discrimination and filing the EEOC charge of discrimination and Alali, Murphy has denied Plaintiff a substantial portion of his tuition reimbursement to which he was entitled. Prior to filing Alali I, Murphy advised both Plaintiff and the PBA President that he had no intention of reimbursing Plaintiff any part of his tuition. After Alali I was filed, Murphy conveniently retracted his earlier position and falsely advised Plaintiff that he was going to reimburse a greater portion of Alali's tuition as compared to other members of the Department. In fact, Murphy lied and reimbursed substantially less of Plaintiff's tuition as compared to another officer whose tuition was nearly identical to Plaintiff's (Pl. Response to Def. 56.1 Stmt ¶127).

Further retaliatory conduct continued by Defendants after Alali II was filed on April 11, 2007. On April 20, 2007, Plaintiff expressed his concern to Internal Affairs Lieutenant Fortunato that Plaintiff had to await an inordinate amount of time for police assistance as he was attempting to arrest a suspect. Indeed, Plaintiff wrote, when he attempted to document this fact in an incident report, Brady admitted that what happened to Plaintiff wrong but he (Brady) refused to sign the incident report and instead ordered Plaintiff to delete it from the report. Plaintiff attributed what happened to harassment based on his heritage (Pl. 56.1 Stmt ¶53).

On May 30, 2007, Plaintiff again wrote to Carroll to complain about the "recurring bigotry solely based on heritage" and on June 22, 2007 in a rebuttal communication addressed to Gazzola and copied to Carroll, Murphy among others, Plaintiff again complained of a biased performance appraisal based solely heritage (Pl. 56.1 Stmt ¶55).

---

[9] See footnote four.

On July 12, 2007, Plaintiff addressed another correspondence to Carroll expressing concern about the harassment Gazzola and his other supervisors were directing at him (Alali) based on his heritage (Pl. 56.1 Stmt ¶57).

The pièce de résistance of Defendants' retaliatory conduct occurred on August 31, 2007. At approximately 10:00 a.m. that day, Plaintiff personally delivered to Carroll a written Interdepartmental Communication dated August 22, 2007 which was copied to Carroll, Murphy and Gazzola among others, complaining of retaliation.  Later that same day, Carroll suspended Plaintiff without pay and clearly not so coincidentally, disciplinary charges were then preferred against Plaintiff on September 11, 2007.

## C. There are Material Facts, if Believed, that Defendants were Motivated By Retaliatory Animus

With respect to causation, all Plaintiff needs to demonstrate is that retaliation played a **motivating factor** in the adverse employment actions. In doing so he may rely on direct evidence of retaliatory animus or solely on circumstantial evidence such as: (1) the timing of the adverse action in relation to the protected activity; (2) different treatment of fellow employees; **or** (3) the defendants' explanation for the adverse action lacks credibility.[10]  Rainola, 243 F.3d at 625; Desert Palace, Inc., v. Costa, 123 S.Ct. 2148, 2154 (2003).

"[C]ausation can be established by showing that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus." Uddin v. City of New York, 427 F.Supp.2d 414, 432 (S.D.N.Y.2006), *citing* Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir.1990).

---

[10] Plaintiff need not show that Defendants' proffered reason played no role in the decision at issue in order to sustain the burden of proof Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 81 (2d Cir. 2001).

The retaliatory actions taken against Plaintiff commenced within days of the EEOC charge and the filing of <u>Alali I</u> in Court. *See* <u>Richardson v. New York State Dep't of Corr. Service</u>, 180 F.3d 426, 446-47 (2d Cir.1999) *abrogated on other grounds*, <u>Burlington</u>, 548 U.S. 53, 126 S.Ct. 2405 (acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier); <u>Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County</u>, 252 F.3d 545, 558 (2d Cir. 2001) ("This Court has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory actions."), *citing inter alia*, <u>Grant v. Bethlehem Steel Corp.</u>, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight-month gap suggests a causal relationship); <u>Suggs v. Port Auth. of N.Y. and N.J.</u>, 1999 WL 269905 at *6 (S.D.N.Y. May 4, 1999) (six month gap suggests causal relationship); <u>Bernhardt v. Interbank of N.Y.</u>, 18 F.Supp.2d 218, 226 (E.D.N.Y. 1998) (eleven months might suggest causal relationship); <u>Stephens v. State Univ. of N.Y. at Buffalo</u>, 11 F.Supp.2d, 242, 250 (W.D.N.Y. 1998) (six month gap might show causal relationship).

Here, there is evidence of both direct and indirect evidence of causation. Defendants' retaliatory actions commenced within days of Plaintiff filing the EEOC charge of discrimination and the same day <u>Alali I</u> was filed in this Court. On that day <u>Alali I</u> was filed, DeBara humiliated Plaintiff in front of his peers by assigning him to a fixed hospital post on February 21, 2007; on the same day, when Plaintiff asked Wilson why DeBara assigned him to the post, Wilson cursed at Plaintiff "[g]et the fuck out of my face now Raz. Not another fucking word".

Direct evidence of DeBara's discriminatory/retaliatory motive came within a couple days of the February 21st incident when he punitively assigned Plaintiff to a foot patrol post in the snow. When asked why by Plaintiff the reason for this assignment, DeBara responded "because,

we can, we could put you anywhere Bin Laden" and later Morrell sarcastically advised Plaintiff that he should "hurry up and go outside. It's really cold out – bundle up" (Pl. 56.1 Stmt ¶45). On March 8, 2007 Austin and Morrell advised Plaintiff that Gazzola and Marshall advised supervisors to give Plaintiff undesirable assignments.

Similarly, Gazzola further advised Plaintiff on March 22, 2007 that he was forbidden from working overtime, special detail assignments and consideration for any specialized unit assignments and engaging in tour switches with other officers and (Pl. 56.1 Stmt ¶48).

On April 7, 2007, Austin ordered Plaintiff to perform civilian functions and smugly advised Plaintiff that "[i]t looks like you are going backwards like the good old times" and Brady then added insult to injury by stating "you better get a good lunch at 800 [hours] since you won't be able to leave the [radio] room, good luck." Another example of direct evidence of Defendants' discriminatory and retaliatory animus was when Wilson punitively assigned Plaintiff to work with civilian employees because "[y]ou are an Arab and its Easter. Camel jockeys don't celebrate Easter" (Pl. 56.1 Stmt ¶50).

After Plaintiff filed Alali II in this Court on April 11, 2007, Defendants' retaliatory conduct continued. On April 20, 2007, Defendants delayed police assistance in order to aid Plaintiff in an arrest of a suspect -- thereby endangering Plaintiff's well being . On August 31, 2007, Carroll suspended Plaintiff without pay a few hours after Plaintiff personally delivered to him (Carroll) a written complaint of discrimination and retaliation.

## POINT II

## DEFENDANTS ARE NOT ENTITLED
## TO QUALIFIED IMMUNITY

Although there is no individual liability under Title VII, individual Defendants can be

held liable under Section 1983 and Section 1981 and under Section 296 of the New York State

Human Rights Law. In order to establish a violation, "a plaintiff must establish a given

defendant's personal involvement in the claimed violation in order to hold that defendant liable

in his individual capacity under section 1983." Patterson v. County of Oneida, 375 F.3d 206,

229 (2d Cir. 2004); see also Hawkins v. County of Oneida, 497 F.Supp.2d 362, 376 (N.D.N.Y.

2007). As set forth by the Second Circuit, in addition to direct participation in the alleged

violation, personal involvement may also include "gross negligence in the supervision of

subordinates who committed the wrongful acts and failure take action upon receiving

information that constitutional violations are occurring." Patterson, 375 F.3d at 229.

Given that the only discovery conducted here was Plaintiff's deposition, as the Second

Circuit explained in Stephenson v. John Doe, Detective, 332 F.3d 68, 76-77 (2d Cir.2003), when

determining a motion to dismiss on qualified immunity grounds in advance of full merits

discovery, the plaintiff's version of the facts is presumed to be true, and the question to be

answered is whether a reasonable government officer, confronted with the facts as alleged by

plaintiff, could reasonably have believed that his actions did not violate some settled right.

The inquiry is a two-step one. First, the court must determine whether, taking the facts in

the light most favorable to the party asserting the injury, an infraction was committed. Saucier v.

Katz, 533 U.S. 194, 201, 21 S.Ct. 2151 (2001). If the answer to that question is yes, the court

must decide whether a reasonable official in defendant's position (as that position is described by

25

plaintiff) ought to have known that he was violating plaintiff's rights *by doing what plaintiff alleges he did.* Ordinarily, the relevant inquiry will be whether the law is in fact well-settled, because if it is, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727 (1982).

Clearly the right to be free from discrimination and retaliation were clearly established at the time of the adverse action and the Defendants could not reasonably believe that it was permissible to engage in discriminatory and retaliatory conduct. *See* Lizardo, 270 F.3d at 105; Kessler, 461 F.3d 199 (2d Cir. 2006); CBOCS West, 128 S.Ct. 1951 (May 27, 2008); Hawkins, 163 F.3d at 693; Schiano, 445 F.3d at 609.

**A. DeBara is not Entitled To Qualified Immunity**

In view of the retaliatory action taken by DeBara against Plaintiff after he engaged protected activities, DeBara is not entitled to qualified immunity. Within days of Plaintiff filing the EEOC complaint and the Federal complaint, DeBara punitively assigned Plaintiff to a fixed hospital post to watch a prisoner which was usually assigned to probationary and junior officers. Within days of that incident, DeBara then assigned Plaintiff to a utility car which was considered to be a degrading assignment usually reserved for probationary and junior officers. Further evidencing DeBara's discriminatory and/or retaliatory intent, on March 7, 2007 – approximately two weeks after Plaintiff filed Alali I, DeBara advised Plaintiff the reason he was assigning Plaintiff to foot patrol in the snow in front of Plaintiff's laughing co-workers was "because we can, we could put you anywhere Bin Laden."

DeBara's claimed entitlement to qualified immunity is thus specious.

26

**B. Wilson, Austin, Morrell and Brady are not Entitled to Qualified Immunity**

Given the evidence of Wilson, Austin, Morrell and Brady's involvement, they are not entitled to qualified immunity. In that connection, Wilson, Austin, Morrell and Brady were each his supervisors. In that connection within six weeks of Plaintiff filing <u>Alali I</u>, Wilson assigned Plaintiff to work with civilian employees of the Department despite the availability of four police officers any of whom should have been given the degrading assignment. When Plaintiff questioned Wilson's decision, Wilson justified his decision by outrageously stating, "[y]ou are an Arab and its Easter. Camel jockeys don't celebrate Easter." Again, Wilson's actions belie his claim that he is entitled to qualified immunity.

Austin and Morrell advised Plaintiff that he was routinely to be given undesirable assignments and Morrell further advised Plaintiff that Gazzola and Marshall had directed him (Morrell) as well as other supervisors to give Plaintiff "bad assignments" (Pl. 56.1 Stmt ¶56; Nicaj Aff. Ex. 12). On April 7, 2007 Austin assigned Plaintiff to perform civilian functions of dispatching police vehicles from the Department's radio room despite the availability of four probationary police officers arrogantly advising Plaintiff that "[i]t looks like you are going backwards like the good old times" to which Brady then added "you better get a good lunch at 800 [hours] since won't be able to leave the radio room, good luck". Additionally on April 20, 2007, Brady ignored Plaintiff's complaint that members of the department did not timely respond to Plaintiff's call to assist in the arrest of a suspect – putting Plaintiff in great danger. Notwithstanding Plaintiff's concerns which he documented in an incident report, Brady refused to sign the incident report and directed Plaintiff to remove it in order to conceal the danger to which Plaintiff was subjected by members of the Department (Pl. 56.1 Stmt ¶53). Furthermore, Brady issued Plaintiff a false negative performance evaluation.

27

Additionally, on May 30, 2007, Plaintiff complained that Morrell publicly humiliated Plaintiff by claiming that Plaintiff had improperly written up an arrest. Upon conferring with the District Attorney's office, the District Attorney's office advised both Plaintiff and Morrell that Alali had in fact properly prepared the report and that Morrell was wrong about the law as applied to the facts of the arrest made by Plaintiff. When Plaintiff met with Internal Affairs Lieutenant Fortunato that day with the PBA President to report what happened, Wilson and Austin sent him and Wilson ordered that Plaintiff give Wilson his memo book. When Plaintiff retrieved the memo book, he learned that the $300 contained in it was missing (Nicaj Aff. Ex. 16).

## C. Marshall and Gazzola are not Entitled to Qualified Immunity

As set forth *supra*, Marshall and Gazzola are not entitled to qualified immunity for each of them told Plaintiff's supervisors to give Plaintiff inferior assignments and below standard evaluations. In that connection, approximately one month after Plaintiff filed Alali I in which Gazzola was personally named as a Defendant, on March 21, 2007, Gazzola issued a memorandum concurring with Wilson's below standards. Moreover, the disputed evidence shows that Gazzola told Plaintiff's supervisors to rate Alali as below standards. In so finding, Gazzola removed overtime opportunities for plaintiff; prohibited him from doing tour switches with other employees; and erased him from being considered for specialized units/assignments. Moreover, Plaintiff repeatedly complained about Gazzola's discriminatory and retaliatory treatment of him in a series of communications to Gazzola and Carroll.

**D.    Murphy and Carroll are not Entitled to Qualified Immunity**

There are -- at minimum -- material issues of fact concerning Murphy and Carroll's personal involvement in the retaliatory conduct which precludes summary judgment on qualified immunity. Within approximately two weeks of Plaintiff filing <u>Alali I</u> in this Court, Alali complained to Carroll that Gazzola harassing him and singling him out (Nicaj Aff. Ex. 10, 12). On May 30, 2007, Plaintiff again complained to Carroll about recurring bigotry based on heritage (Nicaj Aff. Ex. 16). On June 21, 2007, Plaintiff complained in writing directly to Gazzola that he received a negative performance evaluation by reason of his heritage, which he also copied to Carroll and Murphy. On June 23, 2007, Plaintiff expressed concern in writing that Morrell continued to harass , humiliate and degrade him which he copied to Carroll (Nicaj Aff. Ex. 18).

On July 12, 2007, Alali again complained to Carroll about the unceasing harassment directed at him (Alali) by Gazzola and Alali's other supervisors (Nicaj Aff. Ex. 19). On August 31, 2007, within hours of Plaintiff personally handing a copy of the interdepartmental memorandum to Carroll -- which was also copied to Murphy and Gazzola -- complaining of discrimination and retaliation, Carroll suspended Plaintiff without pay (Nicaj Aff. Ex. 20, 21).

Additionally, Murphy reimbursed Plaintiff's tuition substantially less than other members of the Department following Plaintiff filing <u>Alali I</u>. Thus, the individual Defendants' actions and inaction in response to Plaintiff's complaints of discrimination and retaliation make granting summary judgment on qualified immunity impossible.

## POINT III

## DEFENDANTS' REMAINING HODGEPODGE
## ARGUMENTS ARE MERITLESS

**A.    The City is not Entitled to Summary Judgment on Plaintiff's Title VII Claim**

Defendants falsely claim that Plaintiff brought a Title VII claim against the individual

Defendants (Defendants' Memorandum p. 30). But the First Claim contained in Alali II is Title

VII, which is only made "against the City" (Loomba Aff. Ex. G p. 8). Defendants' other

arguments is also meritless with respect to the Court being bound by the decision in Alali I. The

Court specifically limited its factual findings to that decision only (Loomba Decl. Ex. E p. 1).

Moreover, in denying Defendants' pre-discovery motion to dismiss Plaintiff's claims in the

instant action, the Court specifically rejected Defendants' assertion that there were duplicative

facts asserted in Alali II that were asserted in Alali I (Loomba Decl. Ex. H p. 3).

**B. The City is not Entitled to Summary Judgment on Plaintiff's Section 1981 and 1983
Retaliation Claims**

In the instant case, the Court has previously rejected the City's motion to dismiss on

grounds that Plaintiff had "not shown the alleged discriminatory acts were performed pursuant to

a municipal policy or custom" (Loomba Decl. Ex. H p. 9).

Municipal liability pursuant Section 1983 may attach when there is even one incident of

retaliation by someone "whose edicts or acts represent official city policy." Gronowski v.

Spencer, 424 F.3d 285, 296 (2d Cir. 2005), citing Pembaur v. City of Cincinnati, 475 U.S. 469,

481 (1986), Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).

Furthermore, in <u>Amnesty America v. Town of West Hartford</u>, 361 F.3d 113, 126 (2d Cir.

2004), the Second Circuit ruled that when a subordinate has committed a violation, a plaintiff

may establish municipal liability, by showing:

> ". . . that a policymaker ordered or ratified the subordinates' actions. . .that
> the policymaker was aware of a subordinate's unconstitutional actions,
> and consciously chose to ignore them, effectively ratifying the actions. .
> .Thus, where a policymaking official exhibits deliberate indifference to
> constitutional deprivations caused by subordinates, such that the official's
> inaction constitutes a 'deliberate choice,' that acquiescence may be
> 'properly thought of as a city policy or custom that is actionable under §
> 1983.'"

<u>Id.</u> at 126.

Defendants again inexplicably rely on the Court's decision in <u>Alali I</u> which limited the

factual findings to that case alone.  Contrary to Defendants' claim, the City is liable given

Carroll, Murphy and Gazzola's role in the retaliatory actions and/or their failure to address

Plaintiff's complaints of discrimination.  Moreover, as the Commissioner, Carroll is a

policymaker. <i>See e.g.,</i> <u>Community Health Care Association of New York v. DeParle</u>, 69

F.Supp.2d 463, 475 (S.D.N.Y. 1999) (Parker, D.J.) (commissioner of department of social

services "unquestionably is a policymaker"); see also <u>Saenz v. Lucas,</u> 2008 WL 2735867

(S.D.N.Y.) (Conner, D.J.) (denying motion to dismiss on municipal liability because captain may

have had final decision making authority with respect to officer conduct during investigation);

and <u>Kempkes v. Downey</u>, 2008 WL 852765, at * 8-9 (S.D.N.Y. Mar. 31, 2008) (denying similar

motion on municipal liability because the court concluded that the Bronxville Police Chief may

be a final policymaker).[11]

---

[11]As it concerns Defendants' statement that they are entitled to absolute immunity based on the Court's ruling in
<u>Alali I</u>, the Court **specifically rejected Defendants' entitlement to absolute immunity** in connection with preferral
of charges against Plaintiff in the pre-discovery motion to dismiss in the case at bar (Loomba Decl. Ex. H p. 8).
Indeed, the applicability of absolute immunity is limited and not favored, particularly in Section 1983 actions where
it has been held to detract from Section 1983's broad remedial purposes. <u>Spear v. Town of West Hartford</u>, 954 F.2d

## CONCLUSION

Defendants' motion for summary judgment should in all respects, be denied

Dated:  White Plains, New York
        August 15, 2008


                          LOVETT & GOULD, LLP

                          By: _____
                          Drita Nicaj (DN 0966)
                          Attorneys for Plaintiffs
                          222 Bloomingdale Road
                          White Plains, New York 10605
                          914-428-8401

---

63, 66 (2d Cir. 1992), *cert. denied*, 506 U.S. 819 (1992); Burns v. Reed, 500 U.S. 478, 486 (1991) (Courts have been "'quite sparing' in their recognition of absolute immunity"). Moreover, employment and personnel decisions generally speaking are administrative acts for the purposes of evaluating official immunity. Dobosz v. Walsh, 892 F.2d 1135 (2d Cir. 1989); Alexander v. Holden, 66 F.3d 62, 66 (4th Cir. 1995); Brennan v. Straub, 246 F.Supp.2d 360 (S.D.N.Y. 2003) (denying absolute immunity since act of eliminating a single position is more administrative than legislative in nature). In Dobosz, the Second Circuit assessed the Defendant's argument that "because he acted as a prosecutor in presenting the charges against Dobosz before the Board of Commissioners he was entitled to absolute immunity under Imbler v. Pachtman, 424 U.S. 409 (1976) and Butz v. Economou, 438 U.S. 478 (1978)." The Second Circuit denied the defendant's claimed entitlement to absolute immunity noting the "important difference" between the holdings of these cases and the facts present where a supervisor initiates disciplinary action and a suspension against a subordinate employee. The Court held that such actions are more appropriately governed by the holding in Forrester v. White, 484 U.S. 219 (1988) and were not absolutely immune. *See* Dobosz, 892 F.3d at 1139-1140. The Second Circuit highlighted the applicability of that Supreme Court decision to this case: "a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other executive branch official who is responsible for making employment decisions. Such decisions, like personnel decision made by judges, are often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to absolute immunity from liability in damages under §1983." Dobosz, 892 F.2d at 1139-1140, *citing* Forrester, 484 U.S. at 229. Clearly, the functions of preferral of charges against a single employee, are administrative acts that do not entitle Defendants Carroll and Gazzola to absolute immunity. When viewed against the binding precedent of this Circuit, Defendants' arguments for absolute immunity must be rejected.